# EXHIBIT A

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

----------------------------------------------------------------X

*In the matter of the arbitration between,*

MICHAEL ZIMA, PATRICIA FUCHS, GEORGE HEINEMANN, as Power of Attorney for GLEN and ELSA HEINEMANN, GEORGE AND LORI HEINEMANN, ROBERT AND GWEN GORMAN, CARL PEDIGO, OLAF BLOCHER, as Trustee of the KONRAD BLOCHER TRUST, dated November 17, 2003, AMY GRAY as Executor of the Estate of LAURA LEFF and Successor Trustee of the LAURA LEFF IRREVOCABLE TRUST, THOMAS HARROLD, JOSEPH DYMEK, individually and as Trustee of the JOSEPH DYMEK TRUST dated May 29, 2007, CHRISTOPHER AND JEAN AMBROSE, as Trustees of the JEAN AMBROSE and CHRISTOPHER AMBROSE TRUST, GORDON STEWART and AVERY TARSHIS

FINRA No.:

Claimants,

v.

TRIAD ADVISORS LLC,

Respondent.

----------------------------------------------------------------X

---

**STATEMENT OF CLAIM**

---

Claimants, Michael Zima, Patricia Fuchs, George and Lori Heinemann, George Heinemann, as Power of Attorney for Glen and Elsa Heinemann, Robert and Gwen Gorman, Carl Pedigo, Olaf Blocher, as Trustee of the Konrad Blocher Trust, dated November 17, 2003, Amy Gray as Executor of the Estate of Laura Leff and Successor Trustee of The Laura Leff Irrevocable Trust, Thomas Harrold, Joseph Dymek, individually and as Trustee of the Joseph Dymek Trust, dated May 29,

2007, Christopher and Jean Ambrose as Trustees of the Jean Ambrose and Christopher Ambrose Trust, Gordon Stewart and Avery Tarshis[1], by and through their undersigned attorneys, Gana Weinstein LLP and Kurta Law, against Triad Advisors LLC ("Triad" or "Respondent"). This arbitration proceeding is properly before FINRA pursuant to the agreements entered into by the parties and under FINRA Rule 12200, which require a member or an associated person of a member to arbitrate disputes arising out of the associated person or member's investment related business activities.

Claimants seek unspecified damages[2], including compensatory damages consisting of what a well-managed account would have performed in an amount presently unknown, together with interest, punitive damages, attorneys' fees, and all forum fees.

## REQUEST FOR EXPEDITED HEARING

Claimants request an ***expedited*** hearing in Chicago, Illinois, based on residency, or alternatively via Zoom. NASD Notice to Parties dated June 7, 2004, titled "Expedited Proceedings for Elderly or Seriously Ill Parties," provides that a claimant may request the arbitration process be expedited when the claimant is elderly or seriously ill. Claimant Gordon Stewart is 89 years old.

Accordingly, and based on the foregoing, Claimants respectfully request that FINRA expedite this matter. FINRA's Arbitrator's manual states the following with respect to hearing dates for an expedited case, "Arbitrators should schedule dates that will expedite the process but

---

[1] This case includes all individual accounts, retirement accounts, partnerships, companies, or trusts owned by Claimants, whether mentioned specifically or not.
[2] This is based upon an initial assessment of a portion of Claimants' investments presently available to them. Claimants reserve the right to amend the specific securities and the amounts of damages at issue as more information becomes available.

still provide a reasonable amount of time for case preparation. FINRA encourages parties and arbitrators to schedule the hearing ***within six months*** from the date of the IPHC." FINRA Arbitrator's Guide, 2017 Revision, Pg. 23 (emphasis added).

## PARTIES

### I. Respondent and Relevant Non-Parties

#### A. Triad Advisors LLC

Respondent Triad Advisors, LLC is a FINRA registered broker dealer CRD # 25803 and an SEC registered # 801-55518, 8-42007. Triad Advisors, LLC's main office location is 5155 Peachtree Parkway Suite 3220 Norcross, Georgia, 30092. Consequently, Triad Advisors LLC is required to follow the rules and regulations promulgated by FINRA, the SEC, and Federal and State securities laws of the states that it conducts business in including Illinois as well as the firm's own internal compliance policies and procedures in carrying out its securities business.

Upon information and belief, Triad has been the subject of multiple arbitrations concerning the actions of its long-time registered representatives, James Walesa (CRD #1061209) and Kenneth Luccioni (CRD #719779), and the specific investments that are the subject of this arbitration. According to FINRA's publicly available BrokerCheck, these claims have resulted in settlements totaling ***more than $4.9 million***. Claimants also understand that Respondent is currently the subject of at least one regulatory investigation concerning the Claimants' investments that form the subject of this arbitration.

Triad is no stranger to such regulatory investigations. In fact, Triad was just recently fined and censured for its unsuitable recommendations and failure to properly supervise its representatives concerning investments offered by a company in which several Claimants also invested, known as LJM. Specifically, FINRA found that "Triad permitted the sale of LJM

[Preservation and Growth Fund] on its platform without conducting reasonable due diligence of LJM and without a sufficient understanding of its risks and features, including the fact that the fund pursued a risky strategy that relied, in part, on purchasing uncovered options. Triad also lacked a reasonable supervisory system to review representatives' LJM recommendations. Triad representatives sold $2,267,000 in LJM to fifty-eight customers. LJM's value dropped 80% during an extreme volatility event in February 2018 and the fund ultimately liquidated and closed, resulting in hundreds of thousands in losses for Triad's customers."

**B. Non-Party James Walesa**

Non-Party James Walesa was at all times material hereto a registered broker with FINRA. Walesa has a lengthy history of customer complaints and personal financial issues and has recently personal bankruptcy and is believed to be under regulatory investigation for his actions that are at issue in this Statement of Claim.

Walesa is also a gifted salesman, who is believed to have raised nearly $100 million in investments for numerous companies with which he was affiliated and had an ownership interest. Through these illicit securities transactions, Walesa and Respondent violated numerous FINRA Rules, SEC regulations, and both federal and state law.

Walesa flaunted his involvement with these companies and was not shy about his fundraising activities. He consistently bragged to his clients about his leadership and ownership positions in the companies and encouraged his clients to encourage their friends and family to invest with Walesa – often stating, in writing, "do not keep my work a secret!"

The companies which Walesa touted to the Claimants as "sure things" and "great opportunities" have been anything but. Despite numerous consolidations and reorganizations,

Walesa has apparently reorganized a number of these entities into a company whose shares are a penny stock.

Disclosure(s)

View By: Date

| | | |
|---|---|---|
| 11/10/2023 | Customer Dispute | Pending |
| 4/27/2023 | Customer Dispute | Pending |
| 3/21/2023 | Customer Dispute | Pending |
| 3/21/2023 | Customer Dispute | Pending |
| 4/7/2022 | Customer Dispute | Pending |
| 7/8/2021 | Customer Dispute | Settled |
| 10/21/2020 | Judgment / Lien | |
| 6/13/2013 | Customer Dispute | Settled |

According to his BrokerCheck, Walesa has been the subject of no fewer than seven (7) FINRA customer disputes, some of which involve dozens of investors, along with a judgment in excess of $2 million that is against him personally.

Additionally, per a recent filing with the US Bankruptcy Court for the Western District of Texas, Walesa is involved in numerous pending lawsuits in courts around the country. Unsurprisingly, Walesa is no longer in the securities industry.

### C. Non-Party Kenneth Luccioni

Non-Party Kenneth Luccioni was at all times material hereto a registered broker with FINRA. Luccioni, like his partner Walesa, also has a troubled past in the securities industry. In fact, Luccioni was recently barred from the securities industry for refusing to cooperate with a FINRA investigation. Luccioni has also been the subject of no fewer than five (5) customer complaints, per BrokerCheck.

Disclosure(s)

View By: Date

| | | |
|---|---|---|
| 1/25/2023 | Customer Dispute | Withdrawn |
| 6/27/2022 | Customer Dispute | Settled |
| 1/5/2021 | Customer Dispute | Settled |
| 3/18/2020 | Customer Dispute | Settled |
| 3/18/2020 | Customer Dispute | Settled |
| 11/9/2018 | Regulatory | Final |

### D. Non-Party, Stephen Denari

Non-Party Stephen Denari was at all times material hereto a registered broker with FINRA.

## II. CLAIMANTS

### *1. Michael Zima*

Michael Zima is 60 years old and resides in Chicago, Illinois. Mr. Walesa is Mr. Zima's cousin. At Mr. Walesa's recommendation, Mr. Zima invested his retirement savings in several speculative products, including Clearday, Round Rock, Trident, LJM.

### *2. NorPatricia Fuchs*

Patricia Fuchs is 69 years old and resides in Eatonville, Washington. Mrs. Fuchs' mother met Mr. Walesa through a widows' group: he met with the group to assist women who previously had no experience in banking. She was a long-time client of Mr. Walesa prior to her passing in 2010. After Mrs. Fuchs returned home from the military in 1992, she met Mr. Walesa and decided to invest her 403b from the military with him. Later, Mrs. Fuchs rolled over her 401k into her account with Mr. Walesa. After Mrs. Fuchs' mother passed in 2010, Mr. Walesa informed her that

she had inherited money from her mother and recommended she invest her inheritance with him. Mr. Walesa recommended Mrs. Fuchs invest over $100,000 in various products, including Clearday, Longhorn Lodging, and Cibolo Creek Partners.

***3. George Heinemann, as Power of Attorney for Glen and Elsa Heinemann***

Glen and Elsa Heinemann are 86 and 82 years old, respectively. They previously resided in Chicago, Illinois, and then they moved to Phoenix, Arizona. They are in the process of moving to Birmingham, Alabama, to be closer to their son, George Heinemann. Glen Heinemann was introduced ot Mr. Walesa nearly 30 years ago and trusted him to invest his funds in a prudent, safe manner for decades. The Heinemanns invested hundreds of thousands of dollars in various private placements recommended by Mr. Walesa and hold thousands of shares of Clearday preferred stock.

***4. George and Lori Heinemann***

George Heinemann was introduced to Mr. Walesa by his parents, Glen and Elsa Heinemann, several years ago. They currently reside in Birmingham, Alabama. Mr. and Mrs. Heinemann invested funds with Mr. Walesa, included money they were saving towards their children's futures. Mr. Heinemann owns a Senior Care Facility, which made him even more interested in Mr. Walesa's investments.

*5.* ***Robert and Gwen Gorman***

Robert and Gwen Gorman reside in Dundee, Illinois. Mrs. Gorman is Mr. and Mrs. Heinemann's daughter and Mr. George Heinemann's sister. The Gormans were induced to invest with Mr. Walesa because of the trusting relationship Mr. Walesa had with the Heinemann family. He recommended they invest in Longhorn.

### *6. Carl Pedigo*

Carl Pedigo resides in Chicago Illinois. Mr. Pedigo invested $50,000 with Mr. Walesa in 2019.

### *7. Olaf Blocher, as Trustee of the Konrad Blocher Trust, dated November 17, 2003*

Konrad Blocher is 88 years old and resides in Illinois. Mr. Blocher met Mr. Walesa through marketing campaigns and free dinner seminars Mr. Walesa offered in the 1990s. Over the course of their relationship, Mr. Blocher and his late wife, Maren, invested significant funds with Mr. Walesa, across their trusts, totaling just over $1 million. Mrs. Blocher passed in 2020, and after her passing, the Maren Blocher Trust dated November 17, 2003 was passed to her husband as successor-trustee and later closed. After Mrs. Blocher's death, their son, Olaf Blocher, began to assist Konrad Blocher with financial matters. Konrad Blocher continued as Trustee of the Konrad Blocher Trust until September 2023. After he resigned, Olaf Blocher was appointed successor trustee. The Konrad Blocher Trust still holds hundreds of thousands of shares of Clearday Common Stock and tens of thousands of Clearday Preferred Stock. The over one million dollars the Blochers invested with Mr. Walesa were meant to be their bequests to their children.

### *8. Amy Gray as Executor of the Estate of Laura Leff and Successor Trustee of The Laura Leff Irrevocable Trust*

Laura Leff was a client of Mr. Walesa for several years. After Ms. Leff started suffering with dementia, her niece, Amy Gray, was appointed Power of Attorney and successor-trustee of the Laura Leff Revocable Trust dated February 14, 2020. Ms. Leff invested in several investments at Mr. Walesa's recommendation, including Clearday, Highland REIT, Round Rock, InventTrust, Shadow Retail, Trident, and Longhorn.

***9. Thomas Harrold***

Thomas Harrold resides in Hoffman Estates, Illinois and is currently 75 years old. Mr. Harrold was introduced to Mr. Walesa when he was invited to attend an investment presentation at a friend's parents' home. After the meeting, Mr. Harrold decided to invest $25,000 with Mr. Walesa. Later, Mr. Harrold purchased additional Clearday stock.

***10. Joseph Dymek, Individually and as Trustee of the Joseph Dymek Trust dated May 29, 2007***

Joseph Dymek is 65 years old and resides in Rhode Island. He met Mr. Walesa in the 1990s through a co-ed touch football league in Colorado. Mr. Dymek is still working because he lost over $300,000 in investments recommended by Mr. Walesa.

***11. Christopher and Jean Ambrose, as Trustees of the Jean Ambrose and Christopher Ambrose Trust***

Jean and Christopher Ambrose reside in Chicago, Illinois and have done so at all times relevant to this action. The investments at issue were previously part of the William Tosch Living Trust. Mr. and Mrs. Ambrose inherited Mrs. Ambrose's father's trust and investments after his death in 2019, and they became part of the Jean Ambrose and Christopher Ambrose Trust. Mr. Tosch was introduced to his brokers, Mr. Walesa and Stephen Denari (CRD # 5138293) by his accountant several years ago. The Ambroses now claim losses of at least $100,000 in investments recommended by Mr. Walesa. They had previously intended to use those funds to repay their children's student loans for college.

***12. Gordon Stewart***

Gordon Stewart is 89 years old and currently resides in a nursing home in San Francisco, California. Mr. Stewart met Mr. Walesa in New York over thirty years ago. Mr. Stewart invested the inheritance he received from his father, over $500,000, with Mr. Walesa.

***13. Avery Tarshis***

Avery Tarshis is 74 years old and resides in Northbrook, Illinois. Mr. Tarshis built a relationship with Mr. Luccioni several years ago and invested over $30,000 at Mr. Luccioni's direction.

## INTRODUCTION

Claimants trusted Triad through its representatives James Walesa and Stephen Denari (the "Brokers") to prudently invest their savings and act in their best interests. Instead, Triad abused Claimants' trust by recommending that the Claimants invest in several private entities in which Walesa were involved as either an owner, executive, or both. As set forth in greater detail below, FINRA imposes strict obligations on brokerage firms in the supervision of their registered representatives like Walesa, Luccioni, and Denari.

Specifically, brokerage firms are required to carefully monitor and supervise their representatives' investment related activities. In circumstances such as this, where the representatives are soliciting their customers to invest in businesses in which they have either an ownership interest and/or an executive leadership position, brokerage firms are required to closely scrutinize these activities due in no small part to the inherent conflict of interest. These strict requirements are designed to ensure investor protection. To that end, many brokerage firms simply prohibit their representatives from engaging in such fundraising activities and prohibit them from selling any investment product that is not been vetted by the firm and placed on the firm's approved product list.

Unfortunately, Respondent failed to adhere to these requirements and failed to protect investors, including the Claimants. Rather, Respondent allowed Walesa and Luccioni to openly raise nearly $100 million in investment from Respondent's customers without any interference or

supervision. Walesa and Luccioni painted a rosy picture of the various corporate restructuring events which took place over the years between the various entities – each time assuring the Claimants that these were great deals and the investments were on the precipice of paying investors handsomely. Respondent also allowed Walesa and Luccioni to circulate fake account statements and investment updates to the Claimants which represented to the Claimants that the investments were performing well.

In doing so, Respondent violated its supervisory obligations and is responsible for the losses sustained by Claimants, which are substantial. Moreover, due to Respondent's tortious conduct, Claimants have been deprived of the ability to generate the reasonable returns they could have reasonably expected had they been invested in a *bona fide,* well-managed, and diversified portfolio of stocks, bonds, and/or mutual funds during the relevant time period.

## FACTUAL BACKGROUND

### I. Introduction

James Walesa considered himself to be (and portrayed himself publicly as) a skilled and sophisticated financier. To that end, Walesa became involved in a number of private and publicly traded companies over the past several years (hereinafter, the "Companies"). The list of companies in which Walesa was involved is extensive and includes, but is not limited to:

- Cibolo Creek Partners;
- Trident Healthcare;
- Longhorn Lodging;
- Shadow Retail;
- Farm to Market Development ;
- Hill Country Partners;
- Allied Integral United d/b/a Clearday;
- Round Rock Development Partners;
- Citadel Explorations;
- SitePro (f/k/a Amplisine Labs); and
- Gadsden Properties.

Walesa's involvement in these companies included roles as both an investor and/or an executive. For example, Allied Integral United Inc. (d/b/a Clearday) is a public company for which ***Walesa is the chairman and chief executive officer***.[3] Other examples include Citadel Exploration Inc., a public company of which ***Walesa was chairman of the board***[4] and Cibolo Creek Partners, a private real estate fund of which ***Walesa is a Director***.[5] The Brokers' customers also invested heavily in Round Rock Development Partners, L.P. and Longhorn Lodging, LP—private funds for which ***Walesa's Cibolo Creek Partners is an executive officer and manager***.[6,7,8,9]

Walesa and Luccioni openly raised capital for the Companies. However, the two consistently cut corners, resulting in their capital raising activities being illegitimately structured and improperly conducted – ***making the sale of these securities highly illegal***.

Incredibly, despite the illegality of their endeavors, the two made ***<u>no attempts</u> to hide their activities from Respondent***. In fact, upon information and belief, Walesa even ***affirmatively disclosed*** to Respondent that he was both raising capital for and involved in the management of at least some (if not all) of the Companies. As to the public companies, his involvement was also publicly disclosed in the companies' respective SEC filings available on the EDGAR online repository. Walesa also filed multiple Form Ds[10] for many of the Companies with the SEC, which

---

[3] https://www.sec.gov/Archives/edgar/data/895665/000149315221022360/form8-k.htm
[4] https://www.sec.gov/Archives/edgar/data/895665/000149315221022360/form8-k.htm
[5] https://www.sec.gov/Archives/edgar/data/0001456537/000145653712000001/xslFormDX01/primary_doc.xml
[6] https://pitchbook.com/profiles/fund/15284-53F#overview
[7] https://pitchbook.com/profiles/fund/15285-52F
[8] https://www.sec.gov/Archives/edgar/data/0001337983/000133798314000003/xslFormDX01/primary_doc.xml
[9] https://www.sec.gov/Archives/edgar/data/0001456535/000145653514000001/xslFormDX01/primary_doc.xml
[10] A Form D is filed for all investments which are offered pursuant to an exemption from registration under Regulation D of the Securities Act of 1933. Regulation D offerings are exempt from the SEC's disclosure requirements and, other than the Form D, no other documentation or

were publicly available on EDGAR, as well. A simple search of his name was all that was necessary to see every public company in which he was involved. Yet, it appears Respondent either never did that, or did but ignored the results.

Curiously, the Brokers' capital raising activities had all the hallmarks of being done with Respondent's acquiescence, blessing, and involvement. To wit, Claimants understand that Triad even had soliciting dealer agreements with several of the Companies pursuant to which Respondent agreed to raise capital from investors for those Companies – and receive selling commissions for its efforts. Respondent's customers also frequently received and executed official Triad paperwork in connection with their investment in the Companies that was on official Triad letterhead and that referred to the investments in the Companies as being "offered through Triad Advisors, Inc." The subscription agreements executed by investors in the Companies were also signed by the Brokers on behalf of Triad Advisors as the selling broker-dealer.

Then, after the investments were made, Respondent regularly processed dividend checks received from these Companies for the benefit of its customers and proceeded to deposit them in their respective customer's Triad account. In certain circumstances, such as where the investments in the Companies were made through IRA accounts, Respondent entered into an arrangement with third party IRA custodians to custody these investments on Triad's behalf and process dividend checks.

The Brokers also emailed regularly with investors and the third-party IRA custodians about the status of their investments in the Companies. These third-party custodians were approved custodians by Triad and often housed legitimate investments.

---

public disclosure is required under federal law. Since there is very little public disclosure, Reg D private placements live in an information black hole, with investors kept largely in the dark about the funds operations and performance.

Over the years, Walesa and Luccioni provided regular updates to investors on Triad letterhead and over email. These updates continued throughout their tenure with Respondent and were made both orally and in writing. The updates were designed for one purpose – which was not to the actually update the Claimants on the true performance of their investments – but rather to tell the Claimants that their investments were performing well and profitable. And it worked. Over the years, Claimants received updates about various acquisitions and mergers by and between the entities in which they had invested and were told about how these corporate actions would increase profits and returns to investors. Until very recently, Claimants believed that their investments were actually performing as the Brokers promised. Indeed, it was not until only a few short months ago, in September 2023 when Walesa filed for personal bankruptcy, that Claimants realized things may be amiss and began to fear that their investments had been lost.

As detailed in the next section below, the aforementioned actions taken by Walesa and Luccioni constitute numerous violations of FINRA, SEC, state, and federal regulations. Each of the foregoing should have been a red flag and call to action for Respondent. As a result of Respondent's failure to act, the Brokers' illegal activities continued for years unencumbered, resulting in substantial losses to the Claimants' irreplaceable savings.

## II. Respondent's Supervisory Obligations

The state of the law is unambiguous: a ***broker-dealer must supervise all investment related activities of its registered representatives*** as though such activities were conducted through the broker-dealer. Yet, Respondent failed to supervise the Brokers' activities and, in doing so, violated applicable FINRA and SEC Rules.

The Securities and Exchange Act Section ("Exchange Act") 15(b)(4)(E) provides that the SEC can sanction or revoke the registration of any member firm:

> "if it finds…that such broker or dealer…has willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, [the Securities Exchange Act of 1934], the rules or regulations under any of such statutes, or the rules of the Municipal Securities Rulemaking Board, or has failed reasonably to supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation, if such other person is subject to his supervision." (emphasis added).

***The Exchange Act requires broker-dealers to supervise a representative's investment activities, <u>no matter how the activity is executed</u>***, providing a prophylactic approach to supervision designed to prevent violations of the securities laws.

FINRA implemented Rule 3110 to comply with the Exchange Act's supervision requirements.[11] FINRA Rule 3110 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

---

[11] The duty to supervise is violated where either: (1) awareness of 'red flags' are not followed up with proper supervision; or (2) policies and procedures are deficient resulting in failure to detect 'red flags.' *See In the Matter of the Application of Michael H. Hume* ("Hume"), Exchange Act Rel. No. 35608, 52 S.E.C. 243, 1995 SEC LEXIS 983, at*5 (Apr. 17, 1995). (liability imposed "where a supervisor was aware only of 'red flags' or 'suggestions' of irregularities" and fails to follow up.); Kernweis, 2000 WL 33299605 at *13 (*quoting In re Scudder Investments, Inc.*, Investment Act Rel. No. 24218, 1999 SEC LEXIS 2737, at *18 (Dec. 22, 1999). ("[l]iability for failure to supervise may be imposed when a supervisor '[fails] to learn of improprieties when diligent application of supervisory procedures would have uncovered them.'").

Both FINRA and the SEC have focused on the high number of investment frauds perpetrated through outside business activities ("OBAs") and the fact that off-site locations may be used by brokers to conceal OBAs and securities fraud.[12]

At issue in this case are Respondent's obligations concerning: 1) the outside business activities and private securities transactions of its registered representatives (also known colloquially as "selling away"), and 2) the reasonable basis and customer-specific prongs of the Suitability Rule. As set forth in Sec. 1 and 2, below, as related to the Brokers' fundraising activities for the Companies, one of the two applies. To wit:

1. In the event that Walesa's affiliation with and solicitation of investment in the Companies was approved by Respondent as an outside business activity and private securities transaction, then the firm would be required to supervise Walesa's involvement, as well as supervise each of the investment transactions as if they were sold through the firm. *See, e.g.,* FINRA Rules 3270 and 3280.

2. On the other hand, if Respondent permitted Walesa and Luccioni to sell investments in the Companies through Respondent, then Respondent was required to conduct reasonable and adequate due diligence on the Companies before approving them for sale (reasonably basis suitability), as well as supervise each individual investment to ensure that it was suitable for the customer to whom it was sold (customer-specific suitability). *See, e.g.,* FINRA Rule 2111.

Claimants will demonstrate at the hearing that Respondent did neither successfully and is therefore responsible for Claimants losses suffered in their investments.

---

[12] *Staff Legal Bulletin No. 17: Remote Office Supervision*, S.E.C. Release No. SLB-3A (CF), 2004 WL 5698359, at * 1 (Mar. 19, 2004) ("Some broker-dealer firms have geographically dispersed offices staffed by only a few people, and many are not subject to onsite supervision. Their distance from compliance and supervisory personnel can make it easier for registered representatives (representatives) and other employees in these offices to carry out and conceal violations of the securities laws."); *see* also NTM 98-38 ("[t]o be effective...[supervision] must be designed to monitor securities-related activities and detect and prevent regulatory compliance problems of such associated persons working at unregistered offices…").

### A. Outside Business Activities and Private Securities Transactions of Registered Representatives

Rules 3270 and 3280 are the primary rules that govern the supervision of outside business activities and private securities transactions of registered representatives. Pursuant to Rule 3270 "Outside Business Activities of Registered Persons", Respondent had a duty to supervise the Brokers' outside business activities. Specifically, Rule 3270 provides:

> No registered person may be an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he or she has provided prior written notice to the member, in such form as specified by the member. Passive investments and activities subject to the requirements of Rule 3280 shall be exempted from this requirement.

Additionally, where, as here, a registered representatives' outside business activities are "securities related", FINRA Rule 3280 "Private Securities Transactions of an Associated Person" applies. For the purposes of Rule 3280, a "private securities transaction is defined as "any securities transaction outside the regular course or scope of an associated person's employment with a member", which includes the solicitation of the Claimants' investments in the Companies.

As for the Respondent's obligations, Rule 3280(a) provides that "[n]o person associated with a member shall participate in any manner in a private securities transaction except in accordance with the requirements of this Rule." As stated in Rule 3110, final responsibility for ensuring its representatives' compliance with this Rule rests with Respondent. Subsection (b) goes on to require that the representative provide notice to the firm of his or her involvement with the private securities transaction.

Here, Claimants understand that Walesa disclosed his involvement in multiple of the Companies, including Cibolo Creek Partners, which ***still appears on Walesa's BrokerCheck***

***Report to this day***. Accordingly, Respondent was obligated to undertake an investigation into these activities to determine whether or not it would approve the Brokers' participation. If Respondent declined to approve the Brokers' participation, then Respondent had an obligation to ensure that both Brokers complied with Respondent's prohibition. On the other hand, if Respondent approved their participation, then Rule 3280(c)(2) (formerly, NASD Rule 3040(c)(2)) applies:

> If the member approves a person's participation in a transaction pursuant to paragraph (c)(1), ***the transaction shall be recorded on the books and records of the member and the member shall supervise the person's participation in the transaction as if the transaction were executed on behalf of the member***.[13]

(emphasis added).

This means that Respondent was ***required record these transactions on the firm's books and records and supervise the activity as if the activity occurred through the firm***. FINRA has warned firms that it is their responsibility to "review their supervisory procedures to make sure that they are reasonably designed to achieve compliance with [FINRA] Rules 3030 and 3040 [now 3280] regarding outside business activities and private securities transactions…" *See* NTM 01-79: Selling Away and Outside Business Activities.

FINRA has repeatedly sanctioned firms for failing to supervise a broker's outside business activities. In addition, the SEC has sanctioned brokerage firms for schemes conducted by their brokers through private securities transactions. In *In re Commonwealth Equity Services, LLP*, registered representative Bleidt misappropriated over $31 million from more than 100

---

[13] FINRA Rule 3280(e)(1) defines "***Private securities transaction***" as "***<u>any securities transaction</u> outside the regular course or scope of an associated person's employment with a member, including, though not limited to, new offerings of securities which are not registered with the Commission***." Clearly the investments at issue were private securities transactions governed by Rule 3280.

victims through his RIA. SEC Rel. No. 56362, 2007 WL 3071391 (Sept. 6, 2007). The SEC stated that "[u]nder Section 15(b)(4)(E) of the Exchange Act, broker-dealers are responsible for reasonably supervising, with a view to preventing violations of the federal securities laws, persons subject to their supervision." *Id.* at *3. In *Commonwealth* the firm "failed to establish reasonable policies and procedures for responding to red flags related to Bleidt's outside business activities." *Id.* There are other similar examples of firms being sanctioned for failing to supervise outside business activities.[14]

Like Commonwealth Equity Services did nearly two decades ago, in this matter, Respondent Triad ignored the SEC's and FINRA's guidance on supervising private securities transactions and failed to properly supervise the outside business activities of its registered representative.

**B. Due Diligence Obligations for Firm-Approved Investments**

If Respondent approved the investments in the Companies and entered into selling agreements with them to sell these securities ***through the firm*** (as opposed to a private securities transaction), then the analysis would center around whether or not Respondent adequately supervised the suitability of these transactions.

FINRA Rule 2111,[15] also known as the "Suitability Rule," provides:

> (a) A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status,

[14] *In re Signator Investors, Inc., et al*, SEC Rel. No. 75690 (Aug. 13, 2015) (finding that Signator failed to reasonably supervise both brokerage and advisory client activity of its representative leading to 125 clients being defrauded of $13.5 million).
[15] Formerly FINRA Rule 2310.

> investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

FINRA breaks this analysis down into three components: 1) Reasonable basis suitability, 2) customer specific suitability, and 3) quantitative suitability.[16] *Id.*

When selling investments like those the Claimants made in the Companies, the first step broker-dealers must take is to conduct a "reasonable basis suitability" analysis. *See* FINRA Notice to Member 03-71. This is the first step because before a broker-dealer can assess whether an investment is suitability for a particular customer (known as "customer specific suitability") it must first determine if the investment is suitable for sale generally. This process is often referred to simply as due diligence.

Rule 2111 states, in pertinent part:

> (a) The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy. A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule.

The notion behind this obligation is simple – every investor, regardless of risk tolerance or sophistication, has a fundamental right to be protected from fraud and conflicts of interest. Although Respondent is obligated to conduct due diligence on every investment it offers to customers, FINRA and the SEC have long recognized a heightened importance of conducting due

[16] Quantitative suitability is not pertinent to the Claimants' claims in this arbitration.

diligence where, as here, investment products are offered pursuant to an exemption from disclosure requirements. *See* FINRA Notice to Member 10-22.

In this case, most of the investments at issue were never registered with the Securities and Exchange Commission and, instead, were offered pursuant to an exemption from registration under Regulation D of the Securities Act of 1933. Regulation D exempts certain securities offerings from the typical disclosure requirements that are required of all new securities offerings under federal law. Generally, when companies want to issue securities, they are required to file a registration statement or prospectus with the Securities and Exchange Commission. This process, which involves publicly disclosing all material risks in writing, is generally known as an initial public offering. Regulation D offerings are completely exempt from these requirements and, other than a short form called a "Form D," no other documentation or public disclosure is required under federal law.

Due to this inherent lack of disclosure and regulatory oversight, FINRA advises member firms, such as Respondent, that it must be particularly skeptical of such offerings. *See* Notice to Member 03-71. Among other requirements, Respondent would have been expected to review audited financial statements for the Companies and actively question any red flags contained therein. *Kunz v. SEC*, 64 Fed. Appx. 659 (10th Cir. 2011). At the hearing on the merits, the Claimant will show that Respondent failed to conduct a proper review of the Companies and failed its reasonable basis suitability obligations.

Beyond that, Respondent was obligated to ensure that the investments at issue complied with Respondent's customer-specific suitability obligations. This means that Respondent was obligated to ensure that the Claimants' respective investments in the Companies were appropriate for them based upon their own unique investor profiles, including their respective risk tolerances,

investment objectives, net worths, and the like. Claimants will demonstrate at the hearing that even if Respondent otherwise fulfilled its due diligence obligations (which it did not), Respondent's recommendations that the Claimants invest in the Companies were nonetheless unsuitable.

## III. Non-Walesa Company Investments At Issue

### A. Alternative Investments

Respondent and the Brokers also recommended that the Claimants invest in risky alternative investments. These include, but are not limited to limited partnership offerings by Atlas Growth Partners, Ridgewood Energy and other sponsors. Alternative investments commonly pay extraordinarily high commissions, but also expose investors to extraordinarily high risks, including illiquidity and loss of principle. For that reason, FINRA requires that brokerage firms conduct extensive due diligence on them.

### B. LJM Preservation and Growth Fund

Contrary to its name, the LJM Preservation and Growth Fund was very risky and sought neither preservation nor growth. Not only was LJM leveraged with high margin levels, but LJM also operated by selling naked put options on S&P 500 futures. The fund used these options to employ a highly complex strategy known as a "short strangle". A short strangle strategy has unlimited downside (no preservation) and limited upside (no growth). This strategy was extremely high risk. In fact, as early as July 2017, Morningstar reported that the Fund was an aggressive option seller that was "high risk" with high fees. *See* LJM Morningstar Report, dated July 13, 2017.

This is how the fund's strategy is described in its prospectus:

> The Fund seeks to achieve it investment objectives by capturing gains on options sold on S&P futures contracts that can be purchased

> ("closed") at a later date for a lower price than the price realized when originally sold… In the aggregate, the Fund is typically "net short" in the portfolio of contracts that it holds, which means that the Fund holds more uncovered option contracts then covered.

The fund's strategy was essentially to bet that market volatility would not increase significantly and that the market index level would not change. When both market volatility and market index declines occurred simultaneously, as they did during the first week of February 2018, the results were catastrophic for investors in LJM, who lost a combined $700 million dollars or 80% of the fund's NAV. On Monday, February 5, 2018, the share price of LJM plummeted 55.8% from $9.67 to $4.27. Then, on the following day, the price fell by more than half again – dropping 54.6% to $1.94. This represented a loss of more than 80%.

## LEGAL CLAIMS[17]

## POINT I.

## BREACH OF FIDUCIARY DUTY

Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients.[18] In addition, FINRA has stated on numerous occasions that "the suitability

---

[17] The legal claims listed herein are not meant to be an exhaustive list of claims but merely illustrative of the types of claims being made in accordance with FINRA requirements to providea description. Claimants reserve the right to add or amend the legal claims and theories made herein and provide further detail in Claimants' pre-hearing brief.

[18] *See Mansbach v. Prescott, Ball & Turben,* 598F.2d1017 (6th Cir. 1979) (a securities broker dealeris a fiduciary who owes its customer a high degree of care in transacting business); *Byrley v. Nationwide Life Insurance Co.,* 94 Ohio App. 3d 1 (Erie County 1994) ("broker and a client are ina fiduciary relationship."); *United States v. Wolfson,* 2008 WL 1969730, at *2 (S.D.N.Y. May 5, 2008) ("The essence of the argument is that there is no fiduciary relation between a broker and a customer unless the broker is handling a discretionary account. That is simply not true."); *E.F. Hutton & Co. Inc.,* Exchange Act Release No. 25,887, 41 SEC Docket 413, 418 (July 6, 1988) ("The concept of just and equitable principles of trade embodies basic fiduciary responsibilities…"); *Lipkien v. Krinski,* 182 N.Y.S. 454, 192 A.D. 257, 263 (N.Y. App. Div. 1920)(holding that transferring cash to broker gives rise to fiduciary duty regardless of defendants' claimthat they were only clearing broker); *Rolf y. Blyth. Eastman Dillon & Co.,* 570 F.2d 38 (2nd Cir. 1978) (registered representative; as broker for investor, owed investor a fiduciary duty); *Moholt v.Dean Witter Reynolds, Inc.,* 478 F. Supp. 451(D.D.C.1979) (stockbrokers are quasi-fiduciaries andare held to high degree of trustworthiness and fair dealing); *Pachter y. Merrill Lynch. Pierce, Fenner & Johnston. Inc.,* 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were

rule and the concept that a broker's recommendation must be consistent with the customer's best interests are inextricably intertwined." NTM 12-25, Suitability, pg. 3 (Jul. 9, 2012). This means that "a broker make only those recommendations that are consistent with the customer's best interests prohibits a broker from placing his or her interests ahead of the customer's interests." *Id; see also Raghavan Sathianathan,* Exchange Act Rel. No. 54722, 2006 SEC LEXIS 2572, at *21 (Nov. 8, 2006); *Scott Epstein,* Exchange Act Rel. No. 59328, 2009 SEC LEXIS 217, at *40 n.24 (Jan. 30, 2009) ("In interpreting the suitability rule, we have stated that a [broker's] 'recommendations must be consistent with his customer's best interests.'"); *Dane S. Faber,* 57 SEC 297, 310, 2004 SEC LEXIS 277, at *23-24 (2004) (stating that a "broker's recommendations must be consistent with his customer's best interests" and are "not suitable merely because the customer acquiesces in [them]"); *Wendell D. Belden,* 56 S.E.C. 496, 503, 2003SEC LEXIS 1154, at *11 (2003) ("As we have frequently pointed out, a broker's recommendationsmust be consistent with his customer's best interests.").

Respondent violated their fiduciary duty in multiple ways by: 1) recommending an unsuitable investment; 2) omitting material information and providing false and misleading information to Claimants; 3) breach of duty of loyalty through conflicts of interests and placing

---

bound, as plaintiff's agents, to exercise "theutmost good faith" toward him); *Thropp v. Bache Halsey Stuart Shields, Inc.,* 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); *Leboce. S.A. v. Merrill Lynch. Pierce. Fenner & Johnston, Inc.,* 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); *Jaksich y. ThomsonMcKinnon Securities, Inc.,* 582 F. Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); *Utah State University of Agriculture and Applied Science y. Sutro & Co.,* 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trnstee dealing with public funds); *E.F. Hutton & Co. y. Weeks,* 166 Ga.App. 443, 304 S.E.2d 420 (Ga. 1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith); *Wilder v. Meyer,* 779 F. Supp. 164, 168-69 (S.D. Fla. 1991).

personal gain above the interests of the Claimants; and 4) failing to conduct due diligence on the investments recommended. These prongs will be discussed in the following sections.

## POINT II.

## SUITABILITY

Financial advisers must always make suitable recommendations to their clients and must abide by the suitability rules imposed by FINRA. The scope of these duties is defined in FINRA Rule 2111,[19] also known as the "Suitability Rule," which provides:

> (a) A member or an associated person must have a reasonable basis to believe that a ***recommended transaction or investment strategy involving a security or securities*** is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

*See* FINRA Rule 2111 SUITABILITY (emphasis added); *see also* NYSE Rule 405; *In re Larry Ira Klein,* Exchange Act Release. No. 37835 (Oct. 17, 1996) (a representative may make "only such recommendations as would be consistent with [her customers] financial situations and needs."); *In re James Chase,* Exchange Act Rel. No. 47476 (Mar. 10, 2003), 79 SEC Docket 2892, 2897 ("The SEC concluded that the mere disclosure of risks did not satisfy the suitability duty...[n]ot only must the customer be sufficiently sophisticated to fully understand the risks involved with the investment, the customer also must be able to bear those risks.").

---

[19] Formerly FINRA Rule 2310.

In addition, under FINRA 2090 "Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer."

Respondent and its agents violated their suitability obligations to Claimants by: (i) failing to conduct a reasonable basis analysis of the alternative investment strategy, (ii) failing to make customer-specific suitable recommendations, and (iii) over-concentrating Claimants' accounts in the alternative investments. Each aspect of the suitability rule is discussed below.

**A. Reasonable Basis and/or Investment Strategy**

FINRA has long held that Rule 2310 "include[s] having a reasonable basis for recommending a particular security or strategy." *See Notice to Members 96-32,* 1996 NASD LEXIS 51, 2 (May 1996); *see also F.J. Kaufman and Co.,* 50 S.E.C. 164, 168 (1989). First, a broker-dealer must determine whether the product or strategy is suitable for any customer, regardless of that customer's wealth, willingness to accept risk, age, education, or other individual characteristics. *See In re F.J. Kaufman and Company of Virginia*, 50 S.E.C. 164 ("A broker-dealer must have an 'adequate and reasonable basis' for any recommendation that he makes.").

Respondent failed to conduct reasonable due diligence on the investments sold to the Claimants, the majority of which were alternative, non-traded investments. Such investments come with very high costs, fees, and commissions and have historically underperformed safe investments such as treasuries.

FINRA specifically reminded firms in NTM 03-71 that:

> Given the complex nature of NCIs [Alternative Investments] and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of

> NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products.

FINRA reminded members offering NCI's, such as the Alternative Investments, alternatives of their obligations to: (1) conduct adequate due diligence to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risksand rewards associated with the particular product; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products.

In NTM 12-03: Heightened Supervision of Complex Products, FINRA noted it had previously issued multiple notice such as NTM 03-71, NTM 05-26, and NTM 10-22 with a "consistent theme in these Notices is that the complexity of a product often necessitates more scrutiny and supervision by a firm." *Id.*

FINRA has provided an in-depth notice on how to conduct due diligence. FINRA firms havean "obligation to conduct a reasonable investigation of the issuer and the securities they recommend in offerings…" Notice to Members ("NTM") 10-22: Regulation D Offerings, at 1; *see also See Hanly v. SEC,* 415 F.2d 589, 595-96 (2d. Cir. 1969); *SEC v. Great Lake Equities Co.,* 1990 U.S. Dist. LEXIS 19819 at *16-17 (E.D. Mich. 1990); *SEC v. North American Research and Development Corp.,* 424 F.2d 63,84 (2d Cir. 1970); *SEC v. Current Financial Services, Inc.,* 100 F. Supp. 2d 1, 14-15 (D.D.C. 2000); *District Business Conduct Committee for District No. 4 v. Everest Securities, Inc.,* 1994 NASD Discip. Lexis 188 (Sept. 2, 1994), *aff'd,* 52 S.E.C.958, 962-63 (Aug. 26, 1996), *aff'd,* 116 F. 3d 1235 (8th Cir. 1997) (stating that firms are required to exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims); Securities Act Release No. 4445, 27 Fed. Reg. 1415 (Feb. 2, 1962).

FINRA has stated that a brokerage firm has a "special relationship" with a customer "from the fact that in recommending the security, the BD represents to the customer 'that a reasonable investigation has been made and that [its] recommendation rests on the conclusions based on such investigation.'" *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). A brokerage firm "may not rely blindly upon the issuer for information concerning a company," in lieu of conducting its own reasonable investigation. *Id.*at 4 (*citing Everest Securities, Inc. v. US,* 116 F. 3d at 1239 ("reliance on others does not excuse [the respondent's] own lack of investigation").

Indeed, when an issuer seeks to finance a new speculative venture, brokerage firms "must be particularly careful in verifying the issuer's obviously self-serving statements." *Id.* (*citing Everest Securities, Inc.,* 116 F. 3d at 963). In addition, the SEC and courts recognize that a more thorough investigation is required for "securities issued by smaller companies of recent origin." *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). "The fact that a BD's customers may be sophisticated and knowledgeable does not obviate the duty to investigate." *Id.* at 4.

FINRA has defined the following parameters as the *bare minimum* a brokerage firm must document in conducting a reasonable investigation for a Regulation D offering and any subsequent offering for the same issuer:

- the issuer and its management[20];
- the business prospects[21] of the issuer;
- the assets[22] held by or to be acquired by the issuer;
- the claims being made; and
- the intended use of proceeds of the offering
- whether the investor's money is likely to be applied according to the stated use ofproceeds
- whether the stated use of proceeds is reasonable in light of the issuer's businesspurpose and prospects

*Id.* at 5; *see also In Re Brian Prendergast,* 2001 SEC LEXIS 1533 (Aug. 1, 2001); *LegendMerchant Group, Inc.,* NASD No. C10030058 (July 2004); *Shelman Securities, Inc.,* NASD No.C06030013 (Feb. 2004) (private placement memoranda contained material misrepresentations andomissions about use of proceeds in a previous offering). In order to demonstrate the brokerage firmhas performed a reasonable investigation, the firm should retain records documenting both theprocess and results of its investigation. *Id.* at 7. The records should include descriptions of themeetings held of the investigation, tasks performed, documents and other information reviewed,results of the reviews, and the individuals who attended the meetings or conducted the reviews. *Id.* Accordingly, Respondent had a legal obligation to vet and independently investigate the investments and should have been able to provide a due diligence report prior to recommending Alternative Investments.

It is doubtful that Respondent ever conducted a meaningful investigation into these investments, the sponsoring entities, or Walesa's affiliation with them. In sum, Respondent failed

---

[20] FINRA provides a 13 point list of items a reasonable brokerage firm would review with issuer and its management. *Id.* at 8-9.

[21] FINRA provides a 5 point list of items a reasonable brokerage firm would review with to determine the company's business prospects. *Id.* at 9-10.

[22] FINRA provides a 3 point list of items a reasonable brokerage firm would review with to determine the quality of the company's business assets. *Id.* at 9-10.

to conduct a reasonable investigation into the qualities and performance of the investments recommended and could not form a reasonable basis for their recommendations and the investment strategy implemented in Claimants accounts.

**B. Customer Specific Suitability**

The second dimension of FINRA Rule 2310 requires the broker to have a reasonable basis to believe that the recommendation is suitable for the particular customer based on the customer's investment profile. The investment profile includes items such as: financial situation, tax status, investment objectives, risk tolerance, age, and investment experience. *See* FINRA Rule 2310, Recommendations to Customers (Suitability); *see also In re Larry Ira Klein*, Exchange Act Release. No. 37835 (Oct. 17, 1996) (Brokers may make only such recommendations as would be consistent with the customer's financial situation and needs).

FINRA has also warned that "[a]s investors age, their investment time horizons, goals, risk tolerance and tax status may change…[and] seniors and retirees may have less tolerance for certain types of risk than other investors." NTM 07-43: Senior Investors, pg. 2 (Sept. 2007). FINRA also stated that it would scrutinize "recommendations to seniors…that involve…[p]roducts that have withdrawal penalties or otherwise lack liquidity, such as deferred variable annuities…real estate investments and limited partnerships" *Id.* at 4.

Many brokerage firms claim that if an investor's net worth is sufficient to invest in security that such a fact equates to suitability of high risk investments. In NTM 03-71 FINRA issued a clear warning for firms that qualification does not equate to suitability:

> NASD cautions members against relying too heavily upon a customer's financial status as the basis for recommending NCIs. A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability

> obligation; however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met their suitability obligations. NCIs with particular risks maybe suitable for recommendation to only a very narrow band of investors capable of evaluating and being financially able to bear those risks.

NTM 03-71; *In re Arthur Joseph Lewis,* SEC Rel. No. 34-297941991 WL 294317 (Oct. 8, 1991) (The fact that a customer, such as Mrs. McGowan, may be wealthy does not provide a basis for recommending risky investments."); *In re Patrick G. Keel,* SEC Rel. No. 34-31716, 1993 WL 12348 (Jan. 11, 1993) (holding same).

Here, Respondent failed to understand Claimants' investment needs and objectives. Instead, Respondent thought only about their own commissions and unsuitably invested Claimants in the highest paying commission products available.

### C. Respondent Recommended an Impermissible Overconcentration in Alterative Investments

A broker dealer is liable for a claim of unsuitability when it over-concentrates a client's account with a particular investment. *In re Holland,* Exchange Act Release No. 36,621, 60 S.E.C. Docket 2935(Dec. 21, 1995) (good faith immaterial to broker liability). Even if a broker claims a client has agreed to such an overconcentration, a broker's suitability obligations are not absolved. In *Holland*, the SEC concluded:

> Even if we were to accept [the broker's] view that these clients wanted to speculate and were aware of the risks-a conclusion not supported on this record-the Commission has held on many occasions that the test is not whether [the clients] considered the transactions in their account suitable, but whether [the broker] fulfilled the obligation she assumed when she undertook to counsel [them], of making only such recommendations as would be consistent with [their] financial situation and needs.

*Id.* at 736-37 (citing *In re Erdos*, 47 S.E.C. 985, 989 (Nov. 16, 1983)); *see also In re Wickswat*, 50 S.E.C.

Here, Respondent recommended overconcentrated positions in alternative investments to Claimants.

**POINT III.**

**RESPONDENT EITHER FRAUDULENTLY OR NEGLIGENTLY MADE MATERIAL MISREPRESENTATIONS AND OMITTED MATERIAL INFORMATION IN THE ALE OF THE INVESTMENT TO CLAIMANT**

**A. Federal Securities Law**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. See 15 U.S.C.S. §78j. The SEC, pursuant to 15 U.S.C.S. §78j, promulgated S.E.C. Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5). In a typical § 78j(b) private action, a plaintiff must prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

**B. State Securities Acts, Common Law Fraud, and Common Law Negligence**

As herein described, Respondent and its agents violated provisions of multiple state securities acts,[23] including, *e.g.,* the Illinois Securities Act, 815 ILCS 5 et seq., and common law fraud. According to the Illinois Act, it shall be unlawful: "[t]o employ any device, scheme or

[23] Claimants will provide legal briefing at hearing outlining the specific ways Respondent violated each of the applicable state securities acts. As the provisions of each are similar, the Illinois Securities Act is discussed by way of example.

artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12(I). Further, the sale of securities in violation of the Illinois Act provides for statutory interest from the date of sale in the amount of the rate of interest stipulated in the securities sold, as well as attorney's fees for the purchaser. 815 ILCS 5/13(A). As alleged above, Respondent's conduct violated the foregoing rules and laws.

**C. Violation of FINRA Rule 2210**

The FINRA Rules require firms to provide only accurate and balanced communications, forecasting, marketing, and demonstrative information to clients. NTM 08-81 reminds members that:

> Sales materials and oral presentations must present a fair and balanced picture regarding both the risks and benefits of investing in these products. FINRA reminds firms that NASD Rule 2210 and IM-2210-1 require firms to ensure that statements are not misleading within the context in which they are made, and that firms must consider the nature of the audience to which the communication is directed…

In addition, FINRA Rule 2210(d)(1) provides:

> (A) All member communications with the public shall be based on principles of fair dealing and good faith, must be fair and balanced, and must provide a sound basis for evaluating the facts in regard to any particular security or type of security, industry, or service. No member may omit any material fact or qualification if the omission, in the light of the context of the material presented, would cause the communications to be misleading.
>
> (D) Communications with the public may not predict or project performance, imply that past performance will recur or make any exaggerated or unwarranted claim, opinion or forecast. A hypothetical illustration of mathematical principles is permitted, provided that it does not predict or project the performance of an investment or investment strategy

Further, NTM 03-71 provides guidance concerning non-conventional investments stating:

> [M]embers should provide investors with any prospectus and other disclosure material provided by the issuer or the sponsor. NASD reminds members, however, that simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by the member, sponsor, or issuer.

*See* NTM 03-71. In addition, NTM 10-22 provides that:

> If a private placement memorandum or other offering document presents information that is not fair and balanced or that is misleading, then the BD that assisted in its preparation may be deemed to have violated NASD Rule 2210. Moreover, sales literature concerning a private placement that a BD distributes will generally be deemed to constitute a communication by that BD with the public, whether or not the BD assisted in its preparation.

NTM 10-22 at 5.

### D. Respondent's Fraudulent Misrepresentations and Omissions

As alleged, Respondent provided false and misleading information to their clients in the sale of securities, management of accounts, and financial planning. As shown above, the presentations made to Claimants by the Brokers both in various marketing materials and orally were knowingly or recklessly false and misleading and omitted material information. Respondent misrepresented therisks and qualities of the investments being.

Respondent concealed known losses on Claimant's investments and otherwise attempted to cover losses. Respondent's representations concerning the performance and returns for these investments and the ongoing investment strategy were not balanced and presented Claimants fairly, an inexperienced investor in these products.

In addition, it is anticipated that with respect to certain investments Respondents will defend themselves by asserting the "prospectus" defense. This defense asserts that Respondent and its agents are allowed to make false statements and misrepresentations to investors so long as a prospectus is provided. This defense has no merit and seeks to undermine the very purpose of the

securities laws. According to the SEC, a person who makes oral misrepresentations to sell a security cannot wash away his liability by handing his victim a prospectus:

> At the expense of restating the obvious, we emphasize that compliance with these requirements for delivery of a prospectus or offering circular does not, however, license broker-dealers or their salesmen to indulge in false or fanciful oral representations to their customers. The anti-fraud provisions of the Securities Act and the Securities Exchange Act apply to all representations whether made orally or in writing, during or after the distribution. We have repeatedly held that the making of representations in the sale of securities unsupported by a reasonable basis is contrary to the obligation of fair dealing imposed on broker-dealers and their salesmen by the securities laws. **This obligation is not diminished because a prospectus or offering circular containing information specified by the Act and our rules has been or is to be delivered. Such information furnishes the background against which the salesman's representations may be tested. Those who sell securities by means of representations inconsistent with it do so at their peril.**

*In the Matter of Ross Secs., Inc.,* SEC Release No. 7069, 41 SEC Docket 509 (Apr. 30, 1963); (emphasis added); *see also In the Matter of the Application of Larry Ira Klein,* SEC Release No. 37835, 63 SEC Docket 52 (Oct. 17, 1996) ("Klein's delivery of a prospectus to Towster does not excuse his failure to inform fully the risks of the investment package he proposed").

This point has been made over and over again by FINRA:

> Members are also advised that, although the prospectus and sales material of a fund include disclosures on many matters, **oral representations by sales personnel that contradict the disclosures in the prospectus or sales literature may nullify the effect of the written disclosures and they make the member liable for rule violation and civil damages** to the customers that result from such oral representations.

NASD Notice to Members 03-71 (emphasis added); NTM 13-18: Guidance on Communications With the Public Concerning Unlisted Real Estate Investment Programs, pg. 2 (May 2013)("Descriptions of real estate programs in communications need to be consistent with the representations in the program's current prospectus."); NTM 04-30 ("However, NASD

reminds firms that simply providing a prospectus does not cure unfair or unbalanced sales or promotional materials, whether prepared by the firm or the issuer."); NTM 05-59 ("Members are further reminded that providing risk disclosures in a prospectus supplement does not cure otherwise deficient disclosure in sales material, even if such sales material is accompanied or preceded by the prospectus supplement.").

**POINT IV.**

**RESPONDENT VIOLATED FINRA RULES 2010, IM-2310, and 2020**

FINRA Rule 2010 requires members to "observe high standards of commercial honor and just and equitable principles of trade" in conducting their business. FINRA Rule 2020 also prohibits members from effecting "any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance." IM-2310-2 - "Fair Dealing with Customers" is cross-referenced by both of the aforementioned provisions and provides a non-exhaustive list of activities that would be inconsistent with the foregoing principals. *See* IM-2310-2: FAIR DEALING WITH CUSTOMERS. The first section of IM-2310-2 outlines member and associated persons obligations in dealing with customers as follows:

> (a)(1) Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with particular emphasis on the requirement to deal fairly with the public.

Respondent egregiously and intentionally violated many of the subsections of IM-2310-2, as discussed *infra.*

## POINT V.

## FAILURE TO SUPERVISE

Respondent unreasonably failed to stop inappropriate sales. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees.

### A. Supervision Standard

Respondent failed to supervise their broker's misconduct. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees. FINRA Rule 3010 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

FINRA Rule 3010: SUPERVISION.

The duty to supervise is a critical component of the securities regulatory scheme. *Inre Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Those who have a duty to supervise have an affirmative responsibility to uphold their duty. *Id.* Regulatory authorities such as the SEC, FINRA and the NYSE have steadily heightened the supervisory obligations of brokerage firms in recent years. Utilizing language employed by the SEC, "effectivesupervision by a broker/dealer is a critical element in the regulatory scheme and its importance hasincreased as firms have grown...broker dealers must provide effective staffing, efficient resourcesand a system of follow-up and review to determine that any responsibility to supervise…is being diligently exercised." *In Re Mabon Nugen & Co.*, 44 SEC Docket 1116, Release No. 27301 (September 27, 1989).

Evidence tending to establish a variance between conduct called for by a firm's procedures and the actions actually undertaken by an employee of the firm may support a finding of liability. *Rupert v. Clayton Brokerage Co. of St. Louis, Inc.*, 737 P.2d 1106, 111 – 12 (Colo. 1987). Supervisors have an obligation to respond vigorously and with the utmost vigilance to indications of irregularity. A supervisor cannot ignore or disregard red flags and must act decisively to detect and prevent improper activity. Indications of wrongdoing demand inquiry as well as adequate follow up and review. *In re Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Also, a violation of internal procedures may support a punitive damages award. *Alrich v. Thomson McKinnon Securities, Inc.,* 589 F.Supp. 683, 685 (S.D.N.Y. 1984). Finally, "a court [or other arbiter] may consider evidence of [a] brokerage firm's internal rules as evidence of the proper standard of care." *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 820 (6th Cir.1981); see *also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F.Supp. 1224, 1227 (D.D.C. 1986) (violation of NASD rule was evidence of broker's negligence).

**B. Outside Business Activities and Private Securities Transactions**

As set forth hereinabove, proper supervision requires compliance with Rules 3270 and 3280. Rule 3270 requires that brokerage firms properly supervise their registered representatives' outside business activities. In the event such activities are securities related and private securities transactions, Rule 3080 requires the brokerage firm to record these transactions on the firm's books and records and supervise the activity as if the activity occurred through the firm. Here, Respondent failed to do the same, thereby violating Rules 3270 and 3280.

**C. "Control Person" Liability**

Respondent is also liable to Claimants for misconduct under the theory of "control person" liability. Both federal and state securities acts impose "control person" liability on all persons

who have the power, direct or indirect, exercised or not, to control another's sale of securities. *See*, *e.g.*, 15 U.S.C.A. § 78t (2011) (stating "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlledperson to any person to whom such controlled person is liable…").

As used in all such securities acts, "the term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981). Respondent was the "control persons" of their brokers at all times relevant to this dispute. Therefore, Respondent is liable for its brokers' misconduct.

**D. Respondeat Superior**

Respondent is liable to Claimants for all of its brokers misconduct under the theory of respondeat superior. Courts have held that respondeat superior liability is created by the "special duties that certain employers assume under the federal securities laws when their conduct is likely to exert strong influence on important investment decisions." *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 181 (3d Cir. 1981). As also explained by the Fifth Circuit, "most investors rely upon the reputation and prestige of the brokerage firm rather than the individual employees with whomthey might deal. Such firms should be held accountable if employees they select utilize the firm's prestige to practice fraud upon the investing public." *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1119 (5th Cir. 1980); *Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir. 1981) (*cited by Sharp v. Coopers & Lybrand,* 649 F.2d at 182) ("(U)nder common law principles, a principal is liable for the deceit of its agent committed in the very business he was appointed to

carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal.") *see also* Restatement (Second) of Agency § 261 ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit fraud upon third persons is subject to liability to such third persons for the fraud"). Similarly, the Sixth Circuit has emphasized that the broker-dealer has "an affirmative obligation to prevent use of the prestige of its firm to defraud the investing public." *Holloway v. Howerdd,* 536 F.2d 690, 696 (6th Cir. 1976); *As You Sow v. AIG Fin. Advisors, Inc.,* 584 F. Supp. 2d 1034, 1047 (M.D. Tenn. 2008) (*citing See Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir. 1981), *cert denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981); *Alvarado v. Morgan Stanley Dean Witter. Inc.,* 448 F.Supp.2d 333 (D.P.R. 2006); *Carroll v John Hancock Distributors, Inc.,* CIV.A. 92-5907, 1994 WL 87160 at *4 (E.D. Pa. Mar. 14, 1994) ("[U]nder Pennsylvania law a principal is liable to third parties for the frauds, concealments etc. of his agent committed within the scope of his employment even though the principal did not authorize or know of such conduct, even if he forbade such acts.").

Respondent is responsible for all of its broker's investment related activities. Regardless of whether or not the firm prohibited misconduct.

**POINT VI.**

**FRAUDULENT INDUCEMENT TO HOLD INVESTMENT**

Claimants claim that Respondent's wrongful or fraudulent conduct induced Claimants to maintain a position and not to change such position, resulting ultimately in a loss. Respondent committed fraud on an ongoing basis, by inducing Claimants to hold onto the unsuitable investments. Respondent was the provider of investment advice to Claimants, including ongoing advice as to retention of the investments. Respondent owed duties to Claimants as previously

described, including theduty not to make misrepresentations of material facts and not to omit to disclose material facts from any communications or reports (oral or in writing) conveyed or delivered to Claimants, on an ongoing basis, not just on the front end.

Claims for falsely inducing investors not to act to their detriment are based upon the following principles:

> Restatement of Torts (Second), sec 525: “One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.”
>
> Restatement of Torts (Second), sec 531: “One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced."
>
> Restatement of Torts (Second), sec 551(“): "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose. ”

As a proximate cause of such false and continuing inducements to retain the unsuitable investments and unsuitable asset allocation in Claimants’ portfolios, the Claimants were made to suffer a loss.

## POINT VII.

## BREACH OF CONTRACT

Claimants and Respondent entered into customer agreements in which Respondent agreed, among other things, to comply with all state and federal securities laws as well as FINRA’s own regulations. Claimants complied with the terms of the contract between the parties, as

memorialized by the parties, and performed or tendered performance thereunder. Claimants performed all conditions precedent and obligations incident to all of the above-referenced contractual obligations or agreements. Respondent breached the customer agreement with the Claimants by violating FINRA and SEC rules. Respondent also violated their own internal written procedures. Respondent is also a party to various "selling agreements" concerning many of these investments. In addition to Respondent's legal obligation to conduct due diligence, the selling agreements also contractually obligated Respondent to conduct due diligence on the offerings. Claimants are third-party beneficiary to those selling agreements. Respondent failed to undertake reasonable due diligence into the offerings, breaching the selling agreement to the detriment of Claimants. As a direct and proximate consequence of Respondent's wrongful conduct, Claimants suffered damages.

**POINT VII.**

**DAMAGES**

As a cause and consequence of the Respondent's misconduct in the handling of Claimants' investment funds, Claimants seek damages consisting of what a well-managed account would have performed in an amount presently unknown.

In addition, Arbitrators have the power to award exemplary, or in other words, punitive damages. As the United States Supreme Court held in *Mastrobuono v. Shearson Lehman Hutton. Inc*., 514 U.S. 52 (1995), the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., grants arbitrators plenary authority to consider and make an award of punitive damages notwithstanding any provision of state law to the contrary.

Here, punitive damages should be assessed against Respondent and is wholly warranted due to the firm's intentional and willful failure to oversee its agent's activities. The callousness to

the consequences which Respondent has shown cry out for a remedy that will not only make Claimants whole, but prevent a repetition of these events which have become all too common place in the industry. Every year millions of investors' funds are squandered or placed in risky high-commission generating strategies that are of no benefit to the investor. Moreover, brokerage firms continually ask for and advertise to induce the public's trust and confidence and then those same brokerage firms attempt to run away when the wrongful acts of those they employ are discovered. The perils that investors face when trusting the brokerage industry is fostered through a policy of scant compensation for victims that profits the industry even when brokerage firms fail in their most basic duties.

FINRA firms continue to behave in a way that suggests that a lack of supervision, and the relatively small amounts of damages that result, are merely a cost of doing business to be borne rather than problem to be corrected. An award that falls short of assessing punitive damages will not take the necessary step of impressing upon Respondent the indisputable need to supervise and manage its employees in accordance with the rules of law and the business ethics of fair trade.

Accordingly, the panel should award punitive damages, interest at the legal rate per annum, as well as attorneys' fees, and costs.

## CONCLUSION

As a result of the conduct set forth above, Claimants requests a final hearing in this matterand that this Panel award damages from Respondent, as follows:

1. Compensatory damages at an amount to be determined at trial;
2. Statutory damages;
3. Interest at the statutory rate;
4. Attorneys' fees;
5. Expert fees;
6. Forum fees;
7. Punitive damages; and
8. Any and all other relief available to Claimants, in law or equity or otherwise, which maybe granted to them by this Arbitration Panel.

Dated: July 26, 2024
New York, NY

Respectfully Submitted,
GANA WEINSTEIN LLP

By: ______________________

Adam J. Gana
Adam J. Weinstein
Mary T. Curry
295 Madison Avenue
Suite 705
New York, New York 10017
Tel: (212) 776-4252

*Attorneys for Michael Zima, Patricia Fuchs, George Heinemann, as Power of Attorney for Glen and Elsa Heinemann, George and Lori Heinemann, Robert and Gwen Gorman, Olaf Blocher, as Trustee of the Konrad Blocher Trust dated November 17, 2003, and Gordon Stewart*

*-and-*

KURTA LAW

By: /s/ Jonathan Kurta
Jonathan Kurta
Robert Van De Veire
Hannah Ross
295 Madison Avenue
Suite 705
New York, New York 10017
Tel: (212) 658-1502

*Attorneys for Carl Pedigo, Amy Gray as Executor of the Estate of Laura Leff and Successor Trustee of The Laura Leff Irrevocable Trust, Thomas Harrold, Joseph Dymek, individually and as Trustee of the Joseph Dymek Trust dated May 29 2007, Christopher and Jean Ambrose, as Trustees of the Jean Ambrose and Christopher Ambrose Trust, and Avery Tarshis*

# EXHIBIT B

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

---------------------------------------------------------------X

*In the matter of the arbitration between,*

MICHAEL ZIMA, PATRICIA FUCHS, GEORGE HEINEMANN, as Power of Attorney for GLEN and ELSA HEINEMANN, GEORGE AND LORI HEINEMANN, ROBERT AND GWEN GORMAN, CARL PEDIGO, OLAF BLOCHER, as Trustee of the KONRAD BLOCHER TRUST, dated November 17, 2003, AMY GRAY as Executor of the Estate of LAURA LEFF and Successor Trustee of the LAURA LEFF IRREVOCABLE TRUST, THOMAS HARROLD, JOSEPH DYMEK, individually and as Trustee of the JOSEPH DYMEK TRUST dated May 29, 2007, CHRISTOPHER AND JEAN AMBROSE, as Trustees of the JEAN AMBROSE and CHRISTOPHER AMBROSE TRUST, GORDON STEWART, AVERY TARSHIS, JAMES MASTRO, JOHN STRATTON, and JOSEPH McHUGH

FINRA No.: 24-01626

Claimants,

v.

TRIAD ADVISORS, LLC,

Respondent.

---------------------------------------------------------------X

**MOTION TO AMEND STATEMENT OF CLAIM**

Pursuant to Rules 12309(b) of the FINRA Code of Arbitration Procedure (the "Code"), Claimants jointly hereby submit to the Panel this Motion to Amend the Statement of Claim (this "Motion"). The purpose of this motion is to add additional claimants, James Mastro, John Stratton, and Joseph McHugh, to this arbitration.

**<u>LEGAL STANDARD</u>**

FINRA Rule 12309 allows parties to amend complaints to add additional parties. If the amendment is proposed after a panel has been appointed, the amendment is allowed only if the panel approves it.

While not binding on the Panel, the Panel should use federal law as a guide in determining whether to permit the amendment of the Statement of Claim. Under Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, "the court should freely give leave when justice so requires." *Id*. Circuit Courts have recognized that Courts should favor amendments to pleadings with "**extreme liberality**" *Eldridge v. Block*, 832 F.2d 1132, 1135 (9th Cir. 1987) (emphasis added); see also *Dussouy v. Gulf Coast Inv. Corp*., 660 F.2d 594, 598 (5th Cir. La. 1981) (recognizing liberal standard for amendment). In *Foman v. Davis*, the Supreme Court also explained:

> In the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

## **REQUESTED AMENDMENT**

Purpose of the Amendment

The purpose of this amendment is to add additional parties who, like the current Claimants, received investment recommendations from the Respondent's registered representatives. The allegations regarding the Respondent's misconduct towards the proposed new Claimants are identical to those made by the existing Claimants. Moreover, the hearing on the merits for this matter has not even been scheduled yet. Given the time between now and the final hearing,

Respondent will have sufficient time to conduct additional discovery and prepare for the final hearing.

Prior to filing this Motion, the Claimants sought the approval of Respondent in an effort to avoid the time and expense of motion practice. Respondent has yet to respond.

**CONCLUSION**

For the foregoing reasons, Claimants respectfully request that the Panel grant this motion in its entirety.

Dated: New York, New York
October 22, 2024

Respectfully submitted,

Adam J. Gana, Esq.
Adam J. Weinstein, Esq.
295 Madison Avenue, Suite 705
New York, New York 10017

*Attorneys for Claimants*

# EXHIBIT A

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

------------------------------------------------------------------X

*In the matter of the arbitration between,*

MICHAEL ZIMA, PATRICIA FUCHS, GEORGE HEINEMANN, as Power of Attorney for GLEN and ELSA HEINEMANN, GEORGE AND LORI HEINEMANN, ROBERT AND GWEN GORMAN, CARL PEDIGO, OLAF BLOCHER, as Trustee of the KONRAD BLOCHER TRUST, dated November 17, 2003, AMY GRAY as Executor of the Estate of LAURA LEFF and Successor Trustee of the LAURA LEFF IRREVOCABLE TRUST, THOMAS HARROLD, JOSEPH DYMEK, individually and as Trustee of the JOSEPH DYMEK TRUST dated May 29, 2007, CHRISTOPHER AND JEAN AMBROSE, as Trustees of the JEAN AMBROSE and CHRISTOPHER AMBROSE TRUST, GORDON STEWART, AVERY TARSHIS, JAMES MASTRO, JOHN STRATTON, and JOSEPH McHUGH

FINRA No.: 24-01626

Claimants,

v.

TRIAD ADVISORS, LLC,

Respondent.

------------------------------------------------------------------X

---

**STATEMENT OF CLAIM**

---

Claimants, Michael Zima, Patricia Fuchs, George and Lori Heinemann, George Heinemann, as Power of Attorney for Glen and Elsa Heinemann, Robert and Gwen Gorman, Carl Pedigo, Olaf Blocher, as Trustee of the Konrad Blocher Trust, dated November 17, 2003, Amy Gray as Executor of the Estate of Laura Leff and Successor Trustee of The Laura Leff Irrevocable Trust, Thomas

Harrold, Joseph Dymek, individually and as Trustee of the Joseph Dymek Trust, dated May 29, 2007, Christopher and Jean Ambrose as Trustees of the Jean Ambrose and Christopher Ambrose Trust, Gordon Stewart, Avery Tarshis, James Mastro, John Stratton, and Joseph McHugh[1], by and through their undersigned attorneys, Gana Weinstein LLP and Kurta Law, against Triad Advisors LLC ("Triad" or "Respondent"). This arbitration proceeding is properly before FINRA pursuant to the agreements entered into by the parties and under FINRA Rule 12200, which require a member or an associated person of a member to arbitrate disputes arising out of the associated person or member's investment related business activities.

Claimants seek unspecified damages[2], including compensatory damages consisting of what a well-managed account would have performed in an amount presently unknown, together with interest, punitive damages, attorneys' fees, and all forum fees.

## REQUEST FOR EXPEDITED HEARING

Claimants request an ***expedited*** hearing in Chicago, Illinois, based on residency, or alternatively via Zoom. NASD Notice to Parties dated June 7, 2004, titled "Expedited Proceedings for Elderly or Seriously Ill Parties," provides that a claimant may request the arbitration process be expedited when the claimant is elderly or seriously ill. Claimant Gordon Stewart is 89 years old.

Accordingly, and based on the foregoing, Claimants respectfully request that FINRA expedite this matter. FINRA's Arbitrator's manual states the following with respect to hearing

[1] This case includes all individual accounts, retirement accounts, partnerships, companies, or trusts owned by Claimants, whether mentioned specifically or not.
[2] This is based upon an initial assessment of a portion of Claimants' investments presently available to them. Claimants reserve the right to amend the specific securities and the amounts of damages at issue as more information becomes available.

dates for an expedited case, "Arbitrators should schedule dates that will expedite the process but still provide a reasonable amount of time for case preparation. FINRA encourages parties and arbitrators to schedule the hearing ***within six months*** from the date of the IPHC." FINRA Arbitrator's Guide, 2017 Revision, Pg. 23 (emphasis added).

## PARTIES

### I. Respondent and Relevant Non-Parties

#### A. Triad Advisors LLC

Respondent Triad Advisors, LLC is a FINRA registered broker dealer CRD # 25803 and an SEC registered # 801-55518, 8-42007. Triad Advisors, LLC's main office location is 5155 Peachtree Parkway Suite 3220 Norcross, Georgia, 30092. Consequently, Triad Advisors LLC is required to follow the rules and regulations promulgated by FINRA, the SEC, and Federal and State securities laws of the states that it conducts business in including Illinois as well as the firm's own internal compliance policies and procedures in carrying out its securities business.

Upon information and belief, Triad has been the subject of multiple arbitrations concerning the actions of its long-time registered representatives, James Walesa (CRD #1061209) and Kenneth Luccioni (CRD #719779), and the specific investments that are the subject of this arbitration. According to FINRA's publicly available BrokerCheck, these claims have resulted in settlements totaling ***more than $4.9 million***. Claimants also understand that Respondent is currently the subject of at least one regulatory investigation concerning the Claimants' investments that form the subject of this arbitration.

Triad is no stranger to such regulatory investigations. In fact, Triad was just recently fined and censured for its unsuitable recommendations and failure to properly supervise its representatives concerning investments offered by a company in which several Claimants also

invested, known as LJM. Specifically, FINRA found that "Triad permitted the sale of LJM [Preservation and Growth Fund] on its platform without conducting reasonable due diligence of LJM and without a sufficient understanding of its risks and features, including the fact that the fund pursued a risky strategy that relied, in part, on purchasing uncovered options. Triad also lacked a reasonable supervisory system to review representatives' LJM recommendations. Triad representatives sold $2,267,000 in LJM to fifty-eight customers. LJM's value dropped 80% during an extreme volatility event in February 2018 and the fund ultimately liquidated and closed, resulting in hundreds of thousands in losses for Triad's customers."

**B. Non-Party James Walesa**

Non-Party James Walesa was at all times material hereto a registered broker with FINRA. Walesa has a lengthy history of customer complaints and personal financial issues and has recently personal bankruptcy and is believed to be under regulatory investigation for his actions that are at issue in this Statement of Claim.

Walesa is also a gifted salesman, who is believed to have raised nearly $100 million in investments for numerous companies with which he was affiliated and had an ownership interest. Through these illicit securities transactions, Walesa and Respondent violated numerous FINRA Rules, SEC regulations, and both federal and state law.

Walesa flaunted his involvement with these companies and was not shy about his fundraising activities. He consistently bragged to his clients about his leadership and ownership positions in the companies and encouraged his clients to encourage their friends and family to invest with Walesa – often stating, in writing, "do not keep my work a secret!"

The companies which Walesa touted to the Claimants as "sure things" and "great opportunities" have been anything but. Despite numerous consolidations and reorganizations,

Walesa has apparently reorganized a number of these entities into a company whose shares are a penny stock.

Disclosure(s)

View By: Date

| | | |
|---|---|---|
| 11/10/2023 | Customer Dispute | Pending |
| 4/27/2023 | Customer Dispute | Pending |
| 3/21/2023 | Customer Dispute | Pending |
| 3/21/2023 | Customer Dispute | Pending |
| 4/7/2022 | Customer Dispute | Pending |
| 7/8/2021 | Customer Dispute | Settled |
| 10/21/2020 | Judgment / Lien | |
| 6/13/2013 | Customer Dispute | Settled |

According to his BrokerCheck, Walesa has been the subject of no fewer than seven (7) FINRA customer disputes, some of which involve dozens of investors, along with a judgment in excess of $2 million that is against him personally.

Additionally, per a recent filing with the US Bankruptcy Court for the Western District of Texas, Walesa is involved in numerous pending lawsuits in courts around the country. Unsurprisingly, Walesa is no longer in the securities industry.

**C. Non-Party Kenneth Luccioni**

Non-Party Kenneth Luccioni was at all times material hereto a registered broker with FINRA. Luccioni, like his partner Walesa, also has a troubled past in the securities industry. In fact, Luccioni was recently barred from the securities industry for refusing to cooperate with a FINRA investigation. Luccioni has also been the subject of no fewer than five (5) customer complaints, per BrokerCheck.

Disclosure(s)

View By: Date

| | | |
|---|---|---|
| 1/25/2023 | Customer Dispute | Withdrawn |
| 6/27/2022 | Customer Dispute | Settled |
| 1/5/2021 | Customer Dispute | Settled |
| 3/18/2020 | Customer Dispute | Settled |
| 3/18/2020 | Customer Dispute | Settled |
| 11/9/2018 | Regulatory | Final |

### D. Non-Party, Stephen Denari

Non-Party Stephen Denari was at all times material hereto a registered broker with FINRA.

## II. CLAIMANTS

### *1. Michael Zima*

Michael Zima is 60 years old and resides in Chicago, Illinois. Mr. Walesa is Mr. Zima's cousin. At Mr. Walesa's recommendation, Mr. Zima invested his retirement savings in several speculative products, including Clearday, Round Rock, Trident, LJM.

### *2. Patricia Fuchs*

Patricia Fuchs is 69 years old and resides in Eatonville, Washington. Mrs. Fuchs' mother met Mr. Walesa through a widows' group: he met with the group to assist women who previously had no experience in banking. She was a long-time client of Mr. Walesa prior to her passing in 2010. After Mrs. Fuchs returned home from the military in 1992, she met Mr. Walesa and decided to invest her 403b from the military with him. Later, Mrs. Fuchs rolled over her 401k into her account with Mr. Walesa. After Mrs. Fuchs' mother passed in 2010, Mr. Walesa informed her that

she had inherited money from her mother and recommended she invest her inheritance with him. Mr. Walesa recommended Mrs. Fuchs invest over $100,000 in various products, including Clearday, Longhorn Lodging, and Cibolo Creek Partners.

#### *3. George Heinemann, as Power of Attorney for Glen and Elsa Heinemann*

Glen and Elsa Heinemann are 86 and 82 years old, respectively. They previously resided in Chicago, Illinois, and then they moved to Phoenix, Arizona. They are in the process of moving to Birmingham, Alabama, to be closer to their son, George Heinemann. Glen Heinemann was introduced ot Mr. Walesa nearly 30 years ago and trusted him to invest his funds in a prudent, safe manner for decades. The Heinemanns invested hundreds of thousands of dollars in various private placements recommended by Mr. Walesa and hold thousands of shares of Clearday preferred stock.

#### *4. George and Lori Heinemann*

George Heinemann was introduced to Mr. Walesa by his parents, Glen and Elsa Heinemann, several years ago. They currently reside in Birmingham, Alabama. Mr. and Mrs. Heinemann invested funds with Mr. Walesa, included money they were saving towards their children's futures. Mr. Heinemann owns a Senior Care Facility, which made him even more interested in Mr. Walesa's investments.

#### *5. Robert and Gwen Gorman*

Robert and Gwen Gorman reside in Dundee, Illinois. Mrs. Gorman is Mr. and Mrs. Heinemann's daughter and Mr. George Heinemann's sister. The Gormans were induced to invest with Mr. Walesa because of the trusting relationship Mr. Walesa had with the Heinemann family. He recommended they invest in Longhorn.

### *6. Carl Pedigo*

Carl Pedigo resides in Chicago Illinois. Mr. Pedigo invested $50,000 with Mr. Walesa in 2019.

### *7. Olaf Blocher, as Trustee of the Konrad Blocher Trust, dated November 17, 2003*

Konrad Blocher is 88 years old and resides in Illinois. Mr. Blocher met Mr. Walesa through marketing campaigns and free dinner seminars Mr. Walesa offered in the 1990s. Over the course of their relationship, Mr. Blocher and his late wife, Maren, invested significant funds with Mr. Walesa, across their trusts, totaling just over $1 million. Mrs. Blocher passed in 2020, and after her passing, the Maren Blocher Trust dated November 17, 2003 was passed to her husband as successor-trustee and later closed. After Mrs. Blocher's death, their son, Olaf Blocher, began to assist Konrad Blocher with financial matters. Konrad Blocher continued as Trustee of the Konrad Blocher Trust until September 2023. After he resigned, Olaf Blocher was appointed successor trustee. The Konrad Blocher Trust still holds hundreds of thousands of shares of Clearday Common Stock and tens of thousands of Clearday Preferred Stock. The over one million dollars the Blochers invested with Mr. Walesa were meant to be their bequests to their children.

### *8. Amy Gray as Executor of the Estate of Laura Leff and Successor Trustee of The Laura Leff Irrevocable Trust*

Laura Leff was a client of Mr. Walesa for several years. After Ms. Leff started suffering with dementia, her niece, Amy Gray, was appointed Power of Attorney and successor-trustee of the Laura Leff Revocable Trust dated February 14, 2020. Ms. Leff invested in several investments at Mr. Walesa's recommendation, including Clearday, Highland REIT, Round Rock, InventTrust, Shadow Retail, Trident, and Longhorn.

### *9. Thomas Harrold*

Thomas Harrold resides in Hoffman Estates, Illinois and is currently 75 years old. Mr. Harrold was introduced to Mr. Walesa when he was invited to attend an investment presentation at a friend's parents' home. After the meeting, Mr. Harrold decided to invest $25,000 with Mr. Walesa. Later, Mr. Harrold purchased additional Clearday stock.

### *10. Joseph Dymek, Individually and as Trustee of the Joseph Dymek Trust dated May 29, 2007*

Joseph Dymek is 65 years old and resides in Rhode Island. He met Mr. Walesa in the 1990s through a co-ed touch football league in Colorado. Mr. Dymek is still working because he lost over $300,000 in investments recommended by Mr. Walesa.

### *11. Christopher and Jean Ambrose, as Trustees of the Jean Ambrose and Christopher Ambrose Trust*

Jean and Christopher Ambrose reside in Chicago, Illinois and have done so at all times relevant to this action. The investments at issue were previously part of the William Tosch Living Trust. Mr. and Mrs. Ambrose inherited Mrs. Ambrose's father's trust and investments after his death in 2019, and they became part of the Jean Ambrose and Christopher Ambrose Trust. Mr. Tosch was introduced to his brokers, Mr. Walesa and Stephen Denari (CRD # 5138293) by his accountant several years ago. The Ambroses now claim losses of at least $100,000 in investments recommended by Mr. Walesa. They had previously intended to use those funds to repay their children's student loans for college.

### *12. Gordon Stewart*

Gordon Stewart is 89 years old and currently resides in a nursing home in San Francisco, California. Mr. Stewart met Mr. Walesa in New York over thirty years ago. Mr. Stewart invested the inheritance he received from his father, over $500,000, with Mr. Walesa.

*13. Avery Tarshis*

Avery Tarshis is 74 years old and resides in Northbrook, Illinois. Mr. Tarshis built a relationship with Mr. Luccioni several years ago and invested over $30,000 at Mr. Luccioni's direction.

*14. James Mastro*

James Mastro resides in Naperville, Illinois. Mr. Mastro invested $200,000 across LJM investments at the direction of his broker, Kenneth Luccioni. As a result of this investment, Claimant incurred substantial losses.

*15. John Stratton*

John Stratton resides in Hurst, Texas. Mr. Stratton invested $332,500 across several investments recommended to him by Mr. Walesa, including Trident Healthcare, Longhorn Lodging, and Shadow Retail. As a result of these investments, Mr. Stratton incurred substantial losses.

*16. Joseph McHugh*

Joseph McHugh resides in Chicago, Illinois. Mr. McHugh invested in several problematic investments at the recommendation of Mr. Walesa, including Highland REIT, RoundRock, and LJM. As a result of these investments, Claimant incurred substantial losses.

## INTRODUCTION

Claimants trusted Triad through its representatives James Walesa, Kenneth Lucioni, and Stephen Denari (the "Brokers") to prudently invest their savings and act in their best interests. Instead, Triad abused Claimants' trust by recommending that the Claimants invest in several private entities in which Walesa were involved as either an owner, executive, or both. As set forth

in greater detail below, FINRA imposes strict obligations on brokerage firms in the supervision of their registered representatives like Walesa, Luccioni, and Denari.

Specifically, brokerage firms are required to carefully monitor and supervise their representatives' investment related activities. In circumstances such as this, where the representatives are soliciting their customers to invest in businesses in which they have either an ownership interest and/or an executive leadership position, brokerage firms are required to closely scrutinize these activities due in no small part to the inherent conflict of interest. These strict requirements are designed to ensure investor protection. To that end, many brokerage firms simply prohibit their representatives from engaging in such fundraising activities and prohibit them from selling any investment product that is not been vetted by the firm and placed on the firm's approved product list.

Unfortunately, Respondent failed to adhere to these requirements and failed to protect investors, including the Claimants. Rather, Respondent allowed Walesa and Luccioni to openly raise nearly $100 million in investment from Respondent's customers without any interference or supervision. Walesa and Luccioni painted a rosy picture of the various corporate restructuring events which took place over the years between the various entities – each time assuring the Claimants that these were great deals and the investments were on the precipice of paying investors handsomely. Respondent also allowed Walesa and Luccioni to circulate fake account statements and investment updates to the Claimants which represented to the Claimants that the investments were performing well.

In doing so, Respondent violated its supervisory obligations and is responsible for the losses sustained by Claimants, which are substantial. Moreover, due to Respondent's tortious conduct, Claimants have been deprived of the ability to generate the reasonable returns they could

have reasonably expected had they been invested in a *bona fide,* well-managed, and diversified portfolio of stocks, bonds, and/or mutual funds during the relevant time period.

## FACTUAL BACKGROUND

### I. Introduction

James Walesa considered himself to be (and portrayed himself publicly as) a skilled and sophisticated financier. To that end, Walesa became involved in a number of private and publicly traded companies over the past several years (hereinafter, the "Companies"). The list of companies in which Walesa was involved is extensive and includes, but is not limited to:

- Cibolo Creek Partners;
- Trident Healthcare;
- Longhorn Lodging;
- Shadow Retail;
- Farm to Market Development ;
- Hill Country Partners;
- Allied Integral United d/b/a Clearday;
- Round Rock Development Partners;
- Citadel Explorations;
- SitePro (f/k/a Amplisine Labs); and
- Gadsden Properties.

Walesa's involvement in these companies included roles as both an investor and/or an executive. For example, Allied Integral United Inc. (d/b/a Clearday) is a public company for which ***Walesa is the chairman and chief executive officer***.[3] Other examples include Citadel Exploration Inc., a public company of which ***Walesa was chairman of the board***[4] and Cibolo Creek Partners, a private real estate fund of which ***Walesa is a Director***.[5] The Brokers' customers also invested

---

[3] https://www.sec.gov/Archives/edgar/data/895665/000149315221022360/form8-k.htm
[4] https://www.sec.gov/Archives/edgar/data/895665/000149315221022360/form8-k.htm
[5]https://www.sec.gov/Archives/edgar/data/0001456537/000145653712000001/xslFormDX01/primary_doc.xml

heavily in Round Rock Development Partners, L.P. and Longhorn Lodging, LP—private funds for which ***Walesa's Cibolo Creek Partners is an executive officer and manager***.[6,7,8,9]

Walesa and Luccioni openly raised capital for the Companies. However, the two consistently cut corners, resulting in their capital raising activities being illegitimately structured and improperly conducted – ***making the sale of these securities highly illegal***.

Incredibly, despite the illegality of their endeavors, the two made ***no attempts*** ***to hide their activities from Respondent***. In fact, upon information and belief, Walesa even ***affirmatively disclosed*** to Respondent that he was both raising capital for and involved in the management of at least some (if not all) of the Companies. As to the public companies, his involvement was also publicly disclosed in the companies' respective SEC filings available on the EDGAR online repository. Walesa also filed multiple Form Ds[10] for many of the Companies with the SEC, which were publicly available on EDGAR, as well. A simple search of his name was all that was necessary to see every public company in which he was involved. Yet, it appears Respondent either never did that, or did but ignored the results.

Curiously, the Brokers' capital raising activities had all the hallmarks of being done with Respondent's acquiescence, blessing, and involvement. To wit, Claimants understand that Triad

---

[6] https://pitchbook.com/profiles/fund/15284-53F#overview
[7] https://pitchbook.com/profiles/fund/15285-52F
[8]https://www.sec.gov/Archives/edgar/data/0001337983/000133798314000003/xslFormDX01/primary_doc.xml
[9]https://www.sec.gov/Archives/edgar/data/0001456535/000145653514000001/xslFormDX01/primary_doc.xml
[10] A Form D is filed for all investments which are offered pursuant to an exemption from registration under Regulation D of the Securities Act of 1933. Regulation D offerings are exempt from the SEC's disclosure requirements and, other than the Form D, no other documentation or public disclosure is required under federal law. Since there is very little public disclosure, Reg D private placements live in an information black hole, with investors kept largely in the dark about the funds operations and performance.

even had soliciting dealer agreements with several of the Companies pursuant to which Respondent agreed to raise capital from investors for those Companies – and receive selling commissions for its efforts. Respondent's customers also frequently received and executed official Triad paperwork in connection with their investment in the Companies that was on official Triad letterhead and that referred to the investments in the Companies as being "offered through Triad Advisors, Inc." The subscription agreements executed by investors in the Companies were also signed by the Brokers on behalf of Triad Advisors as the selling broker-dealer.

Then, after the investments were made, Respondent regularly processed dividend checks received from these Companies for the benefit of its customers and proceeded to deposit them in their respective customer's Triad account. In certain circumstances, such as where the investments in the Companies were made through IRA accounts, Respondent entered into an arrangement with third party IRA custodians to custody these investments on Triad's behalf and process dividend checks.

The Brokers also emailed regularly with investors and the third-party IRA custodians about the status of their investments in the Companies. These third-party custodians were approved custodians by Triad and often housed legitimate investments.

Over the years, Walesa and Luccioni provided regular updates to investors on Triad letterhead and over email. These updates continued throughout their tenure with Respondent and were made both orally and in writing. The updates were designed for one purpose – which was not to the actually update the Claimants on the true performance of their investments – but rather to tell the Claimants that their investments were performing well and profitable. And it worked. Over the years, Claimants received updates about various acquisitions and mergers by and between the entities in which they had invested and were told about how these corporate actions would

increase profits and returns to investors. Until very recently, Claimants believed that their investments were actually performing as the Brokers promised. Indeed, it was not until only a few short months ago, in September 2023 when Walesa filed for personal bankruptcy, that Claimants realized things may be amiss and began to fear that their investments had been lost.

As detailed in the next section below, the aforementioned actions taken by Walesa and Luccioni constitute numerous violations of FINRA, SEC, state, and federal regulations. Each of the foregoing should have been a red flag and call to action for Respondent. As a result of Respondent's failure to act, the Brokers' illegal activities continued for years unencumbered, resulting in substantial losses to the Claimants' irreplaceable savings.

## II. Respondent's Supervisory Obligations

The state of the law is unambiguous: a ***broker-dealer must supervise <u>all</u> investment related activities of its registered representatives*** as though such activities were conducted through the broker-dealer. Yet, Respondent failed to supervise the Brokers' activities and, in doing so, violated applicable FINRA and SEC Rules.

The Securities and Exchange Act Section ("Exchange Act") 15(b)(4)(E) provides that the SEC can sanction or revoke the registration of any member firm:

> "if it finds…that such broker or dealer…has willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, [the Securities Exchange Act of 1934], the rules or regulations under any of such statutes, or the rules of the Municipal Securities Rulemaking Board, or has failed reasonably to supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation, if such other person is subject to his supervision." (emphasis added).

***The Exchange Act requires broker-dealers to supervise a representative's investment activities, no matter how the activity is executed***, providing a prophylactic approach to supervision designed to prevent violations of the securities laws.

FINRA implemented Rule 3110 to comply with the Exchange Act's supervision requirements.[11] FINRA Rule 3110 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

Both FINRA and the SEC have focused on the high number of investment frauds perpetrated through outside business activities ("OBAs") and the fact that off-site locations may be used by brokers to conceal OBAs and securities fraud.[12]

---

[11] The duty to supervise is violated where either: (1) awareness of 'red flags' are not followed up with proper supervision; or (2) policies and procedures are deficient resulting in failure to detect 'red flags.' *See In the Matter of the Application of Michael H. Hume* ("Hume"), Exchange Act Rel. No. 35608, 52 S.E.C. 243, 1995 SEC LEXIS 983, at*5 (Apr. 17, 1995). (liability imposed "where a supervisor was aware only of 'red flags' or 'suggestions' of irregularities" and fails to follow up.); Kernweis, 2000 WL 33299605 at *13 (*quoting In re Scudder Investments, Inc.*, Investment Act Rel. No. 24218, 1999 SEC LEXIS 2737, at *18 (Dec. 22, 1999). ("[l]iability for failure to supervise may be imposed when a supervisor '[fails] to learn of improprieties when diligent application of supervisory procedures would have uncovered them.'").

[12] *Staff Legal Bulletin No. 17: Remote Office Supervision*, S.E.C. Release No. SLB-3A (CF), 2004 WL 5698359, at * 1 (Mar. 19, 2004) ("Some broker-dealer firms have geographically dispersed offices staffed by only a few people, and many are not subject to onsite supervision. Their distance from compliance and supervisory personnel can make it easier for registered representatives (representatives) and other employees in these offices to carry out and conceal violations of the securities laws."); *see* also NTM 98-38 ("[t]o be effective...[supervision] must be designed to monitor securities-related activities and detect and prevent regulatory compliance problems of such associated persons working at unregistered offices…").

At issue in this case are Respondent's obligations concerning: 1) the outside business activities and private securities transactions of its registered representatives (also known colloquially as "selling away"), and 2) the reasonable basis and customer-specific prongs of the Suitability Rule. As set forth in Sec. 1 and 2, below, as related to the Brokers' fundraising activities for the Companies, one of the two applies. To wit:

1. In the event that Walesa's affiliation with and solicitation of investment in the Companies was approved by Respondent as an outside business activity and private securities transaction, then the firm would be required to supervise Walesa's involvement, as well as supervise each of the investment transactions as if they were sold through the firm. *See, e.g.,* FINRA Rules 3270 and 3280.

2. On the other hand, if Respondent permitted Walesa and Luccioni to sell investments in the Companies through Respondent, then Respondent was required to conduct reasonable and adequate due diligence on the Companies before approving them for sale (reasonably basis suitability), as well as supervise each individual investment to ensure that it was suitable for the customer to whom it was sold (customer-specific suitability). *See, e.g.,* FINRA Rule 2111.

Claimants will demonstrate at the hearing that Respondent did neither successfully and is therefore responsible for Claimants losses suffered in their investments.

**A. Outside Business Activities and Private Securities Transactions of Registered Representatives**

Rules 3270 and 3280 are the primary rules that govern the supervision of outside business activities and private securities transactions of registered representatives. Pursuant to Rule 3270 "Outside Business Activities of Registered Persons", Respondent had a duty to supervise the Brokers' outside business activities. Specifically, Rule 3270 provides:

> No registered person may be an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he or she has provided prior written notice to the member, in such form as specified by the member. Passive investments and activities subject to the requirements of Rule 3280 shall be exempted from this requirement.

Additionally, where, as here, a registered representatives' outside business activities are "securities related", FINRA Rule 3280 "Private Securities Transactions of an Associated Person" applies. For the purposes of Rule 3280, a "private securities transaction is defined as "any securities transaction outside the regular course or scope of an associated person's employment with a member", which includes the solicitation of the Claimants' investments in the Companies.

As for the Respondent's obligations, Rule 3280(a) provides that "[n]o person associated with a member shall participate in any manner in a private securities transaction except in accordance with the requirements of this Rule." As stated in Rule 3110, final responsibility for ensuring its representatives' compliance with this Rule rests with Respondent. Subsection (b) goes on to require that the representative provide notice to the firm of his or her involvement with the private securities transaction.

Here, Claimants understand that Walesa disclosed his involvement in multiple of the Companies, including Cibolo Creek Partners, which ***still appears on Walesa's BrokerCheck Report to this day***. Accordingly, Respondent was obligated to undertake an investigation into these activities to determine whether or not it would approve the Brokers' participation. If Respondent declined to approve the Brokers' participation, then Respondent had an obligation to ensure that both Brokers complied with Respondent's prohibition. On the other hand, if Respondent approved their participation, then Rule 3280(c)(2) (formerly, NASD Rule 3040(c)(2)) applies:

> If the member approves a person's participation in a transaction pursuant to paragraph (c)(1), ***the transaction shall be recorded on the books and records of the member and the member shall supervise the person's participation in the transaction as if the transaction were executed on behalf of the member***.[13]

[13] FINRA Rule 3280(e)(1) defines "***Private securities transaction***" as "***<u>any securities transaction</u> outside the regular course or scope of an associated person's employment with a member,***

(emphasis added).

This means that Respondent was ***required record these transactions on the firm's books and records and supervise the activity as if the activity occurred through the firm***. FINRA has warned firms that it is their responsibility to "review their supervisory procedures to make sure that they are reasonably designed to achieve compliance with [FINRA] Rules 3030 and 3040 [now 3280] regarding outside business activities and private securities transactions…" *See* NTM 01-79: Selling Away and Outside Business Activities.

FINRA has repeatedly sanctioned firms for failing to supervise a broker's outside business activities. In addition, the SEC has sanctioned brokerage firms for schemes conducted by their brokers through private securities transactions. In *In re Commonwealth Equity Services, LLP*, registered representative Bleidt misappropriated over $31 million from more than 100 victims through his RIA. SEC Rel. No. 56362, 2007 WL 3071391 (Sept. 6, 2007). The SEC stated that "[u]nder Section 15(b)(4)(E) of the Exchange Act, broker-dealers are responsible for reasonably supervising, with a view to preventing violations of the federal securities laws, persons subject to their supervision." *Id.* at *3. In *Commonwealth* the firm "failed to establish reasonable policies and procedures for responding to red flags related to Bleidt's outside business activities." *Id.* There are other similar examples of firms being sanctioned for failing to supervise outside business activities.[14]

***including, though not limited to, new offerings of securities which are not registered with the Commission***." Clearly the investments at issue were private securities transactions governed by Rule 3280.

[14] *In re Signator Investors, Inc., et al*, SEC Rel. No. 75690 (Aug. 13, 2015) (finding that Signator failed to reasonably supervise both brokerage and advisory client activity of its representative leading to 125 clients being defrauded of $13.5 million).

Like Commonwealth Equity Services did nearly two decades ago, in this matter, Respondent Triad ignored the SEC's and FINRA's guidance on supervising private securities transactions and failed to properly supervise the outside business activities of its registered representative.

**B. Due Diligence Obligations for Firm-Approved Investments**

If Respondent approved the investments in the Companies and entered into selling agreements with them to sell these securities ***through the firm*** (as opposed to a private securities transaction), then the analysis would center around whether or not Respondent adequately supervised the suitability of these transactions.

FINRA Rule 2111,[15] also known as the "Suitability Rule," provides:

> (a) A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

FINRA breaks this analysis down into three components: 1) Reasonable basis suitability, 2) customer specific suitability, and 3) quantitative suitability.[16] *Id.*

When selling investments like those the Claimants made in the Companies, the first step broker-dealers must take is to conduct a "reasonable basis suitability" analysis. *See* FINRA Notice to Member 03-71. This is the first step because before a broker-dealer can assess whether an

[15] Formerly FINRA Rule 2310.

[16] Quantitative suitability is not pertinent to the Claimants' claims in this arbitration.

investment is suitability for a particular customer (known as "customer specific suitability") it must first determine if the investment is suitable for sale generally. This process is often referred to simply as due diligence.

Rule 2111 states, in pertinent part:

> (a) The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy. A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule.

The notion behind this obligation is simple – every investor, regardless of risk tolerance or sophistication, has a fundamental right to be protected from fraud and conflicts of interest. Although Respondent is obligated to conduct due diligence on every investment it offers to customers, FINRA and the SEC have long recognized a heightened importance of conducting due diligence where, as here, investment products are offered pursuant to an exemption from disclosure requirements. *See* FINRA Notice to Member 10-22.

In this case, most of the investments at issue were never registered with the Securities and Exchange Commission and, instead, were offered pursuant to an exemption from registration under Regulation D of the Securities Act of 1933. Regulation D exempts certain securities offerings from the typical disclosure requirements that are required of all new securities offerings under federal law. Generally, when companies want to issue securities, they are required to file a registration statement or prospectus with the Securities and Exchange Commission. This process, which involves publicly disclosing all material risks in writing, is generally known as an initial

public offering. Regulation D offerings are completely exempt from these requirements and, other than a short form called a "Form D," no other documentation or public disclosure is required under federal law.

Due to this inherent lack of disclosure and regulatory oversight, FINRA advises member firms, such as Respondent, that it must be particularly skeptical of such offerings. *See* Notice to Member 03-71. Among other requirements, Respondent would have been expected to review audited financial statements for the Companies and actively question any red flags contained therein. *Kunz v. SEC*, 64 Fed. Appx. 659 (10th Cir. 2011). At the hearing on the merits, the Claimant will show that Respondent failed to conduct a proper review of the Companies and failed its reasonable basis suitability obligations.

Beyond that, Respondent was obligated to ensure that the investments at issue complied with Respondent's customer-specific suitability obligations. This means that Respondent was obligated to ensure that the Claimants' respective investments in the Companies were appropriate for them based upon their own unique investor profiles, including their respective risk tolerances, investment objectives, net worths, and the like. Claimants will demonstrate at the hearing that even if Respondent otherwise fulfilled its due diligence obligations (which it did not), Respondent's recommendations that the Claimants invest in the Companies were nonetheless unsuitable.

## III. Non-Walesa Company Investments At Issue

### A. Alternative Investments

Respondent and the Brokers also recommended that the Claimants invest in risky alternative investments. These include, but are not limited to limited partnership offerings by Atlas Growth Partners, Ridgewood Energy and other sponsors. Alternative investments commonly pay

extraordinarily high commissions, but also expose investors to extraordinarily high risks, including illiquidity and loss of principle. For that reason, FINRA requires that brokerage firms conduct extensive due diligence on them.

**B. LJM Preservation and Growth Fund**

Contrary to its name, the LJM Preservation and Growth Fund was very risky and sought neither preservation nor growth. Not only was LJM leveraged with high margin levels, but LJM also operated by selling naked put options on S&P 500 futures. The fund used these options to employ a highly complex strategy known as a "short strangle". A short strangle strategy has unlimited downside (no preservation) and limited upside (no growth). This strategy was extremely high risk. In fact, as early as July 2017, Morningstar reported that the Fund was an aggressive option seller that was "high risk" with high fees. *See* LJM Morningstar Report, dated July 13, 2017.

This is how the fund's strategy is described in its prospectus:

> The Fund seeks to achieve it investment objectives by capturing gains on options sold on S&P futures contracts that can be purchased ("closed") at a later date for a lower price than the price realized when originally sold… In the aggregate, the Fund is typically "net short" in the portfolio of contracts that it holds, which means that the Fund holds more uncovered option contracts then covered.

The fund's strategy was essentially to bet that market volatility would not increase significantly and that the market index level would not change. When both market volatility and market index declines occurred simultaneously, as they did during the first week of February 2018, the results were catastrophic for investors in LJM, who lost a combined $700 million dollars or 80% of the fund's NAV. On Monday, February 5, 2018, the share price of LJM plummeted 55.8% from $9.67 to $4.27. Then, on the following day, the price fell by more than half again – dropping 54.6% to $1.94. This represented a loss of more than 80%.

## LEGAL CLAIMS[17]

### POINT I.

### BREACH OF FIDUCIARY DUTY

Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients.[18] In addition, FINRA has stated on numerous occasions that "the suitability rule and the concept that a broker's recommendation must be consistent with the customer's best interests are inextricably intertwined." NTM 12-25, Suitability, pg. 3 (Jul. 9, 2012). This means that "a broker make only those recommendations that are consistent with the customer's best

[17] The legal claims listed herein are not meant to be an exhaustive list of claims but merely illustrative of the types of claims being made in accordance with FINRA requirements to providea description. Claimants reserve the right to add or amend the legal claims and theories made herein and provide further detail in Claimants' pre-hearing brief.

[18] *See Mansbach v. Prescott, Ball & Turben,* 598F.2d1017 (6th Cir. 1979) (a securities broker dealeris a fiduciary who owes its customer a high degree of care in transacting business); *Byrley v. Nationwide Life Insurance Co.,* 94 Ohio App. 3d 1 (Erie County 1994) ("broker and a client are ina fiduciary relationship."); *United States v. Wolfson,* 2008 WL 1969730, at *2 (S.D.N.Y. May 5, 2008) ("The essence of the argument is that there is no fiduciary relation between a broker and a customer unless the broker is handling a discretionary account. That is simply not true."); *E.F. Hutton & Co. Inc.,* Exchange Act Release No. 25,887, 41 SEC Docket 413, 418 (July 6, 1988) ("The concept of just and equitable principles of trade embodies basic fiduciary responsibilities…"); *Lipkien v. Krinski,* 182 N.Y.S. 454, 192 A.D. 257, 263 (N.Y. App. Div. 1920)(holding that transferring cash to broker gives rise to fiduciary duty regardless of defendants' claimthat they were only clearing broker); *Rolf y. Blyth. Eastman Dillon & Co.,* 570 F.2d 38 (2nd Cir. 1978) (registered representative; as broker for investor, owed investor a fiduciary duty); *Moholt v.Dean Witter Reynolds, Inc.,* 478 F. Supp. 451(D.D.C.1979) (stockbrokers are quasi-fiduciaries andare held to high degree of trustworthiness and fair dealing); *Pachter y. Merrill Lynch. Pierce, Fenner & Johnston. Inc.,* 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "theutmost good faith" toward him); *Thropp v. Bache Halsey Stuart Shields, Inc.,* 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); *Leboce. S.A. v. Merrill Lynch. Pierce. Fenner & Johnston, Inc.,* 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); *Jaksich y. ThomsonMcKinnon Securities, Inc.,* 582 F. Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); *Utah State University of Agriculture and Applied Science y. Sutro & Co.,* 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trnstee dealing with public funds); *E.F. Hutton & Co. y. Weeks,* 166 Ga.App. 443, 304 S.E.2d 420 (Ga. 1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith); *Wilder v. Meyer,* 779 F. Supp. 164, 168-69 (S.D. Fla. 1991).

interests prohibits a broker from placing his or her interests ahead of the customer's interests." *Id; see also Raghavan Sathianathan,* Exchange Act Rel. No. 54722, 2006 SEC LEXIS 2572, at *21 (Nov. 8, 2006); *Scott Epstein,* Exchange Act Rel. No. 59328, 2009 SEC LEXIS 217, at *40 n.24 (Jan. 30, 2009) ("In interpreting the suitability rule, we have stated that a [broker's] 'recommendations must be consistent with his customer's best interests.'"); *Dane S. Faber,* 57 SEC 297, 310, 2004 SEC LEXIS 277, at *23-24 (2004) (stating that a "broker's recommendations must be consistent with his customer's best interests" and are "not suitable merely because the customer acquiesces in [them]"); *Wendell D. Belden,* 56 S.E.C. 496, 503, 2003SEC LEXIS 1154, at *11 (2003) ("As we have frequently pointed out, a broker's recommendationsmust be consistent with his customer's best interests.").

Respondent violated their fiduciary duty in multiple ways by: 1) recommending an unsuitable investment; 2) omitting material information and providing false and misleading information to Claimants; 3) breach of duty of loyalty through conflicts of interests and placing personal gain above the interests of the Claimants; and 4) failing to conduct due diligence on the investments recommended. These prongs will be discussed in the following sections.

## POINT II.

## SUITABILITY

Financial advisers must always make suitable recommendations to their clients and must abide by the suitability rules imposed by FINRA. The scope of these duties is defined in FINRA Rule 2111,[19] also known as the "Suitability Rule," which provides:

> (a) A member or an associated person must have a reasonable basis to believe that a ***recommended transaction or investment strategy involving a security or securities*** is suitable for the customer, based on the information obtained through the

[19] Formerly FINRA Rule 2310.

> reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

*See* FINRA Rule 2111 SUITABILITY (emphasis added); *see also* NYSE Rule 405; *In re Larry Ira Klein,* Exchange Act Release. No. 37835 (Oct. 17, 1996) (a representative may make "only such recommendations as would be consistent with [her customers] financial situations and needs."); *In re James Chase,* Exchange Act Rel. No. 47476 (Mar. 10, 2003), 79 SEC Docket 2892, 2897 ("The SEC concluded that the mere disclosure of risks did not satisfy the suitability duty...[n]ot only must the customer be sufficiently sophisticated to fully understand the risks involved with the investment, the customer also must be able to bear those risks.").

In addition, under FINRA 2090 "Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer."

Respondent and its agents violated their suitability obligations to Claimants by: (i) failing to conduct a reasonable basis analysis of the alternative investment strategy, (ii) failing to make customer-specific suitable recommendations, and (iii) over-concentrating Claimants' accounts in the alternative investments. Each aspect of the suitability rule is discussed below.

**A. Reasonable Basis and/or Investment Strategy**

FINRA has long held that Rule 2310 "include[s] having a reasonable basis for recommending a particular security or strategy." *See Notice to Members 96-32,* 1996 NASD LEXIS 51, 2 (May 1996); *see also F.J. Kaufman and Co.,* 50 S.E.C. 164, 168 (1989). First, a broker-dealer must

determine whether the product or strategy is suitable for any customer, regardless of that customer's wealth, willingness to accept risk, age, education, or other individual characteristics. *See In re F.J. Kaufman and Company of Virginia*, 50 S.E.C. 164 ("A broker-dealer must have an 'adequate and reasonable basis' for any recommendation that he makes.").

Respondent failed to conduct reasonable due diligence on the investments sold to the Claimants, the majority of which were alternative, non-traded investments. Such investments come with very high costs, fees, and commissions and have historically underperformed safe investments such as treasuries.

FINRA specifically reminded firms in NTM 03-71 that:

> Given the complex nature of NCIs [Alternative Investments] and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products.

FINRA reminded members offering NCI's, such as the Alternative Investments, alternatives of their obligations to: (1) conduct adequate due diligence to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risksand rewards associated with the particular product; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products.

In NTM 12-03: Heightened Supervision of Complex Products, FINRA noted it had previously issued multiple notice such as NTM 03-71, NTM 05-26, and NTM 10-22 with a "consistent theme in these Notices is that the complexity of a product often necessitates more scrutiny and supervision by a firm." *Id.*

FINRA has provided an in-depth notice on how to conduct due diligence. FINRA firms havean "obligation to conduct a reasonable investigation of the issuer and the securities they recommend in offerings…" Notice to Members ("NTM") 10-22: Regulation D Offerings, at 1; *see also See Hanly v. SEC,* 415 F.2d 589, 595-96 (2d. Cir. 1969); *SEC v. Great Lake Equities Co.,* 1990 U.S. Dist. LEXIS 19819 at *16-17 (E.D. Mich. 1990); *SEC v. North American Research and Development Corp.,* 424 F.2d 63,84 (2d Cir. 1970); *SEC v. Current Financial Services, Inc.,* 100 F. Supp. 2d 1, 14-15 (D.D.C. 2000); *District Business Conduct Committee for District No. 4 v. Everest Securities, Inc.,* 1994 NASD Discip. Lexis 188 (Sept. 2, 1994), *aff'd,* 52 S.E.C.958, 962-63 (Aug. 26, 1996), *aff'd,* 116 F. 3d 1235 (8th Cir. 1997) (stating that firms are required to exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims); Securities Act Release No. 4445, 27 Fed. Reg. 1415 (Feb. 2, 1962).

FINRA has stated that a brokerage firm has a "special relationship" with a customer "from the fact that in recommending the security, the BD represents to the customer 'that a reasonable investigation has been made and that [its] recommendation rests on the conclusions based on such investigation.'" *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). A brokerage firm "may not rely blindly upon the issuer for information concerning a company," in lieu of conducting its own reasonable investigation. *Id.*at 4 (*citing Everest Securities, Inc. v. US,* 116 F. 3d at 1239 ("reliance on others does not excuse [the respondent's] own lack of investigation").

Indeed, when an issuer seeks to finance a new speculative venture, brokerage firms "must be particularly careful in verifying the issuer's obviously self-serving statements." *Id.* (*citing Everest Securities, Inc.,* 116 F. 3d at 963). In addition, the SEC and courts recognize that a more thorough investigation is required for "securities issued by smaller companies of recent origin." *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). "The fact that a BD's customers may be sophisticated and

knowledgeable does not obviate the duty to investigate." *Id.* at 4.

FINRA has defined the following parameters as the *bare minimum* a brokerage firm must document in conducting a reasonable investigation for a Regulation D offering and any subsequent offering for the same issuer:

- the issuer and its management[20];
- the business prospects[21] of the issuer;
- the assets[22] held by or to be acquired by the issuer;
- the claims being made; and
- the intended use of proceeds of the offering
- whether the investor's money is likely to be applied according to the stated use ofproceeds
- whether the stated use of proceeds is reasonable in light of the issuer's businesspurpose and prospects

*Id.* at 5; *see also In Re Brian Prendergast,* 2001 SEC LEXIS 1533 (Aug. 1, 2001); *LegendMerchant Group, Inc.,* NASD No. C10030058 (July 2004); *Shelman Securities, Inc.,* NASD No.C06030013 (Feb. 2004) (private placement memoranda contained material misrepresentations andomissions about use of proceeds in a previous offering). In order to demonstrate the brokerage firmhas performed a reasonable investigation, the firm should retain records documenting both theprocess and results of its investigation. *Id.* at 7. The records should include descriptions of themeetings held of the investigation, tasks performed, documents and other information reviewed,results of the reviews, and the individuals who attended the meetings or conducted the reviews. *Id.* Accordingly, Respondent had a legal obligation to vet and independently investigate the investments and should have been able to provide a due diligence report prior to recommending Alternative Investments.

[20] FINRA provides a 13 point list of items a reasonable brokerage firm would review with issuer and its management. *Id.* at 8-9.

[21] FINRA provides a 5 point list of items a reasonable brokerage firm would review with to determine the company's business prospects. *Id.* at 9-10.

[22] FINRA provides a 3 point list of items a reasonable brokerage firm would review with to determine the quality of the company's business assets. *Id.* at 9-10.

It is doubtful that Respondent ever conducted a meaningful investigation into these investments, the sponsoring entities, or Walesa's affiliation with them. In sum, Respondent failed to conduct a reasonable investigation into the qualities and performance of the investments recommended and could not form a reasonable basis for their recommendations and the investment strategy implemented in Claimants accounts.

**B. Customer Specific Suitability**

The second dimension of FINRA Rule 2310 requires the broker to have a reasonable basis to believe that the recommendation is suitable for the particular customer based on the customer's investment profile. The investment profile includes items such as: financial situation, tax status, investment objectives, risk tolerance, age, and investment experience. *See* FINRA Rule 2310, Recommendations to Customers (Suitability); *see also In re Larry Ira Klein*, Exchange Act Release. No. 37835 (Oct. 17, 1996) (Brokers may make only such recommendations as would be consistent with the customer's financial situation and needs).

FINRA has also warned that "[a]s investors age, their investment time horizons, goals, risk tolerance and tax status may change…[and] seniors and retirees may have less tolerance for certain types of risk than other investors." NTM 07-43: Senior Investors, pg. 2 (Sept. 2007). FINRA also stated that it would scrutinize "recommendations to seniors…that involve…[p]roducts that have withdrawal penalties or otherwise lack liquidity, such as deferred variable annuities…real estate investments and limited partnerships" *Id.* at 4.

Many brokerage firms claim that if an investor's net worth is sufficient to invest in security that such a fact equates to suitability of high risk investments. In NTM 03-71 FINRA issued a clear warning for firms that qualification does not equate to suitability:

> NASD cautions members against relying too heavily upon a customer's financial status as the basis for recommending NCIs.

> A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability obligation; however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met their suitability obligations. NCIs with particular risks maybe suitable for recommendation to only a very narrow band of investors capable of evaluating and being financially able to bear those risks.

NTM 03-71; *In re Arthur Joseph Lewis,* SEC Rel. No. 34-297941991 WL 294317 (Oct. 8, 1991) (The fact that a customer, such as Mrs. McGowan, may be wealthy does not provide a basis for recommending risky investments."); *In re Patrick G. Keel,* SEC Rel. No. 34-31716, 1993 WL 12348 (Jan. 11, 1993) (holding same).

Here, Respondent failed to understand Claimants' investment needs and objectives. Instead, Respondent thought only about their own commissions and unsuitably invested Claimants in the highest paying commission products available.

**C. Respondent Recommended an Impermissible Overconcentration in Alterative Investments**

A broker dealer is liable for a claim of unsuitability when it over-concentrates a client's account with a particular investment. *In re Holland,* Exchange Act Release No. 36,621, 60 S.E.C. Docket 2935(Dec. 21, 1995) (good faith immaterial to broker liability). Even if a broker claims a client has agreed to such an overconcentration, a broker's suitability obligations are not absolved. In *Holland*, the SEC concluded:

> Even if we were to accept [the broker's] view that these clients wanted to speculate and were aware of the risks-a conclusion not supported on this record-the Commission has held on many occasions that the test is not whether [the clients] considered the transactions in their account suitable, but whether [the broker] fulfilled the obligation she assumed when she undertook to counsel [them], of making only such recommendations as would be consistent with [their] financial situation and needs.

*Id.* at 736-37 (citing *In re Erdos*, 47 S.E.C. 985, 989 (Nov. 16, 1983)); *see also In re Wickswat*, 50 S.E.C.

Here, Respondent recommended overconcentrated positions in alternative investments to Claimants.

**POINT III.**

**RESPONDENT EITHER FRAUDULENTLY OR NEGLIGENTLY MADE MATERIAL MISREPRESENTATIONS AND OMITTED MATERIAL INFORMATION IN THE ALE OF THE INVESTMENT TO CLAIMANT**

**A. Federal Securities Law**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. See 15 U.S.C.S. §78j. The SEC, pursuant to 15 U.S.C.S. §78j, promulgated S.E.C. Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5). In a typical § 78j(b) private action, a plaintiff must prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

**B. State Securities Acts, Common Law Fraud, and Common Law Negligence**

As herein described, Respondent and its agents violated provisions of multiple state securities acts,[23] including, *e.g.,* the Illinois Securities Act, 815 ILCS 5 et seq., and common law fraud. According to the Illinois Act, it shall be unlawful: "[t]o employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12(I). Further, the sale of securities in violation of the Illinois Act provides for statutory interest from the date of sale in the amount of the rate of interest stipulated in the securities sold, as well as attorney's fees for the purchaser. 815 ILCS 5/13(A). As alleged above, Respondent's conduct violated the foregoing rules and laws.

### C. Violation of FINRA Rule 2210

The FINRA Rules require firms to provide only accurate and balanced communications, forecasting, marketing, and demonstrative information to clients. NTM 08-81 reminds members that:

> Sales materials and oral presentations must present a fair and balanced picture regarding both the risks and benefits of investing in these products. FINRA reminds firms that NASD Rule 2210 and IM-2210-1 require firms to ensure that statements are not misleading within the context in which they are made, and that firms must consider the nature of the audience to which the communication is directed…

In addition, FINRA Rule 2210(d)(1) provides:

> (A) All member communications with the public shall be based on principles of fair dealing and good faith, must be fair and balanced, and must provide a sound basis for evaluating the facts in regard to any particular security or type of security, industry, or service. No member may omit any material fact or qualification if the omission, in the light of the context of the material presented, would cause the communications to be misleading.

[23] Claimants will provide legal briefing at hearing outlining the specific ways Respondent violated each of the applicable state securities acts. As the provisions of each are similar, the Illinois Securities Act is discussed by way of example.

> (D) Communications with the public may not predict or project performance, imply that past performance will recur or make any exaggerated or unwarranted claim, opinion or forecast. A hypothetical illustration of mathematical principles is permitted, provided that it does not predict or project the performance of an investment or investment strategy

Further, NTM 03-71 provides guidance concerning non-conventional investments stating:

> [M]embers should provide investors with any prospectus and other disclosure material provided by the issuer or the sponsor. NASD reminds members, however, that simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by the member, sponsor, or issuer.

*See* NTM 03-71. In addition, NTM 10-22 provides that:

> If a private placement memorandum or other offering document presents information that is not fair and balanced or that is misleading, then the BD that assisted in its preparation may be deemed to have violated NASD Rule 2210. Moreover, sales literature concerning a private placement that a BD distributes will generally be deemed to constitute a communication by that BD with the public, whether or not the BD assisted in its preparation.

NTM 10-22 at 5.

**D. Respondent's Fraudulent Misrepresentations and Omissions**

As alleged, Respondent provided false and misleading information to their clients in the sale of securities, management of accounts, and financial planning. As shown above, the presentations made to Claimants by the Brokers both in various marketing materials and orally were knowingly or recklessly false and misleading and omitted material information. Respondent misrepresented therisks and qualities of the investments being.

Respondent concealed known losses on Claimant's investments and otherwise attempted to cover losses. Respondent's representations concerning the performance and returns for these

investments and the ongoing investment strategy were not balanced and presented Claimants fairly, an inexperienced investor in these products.

In addition, it is anticipated that with respect to certain investments Respondents will defend themselves by asserting the "prospectus" defense. This defense asserts that Respondent and its agents are allowed to make false statements and misrepresentations to investors so long as a prospectus is provided. This defense has no merit and seeks to undermine the very purpose of the securities laws. According to the SEC, a person who makes oral misrepresentations to sell a security cannot wash away his liability by handing his victim a prospectus:

> At the expense of restating the obvious, we emphasize that compliance with these requirements for delivery of a prospectus or offering circular does not, however, license broker-dealers or their salesmen to indulge in false or fanciful oral representations to their customers. The anti-fraud provisions of the Securities Act and the Securities Exchange Act apply to all representations whether made orally or in writing, during or after the distribution. We have repeatedly held that the making of representations in the sale of securities unsupported by a reasonable basis is contrary to the obligation of fair dealing imposed on broker-dealers and their salesmen by the securities laws. **This obligation is not diminished because a prospectus or offering circular containing information specified by the Act and our rules has been or is to be delivered. Such information furnishes the background against which the salesman's representations may be tested. Those who sell securities by means of representations inconsistent with it do so at their peril.**

*In the Matter of Ross Secs., Inc.,* SEC Release No. 7069, 41 SEC Docket 509 (Apr. 30, 1963); (emphasis added); *see also In the Matter of the Application of Larry Ira Klein,* SEC Release No. 37835, 63 SEC Docket 52 (Oct. 17, 1996) ("Klein's delivery of a prospectus to Towster does not excuse his failure to inform fully the risks of the investment package he proposed").

This point has been made over and over again by FINRA:

> Members are also advised that, although the prospectus and sales material of a fund include disclosures on many matters, **oral representations by sales personnel that contradict the**

> **disclosures in the prospectus or sales literature may nullify the effect of the written disclosures and they make the member liable for rule violation and civil damages** to the customers that result from such oral representations.

NASD Notice to Members 03-71 (emphasis added); NTM 13-18: Guidance on Communications With the Public Concerning Unlisted Real Estate Investment Programs, pg. 2 (May 2013)("Descriptions of real estate programs in communications need to be consistent with the representations in the program's current prospectus."); NTM 04-30 ("However, NASD reminds firms that simply providing a prospectus does not cure unfair or unbalanced sales or promotional materials, whether prepared by the firm or the issuer."); NTM 05-59 ("Members are further reminded that providing risk disclosures in a prospectus supplement does not cure otherwise deficient disclosure in sales material, even if such sales material is accompanied or preceded by the prospectus supplement.").

## POINT IV.

## RESPONDENT VIOLATED FINRA RULES 2010, IM-2310, and 2020

FINRA Rule 2010 requires members to "observe high standards of commercial honor and just and equitable principles of trade" in conducting their business. FINRA Rule 2020 also prohibits members from effecting "any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance." IM-2310-2 - "Fair Dealing with Customers" is cross-referenced by both of the aforementioned provisions and provides a non-exhaustive list of activities that would be inconsistent with the foregoing principals. *See* IM-2310-2: FAIR DEALING WITH CUSTOMERS. The first section of IM-2310-2 outlines member and associated persons obligations in dealing with customers as follows:

> (a)(1) Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with particular emphasis on the requirement to deal fairly with the public.

Respondent egregiously and intentionally violated many of the subsections of IM-2310-2, as discussed *infra.*

**POINT V.**

**FAILURE TO SUPERVISE**

Respondent unreasonably failed to stop inappropriate sales. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees.

**A. Supervision Standard**

Respondent failed to supervise their broker's misconduct. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees. FINRA Rule 3010 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

FINRA Rule 3010: SUPERVISION.

The duty to supervise is a critical component of the securities regulatory scheme. *Inre Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Those who have a duty to supervise have an affirmative responsibility to uphold their duty. *Id.* Regulatory authorities such as the SEC, FINRA and the NYSE have steadily heightened the supervisory obligations of brokerage firms in recent years. Utilizing language employed by the SEC, "effectivesupervision by

a broker/dealer is a critical element in the regulatory scheme and its importance hasincreased as firms have grown...broker dealers must provide effective staffing, efficient resourcesand a system of follow-up and review to determine that any responsibility to supervise…is being diligently exercised." *In Re Mabon Nugen & Co.*, 44 SEC Docket 1116, Release No. 27301 (September 27, 1989).

Evidence tending to establish a variance between conduct called for by a firm's procedures and the actions actually undertaken by an employee of the firm may support a finding of liability. *Rupert v. Clayton Brokerage Co. of St. Louis, Inc.*, 737 P.2d 1106, 111 – 12 (Colo. 1987). Supervisors have an obligation to respond vigorously and with the utmost vigilance to indications of irregularity. A supervisor cannot ignore or disregard red flags and must act decisively to detect and prevent improper activity. Indications of wrongdoing demand inquiry as well as adequate follow up and review. *In re Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Also, a violation of internal procedures may support a punitive damages award. *Alrich v. Thomson McKinnon Securities, Inc.,* 589 F.Supp. 683, 685 (S.D.N.Y. 1984). Finally, "a court [or other arbiter] may consider evidence of [a] brokerage firm's internal rules as evidence of the proper standard of care." *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 820 (6th Cir.1981); see *also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F.Supp. 1224, 1227 (D.D.C. 1986) (violation of NASD rule was evidence of broker's negligence).

**B. Outside Business Activities and Private Securities Transactions**

As set forth hereinabove, proper supervision requires compliance with Rules 3270 and 3280. Rule 3270 requires that brokerage firms properly supervise their registered representatives' outside business activities. In the event such activities are securities related and private securities transactions, Rule 3080 requires the brokerage firm to record these transactions on the firm's books

and records and supervise the activity as if the activity occurred through the firm. Here, Respondent failed to do the same, thereby violating Rules 3270 and 3280.

**C. "Control Person" Liability**

Respondent is also liable to Claimants for misconduct under the theory of "control person" liability. Both federal and state securities acts impose "control person" liability on all persons who have the power, direct or indirect, exercised or not, to control another's sale of securities. *See*, *e.g.*, 15 U.S.C.A. § 78t (2011) (stating "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlledperson to any person to whom such controlled person is liable…").

As used in all such securities acts, "the term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981). Respondent was the "control persons" of their brokers at all times relevant to this dispute. Therefore, Respondent is liable for its brokers' misconduct.

**D. Respondeat Superior**

Respondent is liable to Claimants for all of its brokers misconduct under the theory of respondeat superior. Courts have held that respondeat superior liability is created by the "special duties that certain employers assume under the federal securities laws when their conduct is likely to exert strong influence on important investment decisions." *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 181 (3d Cir. 1981). As also explained by the Fifth Circuit, "most investors rely upon the reputation and prestige of the brokerage firm rather than the individual employees with whomthey

might deal. Such firms should be held accountable if employees they select utilize the firm's prestige to practice fraud upon the investing public." *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1119 (5th Cir. 1980); *Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir. 1981) (*cited by Sharp v. Coopers & Lybrand,* 649 F.2d at 182) ("(U)nder common law principles, a principal is liable for the deceit of its agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal.") *see also* Restatement (Second) of Agency § 261 ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit fraud upon third persons is subject to liability to such third persons for the fraud"). Similarly, the Sixth Circuit has emphasized that the broker-dealer has "an affirmative obligation to prevent use of the prestige of its firm to defraud the investing public." *Holloway v. Howerdd,* 536 F.2d 690, 696 (6th Cir. 1976); *As You Sow v. AIG Fin. Advisors, Inc.,* 584 F. Supp. 2d 1034, 1047 (M.D. Tenn. 2008) (*citing See Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir. 1981), *cert denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981); *Alvarado v. Morgan Stanley Dean Witter. Inc.,* 448 F.Supp.2d 333 (D.P.R. 2006); *Carroll v John Hancock Distributors, Inc.,* CIV.A. 92-5907, 1994 WL 87160 at *4 (E.D. Pa. Mar. 14, 1994) ("[U]nder Pennsylvania law a principal is liable to third parties for the frauds, concealments etc. of his agent committed within the scope of his employment even though the principal did not authorize or know of such conduct, even if he forbade such acts.").

Respondent is responsible for all of its broker's investment related activities. Regardless of whether or not the firm prohibited misconduct.

## POINT VI.

## FRAUDULENT INDUCEMENT TO HOLD INVESTMENT

Claimants claim that Respondent's wrongful or fraudulent conduct induced Claimants to maintain a position and not to change such position, resulting ultimately in a loss. Respondent committed fraud on an ongoing basis, by inducing Claimants to hold onto the unsuitable investments. Respondent was the provider of investment advice to Claimants, including ongoing advice as to retention of the investments. Respondent owed duties to Claimants as previously described, including theduty not to make misrepresentations of material facts and not to omit to disclose material facts from any communications or reports (oral or in writing) conveyed or delivered to Claimants, on an ongoing basis, not just on the front end.

Claims for falsely inducing investors not to act to their detriment are based upon the following principles:

> Restatement of Torts (Second), sec 525: "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."
>
> Restatement of Torts (Second), sec 531: "One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced."
>
> Restatement of Torts (Second), sec 551("): "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose. "

As a proximate cause of such false and continuing inducements to retain the unsuitable investments and unsuitable asset allocation in Claimants' portfolios, the Claimants were made to suffer a loss.

**POINT VII.**

**BREACH OF CONTRACT**

Claimants and Respondent entered into customer agreements in which Respondent agreed, among other things, to comply with all state and federal securities laws as well as FINRA's own regulations. Claimants complied with the terms of the contract between the parties, as memorialized by the parties, and performed or tendered performance thereunder. Claimants performed all conditions precedent and obligations incident to all of the above-referenced contractual obligations or agreements. Respondent breached the customer agreement with the Claimants by violating FINRA and SEC rules. Respondent also violated their own internal written procedures. Respondent is also a party to various "selling agreements" concerning many of these investments. In addition to Respondent's legal obligation to conduct due diligence, the selling agreements also contractually obligated Respondent to conduct due diligence on the offerings. Claimants are third-party beneficiary to those selling agreements. Respondent failed to undertake reasonable due diligence into the offerings, breaching the selling agreement to the detriment of Claimants. As a direct and proximate consequence of Respondent's wrongful conduct, Claimants suffered damages.

**POINT VII.**

**DAMAGES**

As a cause and consequence of the Respondent's misconduct in the handling of Claimants' investment funds, Claimants seek damages consisting of what a well-managed account would have performed in an amount presently unknown.

In addition, Arbitrators have the power to award exemplary, or in other words, punitive damages. As the United States Supreme Court held in *Mastrobuono v. Shearson Lehman Hutton.*

*Inc*., 514 U.S. 52 (1995), the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., grants arbitrators plenary authority to consider and make an award of punitive damages notwithstanding any provision of state law to the contrary.

Here, punitive damages should be assessed against Respondent and is wholly warranted due to the firm's intentional and willful failure to oversee its agent's activities. The callousness to the consequences which Respondent has shown cry out for a remedy that will not only make Claimants whole, but prevent a repetition of these events which have become all too common place in the industry. Every year millions of investors' funds are squandered or placed in risky high-commission generating strategies that are of no benefit to the investor. Moreover, brokerage firms continually ask for and advertise to induce the public's trust and confidence and then those same brokerage firms attempt to run away when the wrongful acts of those they employ are discovered. The perils that investors face when trusting the brokerage industry is fostered through a policy of scant compensation for victims that profits the industry even when brokerage firms fail in their most basic duties.

FINRA firms continue to behave in a way that suggests that a lack of supervision, and the relatively small amounts of damages that result, are merely a cost of doing business to be borne rather than problem to be corrected. An award that falls short of assessing punitive damages will not take the necessary step of impressing upon Respondent the indisputable need to supervise and manage its employees in accordance with the rules of law and the business ethics of fair trade.

Accordingly, the panel should award punitive damages, interest at the legal rate per annum, as well as attorneys' fees, and costs.

## CONCLUSION

As a result of the conduct set forth above, Claimants requests a final hearing in this matterand that this Panel award damages from Respondent, as follows:

1. Compensatory damages at an amount to be determined at trial;
2. Statutory damages;
3. Interest at the statutory rate;
4. Attorneys' fees;
5. Expert fees;
6. Forum fees;
7. Punitive damages; and
8. Any and all other relief available to Claimants, in law or equity or otherwise, which maybe granted to them by this Arbitration Panel.

Dated: October 22, 2024
New York, NY

Respectfully Submitted,
GANA WEINSTEIN LLP

By: ______________________________

Adam J. Gana
Adam J. Weinstein
Mary T. Curry
295 Madison Avenue
Suite 705
New York, New York 10017
Tel: (212) 776-4252

*Attorneys for Michael Zima, Patricia Fuchs, George Heinemann, as Power of Attorney for Glen and Elsa Heinemann, George and Lori Heinemann, Robert and Gwen Gorman, Olaf Blocher, as Trustee of the Konrad Blocher Trust dated November 17, 2003, Gordon Stewart, James Mastro, John Stratton, and Joseph McHugh,*

*-and-*

KURTA LAW

By: _/s/ Jonathan Kurta________________
Jonathan Kurta
Robert Van De Veire
Hannah Ross
295 Madison Avenue
Suite 705
New York, New York 10017
Tel: (212) 658-1502

*Attorneys for Carl Pedigo, Amy Gray as Executor of the Estate of Laura Leff and Successor Trustee of The Laura Leff Irrevocable Trust, Thomas Harrold, Joseph Dymek, individually and as Trustee of the Joseph Dymek Trust dated May 29 2007, Christopher and Jean Ambrose, as Trustees of the Jean Ambrose and Christopher Ambrose Trust, and Avery Tarshis*

# EXHIBIT C

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION

| | | |
|---|---|---|
| MICHAEL ZIMA, *et al.*, | ) | |
| | ) | |
| Claimants, | ) | |
| v. | ) | |
| | ) | FINRA Arbitration No. 24-01626 |
| TRIAD ADVISORS, LLC, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**RESPONDENT'S SPECIAL APPEARANCE ANSWER AND**
**AFFIRMATIVE DEFENSES TO CLAIMANTS' STATEMENT OF CLAIM**

Respondent Triad Advisors, LLC ("Triad" or "Respondent"), by and through the undersigned counsel, hereby submits this Special Appearance Answer and Affirmative Defenses to the Statement of Claim filed by Claimants. Respondent's Special Appearance Answer is based upon the investigation to date, and Respondent reserves the right to amend same.

## SPECIAL APPEARANCE ANSWER

### I. PRELIMINARY STATEMENT

As an initial matter, Claimants' Statement of Claim includes eighteen (18) different Claimants from twelve (12) separate households, which creates an excessive burden for Respondent, who is now forced to investigate a large number of claims in a short amount of time. As this investigation is still ongoing, Respondent files this Special Appearance Answer and reserves all rights in FINRA and in court related to the claims at issue. In particular, Respondent reserves its right to move to sever these claims, which have been improperly joined in a single action. Additionally, based on Respondent's investigation to date, it appears that several of the named Claimants were never customers of Respondent, and others make claims related to purchases that fall outside the FINRA Eligibility Rule. Accordingly, Respondent intends to seek

dismissal of the stale claims through a Motion to Dismiss. Furthermore, Respondent reserves its right to seek leave in Court to enjoin the claims filed by Claimants who were never customers of Respondent. Finally, Respondent reserves its right to amend this Answer to add third parties and/or claims, as needed.

## II. SUMMARY OF RESPONSE

Claimants' Statement of Claim (the "SOC") alleges a wide array of claims against Triad stemming from Claimants' informed investment decisions. Although the SOC is quite vague and, for many Claimants, does not even specify which investments are at issue, the claims appear to stem primarily from two groups of investments. *First*, Claimants allege losses from their informed decisions to invest in alternative investments, including in the oil and gas industry. After various global policy and market shifts, which Triad could not have anticipated when Claimants invested in the products at issue, certain Claimants allege that the value of these investments dropped. Armed with 20/20 hindsight, Claimants contend that Triad failed in its due diligence obligations to Claimants as they seek to nullify their written acknowledgements and undo their informed decisions in order to transfer all risks associated with their investment practices to their broker-dealer. Triad undertook appropriate due diligence and the claims against it fail.

*Second*, Claimants allege claims related to companies in which former Triad advisor James Walesa held an interest. Those investments do not appear to have been made through Triad and, as such, Triad is not liable for any alleged losses therefrom.

In addition to lacking merit, from an assessment at this early stage based on information known to date, many – if not all – of Claimants' claims fall outside of the FINRA eligibility period and are therefore not subject to adjudication by the Panel. FINRA Rule 12206 provides, in no uncertain terms, that "no claim shall be eligible for submission to arbitration under the Code where

six years have elapsed from the occurrence or event giving rise to the claim." Accordingly, as discussed further below, given that Claimants filed the Statement of Claim in July 2024, any claims asserted in this proceeding relating to investments purchased before July 2018 should be dismissed at the outset on the grounds that they are simply ineligible for FINRA arbitration. In addition, the claims are clearly time-barred under even the longest of applicable statutes of limitations.

In short, Claimants have no basis to assert any claims for relief against Triad. Accordingly, the Statement of Claim should be denied in its entirety and all forum fees assessed against Claimants.

## III. FACTUAL BACKGROUND

### a. The Parties

#### i. *Triad and Its Former Representatives*

At all times relevant to this dispute, Triad was and still is a FINRA member firm registered to sell securities in all 50 U.S. states.

Former Triad representative James Walesa entered the financial industry over 40 years ago, in 1982. He was registered with Triad from 2000 to 2019. Contrary to the picture painted by the SOC, until Claimants' counsel set their sights on Triad in a group of similar claims, Walesa's record reflected only two other customer complaints in his decades of service, neither of which bears any relevance whatsoever to the allegations in this proceeding. As of December 2021, Walesa is no longer a registered broker.

Former Triad representative Kenneth Luccioni entered the financial industry over 40 years ago, in 1980. He was registered with Triad from 2000 to 2016. During the entirety of Mr. Luccioni's tenure with Triad, he maintained a pristine record, with absolutely no customer complaints reported on his CRD. However, after leaving Triad, in 2018 he was barred by FINRA for failing to "provide documents and information to FINRA in connection with an investigation

into whether he had failed to disclose federal and state tax liens on his Uniform Application for Securities Industry Registration or Transfer (Form U4)." Contrary to the picture painted by Claimants, Mr. Luccioni's bar had nothing to do with customer complaints and nothing to do with Triad.

#### *ii. Claimants*

Claimants represent an attorney-assembled amalgamation of unrelated individuals and couples with nothing in common beyond their chosen registered representative and, years later, their legal counsel. Based on what is known to date, given that the bulk of their claims fall outside of the six-year eligibility period of FINRA Rule 12206, as well as the SEC's books and records Rule 17a-4 and/or other SEC Rules or regulations relating to the retention of broker-dealer records, Triad's records relating to each of the unrelated claimants are scant. Nevertheless, based on what evidence remains, it is clear that many of the Claimants did not even invest with Triad, and of those that did, only a fraction made the investments at issue through Triad.[1]

### b. Claimants' Investments at Issue

Claimants allege losses from their informed decisions to invest in several alternative investments, including in the oil and gas industry, during the Obama Administration. Claimants seek to have the Panel believe that Triad improperly facilitated the sale of unsuitable investments for the purpose of generating high commissions and fees for the firm. In particular, Claimants focus on their investments in 1) Atlas Growth Partners, L.P. ("AGP"), a partnership formed in 2013 to acquire oil and gas assets in North America and, subsequently, drill developmental wells on those properties and 2) LJM Preservation & Growth Fund ("LJM"), was a well-established

[1] Pursuant to FINRA Rule 12504, that Triad was not associated with the transactions or securities in question provides an independent basis for dismissal in additional to the ineligibility of the claims.

company that had been operating since 2006, offering various classes of investments. The SOC also alleges that Claimants suffered losses from investments in certain companies in which James Walesa may have held an interest (the "Walesa Companies").

***i. Atlas Growth Partners***

As was disclosed in AGP's prospectus as one of many potential outcomes of the speculative drilling enterprise, AGP ultimately did not prove profitable for its investors. Indeed, the oil market overall took a substantial hit in 2016, suffering one of the largest price declines since World War II. Those losses were exacerbated by the unforeseeable consequences of the COVID-19 pandemic, which led to further declines and volatility for oil and gas prices worldwide. This perfect storm of unanticipated shifts in global policies, advancements in drilling and extraction technology, and a once-in-a-century global health crisis, negatively impacted oil and gas investors to an extent that Triad could not have anticipated back when Claimants invested in AGP.

AGP was a Regulation D offering made only to accredited investors as defined in Regulation D under the Securities Act of 1933. An accredited investor included, among other things, those individuals with a net worth of at least $1 million, or individuals with an income of more $200,000 for two most recent years (or joint income more than $300,000). To invest in AGP, investors needed to complete the appropriate Purchaser Questionnaire contained within the Subscription Packet, certifying they met the qualifications as an accredited investor. In addition to affirming their status as accredited investors, AGP investors also had to acknowledge the various risks posed by their decision to invest in a speculative market. Additionally, investors had to certify that they had read and understood the AGP Private Offering Memorandum, which included the relevant Partnership Agreement. Pages 18 through 45 of the Memorandum are devoted to detailing

various risk factors facing the partnership. A copy of those Risk Factors has been attached hereto as **Exhibit A**.

In addition to numerous specific risk disclosures such as (a) The intended Quarterly Distributions to Investors May be Reduced or Delayed; (b) Economic Conditions and Instability in the Financial Markets Could Harm the Partnership's Business Which, in Turn, Could Impact the Cash it Has to Make Distributions; and (c) Drilling for and Producing Natural Gas and Oil are High-Risk Activities with Many Uncertainties; even the preamble to the "Risk Factors" reads in part as follows:

> An investment in the Partnership involves a high degree of risk. There can be no assurance that the Partnership will achieve its investment and operating objectives. An investor in the Partnership should be able to hold the investment for an indefinite time and be financially able to bear the total loss of the investment.

But now, armed with 20/20 hindsight, Claimants contend that Triad failed in its due diligence obligations to Claimants as they seek to nullify their written acknowledgements, and undo their informed decisions in order to transfer all risks associated with their speculative investment practices to their broker-dealer.

***ii. LJM***

In addition to AGP, Claimants allege Triad is responsible for losses related to LJM. However, in connection with making each of these investments, Claimants received written offering materials setting forth the risks associated with these investments. Claimants repeatedly confirmed that they received written offering materials setting forth the risks associated with investing in LJM and that they were accredited investors. Therefore, to the extent LJM underperformed Claimants' expectations, they cannot hold Triad liable.

As noted above, LJM was a well-established company that had been operating since 2006, offering various classes of investments. In 2013, LJM formed the LJM Preservation and Growth Fund, which is at issue in this arbitration. The LJM Preservation and Growth Fund had $805,000,000 in assets under management across all share classes at the end of January 2018. The Fund marketed itself as investing in long and short options on the S&P 500 Index futures that seek to profit primarily from the volatility premium, which was the spread between implied and realized volatility.

Historically, the LJM Fund performed consistently with the goals stated in the Prospectus historically. Indeed, the Prospectus itself did not make any disclosures that amounted to red flags. The quantity and substance of risk disclosures for LJM Fund was comparable to other similar funds. The Prospectus clearly disclosed risks that were specific to the LJM Fund such as active trading risk, valuation risk, and numerous types of call and put option scenarios. However, after a surprise spike in market turbulence dramatically affected investment strategies premised on low volatility, the LJM Fund lost more than 80% over two days of trading on February 5th and 6th, 2018 ("LJM Collapse"). Within weeks of the LJM Collapse, the fund was closed and liquidated.

No information which would have been a red flag was set forth by the LJM Fund until its collapse. Triad conducted appropriate due diligence prior to allowing registered representatives the opportunity to recommend the investment to suitable clients. No amount of reasonable due diligence by Respondent could have predicted what happened. Accordingly, Claimants cannot establish that Triad knew or should have known that LJM would suffer losses at the time that Claimants made their investments. Even if they could, many of the investments at issue are untimely and any related claims should be dismissed.

***iii. The Walesa Companies***

Finally, the SOC vaguely alleges that Walesa recommended to certain Claimants investments in companies in which he held an ownership or investment interest. Claimants do not specify which company(ies) they allegedly invested in, but generally allege that Walesa held interests in the following companies, and that he stood to personally benefit from those respective investments: Cibolo Creek Partners; Trident Healthcare; Longhorn Lodging; Shadow Retail; Farm to Market Development; Hill Country Partners; Allied Integral United d/b/a Clearday; Round Rock Development Partners; Citadel Explorations; SitePro (f/k/a Amplisine Labs); and Gadsden Properties. However, upon information and belief, no such investments were made through Triad.

Accordingly, Claimants' claims have no merit and must be denied.

## IV. LEGAL ARGUMENT

### a. <u>The Claims Are Ineligible for FINRA Arbitration.</u>

FINRA Rule 12206(a) provides as follows: "[n]o claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim." This Eligibility Rule mandates the dismissal of claims before a hearing when, as here, the moving party can establish that more than six years have elapsed from the occurrence or event giving rise to the claim. FINRA's Eligibility Rule has been established as a substantive limitation on the scope of claims that the parties are obligated to arbitrate. FINRA's six-year eligibility period, unlike a statute of limitations, is a statute of repose and cannot be "tolled" or otherwise extended. Thus, any claim relating to an investment recommendation must be filed no later than six years from the date of the investment and cannot be extended beyond that date.

On information and belief, several investments at issue predate the eligibility period. Any allegations that these investment recommendations were unsuitable or that Triad materially

misrepresented these investments must relate to conduct that occurred, by definition, on or before the dates Claimants purchased the Investments at Issue. Indeed, courts have long recognized that in claims such as these "the date of the occurrence or event giving rise to the act or dispute, claim or controversy, for purposes of [Rule 12206], is the *date of the investment*." *See Dean Witter Reynolds, Inc. v. McCoy*, 853 F. Supp. 1023, 1030 (D. TN 1994) (emphasis added).

Accordingly, Triad will be filing a Motion to Dismiss seeking immediate dismissal of these claims.

**b. <u>Claimants' Investments Were Suitable</u>**

To the extent any of Claimants' claims were timely filed, they should nonetheless be dismissed on the grounds that they lack merit. Claimants erroneously allege that their Triad portfolios were over-concentrated in non-traded investments, that the risks and features of these investments were not fully disclosed, and that Triad failed to conduct adequate due diligence on these investments. These allegations are entirely without merit.

Under FINRA Rule 2111(a):

> [A] member firm or associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile.
>
> * * *
>
> A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated persons in connection with such recommendation.

Whether a recommendation is reasonable is determined based on the particular customer involved and the circumstances of each investment. Recommendations are suitable if, as in this

instance, they meet the customer's investment objectives and are consistent with the customer's stated financial situation and needs.

To the extent this case is not otherwise dismissed or severed as discussed above, Triad intends to establish at the evidentiary hearing that the investments Claimants purchased through Triad were entirely suitable in light of their stated financial condition and investment goals. Additionally, Claimants affirmed in writing that they understood the very risks of which they now complain and that they were able to bear the same risk of loss for which they now seek damages in this action. Claimants cannot meet their burden in establishing that the investments at issue were incompatible with their investment objectives. Accordingly, their claims for unsuitability fail.

Claimants also argue – without any factual support whatsoever – that Triad failed to conduct reasonable due diligence into Claimants' investments. As Triad will demonstrate at the hearing in this matter, this unsubstantiated allegation is simply false. The evidence will demonstrate that Triad conducted robust and thorough due diligence regarding the investments that clearly met industry standards.

Perhaps Claimants expect to succeed with respect to their suitability claims because their investments underperformed their expectations. However, the SOC gives no reason to believe that any such issues in these investments should have been considered red flags at the time the recommendations were made. Claimants will be unable to meet their burden of proof on their due diligence claims at the arbitration hearing because there is no evidence to suggest that Triad should have known, before Claimants invested, that any problems with these investments would arise. Claimants' allegations of failure to conduct due diligence amount to nothing more than an assertion that Triad should have predicted the future. Such claims are not sustainable as a matter of law and should be summarily dismissed.

**c. Claimants Cannot Demonstrate a False Statement or Omission of a Material Fact.**

Claimants allege multiple causes of action relying on their conclusory assertion that Triad intentionally misrepresented or omitted material information about the investments at issue, including claims for breach of fiduciary duty, violations of the Securities Exchange Act and Illinois Securities Act, and violations of FINRA rules. But Claimants fail to articulate what *facts*, precisely, Triad knowingly withheld or misrepresented, beyond the vague allegation that Triad "misrepresented therisks *[sic]* and qualities of the investments." SOC at 34.

But Claimants' allegations are belied by the multiple written disclosures making clear that their investments carried *significant* risks (potentially including a total loss) and could *not* guarantee distributions. When, as here, an investor receives written warnings disclosing the risks and features of an investment, the investor is legally precluded from relying on any purported representations that contradict the written warnings. *See San Diego County Emples. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 120 (S.D.N.Y. 2010); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 493 (S.D.N.Y. 2005) (dismissing plaintiff's fraud and misrepresentation claims where they were based on alleged statements contradicted by offering documents); *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 630 (4th Cir. 1977) ("We have found no case, however, in which the benefit of the bargain measurement has been applied to compensate a plaintiff for loss of an orally-created expectancy that is known to be directly contrary to the terms of a written agreement.").

Further, Claimants have failed to allege a single fact in support of their claim for a "fraudulent inducement to hold [an] investment." Relying on the Restatement of Torts, Claimants allege without a shred of evidence that Respondent induced Claimants to hold onto unsuitable investments. SOC at 49. But there is no need to look to the Restatement of Torts when FINRA provides its own standard- Comments regarding a "good deal" simply do not constitute the type

of *explicit* recommendation to hold referred to in FINRA Rule 2111. *See* Regulatory Notice 12-25, *Additional Guidance on FINRA's New Suitability Rule*, A3 ("The hold recommendation must be explicit.");[2] *see also* FINRA Rule 2111.03.

Accordingly, Claimants' misrepresentation/fraud claims must be denied.

**d. <u>Claimants Cannot Demonstrate a Breach of Fiduciary Duty.</u>**

Claimants cannot state a claim for breach of fiduciary duty because they cannot establish a general fiduciary duty or a transaction-based duty that was allegedly breached. Here, Respondent did not owe any duty, let alone a fiduciary duty, to Claimants. As noted above, many Claimants did not have any relationship with Triad, and therefore Triad did not owe them any duty.

Additionally, even where Triad did have some relationship with a claimant, a broker does not have a fiduciary duty to a non-discretionary account, as was the case with many of Claimants' investments. *See, e.g., Indep. Order of Foresters v. Donaldson, Lufkin & Jenrette, Inc*., 157 F.3d 933, 940 (2d Cir. 1998) (broker-investor relationship creates general fiduciary duty "only where the customer has delegated discretionary trading authority to the broker"); *see also Ciccone v. Hersh*, 530 F. Supp. 2d 574, 578-79 (S.D. NY 2008) (holding that summary judgment was properly granted on the plaintiffs' claim for breach of fiduciary duty because an investment and financial advisor did not have a fiduciary relationship with customers holding non-discretionary accounts).

Even if Triad owed Claimants a fiduciary duty (which it did not), the scope of that duty was very limited and the duty itself, assuming there was one, was properly discharged. Claimants made informed decisions to invest a portion of their stated investable assets in non-traded investments, which was entirely reasonable. They cannot prove facts giving rise to a claim for

---

[2] Available online at https://www.finra.org/rules-guidance/notices/12-25.

breach of fiduciary duty. Accordingly, Claimants cannot sustain a claim for breach of fiduciary duty and Panel should therefore deny these claims as a matter of law.

**e. <u>Claimants' Claim for Alleged Violations of FINRA Rules Fails as a Matter of Law.</u>**

Claimants' SOC also alleges that Respondent purportedly violated various FINRA rules. It is well established that there is no private right of action for violations of FINRA rules. *See Klock v. Lehman Brothers Kuhn Loeb Inc.*, 584 F. Supp. at 217; *Bergen v. Rothschild,* 648 F. Supp. at 587. Although FINRA (formerly NASD) has the "power to initiate a disciplinary proceeding against any FINRA member or associated person for violating any FINRA rule," *Fiero v. Financial Industry Regulatory Auth., Inc.*, 660 F.3d 569, 572 (2d Cir. 2011), courts have repeatedly held that FINRA rules do not provide for a private right of action. *See, e.g., Jaksich v. Thompson McKinnon Sec. Litig.,* 582 F. Supp. 485, 500 (S.D.N.Y. 1984) (inappropriate for courts to enforce general obligations created by NASD Rule 405 (requiring members to supervise accounts diligently and avoid placing customers in unsuitable investments) because such rule "lacks the requisite precision in defining rights and obligations to satisfy the *Colonial* standard [*Colonial Realty Corp v. Bache & Co.*, 358 F.3d 178 (2d Cir.), cert. denied, 385 U.S. 817 (1966)], and adds little or nothing to duties imposed by statute or by the common law"). As recently explored at length the arbitration award issued in FINRA Case No. 018-04051, "no law, FINRA rules, or regulations support or acknowledge" claims for violations of FINRA rules. *In the Matter of the Arbitration Between: Claimant, Tanya Coffeen,* No. 18-04051, 2019 WL 4915512, at *3 (Sept. 25, 2019).

These claims therefore have no merit and should be dismissed.

**f. <u>Claimants' Claim for Breach of Contract Fails as a Matter of Law.</u>**

Claimants cannot maintain a breach of contract claim against Respondent. First, as noted above, Triad did not have any contractual relationship with several of the Claimants. Moreover, even where Triad had some relationship with a claimant, in several instances, Triad was still unaffiliated with the accounts or investments at issue. Without a contract, there can be no breach of contract, and Claimants' claim fails.

Even if Respondent were under a contract with Claimants, they do not specify the alleged contractual breaches at issue. Importantly, a breach of contract claim arises from a broker-dealer's non-compliance with regulatory rules only when a specific contract provision obligates the broker-dealer to comply with those rules. *See § 14:175. Is There a Private Remedy for Violation of FINRA or Exchange Rules?*, 5 Law Sec. Reg. § 14:175 ("As for violations of exchange FINRA, or NASD rules, it is generally held that violation of a rule of a self-regulatory organization will not, by itself, support a private right of action."); *see also Spicer v. Chicago Bd. of Options Exchange, Inc.*, 977 F.2d 255, Fed. Sec. L. Rep. (CCH) ¶ 97016 (7th Cir. 1992) (no private right of action for exchange rules); *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, Fed. Sec. L. Rep. (CCH) ¶ 94993, R.I.C.O. Bus. Disp. Guide (CCH) ¶ 7442 (6th Cir. 1990) (no private right of action under New York Stock Exchange know your customer rule); *Carrott v. Shearson Hayden Stone, Inc.*, 724 F.2d 821, Fed. Sec. L. Rep. (CCH) ¶ 99640 (9th Cir. 1984); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, Fed. Sec. L. Rep. (CCH) ¶ 97296, 54 A.L.R. Fed. 1 (9th Cir. 1980); *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178 (2d Cir. 1966); *Brady v. Calyon Securities (USA)*, 406 F. Supp. 2d 307 (S.D. N.Y. 2005) (citing *In re VeriFone Securities Litigation*, 11 F.3d 865, 870, Fed. Sec. L. Rep. (CCH) ¶ 97820 (9th Cir. 1993) to hold no implied remedy for violation of NAD or

NYSE rules); *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 2016 WL 4095973 at *16-17 (S.D. Tex. 2016) (no implied remedy for violation of FINRA rules).

Instead, Claimants' breach of contract claim is nothing more than a creative attempt to sue Triad for alleged violations of FINRA rules, even though there is no contract between Triad and Claimants which references those rules. Presumably, the reason Claimants attempts to transform these alleged regulatory violations into a breach of contract claim is that they are well aware that customers cannot bring a private right of action for alleged violations of industry rules, as noted above.

Similarly, Claimants' allegation that Triad breached its obligations under its selling agreement with the various issuers also fails. As an initial matter, Triad satisfied any obligations that it owed to the issuers under these agreements. Moreover, Claimants cannot establish that they are third-party beneficiaries under these selling agreements. *See WM. T. Burnett Holding LLC v. Berg Brothers Co.*, 235 Md.App. 204, 212 (2017) (quoting Lovell Land v. SHA, 408 Md. 242 (2009)) (an intended beneficiary must establish that "'that the promise shall be made to him in fact, though not in form'" and that "'the parties intend to recognize him as the primary party in interest and as privy to the promise'"). Claimants fail to establish the necessary elements of a third-party contract claim. Instead, they rely solely on the conclusory allegation that they are "third-party beneficiary *[sic]* to those selling agreements." SOC at 51.

Claimants have failed to state a claim on which relief can be granted because they failed to identify any alleged contract that was purportedly breached because, in fact, no contract was breached, and all such claims should be dismissed as a matter of law.

**g. <u>Respondent Was Not Negligent, and Any of Claimants' Negligence-Related Claims Fail as a Matter of Law.</u>**

To properly state a cause of action in negligence in Illinois, a plaintiff must establish the following elements: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; and (3) the breach was the proximate cause of the plaintiff's injuries. *Nowak v. Coghil*l, 296 Ill.App.3d 886, 892, 231 Ill.Dec. 15, 695 N.E.2d 532 (1998)

Claimants' negligence and negligent supervision claims are based on Triad's purported failure to recommend suitable investments to Claimants and their claim that it failed to have a reasonable supervisory system in place. However, as discussed above, there is no viable negligence claim against Triad for the Investments at Issue as the investments were not made through Triad, and/or they were suitable when Claimants purchased them. Further, the risks and features associated with the Investments at Issue, such as the fact that they were illiquid and could suffer a total loss of principal, were clearly disclosed in the purchase documents Claimants received prior to making their investments and they acknowledged their understanding of those risks in confirming their investment selections. Moreover, Triad had a reasonable system of supervision of its representatives and its customer accounts, which it enforced to achieve compliance with applicable securities laws and regulations. Therefore, Triad did not breach any duty it purportedly owed to Claimants and their claim for negligence will not stand.

**h. <u>There is no basis for Claimants' Supervision Claims.</u>**

The SOC alleges that Triad somehow failed to supervise the sale of Claimants' investments, without giving any factual explanation or basis for same. As an initial matter, this claim rings hollow for the simple reason that there is no evidence to support any allegation of underlying wrongdoing. Triad cannot have any derivative liability for its brokers' alleged conduct

– whether based on respondeat superior or control person theories – unless Claimants can establish that the brokers' underlying conduct was wrongful, which they cannot.

Even if there was some factual basis to this claim (which there is not), Claimants' allegation that Triad somehow failed to supervise is unsupportable. Not only is there is no private right of action as a matter of law, which precludes Claimants from recovering on any claims premised upon Triad's alleged "failure to supervise", but the evidence will also demonstrate that Triad had policies and procedures in place during the relevant time period that were in compliance with all applicable securities industry laws, rules and regulations and that Triad complied with its supervisory duties. Indeed, Triad established and always maintained, consistent with all of its regulatory obligations, a robust and reasonable system of supervision. In fact, Triad has complied fully with FINRA Rule 2330, which states "[a] Principal can approve the transaction only if it suitable based on the factors that a Registered Representative must consider when making a recommendation." As discussed above, Triad reviewed the suitability of Claimants' investments and considered all the factors a registered representative must consider in recommending these types of investments. Therefore, Triad established reasonable supervisory procedures and fulfilled its supervisory obligations with respect to Claimants' investments.

A brokerage firm satisfies its duty to supervise employees if it has procedures and systems for applying those procedures that are reasonably expected to achieve compliance with applicable securities rules and regulations. "Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonable designed to achieve compliance with applicable securities laws and regulations and with applicable FINRA Rules." *See* FINRA Rule 3110; *Carpenter v. Harris, Upham & Co.*, Inc., 594 F.2d. 388, 394 (4th Cir. 1979) ("While the standards of supervision may be stringent, this

does not create absolute liability for every violation of the securities laws committed by a supervised individual. It is required of the controlling person only that he maintain an adequate system of internal control, and that he maintain the system in a diligent manner.").

Triad's conduct was at all times consistent with the required standard of reasonable care, within its own internal standards and within applicable industry standards. Triad established a reasonable system of supervision of its representatives and its customer accounts, which it enforced to achieve compliance with applicable securities laws and regulations.

Moreover, Claimants' allegations that Respondent somehow failed to supervise is unsupportable as a matter of law for the simple reason that *there is no private right of action for such a claim. See Klock v. Lehman Brothers Kuhn Loeb Inc.*, 584 F. Supp. 210, 217 (S.D.N.Y. 1984) (holding no private right of action under NASD Rules); *see also Bergen v. Rothschild,* 648 F. Supp. 582, 587 (D.D.C. 1986). Accordingly, Claimants cannot recover for any claims premised upon Respondent's alleged "failure to supervise," because no private right of action exists to assert such a claim. Moreover, even if a private right of action did exist (which it does not), Respondent acted appropriately.

## V. RESPONSE TO SPECIFIC PARAGRAPHS IN STATEMENT OF CLAIM

With regard to Claimants' allegations, Respondent refers the Panel to the course of events discussed above and otherwise denies the allegations set forth in the Statement of Claim. Respondent denies that it or its associated persons engaged in any wrongful conduct and denies all claims made in the Statement of Claim. Respondent denies all legal claims made in the Statement of Claim. Respondent further denies all prayers for relief by Claimants and denies that Claimants are entitled to recovery or any relief of any type whatsoever in this matter. Each and

every allegation contained in the Statement of Claim not specifically admitted or denied is hereby denied.

## VI. RESPONDENT'S AFFIRMATIVE DEFENSES

The following affirmative defenses are based on Respondent's investigation to date, and Respondent reserves the right to assert additional affirmative defenses that may be revealed during the course of this proceeding.

**a.** **Failure to State a Claim:** Claimants have failed to state a claim upon which relief can be granted. Similarly, Claimants failed to specify the relevant facts and remedies requested as required by FINRA Rule 12302(a). The Panel should dismiss Claimants' purported causes of action as they are all without merit or factual support.

**b.** **No Private Right of Action:** To the extent that Claimants' purported claims are based on alleged violations of the rules and regulations of self-regulatory organizations such as FINRA, those claims are barred because there is no private right of action for such alleged violations.

**c.** **Statute of Limitations/Repose and Prescription and the Eligibility Rule:** Claimants' purported causes of action are barred in whole or in part by applicable statutes of limitations, statutes of repose, or prescriptive periods, including but not limited to the FINRA Eligibility Rule.

**d.** **Claimants' Negligence, Assumption of Risk, Failure to Exercise Reasonable Diligence, Failure to Mitigate, and Unclean Hands:** Claimants knowingly, voluntarily, and willingly assumed the risks of the investments at issue. As set forth above, based on the information available, information was appropriately disclosed regarding the nature of the investments and potential risks involved. Moreover, Claimants had full access to the details

regarding all aspects of the investments. Claimants did not take any steps to complain, let alone attempt to mitigate the consequences of any alleged wrongdoing, with respect to the investments. Finally, Claimants acted inequitably if they made representations to Respondent that were untrue.

**e. Waiver, Acquiescence, Ratification, Laches, and Estoppel:** The equitable doctrines of waiver, acquiescence, ratification, laches, and estoppel operate to bar Claimants from recovering any damages in this action:

- Claimants at all times had access to materials providing them full knowledge of the value and nature of the investment;
- Claimants made representations to Respondent that Respondent had the right to rely upon; and
- Claimants had a duty to monitor the investment at issue and to promptly object to any errors or improprieties. Claimants now contend that the investments were unsuitable or otherwise improper. If those allegations are true (which Respondent in no way admits and hereby denies), then Claimants remaining silent about the investment in hopes of benefiting therefrom constitutes ratification of the investment and waiver of any right they may have had to object.

Claimants' decision to bring this claim, years after the investments at issue were opened, is clearly based on Claimants' view now that they should get money because the investments did not perform as they would have liked. This clearly establishes that this action is barred under the equitable doctrines of waiver, acquiescence, ratification, laches, and estoppel.

**f. Contributory/Comparative Negligence:** Claimants' purported claims against Respondent are barred in whole or in part under the doctrines of contributory or comparative negligence.

**g. Compliance with Standards:** Respondent did not breach any duty to Claimants. Based on information available to Respondent, Claimants received proper advice and full disclosure, and all duties, if any, and obligations under applicable state and federal laws and regulations were fully discharged. Based on information available to Respondent, the purchase of

the investments at issue was handled in accordance with all applicable brokerage industry standards, guidelines, and requirements.

**h.** **<u>No Intent or Reasonable Reliance</u>:** Claimants' allegations that Respondent made intentional or negligent omissions of material fact are absolutely false. Claimants cannot show any justifiable reliance on any alleged misrepresentations or omissions. Moreover, as a matter of fact, it is only with the benefit of hindsight that Claimants now make these allegations. Accordingly, any of Claimants' causes of action based on such alleged reliance should be dismissed.

**i.** **<u>No Fiduciary Duty or Breach of Duty</u>:** Claimants' purported claims against Respondent are barred in whole or in part because there was no confidential, fiduciary, special, or privity-like relationship between the parties. Furthermore, there was no breach of any duty or obligation owed to Claimants. Claimants' negligence claim fails for this reason as well.

**j.** **<u>Respondent Made Truthful Statements, Acted in Good Faith, and Had No Knowledge of Any Untruth</u>:** Claimants' purported claims against Respondent are barred in whole or in part because Respondent did not make any false or misleading statements or omissions of material fact relating to Claimants. Respondent at all times acted in good faith and did not directly or indirectly engage in any improper act or acts constituting a violation or cause of action arising under federal or state securities laws or any other law or FINRA Rule. Respondent did not know and, in the exercise of reasonable care, could not have known, of any untruth or omission that may be alleged by Claimants.

**k.** **<u>Proper Supervision</u>:** Claimants' purported claims against Respondent are barred in whole or in part because Respondent had no duty to supervise Mr. Walesa or Mr. Luccioni with respect to Claimants' accounts and investments at issue which were sold by other firms and held

in accounts with no connection to Triad. Additionally, Claimants' purported claims against Respondent are barred in whole or in part because at all times mentioned in the Statement of Claim, Respondent maintained an adequate and reasonable system of supervision and control over its representatives, and at all times acted in good faith. Respondent fully performed its supervisory obligations under applicable state and federal laws.

**l.** **No Damages:** Claimants' claims are barred because they have not suffered any injury in fact and/or have no damages.

**m.** **No Causation or Transaction/Loss Causation:** Claimants' purported claims against Respondent are barred in whole or in part because they have no damage and any alleged damages (if there were any) were not proximately caused by any wrongdoing on Respondent's part. Furthermore, Claimants cannot show transaction or loss causation. Any alleged loss was caused by third parties outside the control and influence of Respondent, or by the overall economy and, therefore, Respondent cannot be held liable for any actions or inactions of those third parties or the markets as a whole.

**n.** **Indemnification:** Respondent reserves any and all indemnification rights it may have, whether on the basis of contract, common law, or otherwise, against any person or entity named in this action or otherwise.

**o.** **Improper Party:** Respondent is not a proper party to this arbitration as it was not associated with the account(s) at issue in this claim.

## VII. RESPONDENT'S REQUEST FOR OTHER RELIEF

Respondent respectfully requests that the Panel dismiss Claimants' Statement of Claim in its entirety, award Respondent its costs and expenses incurred in defense of this matter under

common law and state law, including attorneys' fees, and award such other and further relief to which Respondent may be entitled.

Respectfully submitted this 1st day of October, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

*/s/ Scott Sherman*
Scott N. Sherman (Georgia Bar #642090)
201 17th Street NW, Suite 1700
Atlanta, Georgia 30363
Phone: (404) 322-6000
Fax: (404)322-6050
Email: scott.sherman@nelsonmullins.com
***Attorney for Respondent***

## CERTIFICATE OF SERVICE

I hereby certify that I have served ***Respondent's Special Appearance Answer and Affirmative Defenses to Claimants' Statement of Claim*** via the DR Portal to:

Adam J. Gana, Esq.
Adam J. Weinstein, Esq.
GANA WEINSTEIN LLP
295 Madison Avenue, Suite 705
New York, New York 10017
Phone: (212) 776-4251
agana@ganallp.com

Jonathan Kurta
KURTA LAW
295 Madison Avenue, Suite 705
New York, New York 10017
Tel: (212) 658-1502
jkurta@kurtalawfirm.com

***Attorneys for Claimants***

This 1st day of October, 2024.

*/s/ Scott Sherman*
Scott N. Sherman
Georgia Bar No. 642090
***Attorney for Respondent***

# EXHIBIT A

## RISK FACTORS

*An investment in the Partnership involves a high degree of risk. There can be no assurance that the Partnership will achieve its investment and operating objectives. An investor in the Partnership should be able to hold the investment for an indefinite time and be financially able to bear the total loss of the investment. An investor in the Partnership should carefully consider the following risk factors, together with the other information contained in this Memorandum, before investing in the Common Units and Warrants. If any of the risks discussed in this Memorandum were to occur, the Partnership's business, prospects, financial condition, liquidity and results of operations, and its ability to pay distributions, could be materially impaired.*

### Risks Related to an Investment in the Partnership

***The Partnership Has No Operating History. It May Not Be Able To Operate Its Business Successfully Or Generate Sufficient Revenue To Make Distributions To The Limited Partners.*** The Partnership is a recently-organized Delaware limited partnership that has not yet begun to acquire and develop natural gas and oil properties. It is subject to all of the business risks and uncertainties associated with any new business, including the risk that it will not be able to achieve its investment objectives and that the value of an investment in the Partnership could decline substantially. The Partnership's ability to achieve returns for the Limited Partners depends on its ability both to generate sufficient cash flow to pay distributions and to expand its operations, and the Partnership cannot assure you that it will be able to do either.

***The Partnership Relies Completely On The General Partner And Atlas Energy To Provide The Partnership With Its Facilities And Personnel And To Conduct Operations.*** The Partnership has no employees and no separate facilities. Consequently, the Partnership completely relies on the General Partner and, because the General Partner has no direct employees, upon Atlas Energy, to provide the Partnership its facilities and personnel. The General Partner and, through it, Atlas Energy, have significant discretion as to the implementation of the Partnership's operating policies and investment strategies. Moreover, the Partnership believes that its success depends to a significant extent upon the experience of the General Partner's and Atlas Energy's management team. The departure of any of the members of this management team could harm the Partnership's investment performance.

***The Partnership May Not Have Results Similar To The Results Obtained By The General Partner's Affiliates In Their Prior Activities, And May Incur Losses.*** The General Partner's Affiliates have sponsored numerous drilling and production programs and have actively developed and grown several MLPs (see "Business Overview – General Partner" and " – Prior Activities"). Because the Partnership's activities will be in different geographic areas and geologic formations than many of the prior programs, and because of the different nature of the prior MLPs developed by the General Partner's Affiliates, there can be no assurance that the Partnership's results will be similar to those of the prior programs and MLPs, or that the Partnership, as a result of the risks discussed in this "Risk Factors" section, or other factors discussed elsewhere in this Memorandum, will not incur losses.

***Changes In Laws Or Regulations That Require An Amendment To The Partnership Agreement Could Limit The Rights Of Limited Partners.*** The General Partner may, without the consent of the Limited Partners, amend the Partnership Agreement to reflect any changes as a result of a change in law or regulation that causes any term or condition set forth in this Memorandum or the Partnership Agreement to be no longer viable, as determined by the General Partner in its sole discretion. The General Partner expects that any such changes will be made as narrowly as possible in order to effectuate the original intent of this Memorandum and the Partnership Agreement. Nevertheless, any such change could limit the rights and obligations of the Partnership or Limited Partners.

***Upon A Listing Event, The Partnership Agreement Will Automatically Be Amended And Restated, Becoming The Post-Listing Agreement, Which Will Alter Some Of Your Rights As A Limited Partner.*** If the Liquidity Event undertaken by the Partnership is a Listing Event, the Partnership Agreement will automatically be amended and restated to become the Post-Listing Agreement. Some of your rights as a Limited Partner will be altered as a result of that amendment and restatement, particularly voting rights. For a summary of the material differences between the Partnership Agreement and the Post-Listing Agreement, see "Summary of Partnership Agreement." A form of the Partnership Agreement, with a form of the Post-Listing Agreement attached as an exhibit, is attached to this Memorandum as Exhibit D.

***Absence Of Protection Under The Investment Company Act.*** The Partnership will not register, and does not expect in the future to be required to register, as an investment company under the Investment Company Act, in reliance upon an exemption therefrom. The Investment Company Act generally requires investment companies to have at least 40.0% independent directors and regulates the relationship between an investment adviser (*i.e.*, the General Partner, if the Partnership were required to register under the Investment Company Act) and the investment company (*i.e.*, the Partnership, if it were required to register under the Investment Company Act), in particular with respect to Affiliate transactions. Such protections afforded by the Investment Company Act will not and are not expected to be applicable to the Partnership. Should the Partnership register as an investment company and the Investment Company Act becomes applicable to the Partnership, these protections may be implemented in a manner that alters other rights and obligations of the Partnership or Limited Partners. See "Changes In Laws Or Regulations That Require An Amendment To The Partnership Agreement Could Limited The Rights Of Limited Partners" above.

***Absence Of Protection Under The Investment Advisers Act.*** The General Partner will not register, and does not expect in the future to be required to register, as an investment adviser under the Investment Advisers Act, because it does not meet the definition of an investment adviser. The Investment Advisers Act includes provisions intended to protect clients of an investment adviser, including provisions such as restrictions on the performance-based compensation to registered investment advisers. Such protections afforded by the Investment Advisers Act will not and are not expected to be applicable to the General Partner or to the Partnership. Should the General Partner register as an investment adviser and the Investment Advisers Act become applicable to the General Partner and to the Partnership, these protections

may be implemented in a manner that alters other rights and obligations of the Partnership or Limited Partners. See "Changes In Laws Or Regulations That Require An Amendment To The Partnership Agreement Could Limited The Rights Of Limited Partners" above.

***The Fiduciary Duties Of The General Partner's Officers And Directors May Conflict With Those They May Have To Atlas Energy, ARP And APL.*** Conflicts of interest exist and may arise in the future as a result of the relationships between the General Partner and its Affiliates (including Atlas Energy and its Affiliates), on the one hand, and the Partnership and its Limited Partners, on the other hand. Conflicts may arise as a result of the duties of the General Partner to act for the benefit of its owners, which may conflict with the Partnership's interests and the interests of its unitholders. The directors and officers of Atlas Energy have duties to manage Atlas Energy and the General Partner in a manner beneficial to its owners. In addition, many of the officers and directors of the General Partner serve in similar capacities with Atlas Energy and its Affiliates, which may lead to additional conflicts of interest. At the same time, the General Partner has fiduciary duties to the Partnership and the Limited Partners under the Partnership Agreement and the Post-Listing Agreement and applicable law.

***Increases In The Costs Of The Wells Or Cost Overruns May Adversely Affect Your Return.*** If the Partnership incurs a cost overrun in drilling or completing a well or wells, then the General Partner anticipates that it would use the Partnership's offering proceeds, if available, to pay the cost overrun or seek debt financing. Using offering proceeds to pay cost overruns may result in the Partnership drilling fewer wells or, if debt financing is used, incurring on-going debt service expenses. In either such situation, the amount of the Partnership's cash available for distributions may be less than the amount that otherwise would have been available.

***The Partnership And Other Partnerships Sponsored By Affiliates Of Atlas Energy May Compete With Each Other For Prospects, Equipment, Subcontractors, And Personnel.*** The Partnership and other partnerships sponsored by Affiliates of Atlas Energy may have unexpended capital funds at the same time. Thus, these partnerships or joint ventures may compete for suitable prospects, equipment, subcontractors, and the services of Atlas Energy's personnel. This may make it more difficult for the Partnership to pursue its acquisition and drilling activities and lessen the ability of the Partnership to make distributions.

***Compensation And Fees To The General Partner Will Reduce Cash Distributions.*** The General Partner has received its General Partner interest, including its IDRs, for only nominal consideration. In addition, the General Partner will receive an annual management fee as well as reimbursement of direct costs regardless of the success of the Partnership's wells. These fees and direct costs will reduce the amount of cash otherwise distributable to the Limited Partners.

***The Intended Quarterly Distributions To Investors May Be Reduced Or Delayed.*** Cash distributions to you and the other investors may not be paid each quarter. Distributions may be reduced or deferred, in the discretion of the General Partner, due to local, state, and federal regulations regarding permitting, fracturing, production, conservation, water disposal and treatment, and pipeline construction and transportation of natural gas and oil, or to the extent the Partnership's revenues are used for any of the following:

- management fees to and direct cost reimbursements of the General Partner;
- repayment of borrowings, if any;
- any cost overruns in drilling and completing wells;
- remedial work to improve a well's producing capability, including multiple hydraulic fracturing operations in each horizontal well;
- direct costs and general and administrative expenses of the Partnership;
- reserves, including a reserve for the estimated costs of eventually plugging and abandoning the wells; or
- indemnification of the General Partner and its Affiliates by the Partnership for losses or liabilities incurred in connection with the Partnership's activities.

***Economic Conditions And Instability In The Financial Markets Could Harm The Partnership's Business Which, In Turn, Could Impact The Cash It Has To Make Distributions.*** The Partnership's operations will be affected by conditions in both domestic and global economies and financial markets. The consequences of a recurring economic recession or financial crisis could lower economic activity and result in lower energy prices, reduced demand for oil and gas and shut-ins of wells by their operators until prices improve. Any of these events may reduce the Partnership's revenues and reduce the cash that it has available to fund its operations and make distributions to the Limited Partners.

Also, general economic conditions could affect the ability of key equipment suppliers and drilling subcontractors to provide services to the Partnership which could result in delays in drilling or completing the Partnership's wells. Additionally, general market conditions for natural gas and oil could impact the Partnership's and the General Partner's anticipated derivative instruments. For example, if a counterparty to a hedging arrangement affecting the Partnership is unable to perform its obligations and the derivative instrument is terminated, the Partnership's cash flow could be reduced, which in turn could reduce distributions to the Limited Partners.

***Significant Physical Effects Of Climatic Change Have The Potential To Damage The Partnership's Wells, Disrupt Its Production Activities And Cause It To Incur Significant Costs In Preparing For Or Responding To Those Effects.*** Climate change could have an effect on the severity of weather (including hurricanes and floods), sea levels and water availability, the occurrence of any of which could result in damages to the Partnership's wells, disruption of the Partnership's production activities because of damages to its facilities, increases in the Partnership's costs of operation, less efficient or non-routine operating practices, or increased costs for insurance coverage. Significant physical effects of climate change could also disrupt the transportation of the Partnership's natural gas and oil by midstream companies, service companies or suppliers with whom it has a business relationship and reduce purchases of the Partnership's natural gas and oil production. Losses by the Partnership from these potential adverse effects may not be covered by insurance.

***An Increase In The Differential Between The NYMEX Or Other Benchmark Prices Of Natural Gas And Oil And The Wellhead Price That The Partnership Receives For Its Production Could Significantly Reduce Its Cash Available For Distribution And Limit Its Ability To Maintain Or Expand Its Operations.*** The prices that the Partnership will receive for its natural gas and oil production sometimes reflect a discount to relevant benchmark prices, such as those on the New York Mercantile Exchange ("NYMEX"). The difference between the benchmark price and the price that the Partnership receives is called a differential. Increases in the differential between the benchmark prices for natural gas and oil and the wellhead price that the Partnership receives could significantly reduce the Partnership's cash available for distribution and limit its ability to maintain or expand its operations.

***Drilling For And Producing Natural Gas And Oil Are High-Risk Activities With Many Uncertainties.*** The Partnership's anticipated drilling activities are subject to many risks, including the risk that it will not discover commercially productive reservoirs. Drilling for natural gas and oil can be uneconomic, not only because dry holes may be drilled, but also because productive wells may not produce sufficient revenues to cover the costs of the dry holes, if any, or even the costs of drilling and completing the wells. In addition, the Partnership's drilling and producing operations may be curtailed, delayed or canceled as a result of other factors, including:

- higher costs, shortages or delivery delays of equipment and services;
- unexpected operational events and drilling conditions;
- adverse weather conditions;
- facility or equipment malfunctions;
- title problems;
- pipeline ruptures or spills;
- compliance with environmental and other governmental requirements;
- unusual or unexpected geological formations;
- formations with abnormal pressure;
- leaks or discharges of toxic gases, brine, natural gas, oil, hydraulic fracturing fluid and wastewater from a well;
- injury or loss of life and property damage to a well or third-party property;
- environmental accidents, including groundwater contamination;
- fires, blowouts, craterings and explosions; and

- uncontrollable flows of natural gas or oil well fluids.

Any one or more of these factors could reduce or delay the Partnership's receipt of drilling and production revenues and increase its costs, thereby reducing its ability to make distributions to Limited Partners. In addition, any of these events can cause substantial losses, which may not fully be cover by insurance, including personal injury or loss of life, damage to or destruction of property, natural resources and equipment, pollution, environmental contamination, loss of wells and regulatory penalties, which could reduce the Partnership's cash flow and its ability to make distributions to its Limited Partners.

***Conflicts Of Interest Between The General Partner And The Limited Partners May Not Necessarily Be Resolved In Favor Of The Limited Partners.*** There are potential conflicts of interest between the Limited Partners and the General Partner and its Affiliates. These conflicts of interest include the following:

- the General Partner has determined the compensation and reimbursement that it and its Affiliates will receive in connection with the Partnership without arm's length negotiations;
- the Partnership may acquire projects from the General Partner and its Affiliates, and it is possible that those Projects could constitute a substantial portion of the Partnership's total Projects;
- the General Partner must monitor and enforce, on behalf of the Partnership, its own compliance with the Partnership Agreement and any activities conducted for the Partnership by officers, directors or employees of Atlas Energy or its Affiliates, all of whom are Affiliates of the General Partner;
- the General Partner will determine the amount and timing of cash distributions from the Partnership and the amount of cash reserved by the Partnership for future operations;
- if the General Partner, as tax matters partner, represents the Partnership before the Internal Revenue Service ("IRS") there could be a potential conflict between the General Partner's determination of what is in the best interest of the Limited partners as a group and the interests of a particular Limited Partner, including decisions as to whether to expend Partnership funds to contest a proposed adjustment by the IRS, if any, to the amount of deductible intangible drilling costs; and
- the same legal counsel represents the General Partner and the Partnership.

These conflicts of interest may not be resolved in a way satisfactory to some or all of the Limited Partners.

***Lack Of Independent Underwriter May Reduce Due Diligence Investigation Of The Partnership And The General Partner.*** Anthem, which is Affiliated with the General Partner, serves as the dealer-manager of this offering. However, Anthem's due diligence examination concerning the Partnership cannot be considered to be independent, and it may not be as comprehensive as an investigation that would have been conducted by an independent underwriter or broker dealer.

***Risk Of Noncompliance With State And Federal Securities Laws.*** This Offering has not been registered under the Securities Act in reliance on the "private offering" exemption of Regulation D and available exemptions from securities registration under applicable state securities laws. If it were ultimately determined that the Offering does not qualify for one or more exemptions from registration, a Limited Partner could demand that his purchase of Common Units be rescinded. If a Limited Partner were to rescind his purchase of Common Units, then the capital and assets of the Partnership would be reduced.

***The Partnership May Incur Costs In Connection With Exchange Act Compliance And Become Subject To Liability For Any Failure To Comply.*** If the Partnership sells Common Units to 2,000 or more accredited investors and receives offering proceeds of more than $10 million, then the Partnership will be required to register with the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Compliance with the reporting requirements under the Exchange Act would require the Partnership to timely file quarterly reports on Form 10-Q, annual reports on Form 10-K and current reports on Form 8-K, among other actions, and comply with corporate governance and disclosure requirements under the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"). Were the Partnership to fail to comply with these requirements, it could be subject to sanctions, including fines and other monetary penalties. As a result, registration under the Exchange Act will increase Partnership costs and reduce amounts available for distribution.

***Future Hedging Activities May Adversely Affect The Partnership's Financial Situation And Results Of Operations.*** The General Partner anticipates that the Partnership will engage in hedging activities in the future to help reduce, but not eliminate, the potential adverse effects of changing natural gas and oil prices on some portion or all of the Partnership's cash flow from the sale of its natural gas and oil production for the periods covered by the hedges.

Hedging activities, depending on the hedging instrument used, could reduce the potential benefits of price increases if natural gas or oil prices were to rise substantially over the price established by the hedge. Moreover, the Partnership would be exposed to loss if any of the following occurred in its hedged production:

- the Partnership's actual production is substantially less than expected;
- the counterparties to the hedging contracts fail to perform under the contracts; or
- there is a sudden, unexpected event materially impacting natural gas prices.

Physical hedges are not deemed hedges for accounting purposes because they require firm delivery of natural gas and oil and are considered normal sales of natural gas. The

Partnership will generally limit these arrangements to smaller quantities than those projected to be available at any delivery point. In addition, the General Partner anticipates that the Partnership will enter into financial hedges, which may include, for example, purchases of regulated NYMEX futures and options contracts and non-regulated over-the-counter futures contracts with qualified counterparties. The futures contracts are commitments to purchase or sell natural gas and oil at future dates and generally cover one-month periods for up to six years in the future. However, it is not always possible for the Partnership to engage in a derivative transaction that completely mitigates its exposure to commodity prices and interest rates. Also, the Partnership's financial statements may reflect a gain or loss arising from an exposure to commodity prices and interest rates for which the Partnership is unable to enter into a completely effective hedge transaction.

***Increases In Prices For Natural Gas And Oil Could Result In Non-Cash Balance Sheet Reductions Due To The Accounting Treatment Of Derivative Contracts The Partnership Expects To Enter Into In The Future.*** The General Partner anticipates that in the future the Partnership will enter into natural gas derivative contracts, either through the General Partner or its Affiliates, or directly by the Partnership for its own account, and it will account for these derivative contracts by applying the provisions of Accounting Standards Codification 815, "Derivatives and Hedging." Due to the mark-to-market accounting treatment for these contracts, the Partnership could recognize incremental hedge liabilities between reporting periods resulting from increases in reference prices for natural gas and oil, which could result in the Partnership recognizing a non-cash loss in its accumulated other comprehensive income (loss) and a consequent non-cash decrease in its partners' equity between reporting periods. Any such decrease could be substantial.

***Regulations Promulgated By The Commodities Futures Trading Commission Could Have An Adverse Effect On The Partnership's Ability To Use Derivative Instruments To Reduce The Effect Of Commodity Price, Interest Rate And Other Risks Associated With Its Business.*** The recent adoption of derivatives legislation by the U.S. Congress could have an adverse effect on the Partnership's ability to use derivative instruments to reduce the effect of commodity price, interest rate and other risks associated with its business. The Dodd-Frank Wall Street Reform and Consumer Protection Act, among other provisions, establishes federal oversight and regulation of the over-the-counter derivatives market and entities that participate in that market. The legislation requires the Commodities Futures Trading Commission ("CFTC"), and the SEC to promulgate rules and regulations implementing the new legislation. The CFTC finalized its regulations and has set position limits for certain futures and option contracts in the major energy markets and for swaps that are their economic equivalents. The financial reform legislation may also require the Partnership to comply with margin requirements and with certain clearing and trade-execution requirements in connection with its future derivative activities, although the application of those provisions to the Partnership is uncertain at this time. The financial reform legislation may also require the counterparties to the Partnership's derivative instruments to spin off some of their derivatives activities to separate entities, which may not be as creditworthy as the current counterparties. The new legislation and any new regulations could significantly increase the cost of derivative contracts, materially alter the terms of derivative contracts, reduce the availability of derivatives to protect against risks the Partnership encounters, reduce the Partnership's ability to monetize or restructure its derivative contracts in

existence at that time, and increase its exposure to less creditworthy counterparties. If the Partnership reduces or changes the way it uses derivative instruments as a result of the legislation or regulations, its results of operations may become more volatile and cash flows may be less predictable, which could adversely affect the Partnership's ability to plan for and fund capital expenditures. Finally, the legislation was intended, in part, to reduce the volatility of oil and natural gas prices, which some legislators attributed to speculative trading in derivatives and commodity instruments related to oil and natural gas. The Partnership's revenues could therefore be adversely affected if a consequence of the legislation and regulations is to lower commodity prices. Any of these consequences could have a material adverse effect on the Partnership's financial position, results of operations and/or cash flows.

***Competition In The Natural Gas And Oil Industry Is Intense, Which May Hinder The Partnership's Ability To Acquire Natural Gas And Oil Properties And To Contract For Drilling Equipment.*** The Partnership will operate in a highly competitive environment for acquiring Projects, contracting for drilling equipment and securing trained personnel. The Partnership's competitors may be able to pay more for natural gas and oil properties and drilling equipment than the Partnership's or the General Partner's financial resources permit. Moreover, the Partnership's competitors for investment capital may have better track records in their programs, lower costs or stronger relationships with participants in the oil and gas investment community than the General Partner does. Any of these factors could make it more difficult for the Partnership to execute its business strategy.

Furthermore, competition arises not only from numerous domestic and foreign sources of natural gas and oil but also from other industries that supply alternative sources of energy, such as wind or solar power. Product availability and price are the principal means of competition in selling natural gas and oil. Many oil and gas companies possess greater financial and other resources than the Partnership does, which may enable them to identify and acquire desirable properties and market their natural gas and oil production more effectively than the Partnership can.

***Shortages Of Drilling Rigs, Equipment And Crews, Or The Costs Required To Obtain The Foregoing In A Highly Competitive Environment, Could Impair The Partnership's Operations And Results.*** Increased demand for drilling rigs, equipment and crews, due to increased activity by participants in the Partnership's primary operating areas or otherwise, can lead to shortages of, and increasing costs for, drilling equipment, services and personnel. Shortages of, or increasing costs for, experienced drilling crews and oil field equipment and services could restrict the Partnership's ability to drill wells and conduct its operations. Any delay in the drilling of new wells or significant increase in drilling costs could reduce the Partnership's revenues.

***A Decrease In Natural Gas And Oil Prices Could Subject The Partnership's And The General Partner's Oil And Gas Properties To An Impairment Loss Under Generally Accepted Accounting Principles.*** Generally accepted accounting principles require oil and gas properties and other long-lived assets to be reviewed for impairment whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable. Long-lived assets are reviewed for potential impairments at the lowest levels for which there are identifiable cash

flows that are largely independent of other groups of assets. The Partnership and the General Partner will test their oil and gas properties on a field-by-field basis, by determining if the historical cost of proved properties less the applicable accumulated depletion, depreciation and amortization and estimated abandonment costs is less than the estimated expected undiscounted future cash flows. The expected future cash flows are estimated based on the Partnership's or the General Partner's own economic interests and their plans to continue to produce and develop proved reserves. Expected future cash flow from the sale of production of reserves is calculated based on estimated future prices. The Partnership and the General Partner estimate prices based on current contracts in place at the impairment testing date, adjusted for basis differentials and market related information, including published futures prices. The estimated future level of production is based on assumptions surrounding future levels of prices and costs, field decline rates, market demand and supply, and the economic and regulatory climates. Natural gas and oil prices remain volatile and could decrease in the future. Further declines in the price of natural gas or oil may cause the carrying value of the Partnership's or the General Partner's oil and gas properties to exceed the expected future cash flows, and require that an impairment loss be recognized.

***The Partnership May Issue An Unlimited Number Of Common Units And Other Equity Securities, Including Interests That Are Senior To The Common Units Offered Hereby, Without Approval Of The Limited Partners, Which Would Dilute Your Ownership Interests In The Partnership.*** The Partnership Agreement does not limit the number of Common Units or other equity securities that the Partnership may issue at any time without the approval of the Limited Partners. In addition, the Partnership may issue an unlimited amount of interests that are senior to your interests in right of distribution, liquidation and voting. The issuance by the Partnership of equity interests of equal or senior rank will have the following effects:

- your proportionate ownership interest in the Partnership will decrease;
- your voting rights may be subject to voting rights of the newly-issued interests;
- the amount of cash available for distribution on your interests may decrease;
- the ratio of taxable income to distributions may increase.

In addition, the payment of distributions on any additional interests may increase the risk that the Partnership will not be able to make distributions at prior levels. To the extent new interests are senior to the interests offered hereby, their issuance will increase the uncertainty of the payment of distributions.

***The Partnership May Not Be Able To Identify Suitable Oil And Gas Properties.*** The Partnership's investment strategy depends on the Partnership's ability to acquire Projects. The Partnership may not be able to identify suitable acquisition opportunities or finance and complete any particular acquisition successfully. Furthermore, acquisitions involve a number of risks and challenges, including difficulty in assessing recoverable reserves, future production rates, operating costs, infrastructure requirements, environmental and other liabilities, and other factors beyond the Partnership's control. As a result, the Partnership may not recover its investment in a

Project from the sale of production from the Project, or may not recognize an acceptable return from investments it makes. Any of these factors could adversely affect the Partnership's ability to achieve anticipated levels of cash flows from its Projects or realize other anticipated benefits of Investments.

***Illiquidity Of Securities.*** No public market exists for the Common Units or Warrants, nor may a public market develop. The Common Units and Warrants are illiquid. Eligible Purchasers should invest in the Partnership only if such Eligible Purchasers are willing to assume the risk of a speculative, illiquid, and long-term investment. The transferability of the Common Units and Warrants is limited by securities laws, tax laws, and the Partnership Agreement. Although the Partnership has formulated a liquidity strategy that could provide Limited Partners with liquidity for their investment, the Partnership cannot assure you that it will be able to successfully execute that strategy and, in any event, is not required to seek to do so before the end of the Partnership's term.

***Investors Will Be Required To Make Certain ERISA Representations.*** Generally, Benefit Plan Investors (as defined below) may acquire the Common Units and Warrants subject to certain restrictions. An investment in the Partnership by an employee benefit plan may raise certain issues under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the Internal Revenue Code of 1986, as amended (the "Code"). See "Tax Considerations." In considering whether to purchase the Common Units and Warrants, Benefit Plan Investors and any fiduciary purchasing on behalf of a Benefit Plan Investor or any other plan should consult with their counsel regarding the potential consequences under ERISA or the Code or similar state, federal, foreign or local law of acquiring and holding the Common Units and Warrants.

The Partnership intends to use reasonable efforts to provide that investments in the Partnership by Benefit Plan Investors will not be "significant" for purposes of the Plan Asset Rules (as defined below) by limiting equity participation in the Partnership by Benefit Plan Investors to less than 25% of the value of any class of units in the Partnership (the "25% Threshold"). Each Eligible Purchaser or subsequent transferee of a Common Unit may be required to make certain ERISA-related representations, warranties and covenants in a Purchaser Questionnaire or transfer application, as applicable, in order for the General Partner to determine whether the Eligible Purchaser is a Benefit Plan Investor.

Each Eligible Purchaser and each transferee of a beneficial interest in a Common Unit may be required to represent, warrant and covenant for the benefit of the Partnership: (a) that such purchaser is not and is not acting on behalf of (i) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) subject to Title I of ERISA, (ii) a "plan" (as defined in Section 4975(e)(1) of the Code) subject to Section 4975 of the Code, or (iii) an entity whose underlying assets include plan assets by reason of a plan's investment in such entity (i), (ii) or (iii) being referred to herein as a "Benefit Plan Investor"); or (b)(i) that such purchaser is an Eligible Purchaser that is or is acting on behalf of a Benefit Plan Investor or is a direct or indirect subsequent transferee of such Eligible Purchaser and is (A) a successor to, or (B) a related trust or partnership of, such Benefit Plan Investor and has so advised the General Partner in writing in the related Purchaser Questionnaire or transfer application, as applicable, and (ii) its acquisition

of the Common Units and Warrants, as applicable, does not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code. Pursuant to Section 3(42) of ERISA, governmental, foreign and church plans and any other plans that are not subject to Title I of ERISA or Section 4975 of the Code are no longer included in the definition of Benefit Plan Investors.

**Risks Related to the Partnership's Oil and Gas Operations**

***No Guarantee Of Return Of Investment Or Rate Of Return On Investment Because Of Speculative Nature Of Drilling Natural Gas And Oil Wells.*** Natural gas and oil exploration is an inherently speculative activity. Before the drilling of a well, the General Partner cannot predict with absolute certainty:

- the volume of natural gas and oil recoverable from the well; or
- the time it will take to recover the natural gas and oil.

You may not recover any or all of your investment in the Partnership or, if you do recover your investment in the Partnership, you may not receive a rate of return on your investment that is competitive with other types of investment that may be available to you. Except in the case of a Liquidity Event, you will be able to recover your investment only through distributions of the Partnership's net proceeds from the sale of its natural gas and oil from productive wells.

***Distributions From The Partnership May Be A Return Of Capital Rather Than A Return On Your Investment.*** The amount of cash that the Partnership has available for distribution will depend primarily on its cash flow, including cash reserves, working capital and borrowings, if any, and not solely on profitability, which will be affected by non-cash items. As a result, the Partnership may make cash distributions during periods when it records losses, and it may not make cash distributions during periods when it records net income.

***Because Some Wells May Not Return Their Drilling And Completion Costs, It May Take Many Years To Return Your Investment In Cash, If Ever.*** Even if a well is completed by the Partnership and produces natural gas and oil in commercial quantities, it may not produce enough natural gas and oil to pay for the costs of drilling and completing the well, even if tax benefits are considered. Thus, it may take many years to return your investment in cash, if ever.

***Previous Drilling By Others May Reduce The Partnership's Ability To Find Economically Recoverable Quantities Of Natural Gas Or Oil.*** The Partnership's proposed primary drilling areas are located in areas where other oil and gas companies have previously drilled wells. See "Proposed Activities." As a result, many of the areas to be drilled by the Partnership are in locations that have already been partially depleted or drained by earlier drilling. This may reduce the Partnership's ability to find economically recoverable quantities of natural gas and oil in those areas.

***Horizontal Wells are More Expensive and Difficult to Drill and Complete Than Vertical Wells.*** The General Partner anticipates that some of the wells the Partnership will drill will be horizontal wells. Horizontal wells are more expensive to drill and complete than vertical

wells because of increased costs associated with the drilling rigs needed to drill a horizontal well, including hydraulically fracturing the wells multiple times and using more casing in the wells. Hydraulic fracturing is used to stimulate production of hydrocarbons, particularly natural gas, from tight formations. The process involves the injection of water, sand and chemicals under pressure into formations to fracture the surrounding rock and stimulate production. The process of hydraulically fracturing wells results in higher costs, which may not result in greater recoverable reserves. In addition, horizontal wells will be more susceptible to mechanical problems associated with completing the wells, such as casing collapse and lost equipment, than vertical wells. Further, fracturing the formation in a horizontal well is more complicated than fracturing the same geological formation in a vertical well.

Porosities and permeabilities in the Mississippi Lime and Marble Falls geological formations, areas that the Partnership will initially target for the acquisition of Projects, are very low, so to unlock the hydrocarbons and make the wells productive, substantial hydraulic fracturing treatments using large amounts of water must be performed. Porosity is the percentage of void space between particles that is available for occupancy by either liquids or gases; and permeability is the property of porous rock that allows fluids or gas to flow through it. For example, many horizontal wells require multiple fracturing treatments along the length of the lateral or laterals drilled horizontally in the well, which will be more extensive and complicated than fracturing vertical wells. Thus, there is a greater risk of loss of the well or cost overruns associated with horizontal drilling as compared with vertical drilling.

***Federal Legislation And State Legislative And Regulatory Initiatives Relating To Hydraulic Fracturing Could Result In Increased Costs And Additional Operating Restrictions Or Delays.*** Some states have adopted, and other states are considering adopting, regulations that could restrict hydraulic fracturing in certain circumstances. For example:

- New York has imposed a *de facto* moratorium on the issuance of permits for high volume, horizontal hydraulic fracturing until state administered environmental studies are finalized. The New York Department of Environmental Conservation ("NYDEC") accepted comments on its revised proposal to amend state regulations to address high-volume hydraulic fracturing through January 11, 2013. Final regulations have not yet been issued. In October 2012, NYDEC asked the New York Health Department to assess the health impacts of high volume hydraulic fracturing. The Health Department has not completed its assessment. NYDEC is not expected to take any final action or make any decision regarding hydraulic fracturing until after the health review is completed and NYDEC, through the environmental impact statement, is satisfied that hydraulic fracturing can be done safely in New York State.

- Pennsylvania has adopted a variety of regulations limiting how and where fracturing can be performed. In February 2012, legislation was passed in Pennsylvania requiring, among other things, disclosure of chemicals used in hydraulic fracturing. To implement the new legislative requirements, in August of 2012 the Pennsylvania Department of Environmental Protection issued proposed conceptual changes to its environmental regulations governing oil and gas

operations. The conceptual changes would include requiring secondary containment for tanks associated with hydraulic fracturing and the submission of increased water withdrawal information necessary to secure required Water Management Plans.

- In June 2012, Ohio passed legislation that made several significant amendments to the state's oil and gas law, including additional permitting requirements, chemical disclosure requirements, and site investigation requirements for horizontal wells.

- In September 2012, the Texas Railroad Commission approved new proposed regulations relating to the commercial recycling of produced water and/or hydraulic fracturing flowback fluid.

- In June 2012, the West Virginia Department of Environmental Protection introduced a proposed legislative rule titled "Rules Governing Horizontal Well Development," which imposes more stringent regulation of horizontal drilling. The proposed rule was developed to provide further direction in the implementation and administration of the Natural Gas Horizontal Well Control Act that became effective on December 14, 2011.

In addition to state law, local land use restrictions, such as city ordinances, may restrict or prohibit well drilling activities in general and/or hydraulic fracturing in particular. If state, local, or municipal legal restrictions are adopted in areas where the Partnership plans to conduct operations, the Partnership may incur additional costs to comply with such requirements that may be significant in nature, experience delays or curtailment in the pursuit of exploration, development, or production activities, and perhaps even be precluded from the drilling of wells. Generally, federal, state and local restrictions and requirements are applied consistently to similar types of producers (e.g., conventional, unconventional, etc.), regardless of size of the producing company.

Although, to date, the hydraulic fracturing process has not generally been subject to regulation at the federal level, there are certain governmental reviews either under way or being proposed that focus on environmental aspects of hydraulic fracturing practices, and some federal regulation has taken place. A few of these initiatives are listed here, although others may exist now or be implemented in the future. In April 2012, President Obama established an Interagency Working Group to Support Safe and Responsible Development of Unconventional Domestic Natural Gas Resources with the purpose of coordinating the policies and activities of agencies regarding unconventional gas development. The Environmental Protection Agency ("EPA") has asserted federal regulatory authority over certain hydraulic fracturing activities involving diesel fuel as an additive under the Safe Drinking Water Act. In May 2012, the EPA issued draft permitting guidance for oil and gas hydraulic fracturing activities using diesel fuel. After reviewing comments submitted on the draft guidance in September 2012, the EPA is considering withdrawing the draft guidance and reissuing the policies contained therein as a proposed rulemaking. In addition, legislation that would provide for increased federal regulation of hydraulic fracturing and require disclosure of the chemicals used in the hydraulic fracturing

process could be introduced in the future. Furthermore, a number of federal agencies are analyzing, or have been requested to review, a variety of environmental issues associated with hydraulic fracturing. For example, the EPA is currently studying the potential environmental effects of hydraulic fracturing on drinking water and groundwater. The EPA issued a progress report regarding the hydraulic fracturing study on December 21, 2012. However, the progress report did not provide any results or conclusions. Research results are expected to be released in draft form in late 2014 for review by the public and the EPA Science Advisory Board. The EPA has not provided an anticipated date for completion of the report after peer review. The EPA is also proposing to issue a draft criteria document updating the water quality criteria for chloride in early 2013, and a proposed rule regarding effluent limitation guidelines for natural gas extraction from shale gas in 2014. On May 4, 2012, the U.S. Department of the Interior, Bureau of Land Management, proposed a rule that includes provisions requiring disclosure of chemicals used in hydraulic fracturing and construction standards for hydraulic fracturing on federal lands.

Certain members of U.S. Congress have called upon the U.S. Government Accountability Office to investigate how hydraulic fracturing might adversely affect water resources, and Congress has asked the SEC to investigate the natural gas industry and any possible misleading of investors or the public regarding the economic feasibility of pursuing natural gas deposits in shales by means of hydraulic fracturing. In addition, Congress requested the U.S. Energy Information Administration to provide a better understanding of that agency's estimates regarding natural gas reserves, including reserves from shale formations, as well as uncertainties associated with those estimates. These ongoing or proposed studies, depending on their degree of pursuit and any meaningful results obtained, could result in initiatives to further regulate hydraulic fracturing under the Safe Drinking Water Act or one or more other regulatory mechanisms. If new laws or regulations that significantly restrict hydraulic fracturing are adopted at the state and local level, such laws could make it more difficult or costly for the Partnership to perform hydraulic fracturing to stimulate production from dense subsurface rock formations and, in the event of local prohibitions against commercial production of natural gas, may preclude the Partnership's ability to drill wells. In addition, if hydraulic fracturing becomes regulated at the federal level as a result of federal legislation or regulatory initiatives by the EPA or other federal agencies, the Partnership's fracturing activities could be significantly affected. Some of the potential effects of changes in federal, state or local regulation of hydraulic fracturing operations could include: additional permitting requirements, permitting delays, increased costs, changes in the way operations, drilling and/or completion must be conducted, increased recordkeeping and reporting, and restrictions on the types of additives that can be used. Restrictions on hydraulic fracturing could also reduce the amount of oil and natural gas that the Partnership is ultimately able to produce.

***Recently Promulgated Rules Regulating Air Emissions From Oil And Natural Gas Operations Could Cause The Partnership To Incur Increased Capital Expenditures And Operating Costs.*** In August 2012, the EPA published final rules that establish new air emission controls for oil and natural gas production and natural gas processing operations. Specifically, the EPA's rule package includes New Source Performance Standards ("NSPS") to address emissions of sulfur dioxide and volatile organic compounds ("VOCs"), and a separate set of emission standards to address hazardous air pollutants frequently associated with oil and natural gas production and processing activities. The NSPS require operators, starting in 2015, to reduce

VOC emissions from oil and natural gas production facilities by conducting "green completions" for hydraulic fracturing, that is, recovering rather than venting the gas and natural gas liquids that come to the surface during completion of the fracturing process. The NSPS also establish specific requirements regarding emissions from compressors, dehydrators, storage tanks, and other production equipment. In addition, effective in 2012, the rules establish new notification requirements before conducting hydraulic fracturing and more stringent leak detection requirements for natural gas processing plants. Compliance with the new rules could result in significant costs, including increased capital expenditures and operating costs, and could adversely impact the Partnership's business.

States are also proposing more stringent requirements for air permits for well sites and compressor stations. For example, Pennsylvania has proposed to revise a list of sources exempt from air permitting requirements such that previously exempted types of sources associated with oil and gas exploration and production would be required to either obtain an air permit or satisfy specific requirements (emission limits, monitoring and recordkeeping) in order to claim the permit exemption. In conjunction with this proposal, Pennsylvania has finalized revisions to its General Permit for Natural Gas Production Facilities to impose additional and more stringent requirements and emission limits. Ohio is also considering revising its current General Permit for Natural Gas Production Operations to cover emissions from completion activities.

***Climate Change Legislation Or Regulations Restricting Emissions Of Greenhouse Gases Could Result In Increased Operating Costs.*** Both houses of U.S. Congress have actively considered legislation to reduce emissions of greenhouse gases, and almost half of the states have already taken legal measures to reduce emissions of greenhouse gases, primarily through the planned development of greenhouse gas emission inventories and/or regional greenhouse gas cap and trade programs. Most of these cap and trade programs work by requiring either major sources of emissions or major producers of fuels to acquire and surrender emission allowances, with the number of allowances available for purchase reduced each year until the overall greenhouse gas emission reduction goal is achieved. The adoption of any legislation or regulations that limits emissions of greenhouse gases from the Partnership's operations could require the Partnership to incur costs to reduce emissions of greenhouse gases associated with its operations, and such requirements also could adversely affect demand for the oil and natural gas that the Partnership produces.

In response to findings that emissions of carbon dioxide, methane, and other greenhouse gases present a danger to public health and the environment because emissions of such gases are contributing to the warming of the earth's atmosphere and other climate changes, the EPA has adopted regulations under existing provisions of the Clean Air Act that require entities that produce certain gases to inventory, monitor and report such gases. On November 30, 2010, the EPA published a final greenhouse gas emissions reporting rule relating to natural gas processing, transmission, storage, and distribution activities, which required reporting by September 28, 2012 for emissions occurring in 2011. Additionally, in 2010, the EPA issued rules to regulate greenhouse gas emissions through traditional major source construction and operating permit programs. The EPA confirmed the permitting thresholds established in the 2010 rule in July 2012. These permitting programs require consideration of and, if deemed necessary, implementation of best available control technology to reduce greenhouse gas emissions. As a

result, the Partnership's operations could face additional costs for emissions control and higher costs of doing business.

***Fracturing The Partnership's Horizontal Wells Will Require Large Amounts Of Water And Will Result In Water Damages; All Such Water Must Be Disposed Of At A Reasonable Cost And Within Applicable Environmental Rules Or The Partnership's Ability To Produce Natural Gas And Oil From The Wells Could Be Impaired.*** Hydraulic fracturing requires large amounts of water and results in water discharges that must be treated, recycled or otherwise disposed of. Environmental regulations governing the injection, withdrawal, storage and use of surface water or groundwater necessary for hydraulic fracturing may increase operating costs and cause delays, interruptions or termination of operations, the extent of which cannot be predicted, all of which could have an adverse effect on the Partnership's operations and financial performance. The Partnership's ability to remove and treat, recycle or otherwise dispose of water will affect the Partnership's production, and the cost of water treatment and disposal may affect its ability to make distributions. Also, new environmental regulations could be imposed that would restrict the Partnership's ability to conduct hydraulic fracturing or dispose of water, drilling fluids and other substances associated with the exploration, development and production of natural gas and oil. Further, the wells the Partnership drills will produce water as natural gas is produced from the wells. The Partnership anticipates that it will use trucks to transport the water to water disposal wells or water treatment or recycling facilities in certain areas, and that it will pipe the water to disposal wells in other areas. Although not anticipated by the General Partner, the Partnership may need to drill its own water disposal wells. There is a risk that one or more productive wells drilled by the Partnership, if any, will not be able to produce at their full capacity if the required permit for the water disposal well or other plan for disposal of the water is still pending at the time production from the wells begins.

***Because The Partnership Will Handle Natural Gas And Oil, It May Incur Significant Costs And Liabilities In The Future Resulting From A Failure To Comply With New Or Existing Environmental Regulations Or An Accidental Release Of Hazardous Substances Into The Environment.*** The Partnership's operations, wells and other facilities will be subject to stringent and complex federal, state and local environmental laws and regulations. These include, for example:

- the federal Clean Air Act and comparable state laws and regulations that impose obligations related to air emissions;
- the federal Clean Water Act and comparable state laws and regulations that impose obligations related to spills, releases, streams, wetlands and discharges of pollutants into regulated bodies of water;
- the federal Resource Conservation and Recovery Act ("RCRA") and comparable state laws that impose requirements for the handling and disposal of waste, including wastewater produced from the Partnership's wells and facilities; and
- the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and comparable state laws that regulate the cleanup of hazardous substances that may have been released at drilling sites owned or

operated by the Partnership or at locations to which it has sent wastewater for disposal.

Failure to comply with these laws and regulations may trigger a variety of administrative, civil and criminal enforcement measures, including the assessment of monetary penalties, the imposition of remedial requirements and the issuance of orders enjoining future operations. Certain environmental statutes, including RCRA, CERCLA, the federal Oil Pollution Act and analogous state laws and regulations, impose strict, joint and several liability for costs required to clean up and restore sites where hazardous substances have been disposed of or otherwise released. Moreover, it is not uncommon for neighboring landowners and other third-parties to file claims for personal injury and property damage allegedly caused by the release of hazardous substances or other waste products into the environment.

There is an inherent risk that the Partnership may incur environmental costs and liabilities due to the nature of its business and the substances it handles. Moreover, the possibility exists that stricter laws, regulations or enforcement policies may be enacted or adopted and could significantly increase the Partnership's compliance costs and the cost of any remediation that may become necessary. The Partnership may not be able to recover remediation costs under its respective insurance policies.

***The Partnership Is Subject To Comprehensive Federal, State, Local And Other Laws And Regulations That Could Increase The Cost And Alter The Manner Or Feasibility Of The Partnership Doing Business.*** The Partnership's intended operations will be regulated extensively at the federal, state and local levels. Environmental and other governmental laws and regulations have increased the costs to plan, design, drill, install, operate and abandon natural gas and oil wells. Under these laws and regulations, the Partnership could also be liable for personal injuries, property damage and other damages. Failure to comply with these laws and regulations may result in the suspension or termination of the Partnership's operations and subject the Partnership to administrative, civil and criminal penalties. Moreover, public interest in environmental protection has increased in recent years, and environmental organizations have opposed, with some success, certain drilling projects.

Part of the regulatory environment in which the Partnership will operate includes, in some cases, legal requirements for obtaining environmental assessments, environmental impact studies and/or plans of development before commencing drilling and production activities. In addition, the Partnership's activities will be subject to regulations regarding conservation practices and protection of correlative rights. These regulations affect the Partnership's operations and may limit the quantity of natural gas and oil it may produce and sell. A major risk inherent in the Partnership's drilling plans is the need to obtain drilling permits from state and local authorities. Delays in obtaining regulatory approvals or drilling permits, the failure to obtain a drilling permit for a well or the receipt of a permit with unreasonable conditions or costs could inhibit the Partnership's ability to develop its leases. Additionally, the natural gas and oil regulatory environment could change in ways that might substantially increase the financial and managerial costs of compliance with these laws and regulations and, consequently, reduce the Partnership's profitability.

***Partnership Distributions May Be Reduced If There Is A Decrease In The Price Of Natural Gas And Oil.*** The demand for natural gas and oil and the prices at which the Partnership's natural gas and oil will be sold are uncertain and the Partnership is not guaranteed a specific price for the sale of its natural gas and oil production, except for hedged production, if any. (See "– Risks Related to an Investment in the Partnership – Future Hedging Activities May Adversely Affect the Partnership's Financial Situation and Results of Operation.") Changes in natural gas and oil prices will have a significant impact on the Partnership's profitability, cash flow, and the value of its gas and oil reserves. Lower natural gas and oil prices may not only decrease the Partnership's revenues, but also may reduce the amount of natural gas and oil that the Partnership can produce economically as discussed in "– Risks Related to an Investment in the Partnership – A Decrease in Natural Gas and Oil Prices Could Subject the Partnership's and the General Partner's Oil and Gas Properties to an Impairment Loss under Generally Accepted Accounting Principles." Prices for natural gas and oil may fluctuate widely in response to relatively minor changes in the supply of and demand for natural gas or oil, market uncertainty and a variety of additional factors that are beyond the Partnership's control, such as:

- the level of domestic and foreign supply and demand;
- the price and level of foreign imports and exports;
- the level of consumer product demand;
- weather conditions and fluctuating and seasonal demand;
- overall domestic and global economic conditions;
- political and economic conditions in natural gas and oil producing countries, including those in the Middle East and South America;
- the ability of members of the Organization of Petroleum Exporting Countries to agree to and maintain oil price and production controls;
- the impact of the U.S. dollar exchange rates on natural gas and oil prices;
- technological advances affecting energy consumption;
- domestic and foreign governmental relations, regulations and taxation;
- the impact of energy conservation efforts;
- the cost, proximity and capacity of natural gas pipelines and other transportation facilities; and
- the price and availability of alternative fuels.

These factors make it extremely difficult to predict natural gas and oil price movements with any certainty. In the past, the prices of natural gas and oil have been extremely volatile, and the General Partner expects this volatility to continue in the future.

Also, as discussed in "Federal Income Tax Consequences – Depletion," some of the natural gas and oil production from the Partnership's productive wells may be marginal production under the Code and could qualify for potentially higher rates of percentage depletion.

In the case of the Partnership's marginal production wells, if any, the Partnership will be more sensitive to price declines, which could cause the Partnership to plug and abandon the wells, than if the wells produced at a higher average rate of production that did not qualify for the potentially higher rate of percentage depletion.

***The Partnership May Not Be Paid, Or May Experience Delays In Receiving Payment, For Its Natural Gas And Oil That Has Already Been Delivered To The Purchaser.*** In accordance with industry practice, the Partnership typically will deliver natural gas and oil to a purchaser for a period of up to 60 to 90 days before it receives payment. Thus, it is possible that the Partnership may not be paid for natural gas and oil that already has been delivered if the purchaser fails to pay for any reason, including bankruptcy. This ongoing credit risk also may delay or interrupt the sale of the Partnership's natural gas and oil or the Partnership's negotiation of different terms and arrangements for selling its natural gas and oil to other purchasers. Finally, this credit risk may reduce the price benefit derived by the Partnership from the General Partner's, its Affiliates' or the Partnership's anticipated natural gas and oil hedging arrangements as described in "– Risks Related to an Investment in the Partnership – Future Hedging Activities May Adversely Affect the Partnership's Financial Situation and Results of Operations."

***Increased Costs To Transport The Partnership's Natural Gas And Oil To Market Could Decrease The Partnership's Net Revenues.*** The Partnership's net revenues will decrease the farther its natural gas and oil is transported for sale because of increased transportation costs, which may also result in decreases in the Partnership's distributions to you and the other investors in the Partnership.

***The Third Parties On Whom The Partnership Will Rely For Gathering And Transportation Services Are Subject To Complex Federal, State And Other Laws That Could Adversely Affect The Cost, Manner Or Feasibility Of Conducting The Partnership's Business.*** The operations of the third parties on whom the Partnership relies for gathering and transportation services are subject to complex and stringent laws and regulations that require obtaining and maintaining numerous permits, approvals and certifications from various federal, state and local government authorities. These third parties may incur substantial costs in order to comply with existing laws and regulation. If existing laws and regulations governing such third-party services are revised or reinterpreted, or if new laws and regulations become applicable to their operations, these changes may affect the costs that the Partnership will pay for their services. Similarly, a failure to comply with such laws and regulations by the third parties on whom the Partnership relies could subject the Partnership to liability and, if such failures are material, would require the Partnership to make alternative arrangements, which may not be available or which may involve increased costs.

***The Partnership's Business Depends On Third-Party Natural Gas And Oil Transportation And Processing Facilities And Its Ability To Contract With Those Parties.*** The Partnership's ability to sell its natural gas, NGLs and oil production depends in part on the availability, proximity and capacity of pipeline systems and processing facilities owned by third parties and its ability to contract with those third parties. The lack of available capacity on these systems and facilities could require the Partnership to curtail or shut-in one or more producing wells or delay or discontinue drilling wells in an area where it has acquired Projects. A

curtailment or shut-in of production could materially reduce the Partnership's cash flow, and if a substantial portion of the production is hedged at lower than market prices, those financial hedges would have to be paid from borrowings absent sufficient cash flow. Also, the Partnership may be unable, or elect not to, purchase firm transportation on third party facilities and, in that event, its production transportation could be interrupted by other developers having firm arrangements. If any third-party pipelines and other facilities become partially or fully unavailable to transport or process the Partnership's natural gas and oil production, or if the natural gas quality specifications for a natural gas pipeline or facility changes so as to restrict the Partnership's ability to transport natural gas on those pipelines or facilities, the Partnership could be required to curtail or shut-in one or more of its wells and its revenues could decrease. Also, the disruption of third-party facilities due to maintenance and/or weather could limit the Partnership's ability to market and deliver its natural gas, natural gas liquids, and oil production.

***Possible Leasehold Defects Arising During Drilling Operations Could Result In Unanticipated Losses.*** There may be defects in the Partnership's title to its leases. Although the General Partner will obtain a favorable formal title opinion for the leases before each well is drilled, it generally will not obtain a division order title opinion until after the well is completed. Thus, the Partnership may experience losses from title defects which arose during drilling that would have been disclosed by a division order title opinion, such as liens arising during drilling operations or transfers of interests in the leases after drilling begins. Also, the General Partner may use its own judgment in waiving title requirements for the Partnership's leases and it will not be liable for any failure of title of leases transferred to the Partnership.

***Participation With Third Parties In Drilling Wells May Require The Partnership To Pay Additional Costs And Could Subject Partnership Revenues To The Claims Of The Third-Party's Creditors.*** The General Partner anticipates that the Partnership may participate with third parties in drilling some of its wells. In this regard, additional financial risks exist when the costs of drilling, equipping, completing, and operating wells is shared by more than one person. If the Partnership pays its share of the costs, but another interest owner does not pay its share of the costs, then the Partnership would have to pay the costs of the defaulting party. In this event, the Partnership would receive the defaulting party's revenues from the well, if any, under penalty arrangements set forth in the operating agreement, which may, or may not, cover all of the additional costs paid by the Partnership.

If the Partnership is not the actual operator of the well for all of the working interest owners of the well, then there is a risk that the General Partner will not be able to supervise the third-party operator closely enough, and that decisions related to the following would be made by the third-party operator which may not be in the best interests of the Partnership and its Limited Partners:

- how the well is operated;
- expenditures related to the well; and
- possibly the marketing of the natural gas and oil production from the well.

Further, the third-party operator may have financial difficulties and fail to pay for materials or services on the wells it drills or operates, which would cause the Partnership to incur extra costs in discharging materialmen's and workmen's liens. In this regard, the Partnership may not be the operator of a well for all of the working interest owners of the well if the Partnership owns less than a 50% working interest in the well, or if it acquired the working interest in the well from a third party under arrangements that required the third party to be named operator.

**Federal Income Tax Risks**

***The Partnership's Tax Treatment Depends On Its Status As A Partnership For Federal And State Income Tax Purposes. If The Partnership Were To Become Subject To Entity-Level Taxation For Federal Or State Income Tax Purposes, Taxes Paid Would Reduce The Amount Of Cash Available For Distribution.*** Although the anticipated tax benefits of an investment in the Partnership depend largely on the Partnership being treated as a Partnership for federal income tax purposes, the Partnership has not requested, and does not plan to request, a ruling from the IRS on this or any other tax matter that affects the Partnership. In this regard, current law may change so as to cause the Partnership to be treated as a corporation for U.S. federal income tax purposes or otherwise subject the Partnership to entity-level taxation. Also, because of widespread state budget deficits, several states are evaluating ways to subject Partnerships to entity-level taxation through the imposition of state income, franchise or other forms of taxation.

Following a Listing Event, 90% or more of the Partnership's gross income for every taxable year must be qualifying income, as defined in Section 7704 of the Code. Qualifying income is defined as income and gains derived from the exploration, development, mining or production, processing, refining, transportation (including pipelines transporting gas, oil, or products thereof), or the marketing of any mineral or natural resource (including fertilizer, geothermal energy and timber). The Partnership may not meet this requirement or current law may change so as to cause, in either event, the Partnership to be treated as a corporation for federal income tax purposes or otherwise be subject to federal income tax. The Partnership has not requested, and does not plan to request, a ruling from the IRS on this or any other matter affecting the Partnership.

If the Partnership was treated as a corporation for U.S. federal income tax purposes, it would pay U.S. federal income tax on its taxable income at the corporate tax rates, currently at a maximum rate of 35% and would likely pay state income tax at varying rates. Distributions to you would generally be taxed as corporate distributions, and no income, gain, loss, deduction or credit would flow through to you. Because a tax may be imposed on the Partnership as a corporation, its cash available for distribution could be reduced. Therefore, the Partnership's treatment as a corporation could result in a material reduction in the anticipated cash flow and after-tax return to you, and therefore result in a substantial reduction in the value of Partnership securities.

Current law or Partnership business may change so as to cause the Partnership to be treated as a corporation for U.S. federal income tax purposes or otherwise subject the Partnership to entity-level taxation. In addition, because of widespread state budget deficits, several states are

evaluating ways to subject partnerships to entity-level taxation through the imposition of state income, franchise or other forms of taxation. If any state were to impose a tax upon the Partnership as an entity, the cash available for distribution to you would be reduced.

***Changes In The Law May Reduce Your Tax Benefits From An Investment In The Partnership.*** Your tax benefits from an investment in the Partnership may be affected by changes in the tax laws. For example, President Obama's administration has proposed, among other tax changes, the repeal of certain oil and gas tax benefits, including the repeal of the percentage depletion allowance, the election to expense intangible drilling costs (including your option to amortize intangible drilling costs over a 60 month period), the passive activity exception for working interests, and the tax credit based on the amount of the Partnership's marginal natural gas and/or oil production, if any. These proposals may or may not be enacted into law.

***Limited Partners Need Passive Income To Use Their Partnership Deductions That Exceed The Income From The Partnership.*** If you invest in the Partnership, your share of the Partnership's net losses will be passive losses that cannot be used to offset "active" income, such as salary and bonuses, or portfolio income, such as dividends and interest income. Thus, you may not have enough passive income from the Partnership or net passive income from your other passive activities, if any, to offset a portion or all of your passive deductions from the Partnership. However, any unused passive loss from the Partnership may be carried forward indefinitely by you to offset your passive income in subsequent taxable years. Also, except as described below, the passive activity limitations on your share of the Partnership's losses do not apply to you if you invest in the Partnership and you are a corporation taxable under Subchapter C of the Code which:

- is not a personal service corporation or a closely held corporation;
- is a personal service corporation in which employee-owners hold 10% (by value) or less of the stock, but is not a closely held corporation; or
- is a closely held corporation (that is, five or fewer individuals own more than 50% by value of the stock), but is not a personal service corporation in which employee-owners own more than 10% by value of the stock, in which case you may use your passive losses to offset your net active income (calculated without regard to your passive activity income and losses or portfolio income and losses).

***You May Owe Taxes In Excess Of Your Cash Distributions From The Partnership.*** You may become subject to income tax liability for your share of the Partnership's income in any taxable year in an amount that is greater than the cash and any marginal well production credits you receive from the Partnership in that taxable year. For example:

- if the Partnership borrows money, your share of Partnership revenues used to pay principal on the loan will be included in your income from the Partnership and will not be deductible;

- income from sales of natural gas and oil may be included in your income from the Partnership in one tax year, even though payment is not actually received by the Partnership and, thus, cannot be distributed to you, until the next tax year;
- if there is a deficit in your capital account, the Partnership may allocate income or gain to you even though you do not receive a corresponding distribution of Partnership revenues;
- the Partnership's revenues may be expended by the General Partner for nondeductible costs or retained in the Partnership to establish a reserve for future estimated costs, including a reserve for the estimated costs of eventually plugging and abandoning the wells, which will reduce your cash distributions from the Partnership without a corresponding tax deduction; and
- the taxable disposition of the Partnership's property or your units may result in income tax liability to you in excess of the cash you receive from the transaction.

***You And The Other Investors In The Partnership May Be Subject To State And Local Taxes And Tax Return Filing Requirements As A Result Of Investing In The Partnership.*** In addition to U.S. federal income taxes, you and the other investors will likely be subject to other taxes, including state and local taxes, unincorporated business taxes and estate, inheritance or intangible taxes and tax return filing requirements that are imposed by the various jurisdictions in which the Partnership drills wells or otherwise does business now or in the future, even if you do not reside in any of those jurisdictions. The Partnership presently anticipates that substantially all of its income will be generated in Texas and Oklahoma, although it may drill wells in other states as well. It is your responsibility to file all federal, foreign, state and local tax returns that may be required of you. In this regard, the Partnership's tax counsel has not rendered an opinion on any foreign, state or local tax consequences of an investment in the Partnership.

***Your Tax Benefits From An Investment In The Partnership Are Not Contractually Protected.*** An investment in the Partnership does not give you any contractual protection against the possibility that part or all of the intended tax benefits of your investment will be disallowed by the IRS. No one provides any insurance, tax indemnity or similar agreement for the tax treatment of your investment in the Partnership. You have no right to rescind your investment in the Partnership or to receive a refund of any of your investment in the Partnership if a portion or all of the intended tax consequences of your investment in the Partnership is ultimately disallowed by the IRS or the courts. Also, none of the fees paid by the Partnership to the General Partner, its Affiliates or independent third-parties are refundable or contingent on whether the intended tax consequences of your investment in the Partnership are ultimately sustained if challenged by the IRS.

***An IRS Audit Of The Partnership May Result In An IRS Audit Of Your Personal Federal Income Tax Returns.*** The IRS may audit the Partnership's annual federal information income tax returns, particularly since the Partnership's investors will be eligible to claim deductions for intangible drilling costs and, with respect to wells drilled, completed and placed in service by the Partnership, depreciation of qualified equipment costs. If the Partnership is audited, the IRS also may audit your personal federal income tax returns, including prior years'

returns and items that are unrelated to the Partnership. Any adjustments made by the IRS to the federal information income tax returns of the Partnership could lead to adjustments on your personal federal income tax returns and could reduce the amount of your deductions from the Partnership in 2013 and subsequent tax years.

***Upon A Listing Event, The Partnership Will Adopt Certain Valuation Methodologies That May Result In A Shift Of Income, Gain, Loss And Deduction Between The Partnership And Its Limited Partners. The IRS May Challenge This Treatment, Which Could Adversely Affect The Value Of Your Common Units.*** When the Partnership issues additional interests or engages in certain other transactions, it determines the fair market value of its assets and allocates any unrealized gain or loss attributable to such assets to the capital accounts of its Limited Partners and General Partner. Although the Partnership may from time to time consult with professional appraisers regarding valuation matters, including the valuation of Partnership assets, it may make many of the fair market value estimates itself using a methodology based on the market value of its interests as a means to measure the fair market value of its assets. The methodology may be viewed as understating the value of the Partnership's assets. In that case, there may be a shift of income, gain, loss and deduction between certain Common Unit holders and the General Partner, which may be unfavorable to you. Moreover, under current valuation methods, subsequent purchasers of Common Units may have a greater portion of their Internal Revenue Code Section 743(b) adjustment allocated to the Partnership's tangible assets and a lesser portion allocated to its intangible assets. The IRS may challenge the valuation methods, or the Partnership's allocation of Section 743(b) adjustment attributable to its tangible and intangible assets, and allocations of income, gain, loss and deduction between the General Partner and certain of the Partnership's holders of Common Units.

A successful IRS challenge to these methods or allocations could adversely affect the amount of taxable income or loss being allocated to the Limited Partners. It also could affect the amount of gain on the sale of interests by you and could have a negative impact on the value of Partnership interests or result in audit adjustments to the tax returns of the Limited Partners without the benefit of additional deductions.

# EXHIBIT D

**FINRA ARBITRATION Submission Agreement**

---

In the Matter of the Arbitration Between

Name(s) of Claimant(s)

Joseph Dymek
Estate of Laura Leff
Patricia Fuchs
George and Lori Heinemann
George Heinemann as Power of Attorney
Thomas Harrold
Jean and Christopher Ambrose Trust
Carl Pedigo
Robert and Gwen Gorman
et al

24-01626

Name(s) of Respondent(s)

Triad Advisors LLC

---

1. The undersigned parties ("parties") hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.*

2. The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules.*

3. The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of FINRA Dispute Resolution Services or the arbitrator(s). The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.*

4. The parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement. The parties further agree that a judgment and any interest due thereon, may be

entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment. *

*Respondent agrees to arbitrate this matter only with respect to those Claimants who held a customer relationship with Triad Advisors LLC ("Triad"). With respect to those Claimants who never held a customer relationship with Triad, Respondent has filed an action for declaratory judgment and injunctive relief in the United States District Court for the Northern District of Illinois (the "Injunction Action") to enjoin the following Claimants from proceeding in this arbitration (or any FINRA arbitration proceeding):

· Christopher and Jean Ambrose, as Trustee of the Jean Ambrose and Christopher Ambrose Trust;
· Robert and Gwen Gorman;
· Thomas Harrold; and
· Carl Pedigo.

Accordingly, Respondent maintains its objections with respect to these Claimants and does not agree to arbitrate their claims in the FINRA forum.

John Stratton, whom Claimants seek to add as a Claimant in the Motion to Amend, is also a non-customer and has been named as a Defendant in the Injunction Action. As such, in the event that Claimants' Motion to Amend is granted, Respondent similarly maintains its objections and will not agree to arbitrate Mr. Stratton's claims in the FINRA forum.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

/s/ Gregory M. Curley, Counsel 12/10/2024

Triad Advisors LLC Date

State Capacity if other than individual (e.g., executor, trustee, corporate officer)

LC43A: SUBMISSION AGREEMENT
idr: 08/18/2021

RECIPIENTS:
Scott N. Sherman, Esq., Triad Advisors LLC
Nelson Mullins Riley & Scarborough, 201 17th Street NW, Suite 1700, Atlanta, GA 30363

# EXHIBIT E

FINRA

**TO:** Scott N. Sherman, Esq.

**CC:** Adam J. Gana, Esq.
Jonathan Kurta, Esq.
Michael S. Jordan
Yana Karnaukhov
David Michael Rafferty

**From:** Elisa Guerrero
Senior Case Specialist

**Subject:** FINRA Dispute Resolution Services Arbitration Number 24-01626
Michael Zima, Patricia Fuchs, George Heinemann as Power of Attorney, et al. vs. Triad Advisors LLC

**Date:** December 10, 2024

This office is in receipt of your **Submission Agreement dated December 10, 2024**. However, we note the following deficiencies:

> Please forward an unaltered Submission Agreement (SA) without modification or changes. Modifications to the SA may cause confusion, lead to ancillary litigation, and undermine the enforceability of arbitration awards. Please note any added language will constitute an alteration.

Please correct the deficiencies on the DR Portal within 30 days.

**ALL CORRESPONDENCE (INCLUDING CHECKS) MUST BE CLEARLY MARKED WITH THE APPROPRIATE CASE NUMBER.**

If you have any questions, please do not hesitate to contact me at 312-899-4421 or by email at Elisa.Guerrero@finra.org.

EG:eg:LC15B
idr: 03/14/2024

RECIPIENTS:
Scott N. Sherman, Esq., Nelson Mullins Riley & Scarborough, 201 17th Street NW, Suite 1700, Atlanta, GA 30363
On Behalf Of: Triad Advisors LLC

CC:
Adam J. Gana, Esq., Gana Weinstein LLP, 295 Madison Avenue, Suite 705, New York, NY 10017
On Behalf Of: Michael Zima

Jonathan Kurta, Esq., Kurta Law Firm, 295 Madison Avenue, Suite 705, New York, NY 10017
On Behalf Of: Estate of Laura Leff

Michael S. Jordan
Yana Karnaukhov
David Michael Rafferty

# EXHIBIT F

# ORDER

**Submitted By:** Yana Karnaukhov (On behalf of the arbitration panel)
**Submitted Date:** 12/12/2024 04:41:32 PM ET

**Case ID & Parties:**
***FINRA Dispute Resolution Services***
ORDER

**Case Number:** 24-01626

**In the Matter of the Arbitration Between**

| **Claimant(s)** | **VS** | **Respondent(s)** |
|---|---|---|
| Michael Zima | | Triad Advisors LLC |
| Patricia Fuchs | | |
| George Heinemann as Power of Attorney | | |
| George and Lori Heinemann | | |
| Robert and Gwen Gorman | | |
| The Konrad Blocher Trust | | |
| Gordon Stewart | | |
| Carl Pedigo | | |
| The Laura Leff Irrevocable Trust | | |
| Thomas Harrold | | |
| Joseph Dymek | | |
| The Joseph Dymek Trust | | |
| Jean and Christopher Ambrose Trust | | |
| Avery Tarshis | | |
| Estate of Laura Leff | | |

## PREHEARING CONFERENCE

1. Was a prehearing conference held in the above captioned matter?
- ● **Yes**
- ○ No

a. Prehearing conference date:
A prehearing conference was held in the above captioned matter on ***12/10/2024*** at ***09:30 AM Central Time Zone***

b. The following arbitrator(s) participated in the hearing:
Chairman: Yana Karnaukhov(Participated ☑)

Panelist: Michael Jordan(Participated ☑)

Panelist: David Rafferty(Participated ☑)

c. The following party representatives participated in the hearing:

Identify Claimant Representatives:

***Adam Weinstein***
***Mary Curry***
***Robert Van De Veire***

Identify Respondent Representatives:

***Scott Sherman***
***Lauren Byrne***

d. FINRA Dispute Resolution Services staff attendee:

- ● **The following FINRA Dispute Resolution Services Staff person participated in the hearing:**
  ***Elizabeth Muldoon***
- ○ Not applicable

**ISSUES ADDRESSED**

2. Issues addressed: (i.e., name of motion or request, by which party)

- ● **The following pleadings have been addressed:**

  ***Motion to require respondent to sign the FINRA submission agreement***

**ORDER DECIDED BY**

3. Decided by:

- ○ Chairperson
- ● **Panel**

**RULINGS**

4. Rulings:

- ● **After considering the pleadings submitted by the parties (and oral arguments, if prehearing conference held), the Panel/Chairperson rules as follows:**

***After hearing arguments on the issue and considering all the pleadings, the panel concludes that all parties are subject to FINRA's jurisdiction and that FINRA's submission agreement must be submitted pursuant to the rules. The recently submitted submission agreement that was altered is insufficient. The panel is ordering the submission agreement to be signed and submitted by Respondent within 7 days and recognizes that Respondent has made strenuous objections against filing a submission agreement in the form that FINRA requires and the submission agreement to be filed is only being signed based upon the panel's order to do so to avoid sanctions. The panel will announce sanctions in the future if the order to submit the signed submission agreement is not complied with. The 7 days shall begin from the publication of the order on FINRA's portal.***

5. Order compliance date:

○ The parties should comply with this order by ______

● **Not applicable**

**ASSESSMENT OF FEES**

6. Cost of prehearing conference:

● **If the parties settle this matter with no further hearings, the forum fees for this prehearing conference (or discovery-related motion decided without a prehearing conference) are assessed as follows:**

**50% to Claimant(s), jointly and severally**

**50% to Respondent(s), jointly and severally**

**______% assessed to ______**

**______% assessed to ______**

**______% assessed to ______**

**______% assessed to ______**

○ Not applicable

**ATTACHMENTS**

There are no attached documents.

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OSAIC WEALTH, INC., Plaintiff, v. CHRISTOPHER AMBROSE AND JEAN AMBROSE, AS TRUSTEES OF THE JEAN AMBROSE AND CHRISTOPHER AMBROSE TRUST, GWEN GORMAN, ROBERT GORMAN, THOMAS HARROLD, CARL PEDIGO, AND JOHN STRATTON, Defendants. | ) | CIVIL ACTION NO. ________ |

**DECLARATION IN SUPPORT OF PLAINTIFF'S COMPLAINT AND MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Gregory M. Curley, pursuant to 28 U.S.C. § 1746, hereby declare and state as follows:

1. I am over eighteen (18) years of age and otherwise fully competent and authorized to execute this declaration. The facts set forth in this declaration are based upon my personal knowledge, unless otherwise noted.

2. I am employed by Osaic, Inc., the direct parent of Osaic Wealth, Inc. ("Plaintiff" or "Osaic"), and I maintain a role as Corporate Counsel for Osaic. I work in Garden City, New York, and maintain an office at an Osaic location in Scottsdale, AZ.

3. Osaic is a Delaware corporation with its main office located at 18700 Hayden Road; Suite 255; Scottsdale, AZ 85255.

4. Osaic is the successor to Triad Advisors, LLC ("Triad"). Triad is a formerly registered broker-dealer and member of the Financial Industry Regulatory Authority ("FINRA") and Osaic is a currently registered broker-dealer and member of FINRA.

5. Triad has been named in an underlying FINRA Arbitration, captioned *Michael Zima, et al. v. Triad Advisors LLC*, FINRA Arbitration No. 24-01626 (the "FINRA Arbitration").

6. In the course of my employment, I have grown familiar with Triad's books and records as they relate to customer accounts, customer agreements, and communications between Triad and its customers.

7. Under my direct supervision, my litigation team conducted a good-faith search of Triad's records to determine which, if any, of the twenty Claimants in the FINRA Arbitration ever had customer relationships with Triad. Four separate databases of client records currently and previously utilized by Triad were searched.

8. In doing so, we confirmed, in relevant part, that the Defendants in the above-captioned action, Christopher Ambrose and Jean Ambrose, as Trustees of the Jean Ambrose and Christopher Ambrose Trust, Gwen Gorman, Robert Gorman, Thomas Harrold, Carl Pedigo, and John Stratton (collectively "Defendants"), were never customers of Triad.

9. From our review, we determined that no records exist that demonstrate any of the following: (1) Defendants ever had an account with Triad, either in their individual capacities, in trust, or otherwise; (2) Triad ever provided any investment services or other services to Defendants; or (3) Defendants ever entered into any agreement with Triad to arbitrate any claims.

10. We came to this conclusion, based on the good-faith review of Triad's books and records, because (1) Triad has no customer account profiles under Defendants' names; (2) Triad has no record of receiving any compensation concerning any sales of investments by the associated persons at issue in the FINRA Arbitration to any Defendant; and (3) Triad has no records of any type of communications with Defendants.

11. The associated persons at issue in the FINRA Arbitration are the following: (1) Kenneth Luccioni, an independent contractor who was formerly associated with Triad from 2000 to 2016; (2) James Walesa, an independent contractor who was formerly associated with Triad from 2000 to 2019; and (3) Stephen Denari, an independent contractor who remains associated with Osaic today.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: December 9, 2024.

/s/ Gregory M. Curley
Gregory M. Curley, Esq.