# EXHIBIT B

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

-----------------------------------------------------------------X

*In the matter of the arbitration between,*

MICHAEL ZIMA, PATRICIA FUCHS, GEORGE HEINEMANN, as Power of Attorney for GLEN and ELSA HEINEMANN, GEORGE AND LORI HEINEMANN, ROBERT AND GWEN GORMAN, CARL PEDIGO, OLAF BLOCHER, as Trustee of the KONRAD BLOCHER TRUST, dated November 17, 2003, AMY GRAY as Executor of the Estate of LAURA LEFF and Successor Trustee of the LAURA LEFF IRREVOCABLE TRUST, THOMAS HARROLD, JOSEPH DYMEK, individually and as Trustee of the JOSEPH DYMEK TRUST dated May 29, 2007, CHRISTOPHER AND JEAN AMBROSE, as Trustees of the JEAN AMBROSE and CHRISTOPHER AMBROSE TRUST, GORDON STEWART, AVERY TARSHIS, JAMES MASTRO, JOHN STRATTON, and JOSEPH McHUGH

FINRA No.: 24-01626

Claimants,

v.

TRIAD ADVISORS, LLC,

Respondent.

-----------------------------------------------------------------X

**MOTION TO AMEND STATEMENT OF CLAIM**

Pursuant to Rules 12309(b) of the FINRA Code of Arbitration Procedure (the "Code"), Claimants jointly hereby submit to the Panel this Motion to Amend the Statement of Claim (this "Motion"). The purpose of this motion is to add additional claimants, James Mastro, John Stratton, and Joseph McHugh, to this arbitration.

**LEGAL STANDARD**

FINRA Rule 12309 allows parties to amend complaints to add additional parties. If the amendment is proposed after a panel has been appointed, the amendment is allowed only if the panel approves it.

While not binding on the Panel, the Panel should use federal law as a guide in determining whether to permit the amendment of the Statement of Claim. Under Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, "the court should freely give leave when justice so requires." *Id*. Circuit Courts have recognized that Courts should favor amendments to pleadings with "**extreme liberality**" *Eldridge v. Block*, 832 F.2d 1132, 1135 (9th Cir. 1987) (emphasis added); see also *Dussouy v. Gulf Coast Inv. Corp*., 660 F.2d 594, 598 (5th Cir. La. 1981) (recognizing liberal standard for amendment). In *Foman v. Davis*, the Supreme Court also explained:

> In the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

## **REQUESTED AMENDMENT**

Purpose of the Amendment

The purpose of this amendment is to add additional parties who, like the current Claimants, received investment recommendations from the Respondent's registered representatives. The allegations regarding the Respondent's misconduct towards the proposed new Claimants are identical to those made by the existing Claimants. Moreover, the hearing on the merits for this matter has not even been scheduled yet. Given the time between now and the final hearing,

Respondent will have sufficient time to conduct additional discovery and prepare for the final hearing.

Prior to filing this Motion, the Claimants sought the approval of Respondent in an effort to avoid the time and expense of motion practice. Respondent has yet to respond.

**CONCLUSION**

For the foregoing reasons, Claimants respectfully request that the Panel grant this motion in its entirety.

Dated: New York, New York
October 22, 2024

Respectfully submitted,

Adam J. Gana, Esq.
Adam J. Weinstein, Esq.
295 Madison Avenue, Suite 705
New York, New York 10017

*Attorneys for Claimants*

# EXHIBIT A

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

---------------------------------------------------------------X

*In the matter of the arbitration between,*

MICHAEL ZIMA, PATRICIA FUCHS, GEORGE HEINEMANN, as Power of Attorney for GLEN and ELSA HEINEMANN, GEORGE AND LORI HEINEMANN, ROBERT AND GWEN GORMAN, CARL PEDIGO, OLAF BLOCHER, as Trustee of the KONRAD BLOCHER TRUST, dated November 17, 2003, AMY GRAY as Executor of the Estate of LAURA LEFF and Successor Trustee of the LAURA LEFF IRREVOCABLE TRUST, THOMAS HARROLD, JOSEPH DYMEK, individually and as Trustee of the JOSEPH DYMEK TRUST dated May 29, 2007, CHRISTOPHER AND JEAN AMBROSE, as Trustees of the JEAN AMBROSE and CHRISTOPHER AMBROSE TRUST, GORDON STEWART, AVERY TARSHIS, JAMES MASTRO, JOHN STRATTON, and JOSEPH McHUGH

FINRA No.: 24-01626

Claimants,

v.

TRIAD ADVISORS, LLC,

Respondent.

---------------------------------------------------------------X

---

**STATEMENT OF CLAIM**

---

Claimants, Michael Zima, Patricia Fuchs, George and Lori Heinemann, George Heinemann, as Power of Attorney for Glen and Elsa Heinemann, Robert and Gwen Gorman, Carl Pedigo, Olaf Blocher, as Trustee of the Konrad Blocher Trust, dated November 17, 2003, Amy Gray as Executor of the Estate of Laura Leff and Successor Trustee of The Laura Leff Irrevocable Trust, Thomas

Harrold, Joseph Dymek, individually and as Trustee of the Joseph Dymek Trust, dated May 29, 2007, Christopher and Jean Ambrose as Trustees of the Jean Ambrose and Christopher Ambrose Trust, Gordon Stewart, Avery Tarshis, James Mastro, John Stratton, and Joseph McHugh[1], by and through their undersigned attorneys, Gana Weinstein LLP and Kurta Law, against Triad Advisors LLC ("Triad" or "Respondent"). This arbitration proceeding is properly before FINRA pursuant to the agreements entered into by the parties and under FINRA Rule 12200, which require a member or an associated person of a member to arbitrate disputes arising out of the associated person or member's investment related business activities.

Claimants seek unspecified damages[2], including compensatory damages consisting of what a well-managed account would have performed in an amount presently unknown, together with interest, punitive damages, attorneys' fees, and all forum fees.

**REQUEST FOR EXPEDITED HEARING**

Claimants request an ***expedited*** hearing in Chicago, Illinois, based on residency, or alternatively via Zoom. NASD Notice to Parties dated June 7, 2004, titled "Expedited Proceedings for Elderly or Seriously Ill Parties," provides that a claimant may request the arbitration process be expedited when the claimant is elderly or seriously ill. Claimant Gordon Stewart is 89 years old.

Accordingly, and based on the foregoing, Claimants respectfully request that FINRA expedite this matter. FINRA's Arbitrator's manual states the following with respect to hearing

---

[1] This case includes all individual accounts, retirement accounts, partnerships, companies, or trusts owned by Claimants, whether mentioned specifically or not.

[2] This is based upon an initial assessment of a portion of Claimants' investments presently available to them. Claimants reserve the right to amend the specific securities and the amounts of damages at issue as more information becomes available.

dates for an expedited case, "Arbitrators should schedule dates that will expedite the process but still provide a reasonable amount of time for case preparation. FINRA encourages parties and arbitrators to schedule the hearing ***within six months*** from the date of the IPHC." FINRA Arbitrator's Guide, 2017 Revision, Pg. 23 (emphasis added).

## PARTIES

### I. Respondent and Relevant Non-Parties

#### A. Triad Advisors LLC

Respondent Triad Advisors, LLC is a FINRA registered broker dealer CRD # 25803 and an SEC registered # 801-55518, 8-42007. Triad Advisors, LLC's main office location is 5155 Peachtree Parkway Suite 3220 Norcross, Georgia, 30092. Consequently, Triad Advisors LLC is required to follow the rules and regulations promulgated by FINRA, the SEC, and Federal and State securities laws of the states that it conducts business in including Illinois as well as the firm's own internal compliance policies and procedures in carrying out its securities business.

Upon information and belief, Triad has been the subject of multiple arbitrations concerning the actions of its long-time registered representatives, James Walesa (CRD #1061209) and Kenneth Luccioni (CRD #719779), and the specific investments that are the subject of this arbitration. According to FINRA's publicly available BrokerCheck, these claims have resulted in settlements totaling ***more than $4.9 million***. Claimants also understand that Respondent is currently the subject of at least one regulatory investigation concerning the Claimants' investments that form the subject of this arbitration.

Triad is no stranger to such regulatory investigations. In fact, Triad was just recently fined and censured for its unsuitable recommendations and failure to properly supervise its representatives concerning investments offered by a company in which several Claimants also

invested, known as LJM. Specifically, FINRA found that "Triad permitted the sale of LJM [Preservation and Growth Fund] on its platform without conducting reasonable due diligence of LJM and without a sufficient understanding of its risks and features, including the fact that the fund pursued a risky strategy that relied, in part, on purchasing uncovered options. Triad also lacked a reasonable supervisory system to review representatives' LJM recommendations. Triad representatives sold $2,267,000 in LJM to fifty-eight customers. LJM's value dropped 80% during an extreme volatility event in February 2018 and the fund ultimately liquidated and closed, resulting in hundreds of thousands in losses for Triad's customers."

**B. Non-Party James Walesa**

Non-Party James Walesa was at all times material hereto a registered broker with FINRA. Walesa has a lengthy history of customer complaints and personal financial issues and has recently personal bankruptcy and is believed to be under regulatory investigation for his actions that are at issue in this Statement of Claim.

Walesa is also a gifted salesman, who is believed to have raised nearly $100 million in investments for numerous companies with which he was affiliated and had an ownership interest. Through these illicit securities transactions, Walesa and Respondent violated numerous FINRA Rules, SEC regulations, and both federal and state law.

Walesa flaunted his involvement with these companies and was not shy about his fundraising activities. He consistently bragged to his clients about his leadership and ownership positions in the companies and encouraged his clients to encourage their friends and family to invest with Walesa – often stating, in writing, "do not keep my work a secret!"

The companies which Walesa touted to the Claimants as "sure things" and "great opportunities" have been anything but. Despite numerous consolidations and reorganizations,

Walesa has apparently reorganized a number of these entities into a company whose shares are a penny stock.

Disclosure(s)

View By: Date

| | | |
|---|---|---|
| 11/10/2023 | Customer Dispute | Pending |
| 4/27/2023 | Customer Dispute | Pending |
| 3/21/2023 | Customer Dispute | Pending |
| 3/21/2023 | Customer Dispute | Pending |
| 4/7/2022 | Customer Dispute | Pending |
| 7/8/2021 | Customer Dispute | Settled |
| 10/21/2020 | Judgment / Lien | |
| 6/13/2013 | Customer Dispute | Settled |

According to his BrokerCheck, Walesa has been the subject of no fewer than seven (7) FINRA customer disputes, some of which involve dozens of investors, along with a judgment in excess of $2 million that is against him personally.

Additionally, per a recent filing with the US Bankruptcy Court for the Western District of Texas, Walesa is involved in numerous pending lawsuits in courts around the country. Unsurprisingly, Walesa is no longer in the securities industry.

### C. Non-Party Kenneth Luccioni

Non-Party Kenneth Luccioni was at all times material hereto a registered broker with FINRA. Luccioni, like his partner Walesa, also has a troubled past in the securities industry. In fact, Luccioni was recently barred from the securities industry for refusing to cooperate with a FINRA investigation. Luccioni has also been the subject of no fewer than five (5) customer complaints, per BrokerCheck.

Disclosure(s)

View By: Date

| | | |
|---|---|---|
| 1/25/2023 | Customer Dispute | Withdrawn |
| 6/27/2022 | Customer Dispute | Settled |
| 1/5/2021 | Customer Dispute | Settled |
| 3/18/2020 | Customer Dispute | Settled |
| 3/18/2020 | Customer Dispute | Settled |
| 11/9/2018 | Regulatory | Final |

### D. Non-Party, Stephen Denari

Non-Party Stephen Denari was at all times material hereto a registered broker with FINRA.

## II. CLAIMANTS

### *1. Michael Zima*

Michael Zima is 60 years old and resides in Chicago, Illinois. Mr. Walesa is Mr. Zima's cousin. At Mr. Walesa's recommendation, Mr. Zima invested his retirement savings in several speculative products, including Clearday, Round Rock, Trident, LJM.

### *2. Patricia Fuchs*

Patricia Fuchs is 69 years old and resides in Eatonville, Washington. Mrs. Fuchs' mother met Mr. Walesa through a widows' group: he met with the group to assist women who previously had no experience in banking. She was a long-time client of Mr. Walesa prior to her passing in 2010. After Mrs. Fuchs returned home from the military in 1992, she met Mr. Walesa and decided to invest her 403b from the military with him. Later, Mrs. Fuchs rolled over her 401k into her account with Mr. Walesa. After Mrs. Fuchs' mother passed in 2010, Mr. Walesa informed her that

she had inherited money from her mother and recommended she invest her inheritance with him. Mr. Walesa recommended Mrs. Fuchs invest over $100,000 in various products, including Clearday, Longhorn Lodging, and Cibolo Creek Partners.

***3. George Heinemann, as Power of Attorney for Glen and Elsa Heinemann***

Glen and Elsa Heinemann are 86 and 82 years old, respectively. They previously resided in Chicago, Illinois, and then they moved to Phoenix, Arizona. They are in the process of moving to Birmingham, Alabama, to be closer to their son, George Heinemann. Glen Heinemann was introduced ot Mr. Walesa nearly 30 years ago and trusted him to invest his funds in a prudent, safe manner for decades. The Heinemanns invested hundreds of thousands of dollars in various private placements recommended by Mr. Walesa and hold thousands of shares of Clearday preferred stock.

***4. George and Lori Heinemann***

George Heinemann was introduced to Mr. Walesa by his parents, Glen and Elsa Heinemann, several years ago. They currently reside in Birmingham, Alabama. Mr. and Mrs. Heinemann invested funds with Mr. Walesa, included money they were saving towards their children's futures. Mr. Heinemann owns a Senior Care Facility, which made him even more interested in Mr. Walesa's investments.

*5.* ***Robert and Gwen Gorman***

Robert and Gwen Gorman reside in Dundee, Illinois. Mrs. Gorman is Mr. and Mrs. Heinemann's daughter and Mr. George Heinemann's sister. The Gormans were induced to invest with Mr. Walesa because of the trusting relationship Mr. Walesa had with the Heinemann family. He recommended they invest in Longhorn.

### *6. Carl Pedigo*

Carl Pedigo resides in Chicago Illinois. Mr. Pedigo invested $50,000 with Mr. Walesa in 2019.

### *7. Olaf Blocher, as Trustee of the Konrad Blocher Trust, dated November 17, 2003*

Konrad Blocher is 88 years old and resides in Illinois. Mr. Blocher met Mr. Walesa through marketing campaigns and free dinner seminars Mr. Walesa offered in the 1990s. Over the course of their relationship, Mr. Blocher and his late wife, Maren, invested significant funds with Mr. Walesa, across their trusts, totaling just over $1 million. Mrs. Blocher passed in 2020, and after her passing, the Maren Blocher Trust dated November 17, 2003 was passed to her husband as successor-trustee and later closed. After Mrs. Blocher's death, their son, Olaf Blocher, began to assist Konrad Blocher with financial matters. Konrad Blocher continued as Trustee of the Konrad Blocher Trust until September 2023. After he resigned, Olaf Blocher was appointed successor trustee. The Konrad Blocher Trust still holds hundreds of thousands of shares of Clearday Common Stock and tens of thousands of Clearday Preferred Stock. The over one million dollars the Blochers invested with Mr. Walesa were meant to be their bequests to their children.

### *8. Amy Gray as Executor of the Estate of Laura Leff and Successor Trustee of The Laura Leff Irrevocable Trust*

Laura Leff was a client of Mr. Walesa for several years. After Ms. Leff started suffering with dementia, her niece, Amy Gray, was appointed Power of Attorney and successor-trustee of the Laura Leff Revocable Trust dated February 14, 2020. Ms. Leff invested in several investments at Mr. Walesa's recommendation, including Clearday, Highland REIT, Round Rock, InventTrust, Shadow Retail, Trident, and Longhorn.

***9. Thomas Harrold***

Thomas Harrold resides in Hoffman Estates, Illinois and is currently 75 years old. Mr. Harrold was introduced to Mr. Walesa when he was invited to attend an investment presentation at a friend's parents' home. After the meeting, Mr. Harrold decided to invest $25,000 with Mr. Walesa. Later, Mr. Harrold purchased additional Clearday stock.

***10. Joseph Dymek, Individually and as Trustee of the Joseph Dymek Trust dated May 29, 2007***

Joseph Dymek is 65 years old and resides in Rhode Island. He met Mr. Walesa in the 1990s through a co-ed touch football league in Colorado. Mr. Dymek is still working because he lost over $300,000 in investments recommended by Mr. Walesa.

***11. Christopher and Jean Ambrose, as Trustees of the Jean Ambrose and Christopher Ambrose Trust***

Jean and Christopher Ambrose reside in Chicago, Illinois and have done so at all times relevant to this action. The investments at issue were previously part of the William Tosch Living Trust. Mr. and Mrs. Ambrose inherited Mrs. Ambrose's father's trust and investments after his death in 2019, and they became part of the Jean Ambrose and Christopher Ambrose Trust. Mr. Tosch was introduced to his brokers, Mr. Walesa and Stephen Denari (CRD # 5138293) by his accountant several years ago. The Ambroses now claim losses of at least $100,000 in investments recommended by Mr. Walesa. They had previously intended to use those funds to repay their children's student loans for college.

***12. Gordon Stewart***

Gordon Stewart is 89 years old and currently resides in a nursing home in San Francisco, California. Mr. Stewart met Mr. Walesa in New York over thirty years ago. Mr. Stewart invested the inheritance he received from his father, over $500,000, with Mr. Walesa.

### *13. Avery Tarshis*

Avery Tarshis is 74 years old and resides in Northbrook, Illinois. Mr. Tarshis built a relationship with Mr. Luccioni several years ago and invested over $30,000 at Mr. Luccioni's direction.

### *14. James Mastro*

James Mastro resides in Naperville, Illinois. Mr. Mastro invested $200,000 across LJM investments at the direction of his broker, Kenneth Luccioni. As a result of this investment, Claimant incurred substantial losses.

### *15. John Stratton*

John Stratton resides in Hurst, Texas. Mr. Stratton invested $332,500 across several investments recommended to him by Mr. Walesa, including Trident Healthcare, Longhorn Lodging, and Shadow Retail. As a result of these investments, Mr. Stratton incurred substantial losses.

### *16. Joseph McHugh*

Joseph McHugh resides in Chicago, Illinois. Mr. McHugh invested in several problematic investments at the recommendation of Mr. Walesa, including Highland REIT, RoundRock, and LJM. As a result of these investments, Claimant incurred substantial losses.

## INTRODUCTION

Claimants trusted Triad through its representatives James Walesa, Kenneth Lucioni, and Stephen Denari (the "Brokers") to prudently invest their savings and act in their best interests. Instead, Triad abused Claimants' trust by recommending that the Claimants invest in several private entities in which Walesa were involved as either an owner, executive, or both. As set forth

in greater detail below, FINRA imposes strict obligations on brokerage firms in the supervision of their registered representatives like Walesa, Luccioni, and Denari.

Specifically, brokerage firms are required to carefully monitor and supervise their representatives' investment related activities. In circumstances such as this, where the representatives are soliciting their customers to invest in businesses in which they have either an ownership interest and/or an executive leadership position, brokerage firms are required to closely scrutinize these activities due in no small part to the inherent conflict of interest. These strict requirements are designed to ensure investor protection. To that end, many brokerage firms simply prohibit their representatives from engaging in such fundraising activities and prohibit them from selling any investment product that is not been vetted by the firm and placed on the firm's approved product list.

Unfortunately, Respondent failed to adhere to these requirements and failed to protect investors, including the Claimants. Rather, Respondent allowed Walesa and Luccioni to openly raise nearly $100 million in investment from Respondent's customers without any interference or supervision. Walesa and Luccioni painted a rosy picture of the various corporate restructuring events which took place over the years between the various entities – each time assuring the Claimants that these were great deals and the investments were on the precipice of paying investors handsomely. Respondent also allowed Walesa and Luccioni to circulate fake account statements and investment updates to the Claimants which represented to the Claimants that the investments were performing well.

In doing so, Respondent violated its supervisory obligations and is responsible for the losses sustained by Claimants, which are substantial. Moreover, due to Respondent's tortious conduct, Claimants have been deprived of the ability to generate the reasonable returns they could

have reasonably expected had they been invested in a *bona fide,* well-managed, and diversified portfolio of stocks, bonds, and/or mutual funds during the relevant time period.

## FACTUAL BACKGROUND

### I. Introduction

James Walesa considered himself to be (and portrayed himself publicly as) a skilled and sophisticated financier. To that end, Walesa became involved in a number of private and publicly traded companies over the past several years (hereinafter, the "Companies"). The list of companies in which Walesa was involved is extensive and includes, but is not limited to:

- Cibolo Creek Partners;
- Trident Healthcare;
- Longhorn Lodging;
- Shadow Retail;
- Farm to Market Development ;
- Hill Country Partners;
- Allied Integral United d/b/a Clearday;
- Round Rock Development Partners;
- Citadel Explorations;
- SitePro (f/k/a Amplisine Labs); and
- Gadsden Properties.

Walesa's involvement in these companies included roles as both an investor and/or an executive. For example, Allied Integral United Inc. (d/b/a Clearday) is a public company for which ***Walesa is the chairman and chief executive officer***.[3] Other examples include Citadel Exploration Inc., a public company of which ***Walesa was chairman of the board*** [4] and Cibolo Creek Partners, a private real estate fund of which ***Walesa is a Director***.[5] The Brokers' customers also invested

---

[3] https://www.sec.gov/Archives/edgar/data/895665/000149315221022360/form8-k.htm
[4] https://www.sec.gov/Archives/edgar/data/895665/000149315221022360/form8-k.htm
[5]https://www.sec.gov/Archives/edgar/data/0001456537/000145653712000001/xslFormDX01/primary_doc.xml

heavily in Round Rock Development Partners, L.P. and Longhorn Lodging, LP—private funds for which ***Walesa's Cibolo Creek Partners is an executive officer and manager***.[6,7,8,9]

Walesa and Luccioni openly raised capital for the Companies. However, the two consistently cut corners, resulting in their capital raising activities being illegitimately structured and improperly conducted – ***making the sale of these securities highly illegal***.

Incredibly, despite the illegality of their endeavors, the two made ***<u>no attempts</u> to hide their activities from Respondent***. In fact, upon information and belief, Walesa even ***affirmatively disclosed*** to Respondent that he was both raising capital for and involved in the management of at least some (if not all) of the Companies. As to the public companies, his involvement was also publicly disclosed in the companies' respective SEC filings available on the EDGAR online repository. Walesa also filed multiple Form Ds[10] for many of the Companies with the SEC, which were publicly available on EDGAR, as well. A simple search of his name was all that was necessary to see every public company in which he was involved. Yet, it appears Respondent either never did that, or did but ignored the results.

Curiously, the Brokers' capital raising activities had all the hallmarks of being done with Respondent's acquiescence, blessing, and involvement. To wit, Claimants understand that Triad

---

[6] https://pitchbook.com/profiles/fund/15284-53F#overview

[7] https://pitchbook.com/profiles/fund/15285-52F

[8] https://www.sec.gov/Archives/edgar/data/0001337983/000133798314000003/xslFormDX01/primary_doc.xml

[9] https://www.sec.gov/Archives/edgar/data/0001456535/000145653514000001/xslFormDX01/primary_doc.xml

[10] A Form D is filed for all investments which are offered pursuant to an exemption from registration under Regulation D of the Securities Act of 1933. Regulation D offerings are exempt from the SEC's disclosure requirements and, other than the Form D, no other documentation or public disclosure is required under federal law. Since there is very little public disclosure, Reg D private placements live in an information black hole, with investors kept largely in the dark about the funds operations and performance.

even had soliciting dealer agreements with several of the Companies pursuant to which Respondent agreed to raise capital from investors for those Companies – and receive selling commissions for its efforts. Respondent's customers also frequently received and executed official Triad paperwork in connection with their investment in the Companies that was on official Triad letterhead and that referred to the investments in the Companies as being "offered through Triad Advisors, Inc." The subscription agreements executed by investors in the Companies were also signed by the Brokers on behalf of Triad Advisors as the selling broker-dealer.

Then, after the investments were made, Respondent regularly processed dividend checks received from these Companies for the benefit of its customers and proceeded to deposit them in their respective customer's Triad account. In certain circumstances, such as where the investments in the Companies were made through IRA accounts, Respondent entered into an arrangement with third party IRA custodians to custody these investments on Triad's behalf and process dividend checks.

The Brokers also emailed regularly with investors and the third-party IRA custodians about the status of their investments in the Companies. These third-party custodians were approved custodians by Triad and often housed legitimate investments.

Over the years, Walesa and Luccioni provided regular updates to investors on Triad letterhead and over email. These updates continued throughout their tenure with Respondent and were made both orally and in writing. The updates were designed for one purpose – which was not to the actually update the Claimants on the true performance of their investments – but rather to tell the Claimants that their investments were performing well and profitable. And it worked. Over the years, Claimants received updates about various acquisitions and mergers by and between the entities in which they had invested and were told about how these corporate actions would

increase profits and returns to investors. Until very recently, Claimants believed that their investments were actually performing as the Brokers promised. Indeed, it was not until only a few short months ago, in September 2023 when Walesa filed for personal bankruptcy, that Claimants realized things may be amiss and began to fear that their investments had been lost.

As detailed in the next section below, the aforementioned actions taken by Walesa and Luccioni constitute numerous violations of FINRA, SEC, state, and federal regulations. Each of the foregoing should have been a red flag and call to action for Respondent. As a result of Respondent's failure to act, the Brokers' illegal activities continued for years unencumbered, resulting in substantial losses to the Claimants' irreplaceable savings.

## II. Respondent's Supervisory Obligations

The state of the law is unambiguous: a ***broker-dealer must supervise <u>all</u> investment related activities of its registered representatives*** as though such activities were conducted through the broker-dealer. Yet, Respondent failed to supervise the Brokers' activities and, in doing so, violated applicable FINRA and SEC Rules.

The Securities and Exchange Act Section ("Exchange Act") 15(b)(4)(E) provides that the SEC can sanction or revoke the registration of any member firm:

> "if it finds…that such broker or dealer…has willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, [the Securities Exchange Act of 1934], the rules or regulations under any of such statutes, or the rules of the Municipal Securities Rulemaking Board, or has failed reasonably to supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation, if such other person is subject to his supervision." (emphasis added).

***The Exchange Act requires broker-dealers to supervise a representative's investment activities, no matter how the activity is executed***, providing a prophylactic approach to supervision designed to prevent violations of the securities laws.

FINRA implemented Rule 3110 to comply with the Exchange Act's supervision requirements.[11] FINRA Rule 3110 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

Both FINRA and the SEC have focused on the high number of investment frauds perpetrated through outside business activities ("OBAs") and the fact that off-site locations may be used by brokers to conceal OBAs and securities fraud.[12]

---

[11] The duty to supervise is violated where either: (1) awareness of 'red flags' are not followed up with proper supervision; or (2) policies and procedures are deficient resulting in failure to detect 'red flags.' *See In the Matter of the Application of Michael H. Hume* ("Hume"), Exchange Act Rel. No. 35608, 52 S.E.C. 243, 1995 SEC LEXIS 983, at*5 (Apr. 17, 1995). (liability imposed "where a supervisor was aware only of 'red flags' or 'suggestions' of irregularities" and fails to follow up.); Kernweis, 2000 WL 33299605 at *13 (*quoting In re Scudder Investments, Inc.*, Investment Act Rel. No. 24218, 1999 SEC LEXIS 2737, at *18 (Dec. 22, 1999). ("[l]iability for failure to supervise may be imposed when a supervisor '[fails] to learn of improprieties when diligent application of supervisory procedures would have uncovered them.'").

[12] *Staff Legal Bulletin No. 17: Remote Office Supervision*, S.E.C. Release No. SLB-3A (CF), 2004 WL 5698359, at * 1 (Mar. 19, 2004) ("Some broker-dealer firms have geographically dispersed offices staffed by only a few people, and many are not subject to onsite supervision. Their distance from compliance and supervisory personnel can make it easier for registered representatives (representatives) and other employees in these offices to carry out and conceal violations of the securities laws."); *see* also NTM 98-38 ("[t]o be effective...[supervision] must be designed to monitor securities-related activities and detect and prevent regulatory compliance problems of such associated persons working at unregistered offices…").

At issue in this case are Respondent's obligations concerning: 1) the outside business activities and private securities transactions of its registered representatives (also known colloquially as "selling away"), and 2) the reasonable basis and customer-specific prongs of the Suitability Rule. As set forth in Sec. 1 and 2, below, as related to the Brokers' fundraising activities for the Companies, one of the two applies. To wit:

1. In the event that Walesa's affiliation with and solicitation of investment in the Companies was approved by Respondent as an outside business activity and private securities transaction, then the firm would be required to supervise Walesa's involvement, as well as supervise each of the investment transactions as if they were sold through the firm. *See, e.g.,* FINRA Rules 3270 and 3280.

2. On the other hand, if Respondent permitted Walesa and Luccioni to sell investments in the Companies through Respondent, then Respondent was required to conduct reasonable and adequate due diligence on the Companies before approving them for sale (reasonably basis suitability), as well as supervise each individual investment to ensure that it was suitable for the customer to whom it was sold (customer-specific suitability). *See, e.g.,* FINRA Rule 2111.

Claimants will demonstrate at the hearing that Respondent did neither successfully and is therefore responsible for Claimants losses suffered in their investments.

**A. Outside Business Activities and Private Securities Transactions of Registered Representatives**

Rules 3270 and 3280 are the primary rules that govern the supervision of outside business activities and private securities transactions of registered representatives. Pursuant to Rule 3270 "Outside Business Activities of Registered Persons", Respondent had a duty to supervise the Brokers' outside business activities. Specifically, Rule 3270 provides:

> No registered person may be an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he or she has provided prior written notice to the member, in such form as specified by the member. Passive investments and activities subject to the requirements of Rule 3280 shall be exempted from this requirement.

Additionally, where, as here, a registered representatives' outside business activities are "securities related", FINRA Rule 3280 "Private Securities Transactions of an Associated Person" applies. For the purposes of Rule 3280, a "private securities transaction is defined as "any securities transaction outside the regular course or scope of an associated person's employment with a member", which includes the solicitation of the Claimants' investments in the Companies.

As for the Respondent's obligations, Rule 3280(a) provides that "[n]o person associated with a member shall participate in any manner in a private securities transaction except in accordance with the requirements of this Rule." As stated in Rule 3110, final responsibility for ensuring its representatives' compliance with this Rule rests with Respondent. Subsection (b) goes on to require that the representative provide notice to the firm of his or her involvement with the private securities transaction.

Here, Claimants understand that Walesa disclosed his involvement in multiple of the Companies, including Cibolo Creek Partners, which ***still appears on Walesa's BrokerCheck Report to this day***. Accordingly, Respondent was obligated to undertake an investigation into these activities to determine whether or not it would approve the Brokers' participation. If Respondent declined to approve the Brokers' participation, then Respondent had an obligation to ensure that both Brokers complied with Respondent's prohibition. On the other hand, if Respondent approved their participation, then Rule 3280(c)(2) (formerly, NASD Rule 3040(c)(2)) applies:

> If the member approves a person's participation in a transaction pursuant to paragraph (c)(1), ***the transaction shall be recorded on the books and records of the member and the member shall supervise the person's participation in the transaction as if the transaction were executed on behalf of the member***.[13]

[13] FINRA Rule 3280(e)(1) defines "***Private securities transaction***" as "***<u>any securities transaction</u> outside the regular course or scope of an associated person's employment with a member,***

(emphasis added).

This means that Respondent was ***required record these transactions on the firm's books and records and supervise the activity as if the activity occurred through the firm***. FINRA has warned firms that it is their responsibility to "review their supervisory procedures to make sure that they are reasonably designed to achieve compliance with [FINRA] Rules 3030 and 3040 [now 3280] regarding outside business activities and private securities transactions…" *See* NTM 01-79: Selling Away and Outside Business Activities.

FINRA has repeatedly sanctioned firms for failing to supervise a broker's outside business activities. In addition, the SEC has sanctioned brokerage firms for schemes conducted by their brokers through private securities transactions. In *In re Commonwealth Equity Services, LLP*, registered representative Bleidt misappropriated over $31 million from more than 100 victims through his RIA. SEC Rel. No. 56362, 2007 WL 3071391 (Sept. 6, 2007). The SEC stated that "[u]nder Section 15(b)(4)(E) of the Exchange Act, broker-dealers are responsible for reasonably supervising, with a view to preventing violations of the federal securities laws, persons subject to their supervision." *Id.* at *3. In *Commonwealth* the firm "failed to establish reasonable policies and procedures for responding to red flags related to Bleidt's outside business activities." *Id.* There are other similar examples of firms being sanctioned for failing to supervise outside business activities.[14]

---

***including, though not limited to, new offerings of securities which are not registered with the Commission***." Clearly the investments at issue were private securities transactions governed by Rule 3280.

[14] *In re Signator Investors, Inc., et al*, SEC Rel. No. 75690 (Aug. 13, 2015) (finding that Signator failed to reasonably supervise both brokerage and advisory client activity of its representative leading to 125 clients being defrauded of $13.5 million).

Like Commonwealth Equity Services did nearly two decades ago, in this matter, Respondent Triad ignored the SEC's and FINRA's guidance on supervising private securities transactions and failed to properly supervise the outside business activities of its registered representative.

**B. Due Diligence Obligations for Firm-Approved Investments**

If Respondent approved the investments in the Companies and entered into selling agreements with them to sell these securities ***through the firm*** (as opposed to a private securities transaction), then the analysis would center around whether or not Respondent adequately supervised the suitability of these transactions.

FINRA Rule 2111,[15] also known as the "Suitability Rule," provides:

> (a) A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

FINRA breaks this analysis down into three components: 1) Reasonable basis suitability, 2) customer specific suitability, and 3) quantitative suitability.[16] *Id.*

When selling investments like those the Claimants made in the Companies, the first step broker-dealers must take is to conduct a "reasonable basis suitability" analysis. *See* FINRA Notice to Member 03-71. This is the first step because before a broker-dealer can assess whether an

[15] Formerly FINRA Rule 2310.

[16] Quantitative suitability is not pertinent to the Claimants' claims in this arbitration.

investment is suitability for a particular customer (known as "customer specific suitability") it must first determine if the investment is suitable for sale generally. This process is often referred to simply as due diligence.

Rule 2111 states, in pertinent part:

> (a) The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy. A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule.

The notion behind this obligation is simple – every investor, regardless of risk tolerance or sophistication, has a fundamental right to be protected from fraud and conflicts of interest. Although Respondent is obligated to conduct due diligence on every investment it offers to customers, FINRA and the SEC have long recognized a heightened importance of conducting due diligence where, as here, investment products are offered pursuant to an exemption from disclosure requirements. *See* FINRA Notice to Member 10-22.

In this case, most of the investments at issue were never registered with the Securities and Exchange Commission and, instead, were offered pursuant to an exemption from registration under Regulation D of the Securities Act of 1933. Regulation D exempts certain securities offerings from the typical disclosure requirements that are required of all new securities offerings under federal law. Generally, when companies want to issue securities, they are required to file a registration statement or prospectus with the Securities and Exchange Commission. This process, which involves publicly disclosing all material risks in writing, is generally known as an initial

public offering. Regulation D offerings are completely exempt from these requirements and, other than a short form called a "Form D," no other documentation or public disclosure is required under federal law.

Due to this inherent lack of disclosure and regulatory oversight, FINRA advises member firms, such as Respondent, that it must be particularly skeptical of such offerings. *See* Notice to Member 03-71. Among other requirements, Respondent would have been expected to review audited financial statements for the Companies and actively question any red flags contained therein. *Kunz v. SEC*, 64 Fed. Appx. 659 (10th Cir. 2011). At the hearing on the merits, the Claimant will show that Respondent failed to conduct a proper review of the Companies and failed its reasonable basis suitability obligations.

Beyond that, Respondent was obligated to ensure that the investments at issue complied with Respondent's customer-specific suitability obligations. This means that Respondent was obligated to ensure that the Claimants' respective investments in the Companies were appropriate for them based upon their own unique investor profiles, including their respective risk tolerances, investment objectives, net worths, and the like. Claimants will demonstrate at the hearing that even if Respondent otherwise fulfilled its due diligence obligations (which it did not), Respondent's recommendations that the Claimants invest in the Companies were nonetheless unsuitable.

## III. Non-Walesa Company Investments At Issue

### A. Alternative Investments

Respondent and the Brokers also recommended that the Claimants invest in risky alternative investments. These include, but are not limited to limited partnership offerings by Atlas Growth Partners, Ridgewood Energy and other sponsors. Alternative investments commonly pay

extraordinarily high commissions, but also expose investors to extraordinarily high risks, including illiquidity and loss of principle. For that reason, FINRA requires that brokerage firms conduct extensive due diligence on them.

**B. LJM Preservation and Growth Fund**

Contrary to its name, the LJM Preservation and Growth Fund was very risky and sought neither preservation nor growth. Not only was LJM leveraged with high margin levels, but LJM also operated by selling naked put options on S&P 500 futures. The fund used these options to employ a highly complex strategy known as a "short strangle". A short strangle strategy has unlimited downside (no preservation) and limited upside (no growth). This strategy was extremely high risk. In fact, as early as July 2017, Morningstar reported that the Fund was an aggressive option seller that was "high risk" with high fees. *See* LJM Morningstar Report, dated July 13, 2017.

This is how the fund's strategy is described in its prospectus:

> The Fund seeks to achieve it investment objectives by capturing gains on options sold on S&P futures contracts that can be purchased ("closed") at a later date for a lower price than the price realized when originally sold… In the aggregate, the Fund is typically "net short" in the portfolio of contracts that it holds, which means that the Fund holds more uncovered option contracts then covered.

The fund's strategy was essentially to bet that market volatility would not increase significantly and that the market index level would not change. When both market volatility and market index declines occurred simultaneously, as they did during the first week of February 2018, the results were catastrophic for investors in LJM, who lost a combined $700 million dollars or 80% of the fund's NAV. On Monday, February 5, 2018, the share price of LJM plummeted 55.8% from $9.67 to $4.27. Then, on the following day, the price fell by more than half again – dropping 54.6% to $1.94. This represented a loss of more than 80%.

## LEGAL CLAIMS[17]

## POINT I.

## BREACH OF FIDUCIARY DUTY

Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients.[18] In addition, FINRA has stated on numerous occasions that "the suitability rule and the concept that a broker's recommendation must be consistent with the customer's best interests are inextricably intertwined." NTM 12-25, Suitability, pg. 3 (Jul. 9, 2012). This means that "a broker make only those recommendations that are consistent with the customer's best

---

[17] The legal claims listed herein are not meant to be an exhaustive list of claims but merely illustrative of the types of claims being made in accordance with FINRA requirements to providea description. Claimants reserve the right to add or amend the legal claims and theories made herein and provide further detail in Claimants' pre-hearing brief.

[18] *See Mansbach v. Prescott, Ball & Turben,* 598F.2d1017 (6th Cir. 1979) (a securities broker dealeris a fiduciary who owes its customer a high degree of care in transacting business); *Byrley v. Nationwide Life Insurance Co.,* 94 Ohio App. 3d 1 (Erie County 1994) ("broker and a client are ina fiduciary relationship."); *United States v. Wolfson,* 2008 WL 1969730, at *2 (S.D.N.Y. May 5, 2008) ("The essence of the argument is that there is no fiduciary relation between a broker and a customer unless the broker is handling a discretionary account. That is simply not true."); *E.F. Hutton & Co. Inc.,* Exchange Act Release No. 25,887, 41 SEC Docket 413, 418 (July 6, 1988) ("The concept of just and equitable principles of trade embodies basic fiduciary responsibilities…"); *Lipkien v. Krinski,* 182 N.Y.S. 454, 192 A.D. 257, 263 (N.Y. App. Div. 1920)(holding that transferring cash to broker gives rise to fiduciary duty regardless of defendants' claimthat they were only clearing broker); *Rolf y. Blyth. Eastman Dillon & Co.,* 570 F.2d 38 (2nd Cir. 1978) (registered representative; as broker for investor, owed investor a fiduciary duty); *Moholt v.Dean Witter Reynolds, Inc.,* 478 F. Supp. 451(D.D.C.1979) (stockbrokers are quasi-fiduciaries andare held to high degree of trustworthiness and fair dealing); *Pachter y. Merrill Lynch. Pierce, Fenner & Johnston. Inc.,* 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "theutmost good faith" toward him); *Thropp v. Bache Halsey Stuart Shields, Inc.,* 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); *Leboce. S.A. v. Merrill Lynch. Pierce. Fenner & Johnston, Inc.,* 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); *Jaksich y. ThomsonMcKinnon Securities, Inc.,* 582 F. Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); *Utah State University of Agriculture and Applied Science y. Sutro & Co.,* 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trnstee dealing with public funds); *E.F. Hutton & Co. y. Weeks,* 166 Ga.App. 443, 304 S.E.2d 420 (Ga. 1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith); *Wilder v. Meyer,* 779 F. Supp. 164, 168-69 (S.D. Fla. 1991).

interests prohibits a broker from placing his or her interests ahead of the customer's interests." *Id; see also Raghavan Sathianathan,* Exchange Act Rel. No. 54722, 2006 SEC LEXIS 2572, at *21 (Nov. 8, 2006); *Scott Epstein,* Exchange Act Rel. No. 59328, 2009 SEC LEXIS 217, at *40 n.24 (Jan. 30, 2009) ("In interpreting the suitability rule, we have stated that a [broker's] 'recommendations must be consistent with his customer's best interests.'"); *Dane S. Faber,* 57 SEC 297, 310, 2004 SEC LEXIS 277, at *23-24 (2004) (stating that a "broker's recommendations must be consistent with his customer's best interests" and are "not suitable merely because the customer acquiesces in [them]"); *Wendell D. Belden,* 56 S.E.C. 496, 503, 2003SEC LEXIS 1154, at *11 (2003) ("As we have frequently pointed out, a broker's recommendationsmust be consistent with his customer's best interests.").

Respondent violated their fiduciary duty in multiple ways by: 1) recommending an unsuitable investment; 2) omitting material information and providing false and misleading information to Claimants; 3) breach of duty of loyalty through conflicts of interests and placing personal gain above the interests of the Claimants; and 4) failing to conduct due diligence on the investments recommended. These prongs will be discussed in the following sections.

**POINT II.**

**SUITABILITY**

Financial advisers must always make suitable recommendations to their clients and must abide by the suitability rules imposed by FINRA. The scope of these duties is defined in FINRA Rule 2111,[19] also known as the "Suitability Rule," which provides:

> (a) A member or an associated person must have a reasonable basis to believe that a ***recommended transaction or investment strategy involving a security or securities*** is suitable for the customer, based on the information obtained through the

[19] Formerly FINRA Rule 2310.

> reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

*See* FINRA Rule 2111 SUITABILITY (emphasis added); *see also* NYSE Rule 405; *In re Larry Ira Klein,* Exchange Act Release. No. 37835 (Oct. 17, 1996) (a representative may make "only such recommendations as would be consistent with [her customers] financial situations and needs."); *In re James Chase,* Exchange Act Rel. No. 47476 (Mar. 10, 2003), 79 SEC Docket 2892, 2897 ("The SEC concluded that the mere disclosure of risks did not satisfy the suitability duty...[n]ot only must the customer be sufficiently sophisticated to fully understand the risks involved with the investment, the customer also must be able to bear those risks.").

In addition, under FINRA 2090 "Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer."

Respondent and its agents violated their suitability obligations to Claimants by: (i) failing to conduct a reasonable basis analysis of the alternative investment strategy, (ii) failing to make customer-specific suitable recommendations, and (iii) over-concentrating Claimants' accounts in the alternative investments. Each aspect of the suitability rule is discussed below.

**A. Reasonable Basis and/or Investment Strategy**

FINRA has long held that Rule 2310 "include[s] having a reasonable basis for recommending a particular security or strategy." *See Notice to Members 96-32,* 1996 NASD LEXIS 51, 2 (May 1996); *see also F.J. Kaufman and Co.,* 50 S.E.C. 164, 168 (1989). First, a broker-dealer must

determine whether the product or strategy is suitable for any customer, regardless of that customer's wealth, willingness to accept risk, age, education, or other individual characteristics. *See In re F.J. Kaufman and Company of Virginia*, 50 S.E.C. 164 ("A broker-dealer must have an 'adequate and reasonable basis' for any recommendation that he makes.").

Respondent failed to conduct reasonable due diligence on the investments sold to the Claimants, the majority of which were alternative, non-traded investments. Such investments come with very high costs, fees, and commissions and have historically underperformed safe investments such as treasuries.

FINRA specifically reminded firms in NTM 03-71 that:

> Given the complex nature of NCIs [Alternative Investments] and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products.

FINRA reminded members offering NCI's, such as the Alternative Investments, alternatives of their obligations to: (1) conduct adequate due diligence to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risksand rewards associated with the particular product; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products.

In NTM 12-03: Heightened Supervision of Complex Products, FINRA noted it had previously issued multiple notice such as NTM 03-71, NTM 05-26, and NTM 10-22 with a "consistent theme in these Notices is that the complexity of a product often necessitates more scrutiny and supervision by a firm." *Id.*

FINRA has provided an in-depth notice on how to conduct due diligence. FINRA firms havean "obligation to conduct a reasonable investigation of the issuer and the securities they recommend in offerings…" Notice to Members ("NTM") 10-22: Regulation D Offerings, at 1; *see also See Hanly v. SEC,* 415 F.2d 589, 595-96 (2d. Cir. 1969); *SEC v. Great Lake Equities Co.,* 1990 U.S. Dist. LEXIS 19819 at *16-17 (E.D. Mich. 1990); *SEC v. North American Research and Development Corp.,* 424 F.2d 63,84 (2d Cir. 1970); *SEC v. Current Financial Services, Inc.,* 100 F. Supp. 2d 1, 14-15 (D.D.C. 2000); *District Business Conduct Committee for District No. 4 v. Everest Securities, Inc.,* 1994 NASD Discip. Lexis 188 (Sept. 2, 1994), *aff'd,* 52 S.E.C.958, 962-63 (Aug. 26, 1996), *aff'd,* 116 F. 3d 1235 (8th Cir. 1997) (stating that firms are required to exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims); Securities Act Release No. 4445, 27 Fed. Reg. 1415 (Feb. 2, 1962).

FINRA has stated that a brokerage firm has a "special relationship" with a customer "from the fact that in recommending the security, the BD represents to the customer 'that a reasonable investigation has been made and that [its] recommendation rests on the conclusions based on such investigation.'" *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). A brokerage firm "may not rely blindly upon the issuer for information concerning a company," in lieu of conducting its own reasonable investigation. *Id.*at 4 (*citing Everest Securities, Inc. v. US,* 116 F. 3d at 1239 ("reliance on others does not excuse [the respondent's] own lack of investigation").

Indeed, when an issuer seeks to finance a new speculative venture, brokerage firms "must be particularly careful in verifying the issuer's obviously self-serving statements." *Id.* (*citing Everest Securities, Inc.,* 116 F. 3d at 963). In addition, the SEC and courts recognize that a more thorough investigation is required for "securities issued by smaller companies of recent origin." *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). "The fact that a BD's customers may be sophisticated and

knowledgeable does not obviate the duty to investigate." *Id.* at 4.

FINRA has defined the following parameters as the *bare minimum* a brokerage firm must document in conducting a reasonable investigation for a Regulation D offering and any subsequent offering for the same issuer:

- the issuer and its management[20];
- the business prospects[21] of the issuer;
- the assets[22] held by or to be acquired by the issuer;
- the claims being made; and
- the intended use of proceeds of the offering
- whether the investor's money is likely to be applied according to the stated use ofproceeds
- whether the stated use of proceeds is reasonable in light of the issuer's businesspurpose and prospects

*Id.* at 5; *see also In Re Brian Prendergast,* 2001 SEC LEXIS 1533 (Aug. 1, 2001); *LegendMerchant Group, Inc.,* NASD No. C10030058 (July 2004); *Shelman Securities, Inc.,* NASD No.C06030013 (Feb. 2004) (private placement memoranda contained material misrepresentations andomissions about use of proceeds in a previous offering). In order to demonstrate the brokerage firmhas performed a reasonable investigation, the firm should retain records documenting both theprocess and results of its investigation. *Id.* at 7. The records should include descriptions of themeetings held of the investigation, tasks performed, documents and other information reviewed,results of the reviews, and the individuals who attended the meetings or conducted the reviews. *Id.* Accordingly, Respondent had a legal obligation to vet and independently investigate the investments and should have been able to provide a due diligence report prior to recommending Alternative Investments.

[20] FINRA provides a 13 point list of items a reasonable brokerage firm would review with issuer and its management. *Id.* at 8-9.

[21] FINRA provides a 5 point list of items a reasonable brokerage firm would review with to determine the company's business prospects. *Id.* at 9-10.

[22] FINRA provides a 3 point list of items a reasonable brokerage firm would review with to determine the quality of the company's business assets. *Id.* at 9-10.

It is doubtful that Respondent ever conducted a meaningful investigation into these investments, the sponsoring entities, or Walesa's affiliation with them. In sum, Respondent failed to conduct a reasonable investigation into the qualities and performance of the investments recommended and could not form a reasonable basis for their recommendations and the investment strategy implemented in Claimants accounts.

**B. Customer Specific Suitability**

The second dimension of FINRA Rule 2310 requires the broker to have a reasonable basis to believe that the recommendation is suitable for the particular customer based on the customer's investment profile. The investment profile includes items such as: financial situation, tax status, investment objectives, risk tolerance, age, and investment experience. *See* FINRA Rule 2310, Recommendations to Customers (Suitability); *see also In re Larry Ira Klein*, Exchange Act Release. No. 37835 (Oct. 17, 1996) (Brokers may make only such recommendations as would be consistent with the customer's financial situation and needs).

FINRA has also warned that "[a]s investors age, their investment time horizons, goals, risk tolerance and tax status may change…[and] seniors and retirees may have less tolerance for certain types of risk than other investors." NTM 07-43: Senior Investors, pg. 2 (Sept. 2007). FINRA also stated that it would scrutinize "recommendations to seniors…that involve…[p]roducts that have withdrawal penalties or otherwise lack liquidity, such as deferred variable annuities…real estate investments and limited partnerships" *Id.* at 4.

Many brokerage firms claim that if an investor's net worth is sufficient to invest in security that such a fact equates to suitability of high risk investments. In NTM 03-71 FINRA issued a clear warning for firms that qualification does not equate to suitability:

> NASD cautions members against relying too heavily upon a customer's financial status as the basis for recommending NCIs.

> A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability obligation; however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met their suitability obligations. NCIs with particular risks maybe suitable for recommendation to only a very narrow band of investors capable of evaluating and being financially able to bear those risks.

NTM 03-71; *In re Arthur Joseph Lewis,* SEC Rel. No. 34-297941991 WL 294317 (Oct. 8, 1991) (The fact that a customer, such as Mrs. McGowan, may be wealthy does not provide a basis for recommending risky investments."); *In re Patrick G. Keel,* SEC Rel. No. 34-31716, 1993 WL 12348 (Jan. 11, 1993) (holding same).

Here, Respondent failed to understand Claimants' investment needs and objectives. Instead, Respondent thought only about their own commissions and unsuitably invested Claimants in the highest paying commission products available.

### C. Respondent Recommended an Impermissible Overconcentration in Alterative Investments

A broker dealer is liable for a claim of unsuitability when it over-concentrates a client's account with a particular investment. *In re Holland,* Exchange Act Release No. 36,621, 60 S.E.C. Docket 2935(Dec. 21, 1995) (good faith immaterial to broker liability). Even if a broker claims a client has agreed to such an overconcentration, a broker's suitability obligations are not absolved. In *Holland*, the SEC concluded:

> Even if we were to accept [the broker's] view that these clients wanted to speculate and were aware of the risks-a conclusion not supported on this record-the Commission has held on many occasions that the test is not whether [the clients] considered the transactions in their account suitable, but whether [the broker] fulfilled the obligation she assumed when she undertook to counsel [them], of making only such recommendations as would be consistent with [their] financial situation and needs.

*Id.* at 736-37 (citing *In re Erdos*, 47 S.E.C. 985, 989 (Nov. 16, 1983)); *see also In re Wickswat*, 50 S.E.C.

Here, Respondent recommended overconcentrated positions in alternative investments to Claimants.

**POINT III.**

**RESPONDENT EITHER FRAUDULENTLY OR NEGLIGENTLY MADE MATERIAL MISREPRESENTATIONS AND OMITTED MATERIAL INFORMATION IN THE ALE OF THE INVESTMENT TO CLAIMANT**

**A. Federal Securities Law**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. See 15 U.S.C.S. §78j. The SEC, pursuant to 15 U.S.C.S. §78j, promulgated S.E.C. Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5). In a typical § 78j(b) private action, a plaintiff must prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

**B. State Securities Acts, Common Law Fraud, and Common Law Negligence**

As herein described, Respondent and its agents violated provisions of multiple state securities acts,[23] including, *e.g.,* the Illinois Securities Act, 815 ILCS 5 et seq., and common law fraud. According to the Illinois Act, it shall be unlawful: "[t]o employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12(I). Further, the sale of securities in violation of the Illinois Act provides for statutory interest from the date of sale in the amount of the rate of interest stipulated in the securities sold, as well as attorney's fees for the purchaser. 815 ILCS 5/13(A). As alleged above, Respondent's conduct violated the foregoing rules and laws.

### C. Violation of FINRA Rule 2210

The FINRA Rules require firms to provide only accurate and balanced communications, forecasting, marketing, and demonstrative information to clients. NTM 08-81 reminds members that:

> Sales materials and oral presentations must present a fair and balanced picture regarding both the risks and benefits of investing in these products. FINRA reminds firms that NASD Rule 2210 and IM-2210-1 require firms to ensure that statements are not misleading within the context in which they are made, and that firms must consider the nature of the audience to which the communication is directed…

In addition, FINRA Rule 2210(d)(1) provides:

> (A) All member communications with the public shall be based on principles of fair dealing and good faith, must be fair and balanced, and must provide a sound basis for evaluating the facts in regard to any particular security or type of security, industry, or service. No member may omit any material fact or qualification if the omission, in the light of the context of the material presented, would cause the communications to be misleading.

[23] Claimants will provide legal briefing at hearing outlining the specific ways Respondent violated each of the applicable state securities acts. As the provisions of each are similar, the Illinois Securities Act is discussed by way of example.

> (D) Communications with the public may not predict or project performance, imply that past performance will recur or make any exaggerated or unwarranted claim, opinion or forecast. A hypothetical illustration of mathematical principles is permitted, provided that it does not predict or project the performance of an investment or investment strategy

Further, NTM 03-71 provides guidance concerning non-conventional investments stating:

> [M]embers should provide investors with any prospectus and other disclosure material provided by the issuer or the sponsor. NASD reminds members, however, that simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by the member, sponsor, or issuer.

*See* NTM 03-71. In addition, NTM 10-22 provides that:

> If a private placement memorandum or other offering document presents information that is not fair and balanced or that is misleading, then the BD that assisted in its preparation may be deemed to have violated NASD Rule 2210. Moreover, sales literature concerning a private placement that a BD distributes will generally be deemed to constitute a communication by that BD with the public, whether or not the BD assisted in its preparation.

NTM 10-22 at 5.

**D. Respondent's Fraudulent Misrepresentations and Omissions**

As alleged, Respondent provided false and misleading information to their clients in the sale of securities, management of accounts, and financial planning. As shown above, the presentations made to Claimants by the Brokers both in various marketing materials and orally were knowingly or recklessly false and misleading and omitted material information. Respondent misrepresented therisks and qualities of the investments being.

Respondent concealed known losses on Claimant's investments and otherwise attempted to cover losses. Respondent's representations concerning the performance and returns for these

investments and the ongoing investment strategy were not balanced and presented Claimants fairly, an inexperienced investor in these products.

In addition, it is anticipated that with respect to certain investments Respondents will defend themselves by asserting the "prospectus" defense. This defense asserts that Respondent and its agents are allowed to make false statements and misrepresentations to investors so long as a prospectus is provided. This defense has no merit and seeks to undermine the very purpose of the securities laws. According to the SEC, a person who makes oral misrepresentations to sell a security cannot wash away his liability by handing his victim a prospectus:

> At the expense of restating the obvious, we emphasize that compliance with these requirements for delivery of a prospectus or offering circular does not, however, license broker-dealers or their salesmen to indulge in false or fanciful oral representations to their customers. The anti-fraud provisions of the Securities Act and the Securities Exchange Act apply to all representations whether made orally or in writing, during or after the distribution. We have repeatedly held that the making of representations in the sale of securities unsupported by a reasonable basis is contrary to the obligation of fair dealing imposed on broker-dealers and their salesmen by the securities laws. **This obligation is not diminished because a prospectus or offering circular containing information specified by the Act and our rules has been or is to be delivered. Such information furnishes the background against which the salesman's representations may be tested. Those who sell securities by means of representations inconsistent with it do so at their peril.**

*In the Matter of Ross Secs., Inc.,* SEC Release No. 7069, 41 SEC Docket 509 (Apr. 30, 1963); (emphasis added); *see also In the Matter of the Application of Larry Ira Klein,* SEC Release No. 37835, 63 SEC Docket 52 (Oct. 17, 1996) ("Klein's delivery of a prospectus to Towster does not excuse his failure to inform fully the risks of the investment package he proposed").

This point has been made over and over again by FINRA:

> Members are also advised that, although the prospectus and sales material of a fund include disclosures on many matters, **oral representations by sales personnel that contradict the**

> **disclosures in the prospectus or sales literature may nullify the effect of the written disclosures and they make the member liable for rule violation and civil damages** to the customers that result from such oral representations.

NASD Notice to Members 03-71 (emphasis added); NTM 13-18: Guidance on Communications With the Public Concerning Unlisted Real Estate Investment Programs, pg. 2 (May 2013)("Descriptions of real estate programs in communications need to be consistent with the representations in the program's current prospectus."); NTM 04-30 ("However, NASD reminds firms that simply providing a prospectus does not cure unfair or unbalanced sales or promotional materials, whether prepared by the firm or the issuer."); NTM 05-59 ("Members are further reminded that providing risk disclosures in a prospectus supplement does not cure otherwise deficient disclosure in sales material, even if such sales material is accompanied or preceded by the prospectus supplement.").

**POINT IV.**

**RESPONDENT VIOLATED FINRA RULES 2010, IM-2310, and 2020**

FINRA Rule 2010 requires members to "observe high standards of commercial honor and just and equitable principles of trade" in conducting their business. FINRA Rule 2020 also prohibits members from effecting "any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance." IM-2310-2 - "Fair Dealing with Customers" is cross-referenced by both of the aforementioned provisions and provides a non-exhaustive list of activities that would be inconsistent with the foregoing principals. *See* IM-2310-2: FAIR DEALING WITH CUSTOMERS. The first section of IM-2310-2 outlines member and associated persons obligations in dealing with customers as follows:

> (a)(1) Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with particular emphasis on the requirement to deal fairly with the public.

Respondent egregiously and intentionally violated many of the subsections of IM-2310-2, as discussed *infra.*

**POINT V.**

**FAILURE TO SUPERVISE**

Respondent unreasonably failed to stop inappropriate sales. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees.

### A. Supervision Standard

Respondent failed to supervise their broker's misconduct. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees. FINRA Rule 3010 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

FINRA Rule 3010: SUPERVISION.

The duty to supervise is a critical component of the securities regulatory scheme. *Inre Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Those who have a duty to supervise have an affirmative responsibility to uphold their duty. *Id.* Regulatory authorities such as the SEC, FINRA and the NYSE have steadily heightened the supervisory obligations of brokerage firms in recent years. Utilizing language employed by the SEC, "effectivesupervision by

a broker/dealer is a critical element in the regulatory scheme and its importance hasincreased as firms have grown...broker dealers must provide effective staffing, efficient resourcesand a system of follow-up and review to determine that any responsibility to supervise…is being diligently exercised." *In Re Mabon Nugen & Co.*, 44 SEC Docket 1116, Release No. 27301 (September 27, 1989).

Evidence tending to establish a variance between conduct called for by a firm's procedures and the actions actually undertaken by an employee of the firm may support a finding of liability. *Rupert v. Clayton Brokerage Co. of St. Louis, Inc.*, 737 P.2d 1106, 111 – 12 (Colo. 1987). Supervisors have an obligation to respond vigorously and with the utmost vigilance to indications of irregularity. A supervisor cannot ignore or disregard red flags and must act decisively to detect and prevent improper activity. Indications of wrongdoing demand inquiry as well as adequate follow up and review. *In re Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Also, a violation of internal procedures may support a punitive damages award. *Alrich v. Thomson McKinnon Securities, Inc.,* 589 F.Supp. 683, 685 (S.D.N.Y. 1984). Finally, "a court [or other arbiter] may consider evidence of [a] brokerage firm's internal rules as evidence of the proper standard of care." *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 820 (6th Cir.1981); see *also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F.Supp. 1224, 1227 (D.D.C. 1986) (violation of NASD rule was evidence of broker's negligence).

**B. Outside Business Activities and Private Securities Transactions**

As set forth hereinabove, proper supervision requires compliance with Rules 3270 and 3280. Rule 3270 requires that brokerage firms properly supervise their registered representatives' outside business activities. In the event such activities are securities related and private securities transactions, Rule 3080 requires the brokerage firm to record these transactions on the firm's books

and records and supervise the activity as if the activity occurred through the firm. Here, Respondent failed to do the same, thereby violating Rules 3270 and 3280.

**C. "Control Person" Liability**

Respondent is also liable to Claimants for misconduct under the theory of "control person" liability. Both federal and state securities acts impose "control person" liability on all persons who have the power, direct or indirect, exercised or not, to control another's sale of securities. *See*, *e.g.*, 15 U.S.C.A. § 78t (2011) (stating "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlledperson to any person to whom such controlled person is liable…").

As used in all such securities acts, "the term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981). Respondent was the "control persons" of their brokers at all times relevant to this dispute. Therefore, Respondent is liable for its brokers' misconduct.

**D. Respondeat Superior**

Respondent is liable to Claimants for all of its brokers misconduct under the theory of respondeat superior. Courts have held that respondeat superior liability is created by the "special duties that certain employers assume under the federal securities laws when their conduct is likely to exert strong influence on important investment decisions." *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 181 (3d Cir. 1981). As also explained by the Fifth Circuit, "most investors rely upon the reputation and prestige of the brokerage firm rather than the individual employees with whomthey

might deal. Such firms should be held accountable if employees they select utilize the firm's prestige to practice fraud upon the investing public." *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1119 (5th Cir. 1980); *Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir. 1981) (*cited by Sharp v. Coopers & Lybrand,* 649 F.2d at 182) ("(U)nder common law principles, a principal is liable for the deceit of its agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal.") *see also* Restatement (Second) of Agency § 261 ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit fraud upon third persons is subject to liability to such third persons for the fraud"). Similarly, the Sixth Circuit has emphasized that the broker-dealer has "an affirmative obligation to prevent use of the prestige of its firm to defraud the investing public." *Holloway v. Howerdd,* 536 F.2d 690, 696 (6th Cir. 1976); *As You Sow v. AIG Fin. Advisors, Inc.,* 584 F. Supp. 2d 1034, 1047 (M.D. Tenn. 2008) (*citing See Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir. 1981), *cert denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981); *Alvarado v. Morgan Stanley Dean Witter. Inc.,* 448 F.Supp.2d 333 (D.P.R. 2006); *Carroll v John Hancock Distributors, Inc.,* CIV.A. 92-5907, 1994 WL 87160 at *4 (E.D. Pa. Mar. 14, 1994) ("[U]nder Pennsylvania law a principal is liable to third parties for the frauds, concealments etc. of his agent committed within the scope of his employment even though the principal did not authorize or know of such conduct, even if he forbade such acts.").

Respondent is responsible for all of its broker's investment related activities. Regardless of whether or not the firm prohibited misconduct.

**POINT VI.**

**FRAUDULENT INDUCEMENT TO HOLD INVESTMENT**

Claimants claim that Respondent's wrongful or fraudulent conduct induced Claimants to maintain a position and not to change such position, resulting ultimately in a loss. Respondent committed fraud on an ongoing basis, by inducing Claimants to hold onto the unsuitable investments. Respondent was the provider of investment advice to Claimants, including ongoing advice as to retention of the investments. Respondent owed duties to Claimants as previously described, including theduty not to make misrepresentations of material facts and not to omit to disclose material facts from any communications or reports (oral or in writing) conveyed or delivered to Claimants, on an ongoing basis, not just on the front end.

Claims for falsely inducing investors not to act to their detriment are based upon the following principles:

> Restatement of Torts (Second), sec 525: "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."
>
> Restatement of Torts (Second), sec 531: "One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced."
>
> Restatement of Torts (Second), sec 551("): "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose. "

As a proximate cause of such false and continuing inducements to retain the unsuitable investments and unsuitable asset allocation in Claimants' portfolios, the Claimants were made to suffer a loss.

**POINT VII.**

**BREACH OF CONTRACT**

Claimants and Respondent entered into customer agreements in which Respondent agreed, among other things, to comply with all state and federal securities laws as well as FINRA's own regulations. Claimants complied with the terms of the contract between the parties, as memorialized by the parties, and performed or tendered performance thereunder. Claimants performed all conditions precedent and obligations incident to all of the above-referenced contractual obligations or agreements. Respondent breached the customer agreement with the Claimants by violating FINRA and SEC rules. Respondent also violated their own internal written procedures. Respondent is also a party to various "selling agreements" concerning many of these investments. In addition to Respondent's legal obligation to conduct due diligence, the selling agreements also contractually obligated Respondent to conduct due diligence on the offerings. Claimants are third-party beneficiary to those selling agreements. Respondent failed to undertake reasonable due diligence into the offerings, breaching the selling agreement to the detriment of Claimants. As a direct and proximate consequence of Respondent's wrongful conduct, Claimants suffered damages.

**POINT VII.**

**DAMAGES**

As a cause and consequence of the Respondent's misconduct in the handling of Claimants' investment funds, Claimants seek damages consisting of what a well-managed account would have performed in an amount presently unknown.

In addition, Arbitrators have the power to award exemplary, or in other words, punitive damages. As the United States Supreme Court held in *Mastrobuono v. Shearson Lehman Hutton.*

*Inc*., 514 U.S. 52 (1995), the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., grants arbitrators plenary authority to consider and make an award of punitive damages notwithstanding any provision of state law to the contrary.

Here, punitive damages should be assessed against Respondent and is wholly warranted due to the firm's intentional and willful failure to oversee its agent's activities. The callousness to the consequences which Respondent has shown cry out for a remedy that will not only make Claimants whole, but prevent a repetition of these events which have become all too common place in the industry. Every year millions of investors' funds are squandered or placed in risky high-commission generating strategies that are of no benefit to the investor. Moreover, brokerage firms continually ask for and advertise to induce the public's trust and confidence and then those same brokerage firms attempt to run away when the wrongful acts of those they employ are discovered. The perils that investors face when trusting the brokerage industry is fostered through a policy of scant compensation for victims that profits the industry even when brokerage firms fail in their most basic duties.

FINRA firms continue to behave in a way that suggests that a lack of supervision, and the relatively small amounts of damages that result, are merely a cost of doing business to be borne rather than problem to be corrected. An award that falls short of assessing punitive damages will not take the necessary step of impressing upon Respondent the indisputable need to supervise and manage its employees in accordance with the rules of law and the business ethics of fair trade.

Accordingly, the panel should award punitive damages, interest at the legal rate per annum, as well as attorneys' fees, and costs.

## CONCLUSION

As a result of the conduct set forth above, Claimants requests a final hearing in this matterand that this Panel award damages from Respondent, as follows:

1. Compensatory damages at an amount to be determined at trial;
2. Statutory damages;
3. Interest at the statutory rate;
4. Attorneys' fees;
5. Expert fees;
6. Forum fees;
7. Punitive damages; and
8. Any and all other relief available to Claimants, in law or equity or otherwise, which maybe granted to them by this Arbitration Panel.

Dated: October 22, 2024
New York, NY

Respectfully Submitted,
GANA WEINSTEIN LLP

By: ______________________________

Adam J. Gana
Adam J. Weinstein
Mary T. Curry
295 Madison Avenue
Suite 705
New York, New York 10017
Tel: (212) 776-4252

*Attorneys for Michael Zima, Patricia Fuchs, George Heinemann, as Power of Attorney for Glen and Elsa Heinemann, George and Lori Heinemann, Robert and Gwen Gorman, Olaf Blocher, as Trustee of the Konrad Blocher Trust dated November 17, 2003, Gordon Stewart, James Mastro, John Stratton, and Joseph McHugh,*

*-and-*

KURTA LAW

By: _/s/ Jonathan Kurta_______________

Jonathan Kurta
Robert Van De Veire
Hannah Ross
295 Madison Avenue
Suite 705
New York, New York 10017
Tel: (212) 658-1502

*Attorneys for Carl Pedigo, Amy Gray as Executor of the Estate of Laura Leff and Successor Trustee of The Laura Leff Irrevocable Trust, Thomas Harrold, Joseph Dymek, individually and as Trustee of the Joseph Dymek Trust dated May 29 2007, Christopher and Jean Ambrose, as Trustees of the Jean Ambrose and Christopher Ambrose Trust, and Avery Tarshis*