**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OSAIC WEALTH, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER AMBROSE AND JEAN AMBROSE, AS TRUSTEES OF THE JEAN AMBROSE AND CHRISTOPHER AMBROSE TRUST, GWEN GORMAN, ROBERT GORMAN, THOMAS HARROLD, CARL PEDIGO, AND JOHN STRATTON,<br><br>Defendants. | ) | Case No. 1:24-cv-12657 |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

***INTRODUCTION*** ..... ***1***

***STANDARD OF REVIEW*** ..... ***1***

***LEGAL ARGUMENT*** ..... ***2***

**I. Triad Signed FINRA's Submission Agreement Agreeing to Arbitrate Defendants' Dispute** ..... **2**

**II. Even if Triad did Not Sign the Submission Agreement, it Still Would Be Required to Arbitrate Under FINRA Rule 12200** ..... **7**

1. Defendants Are Customers of Triad's Associated Persons Entitling Them to Arbitrate Their Claims ..... 8
2. Defendants' Dispute Arose in Connection with Triad's Business Activities ..... 10
3. FINRA Rules Support Arbitrating Private Securities Transaction (a/k/a "Selling Away") Cases ..... 11
4. The Cases Relied Upon by Triad Address Inapposite Factual Circumstances And Are Readily Distinguishable ..... 12
5. It is Indisputable that Defendants' Are Customers of Mr. Walesa ..... 13

***CONCLUSION*** ..... ***15***

## TABLE OF AUTHORITIES

### Cases

*AT&T Tech, Inc. v. Communications Workers*,
475 U.S. 643 (1986) .......... 2

*Bensadoun v. Jobe-Riat*,
316 F.3d 171 (2d Cir. 2003) .......... 7

*Berthel Fisher & Co. Financial Services, Inc. v. Larmon,*
695 F.3d 749 (8th Cir. 2012) .......... 12

*Cal. Fina Group, Inc. v. Herrin,*
379 F.3d 311 (5th Cir. 2004) .......... 9

*Centaurus Fin., Inc. v. Ausloos,*
No. 19-CV-243, 2019 WL 2027271 (E.D. Wis. May 8, 2019) .......... 13

*Citigroup Global Markets, Inc. v. Abbar,*
761 F.3d 268 (2d Cir. 2014) .......... 12

*Goldman, Sachs & Co. v. City of Reno,*
747 F.3d 733 (9th Cir. 2014) .......... 12

*Herbert J. Sims & Co., Inc. v. Roven,*
548 F. Supp. 2d 759 (N.D. Cal. 2008) .......... 7

*John Hancock v. Wilson,*
254 F.3d 48 (2d Cir. 2001) .......... 8, 10

*Kingsbury Cap., Inc. v. Kappel,*
No. 20 C 800, 2020 WL 5512136 (N.D. Ill. Sept. 14, 2020) .......... 4

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*,
473 U.S. 626 (1985) .......... 2

*Morgan Keegan & Co. v. Garrett,*
495 F. App'x 443 (5th Cir. 2012) .......... 3

*Morgan Keegan & Co. v. Silverman,*
706 F.3d 562 (4th Cir. 2013) .......... 12

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) .......... 2

*Multi-Financial Securities Corp v. King*,
386 F.3d 1364 (11th Cir. 2004) .......... 9, 10

*O.N. Equity Sales Co. v. Steinke,*
504 F. Supp. 2d 913 (C.D. Cal. 2007) .......... 7

*Prudential Securities v. Emerson*,
905 F.Supp. 1038 (M.D. Fla. 1995) .......... 6

*Raymond James Fin. Servs., Inc. v. Cary,*
709 F.3d 382 (4th Cir. 2013) .......... 12

*Ross Sinclaire & Assocs. v. Premier Sr. Living, LLC,* No. 11-CV-5104 YGR, 2012 WL 2501115 (N.D. Cal. June 27, 2012) ............................ 7

*Safra Sec., LLC v. Gonzalez,* 764 F. App'x 125 (2d Cir. 2019) ............................ 3, 4, 5

*Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) ............................ 2

*Smith v. Bartolini,* No. 01 C 4311, 2003 WL 21148940 (N.D. Ill. May 14, 2003) ............................ 4, 5, 9, 13

*Spear, Leeds & Kellogg v. Cent. Life Assur. Co.*, 85 F.3d 21 (2d Cir. 1996) ............................ 7

*Traderight Sec., Inc. v. Kirschman,* No. 10 C 2042, 2011 WL 614090 (N.D. Ill. Feb. 15, 2011) ............................ 2, 4, 6

*Triad Advisors, Inc. v. Siev,* 60 F. Supp. 3d 395 (E.D.N.Y. 2014) ............................ 10, 13

*Triad Advisors, LLC v. Richard Kim et. al.*, Case No. 24-cv-03092 (N.D. Ill., Nov. 6, 2024) ............................ 3, 4

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960) ............................ 2

*Vestax Sec. Corp. v. McWood,* 280 F.3d 1078 (6th Cir. 2002) ............................ 9, 10

*Washington Square Sec., Inc. v. Aune*, 385 F.3d 432 (4th Cir. 2004) ............................ 7, 9

*Waterford Inv. Servs. v. Bosco,* 682 F.3d 348 (4th Cir. 2012) ............................ 9

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................ 14

**Statutes**

9 U.S.C. § 2 ............................ 6, 7

9 U.S.C. § 4 ............................ 1, 2, 15

Defendants respectfully submit this memorandum of points and authorities in opposition to Osaic Wealth, Inc.'s ("Osaic", "Triad"[1] or "Plaintiff") motion for a preliminary and permeant injunction (the "Motion") and ask the Court, under 9 U.S.C. § 4, to compel Triad to arbitrate Defendants' claims before FINRA.

## **INTRODUCTION**

Defendants are victims of investment scams recommended and perpetrated by Triad's associated person James Walesa. *See* Am. SOC [Doc. 20-2, pg. 11-15]. In the underlying arbitration, Defendants allege that Triad allowed Mr. Walesa to raise nearly $100 million without reasonably supervising its agents' activities. *Id.* at pgs. 9-10.

The parties are required to arbitrate this case under two separate legal theories. First, Triad signed FINRA's submission agreement (the "Submission Agreement") agreeing to arbitrate Defendants' claims. Triad admits it signed the Submission Agreement.

Second, even if Triad did not sign the Submission Agreement, which it did, FINRA Rule 12200 allows for an investor to compel arbitration, where the investor is a customer of the FINRA member firm's associated person. As shown by the declarations and under oath statements accompanying this opposition, Defendants were customers of James Walesa during the time he was associated with Triad. Triad has no plans to introduce any contrary evidence and fails to even suggest another party could have sold the investment products at issue to Defendants.

In sum, facts and legal precedent in this area clearly compels Triad to arbitrate Defendants' claims.

## **STANDARD OF REVIEW**

[1] Triad Advisors LLC would later become Osaic and the firm names denote the same entity.

By passing the Federal Arbitration Act ("FAA"), 9 U.S.C. §4, Congress established a "federal policy favoring arbitration." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (*quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp*., 460 U.S. 1 (1983) (internal quotations omitted). This policy has translated into a judicial presumption of arbitrability. *AT&T Tech, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986). Thus, a court may not deny arbitration unless "it may be said with positive assurance" that arbitration is inappropriate. *Id*. at 650. Accordingly, the parties' intentions to arbitrate are "generously construed" as to issues of arbitrability and any ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.,*473 U.S. at 626 (1985). In sum, "[d]oubts should be resolved in favor of coverage." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83 (1960).

## LEGAL ARGUMENT

### I. Triad Signed FINRA's Submission Agreement Agreeing to Arbitrate Defendants' Dispute

The parties have agreed to arbitrate Defendants' claims. Under the FINRA Rules, an arbitration respondent has 45 days to sign the Submission Agreement and file an Answer. *Traderight Sec., Inc. v. Kirschman,* No. 10 C 2042, 2011 WL 614090, at *4 (N.D. Ill. Feb. 15, 2011) (*citing* FINRA Rule 12303(a)). If a party wishes to contest FINRA's jurisdiction it should do so within the provided 45 day window. FINRA has provided guidance stating that a Panel may sanction a party for failing to sign the Submission Agreement. Declaration of Adam Gana ("Gana Dec.") **Exhibit A**, pgs. 3-4.

FINRA's Submission Agreement in this case states that:

> The undersigned parties [Triad] hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims

> which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

Gana Dec. **Exhibits D.**

Here, Triad signed the Submission Agreement. Triad argues that it signed the Submission Agreement under protest. However, Courts have repeatedly compelled arbitration even when a firm signs the Submission Agreement under protest. In *Safra Sec., LLC v. Gonzalez,* the broker-dealer simultaneously objected to FINRA's jurisdiction and signed a submission agreement. The broker-dealer claimed that it "did not freely assent to the Submission Agreement it signed." 764 F. App'x 125, 126 (2d Cir. 2019). The Second Circuit found that the broker-dealer could not credibly argue that it was induced to sign the Submission Agreement by FINRA. Specifically, the Second Circuit wrote that, "Safra Securities never explains why it could not have maintained its objections to FINRA's jurisdiction, refused to sign the Submission Agreement, and proceeded to the district court, as it later did." *Id.* This Court should similarly find that Triad signed the Submission Agreement and therefore has agreed to arbitrate this matter. *Id.*

Similarly, the Fifth Circuit has found that a firm's jurisdictional challenge on the ground that the investors are not customers are foreclosed after signing the Submission Agreement. *See Morgan Keegan & Co. v. Garrett,* 495 F. App'x 443, 448–49 (5th Cir. 2012). The Fifth Circuit denied the motion to vacate holding that "because the parties signed the Submission Agreement to submit the instant issues to arbitration, we may only set aside the arbitration panel's decision in 'very unusual circumstances.'" *Id.* (citation omitted).

This Court itself has reached the same conclusion on at least four different occasions. Most recently in *Triad Advisors, LLC v. Richard Kim et. al.*, Case No. 24-cv-03092 (N.D. Ill., Nov. 6, 2024). Gana Dec. **Exhibit G.** The *Triad Advisors* case involved the same associated persons and counsels to the Plaintiffs and Defendants. Just as in the present case, *Triad Advisors* continuously

objected to arbitrating the investor claims unless they were direct account holders at Triad. Triad claimed that it timely "contested FINRA's jurisdiction in its initial pleading in the arbitration" and therefore was not bound by the Submission Agreement. *Id.* [Doc. 18, pg. 4]. This Court found that "[n]umerous courts have found substantially similar language in FINRA uniform submission agreements to be 'a clear commitment to arbitrate a dispute, regardless of some reason, not otherwise expressed in the contract's text' for objecting to arbitrability. Gana Dec. **Exhibit G**, pg. 3 (*citing Traderight Sec., Inc. v. Kirschman,* No. 10 C 2042, 2011 WL 614090, at *5 (N.D. Ill. Feb. 15, 2011); *see also Safra Sec., LLC v. Gonzalez,* 764 F. App'x 125, 126 (2d Cir. 2019); *Kingsbury Cap., Inc. v. Kappel,* No. 20 C 800, 2020 WL 5512136, at *4 (N.D. Ill. Sept. 14, 2020); *Smith v. Bartolini,* No. 01 C 4311, 2003 WL 21148940, at *9 (N.D. Ill. May 14, 2003)).

Like the submission agreements before those courts, the Submission Agreement here contains no language reserving Triad's right to contest the arbitrability. Triad's argument is that by simultaneously objecting to arbitrating Defendants' claims while signing the Submission Agreement, it can somehow void the Submission Agreement itself. [Doc. 20, pg. 4-7]. But this reasoning has never been adopted by any court examining the Submission Agreement and runs contrary to basic contract law.

In the underlying arbitration, Triad argued to the FINRA panel that "the FINRA Submission Agreement purports to force Triad to agree to arbitrate all of the claims brought by the different claimants even though some are not customers." Gana Dec. **Exhibit B,** pg. 3. Triad understood the consequences of signing the agreement even going so far as to reference the holding in the *Richard Kim* to the FINRA panel. *Id.* (stating that in the *Richard Kim* case, "Triad had signed the FINRA Submission Agreement while simultaneously objecting to arbitrability" and the court enforced the Submission Agreement). Triad argued that the panel should not follow the

FINRA rules that require participants to sign the Submission Agreement in order "[t]o avoid the inequitable result of *Safra Securities…" Id.* at 5.

Triad knew that it had to come to court to challenge the arbitrability of the claim before signing the Submission Agreement and failed to do so. It appears that Triad initially planned to come to court before signing the Submission Agreement but ultimately chose not to. Triad submitted a declaration in support of a Motion for a Temporary Restraining Order signed by Greg Curley on December 9, 2024 [Doc. 1-3] – four days before the panel ordered Triad to sign the Submission Agreement and 11 days before the deadline imposed by the panel. At any time, Triad could have filed a TRO and sought intervention from this court rather than sign a clearly worded arbitration agreement.

The remainder of Triad's argument grossly misquotes case law and falls apart upon a cursory examination. For example, Triad incorrectly cites *Smith v. Bartolini,* for the proposition that a simultaneous objection to FINRA's jurisdiction while signing a submission agreement voids the agreement to arbitrate. [Doc. 20, pg. 4-5]. *Smith v. Bartolini* makes no such holding. The language Triad quotes supports the opposite conclusion, holding that a submission agreement does not reserve any right to contest jurisdiction. *See Smith v. Bartolini,* 2003 WL 21148940, at *8 ("Smith executed a Uniform Submission Agreement in which he agreed (without reserving any rights to contest jurisdiction) to 'submit the present matter in controversy [to arbitration]...' On its face, this language constitutes a clear and unqualified agreement to arbitrate the disputes contained in the Statement of Claim."). The "without reserving" language references the unreserved nature of the text of the Submission Agreement itself, not a finding that a simultaneous objection voids the agreement to arbitrate as Triad claims.

Similarly, Triad's analysis of *Traderight Sec., Inc.,* is fundamentally flawed. In *Traderight,* the Court held that the firm "explicitly agreed to arbitrate those claims by executing the Submission Agreements." 2011 WL 614090, at *3. The court stated that the firm agreed to arbitrate because it "execut[ed] the USA…and [sought] a finding of no liability on the merits, via the motions to dismiss, in the arbitration proceedings" prior to filing their declaratory judgement action. *Id.* at *4. *Traderight* did not create a formula for voiding the obligation to arbitrate after signing a Submission Agreement.

Finally, *Prudential Securities v. Emerson* is inapplicable here. 905 F.Supp. 1038 (M.D. Fla. 1995). The court in *Emerson* held that both the submission agreement and the FINRA Rules do not encompass certain insurance claims. *Id.* at 1046 (holding insurance claims to be "not arbitrable according to the Uniform Submission Agreement and the NASD Code of Arbitration Procedure which excludes from arbitration those claims involving insurance which are brought against an insurance company."). Here, there is no question that the dispute is arbitrable according to the text of the Submission Agreement.

In fact, Triad has failed to find a single case where any court has disregarded FINRA's Submission Agreement. Having agreed to submit this matter to arbitration, Triad is now bound by its agreement to arbitrate according to the FINRA Rules. The claim that sophisticated broker-dealers on the advice of counsel can freely sign clearly worded arbitration agreements and then later void those agreements is contrary to the U.S. Supreme Court's clear directive to enforce arbitration agreements like any other contract. 9 U.S.C. § 2 empowers this Court to enforce Defendants' arbitration agreement with Triad. Triad will not present any argument under the FAA to invalidate the Submission Agreement, and the firm should be compelled to arbitrate Defendants' claims before FINRA.

## II. Even if Triad did Not Sign the Submission Agreement, it Still Would Be Required to Arbitrate Under FINRA Rule 12200

Pursuant to the FINRA Code of Arbitration Procedure for Customer Disputes Rule 12200:

> Parties must arbitrate a dispute under the Code if:
>
> • Arbitration under the Code is either:
>
> (1) Required by a written agreement, or
> (2) Requested by the customer;
>
> • The dispute is between a customer and a member or associated person of a member; and
>
> • The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

Courts have held that "[t]he NASD[2] Code constitutes an 'agreement in writing' under the Federal Arbitration Act, 9 U.S.C. § 2, which binds [NASD member firms], as an NASD member, to submit an eligible dispute to arbitration upon a customer's demand." *Washington Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004); *Spear, Leeds & Kellogg v. Cent. Life Assur. Co.*, 85 F.3d 21, 26 (2d Cir. 1996); *O.N. Equity Sales Co. v. Steinke,* 504 F. Supp. 2d 913, 916 (C.D. Cal. 2007) ("numerous courts have held that even if there is no direct written agreement to arbitrate . . ., the [NASD] Code serves as a sufficient agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants.") (citations and internal quotations omitted).

Plaintiff does not dispute that FINRA Rule 12200 constitutes an 'agreement in writing' for customers to bring disputes before FINRA arbitration.

---

[2] The National Association of Securities Dealers ("NASD"), is the predecessor of FINRA. "Cases interpreting and apply Rule 10301 apply equally to Rule 12200 since there was no substantive change to the rule." *Ross Sinclaire & Assocs. v. Premier Sr. Living, LLC,* No. 11-CV-5104 YGR, 2012 WL 2501115, at *6 (N.D. Cal. June 27, 2012) (*citing Herbert J. Sims & Co., Inc. v. Roven,* 548 F.Supp.2d 759, 763 n. 2 (N.D.Cal. 2008)

### 1. **<u>Defendants Are Customers of Triad's Associated Persons Entitling Them to Arbitrate Their Claims</u>**

This District, the Second, Fourth, Fifth, Sixth and Eleventh Circuits and dozens of courts around the country have all held that selling away cases like Defendants have filed are arbitrable. These courts have all rejected Triad's argument that an investor needs to have a direct relationship with a member firm to compel arbitration.

In *John Hancock v. Wilson,* the broker Frank Fucilo was "an independent insurance agent and investment broker…authorized [by John Hancock] to sell certain life insurance and annuities on behalf of John Hancock." 254 F.3d 48, 51 (2d Cir. 2001). "Beginning in or about early 1998, Fucilo sold fraudulent promissory notes to the Investors." *Id.* The court found that "[t]he Investors [were] customers of Fucilo [under the NASD Code]." *Id.* The investors had no brokerage accounts or a direct relationship with John Hancock. Further, "[t]here [was] no evidence that Fucilo represented to the Investors that he was affiliated with John Hancock, or that the Investors knew that Fucilo was affiliated with John Hancock." *Id.* In addition, John Hancock claimed not to "have any knowledge that Fucilo was selling [the fraudulent] products." *Id.*

The Second Circuit held that:

> what is important is that the [Investors] were customers of a person associated with [John Hancock]. Because [the Investors] were Fucilo's customers and Fucilo was associated with [John Hancock], this dispute is arbitrable.

*Id.* at 57.

The plain language of Rule 12200 arbitration states a claim is arbitrable where the "dispute is between a customer and a member ***or associated person of a member***…" (emphasis added). In *John Hancock* the Second Circuit held "the term 'customer' plainly refers to *either* the member *or* the associated person['s] customer." 254 F.3d at 59. (emphasis added).

Every circuit court addressing the issue has agreed with the Second Circuit's *John Hancock* decision. *See, e.g., Washington Square Sec., Inc. v. Aune,* 385 F.3d 432, 440 (4th Cir. 2004) ("While Washington Square wishes to limit 'customers' of members to those who opened accounts with the broker, or to those who had an informal business relationship with the broker, neither the plain language of the rule nor the extrinsic evidence of intent requires such an interpretation."); *Waterford Inv. Servs. v. Bosco,* 682 F.3d 348, 353 (4th Cir. 2012) (holding same); *Multi-Financial Securities Corp v. King*, 386 F.3d 1364, 1366 (11th Cir. 2004) (holding that "a customer's direct dealings with an associated person of a[n] NASD member are sufficient to compel a[n] NASD member into arbitration"); *Mony Sec. Corp. v. Bornstein,* 390 F.3d 1340, 1344 (11th Cir. 2004) (holding same); *Cal. Fina Group, Inc. v. Herrin,* 379 F.3d 311, 318 (5th Cir. 2004) ("We find the reasoning of our sister circuits persuasive….'customer' as used in Rule 10301(a) is plainly broad enough to include persons who purchased securities from a registered representative of an NASD-member firm, a.k.a. an 'associated person'…"); *Vestax Sec. Corp. v. McWood,* 280 F.3d 1078, 1081-82 (6th Cir. 2002) (holding same).

This Court has already held that Triad's "customer" argument "makes no sense as a matter of logic." *Smith,* 2003 WL 21148940, at *3. Just like in *Smith*, Triad "focuses heavily on the word 'customer' and believes that it carries with it an implied requirement that Bartolini must have been a customer of the member firm…" *Id.* But FINRA Rule 12200 "contains two separate pathways to arbitration-one involving disputes with a member firm and a separate one involving disputes with an associated person. Under Smith's interpretation, the second pathway would be redundant and would collapse into the first." *Id.* In *Smith* the investors "need only show that she was Smith's customer (not WSI's customer) and that her dispute arose out of his activities." *Id.* at *5.

Triad knows that customers of its associated persons can compel arbitration. In *Triad Advisors, Inc. v. Siev,* the Eastern District of New York found in another selling away case that the investors claims were arbitrable because the investor dealt with Triad's associated person. 60 F. Supp. 3d 395 (E.D.N.Y. 2014). In *Triad,* "Defendants have never maintained an account with Triad or with Tehan." *Id.* at 396. Triad received no compensation for the selling away transactions and did not know about the recommendation. *Id.* Yet, the court held that Mr. Siev's claims were arbitrable because "all that matters is the relationship between the investor and the advisor, and the advisor's status as an associated person." *Id.*

**Exhibit H** contains two dozen district court authorities that have all held that those who engage in investment activity with a firm's associated person can compel their member firm to arbitrate their claims regardless of whether or not the investor separately was a customer of the firm. Gana Dec. **Exhibit H.** The holding in this case should be no different.

**2. Defendants' Dispute Arose in Connection with Triad's Business Activities**

FINRA Rule 12200 requires that the "dispute arises in connection with the business activities of the member or the associated person…" Defendants' dispute arises in connection with the business activities of Triad because a firm's lack of supervision over its associated persons necessarily "arises in connection with its business" for the purposes of Rule 12200. *See Vestax Secs. Corp,* 280 F.3d at 1082 ("A dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business."); *John Hancock,* 254 F.3d at 58-59 (stating that "[a] dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business" and that, in the alternative, the dispute is arbitrable because it arises out of the business of the firm's associated person); *Prins,* 519 F. Supp. 2d at 1012 (holding same); *Sparks,* 2009 WL 2886029, at *4 (holding same) (*citing King,* 386 F.3d at 1370; *John Hancock,* 254 F.3d at 58–59;

*MONY Secs. Corp. v. Bornstein,* 250 F.Supp.2d 1352, 1357 (M.D.Fla. 2003); *First Montauk Secs. Corp.,* 65 F.Supp.2d at 1379).

In sum, Defendants' dispute arises in connection with the business activities of Triad through claims that the firm failed to supervise its associated persons business activities.

### 3. FINRA Rules Support Arbitrating Private Securities Transaction (a/k/a "Selling Away") Cases

Many FINRA cases involve a customer dealing with an associated person without the knowledge or involvement of the associated person's member firm due to the prevalence of selling away in the securities industry. "[FINRA] Rule 3040 prohibits an associated person from selling any security 'away' from the member firm unless the firm has authorized the associated person to make the sale." Notice to Members 01-79.[3]

As far back as 1985, the NASD warned brokerage firms that they "may be liable for the actions of the associated person even though the firm was not aware of his or her participation in the transaction." NTM 85-54: Proposed New Rule of Fair Practice Relating to Private Securities Transactions[4]. When approving FINRA's motion to dismiss rule the SEC noted that:

> FINRA reiterated its position that "selling away" claims are arbitrable under the Codes. Under the Codes, FINRA accepts cases brought by customers against associated persons in selling away cases, **and cases by customers against the associated person's member firm if there is any allegation that the member was or should have been involved in the events, such as an alleged failure to supervise the associated person.**

*See Order Approving Proposed Rule Change,* 74 Fed. Reg. 731, 736 n.37 (Jan. 7, 2009). (emphasis added).

---

[3] Available at: https://www.finra.org/rules-guidance/notices/01-79

[4] Available at: https://www.finra.org/rules-guidance/notices/85-54

As shown FINRA is well aware and accepts selling away cases are being brought within the forum and often involve claims where investors did not open accounts with the member firm.

**4. The Cases Relied Upon by Triad Address Inapposite Factual Circumstances And Are Readily Distinguishable**

Triad fails to provide compelling authority that prevents arbitration in this matter. Instead of citing cases involving customer relationships with a firm's associated person and investments sold away from the firm, Triad cites cases where investors attempted to compel arbitration against broker-dealers that underwrote securities. *See Berthel Fisher & Co. Financial Services, Inc. v. Larmon,* 695 F.3d 749, 752 (8th Cir. 2012); *Morgan Keegan & Co. v. Silverman,* 706 F.3d 562 (4th Cir. 2013). In fact, *Larmon* distinguished the current fact pattern from those in *Larmon* stating, "customers of associated persons of a firm may compel arbitration with the firm." *Id.* at 753. The facts in *Larmon* showed simply that the investors were neither customers of the "firm nor its associated persons…" *Id.*

The same was found in *Raymond James Fin. Servs., Inc. v. Cary,* 709 F.3d 382 (4th Cir. 2013). In that case the investors were solicited by a friend of the Raymond James' associated person to make investments but "had no direct customer relationship with RJFS or [the associated person]." *Id.* at 387. In sum, the investors in Raymond James "did not have any personal contact with [the associated person] regarding Inofin" that would cause them to be customers. *Id.* In *Goldman, Sachs & Co. v. City of Reno,* 747 F.3d 733, 741 (9th Cir. 2014) the investor was a customer of the firm and is not relevant to the fact pattern before the court.

*Citigroup Global Markets, Inc. v. Abbar,* dealt with the issue of whether the customer was a customer of Citi UK or Citi NY that could compel arbitration. 761 F.3d 268 (2d Cir. 2014). Triad knows that *Abbar* has no applicability to the facts at hand because the Eastern District of New York refused to agree with Triad's argument that the Second Circuit's *Abbar* decision

changed existing law on the arbitrability of selling away claims. *Triad Advisors, Inc.,* 60 F. Supp. 3d at 397 ("Triad's reliance on *Abbar* does not assist it. The issue in that case was different.").

Triad argues that *Bartolini* did not hold that one who is customer of a firm's associated person can compel a firm to arbitrate. [Doc. 20, pg. 14]. But *Bartolini's* holding is clear:

> that Bartolini need only show that she was Smith's customer (not WSI's customer) and that her dispute arose out of his activities. She can easily meet this burden. No one would dispute that she was Smith's customer. She met with him face-to-face. He gave her investment advice. She followed that advice. It is that simple. Therefore, arbitration is warranted on this ground alone.

*Bartolini,* 2003 WL 21148940, at *5.

The only contrary authority on point that Triad has found over the last 30 years is *Centaurus Fin., Inc. v. Ausloos,* No. 19-CV-243, 2019 WL 2027271, at *5 (E.D. Wis. May 8, 2019). But this decision should be disregarded because it fails to examine any other selling away case law. None of the decisions of the five circuit courts or any other district court that dealt with a selling away fact pattern were discussed or distinguished by the court. Further, the decision contradicts the plain language of the rule requiring arbitration where the "dispute is between a customer and a member ***or associated person of a member***…" FINRA Rule 12200 (emphasis added). In the nearly six years since its publishing no case has relied on *Ausloos.* The strength of Triad's argument can be boiled down to this single uncited decision that contradicts dozens of other court decisions without persuasive analysis.

The plain language of Rule 12200 and numerous on point authorities have held that customers of a firm's associated person can compel arbitration of the member firm under Rule 12200.

**5. <u>It is Indisputable that Defendants' Are Customers of Mr. Walesa</u>**

Finally, Triad has argued that it needs discovery because "there is no evidence that Defendants were ever customers of Osaic's associated persons Walesa…" [Doc. 20, pg. 8]. Triad's arguments and requests for discovery seek to improperly deny Defendants' the benefits of speedy and efficient arbitration of their claims without any real dispute of facts.

First, Triad seeks to improperly place the burden on Defendants to prove their customer relationship with Mr. Walesa. *Id.* pg. 12. ("Osaic cannot be compelled to arbitrate claims…solely because they allege they were customers of Walesa…without providing any evidence…"). When in fact, the burden is on the Plaintiff "seeking a preliminary injunction must establish that he is likely to succeed on the merits…" *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

Further, multiple witnesses have already submitted sworn statements that Defendants are customers of Mr. Walesa. In Mr. Walesa's bankruptcy filings, he has attested under the penalty of perjury that all of the Defendants are "former client[s]" of his that he owes a debt to. Gana Dec. **Exhibit I**, pgs. 105 (Jean Ambrose), pg. 99 (Gwen and Robert Gorman), pg. 193 (Thomas Harrold), pg. 54 (Carl Pedigo and Nancy Behrendt), pg. 33 (Andy Stratton). It is clear that Mr. Walesa considers Defendants his customers that he engaged in financial transactions with and to whom he now owes a debt.

In addition, Debra Biosca has signed an affidavit affirming that Mr. Walesa and Mr. Luccioni sold the private investments at issue to investors and that she assisted Mr. Walesa in maintaining investor lists and account statements. Gana Dec. **Exhibit J**, ¶¶ 13-16; 29-31; 49. In addition, Ms. Biosca was charged with filing and maintaining all the paperwork associated with Mr. Walesa's investors (¶¶ 33-37), distributing K-1 tax return documents (¶¶ 38-40), and corresponding with clients. (¶¶ 58-63). Further, Ms. Biosca stated that she had provided Defendants' counsel Mr. Walesa's customer lists. *Id.* at ¶¶ 66. Ms. Biosca's affidavit makes no

mention of any other salesperson who sold these investments. Ms. Biosca also stated that many records were lost when Mr. Walesa ordered her to shred the investment records. *Id.* at ¶¶ 53.

Finally, each Defendant has filed a declaration attaching information about their investments, correspondence with Mr. Walesa and Ms. Biosca, and stating that Mr. Walesa was their advisor who solicited them to invest in his private funds. *See* Declaration of Thomas Harrold ("Harrold Dec."); Declaration of John Stratton ("Stratton Dec."); Declaration of Christopher and Jean Ambrose ("Ambrose Dec."); Declaration of Gwen and Robert Gorman ("Gorman Dec."); Declaration of Carl Pedigo ("Pedigo Dec.").

Mr. Walesa sold his private investments to over 100 investors and Triad has agreed that approximately that number of investors were clients of Mr. Walesa. The only criteria Triad has used to deny that Defendants are Mr. Walesa's customers is the fact that Defendants did not separately open an account with Triad. The fact Defendants' are Mr. Walesa's customers cannot be seriously disputed. Triad has never stated that it has any evidence to the contrary, does not intend to call the "real" advisor, and has no alternative explanation as to how Defendants invested in Mr. Walesa's private funds if not through Mr. Walesa. Triad's invented factual disputes are simply to protract these proceedings and mask the lack of relevant authority supporting the Plaintiff's motion.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for a preliminary and permanent injunction and compel Triad to arbitrate Defendants' claims before FINRA arbitration under 9 U.S.C. § 4.

Dated: February 28, 2025

Respectfully Submitted,

/s/ Adam Gana____________

Adam Gana
**GANA WEINSTEIN, LLP**
3706 North Greenview Ave., Suite 100
Chicago, IL 60613
Telephone: (646) 404-0000
agana@ganallp.com

Jonathan Kurta
**KURTA LAW**
295 Madison Ave, Suite 705
New York, NY 10017
Telephone: (212) 658-1502
jkurta@kurtalawfirm.com