**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OSAIC WEALTH, INC.,<br><br>Plaintiff,<br>v.<br><br>CHRISTOPHER AMBROSE AND JEAN AMBROSE, AS TRUSTEES OF THE JEAN AMBROSE AND CHRISTOPHER AMBROSE TRUST, GWEN GORMAN, ROBERT GORMAN, THOMAS HARROLD, CARL PEDIGO, AND JOHN STRATTON,<br><br>Defendants. | ) | CIVIL ACTION NO. 1:24-cv-12657<br><br>***Preliminary Injunction Hearing Requested*** |

**PLAINTIFF OSAIC WEALTH INC.'S CLOSING MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Osaic Wealth, Inc. (f/k/a Triad Advisors, LLC ("Triad")) through undersigned counsel respectfully submits this closing memorandum in further support of its Motion for a Preliminary Injunction prohibiting Defendants from proceeding with the FINRA arbitration they have brought against Triad Advisors, Inc. ("Triad" or "Osaic")[1] on or about July 29, 2024. (ECF 20).

[1] The arbitration is pursued by Defendants against Triad Advisors LLC, a formerly registered broker-dealer now known as Osaic. The terms Triad or Osaic may be used interchangeably here.

# TABLE OF CONTENTS


I. THE EVIDENCE AND LAW MAKE CLEAR OSAIC IS LIKELY TO SUCCEED ON THE MERITS. .......... 1

A. Osaic Did Not Agree to Arbitrate by Written Agreement. .......... 2

B. Discovery Confirms that Defendants Were Not "Customers" of Osaic Directly or of Osaic Through its Associated Person within the Meaning of FINRA Rule 12200 and thus, Osaic Cannot Be Compelled to Arbitrate their Claims in FINRA. .......... 7

C. The Ambrose Defendants Cannot Compel Osaic to Arbitrate Their Claims For the Additional Reason That They Cannot Stand in the Shoes of the Purchaser (William Tosch) To Compel Arbitration. .......... 18

D. Case Law In the Seventh Circuit Holds That Investors Must Have Purchased Securities Through the Member Firm to be "Customers" Entitled to Compel Arbitration. Here, The Private Securities At Issue Were Not Purchased Through Osaic. .......... 21

II. OSAIC HAS SATISFIED THE OTHER REQUIREMENTS FOR A PRELIMINARY INJUNCTION. .......... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Centaurus Fin., Inc. v. Ausloos*,
No. 19-CV-243, 2019 WL 2027271 (E.D. Wis. May 8, 2019) .......... 21

*Citigroup Glob. Markets Inc v. Abbar*,
761 F.3d 268, 274 (2d Cir. 2014) .......... 1

*Digitech Computer, Inc. v. Trans-Care, Inc.*,
583 F. Supp. 2d 984 (S.D. Ind. 2008) .......... 6

*GFRB, LLC v. Worthy Promotional Products, LLC*,
624 F. Supp. 3d 959 (N.D. Ill. 2022) .......... 6

*Interactive Brokers LLC v. Duran*,
2009 WL 393827 (N.D. Ill Feb. 17, 2009) .......... 20

*INTL FCStone Financial, Inc. v. Jacobson*,
19C-1438, 2019 WL 2356989 (N.D. Ill June 4, 2019) .......... 1, 21, 23

*Multi-Financial Securities Corp. v. King*,
386 F.3d 1364 (11th Cir. 2004) .......... 23

*Pershing LLC v. Bevis*,
No. 13-672, 2014 WL 1818098 (M.D. La May 6, 2014) .......... 21

*Prudential Securities v. Emerson*,
905 F.Supp. 1038 (M.D. Fla. 1995) .......... 4, 5

*Smith v. Bartolini*,
2003 WL 21148940 (N.D. Ill, May 14, 2003) .......... 2, 5, 22

*Sokol Holdings v. BMB Munai, Inc.*,
542 F.3d 354 (2d Cir. 2008) .......... 21

*UBS Financial Servs. Inc. v. Carilion Clinic*,
706 F.3d 319 (4th Cir.2013) .......... 1, 2, 21

*Washington Square Sec., Inc. v. Aune*,
385 F.3d 432 (4th Cir. 2004) .......... 23

**Rules**

FINRA Rule 12200 .......... 20

## I. THE EVIDENCE AND LAW MAKE CLEAR OSAIC IS LIKELY TO SUCCEED ON THE MERITS.

Despite ample opportunity to brief and obtain discovery, the unrefuted evidence shows that not a single Defendant has any evidence, not a single document, that shows Triad ever had any contact with any of them. There is no evidence or record of their investments whatsoever in Triad's records, much less any evidence that they purchased their investments through Triad, to provide a proper basis to compel arbitration in accordance with the definition of "customer" endorsed by this Court. In fact, the discovery conducted shows not only that Triad never had a single contract, account, transaction record, account statement, communication or otherwise with any of the Defendants, but that instead, the Defendants purchased the private partnership investments at issue directly from the investment entities through the associated person, James Walesa, rather than through Triad. Under such circumstances, there is no reasonable basis for the Court to conclude that Triad 'consented to' or reasonably expected to arbitrate claims with Defendants, who were investors it had no relationship with and where their alleged purchases were not made through Triad.

The definition of "customer" must be interpreted in a manner consistent with the "reasonable expectations" of FINRA members. *See Citigroup Glob. Markets Inc. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014). While FINRA has not specifically defined the term "customer," Courts have defined it as "one, not a broker or a dealer, who purchases commodities or services from a FINRA member[.]" *See UBS Financial Servs. Inc. v. Carilion Clinic*, 706 F.3d 319, 325 (4th Cir. 2013) (emphasis added) (citing cases that fully support this definition). Indeed, this Court has adopted *Carilion Clinic*'s definition of "customer" under the FINRA rules. *See INTL FCStone Financial, Inc. v. Jacobson*, 19C-1438, 2019 WL 2356989 (N.D. Ill June 4, 2019) ("'[C]ustomer,' as that term is used in the FINRA Rules, refers to one, not a broker or a dealer, who purchases

commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are regulated by FINRA—namely investment banking and securities business activities." (emphasis added) (quoting *Carilion Clinic*, 706 F.3d 319 at 327).

This case presents a clear example of an arbitration demand that Osaic did not consent to because 1) it did not agree to arbitrate by written agreement, and 2) Defendants were never customers of Triad and did not purchase securities from Triad. Therefore, as other courts have held, the injunction remedy is appropriate.

**A. Osaic Did Not Agree to Arbitrate by Written Agreement.**

Osaic did not agree to arbitrate Defendants' claims by written agreement. Contrary to Defendants' argument, a signed FINRA uniform submission agreement does not mandate arbitrability if a party simultaneously objects to jurisdiction. In *Smith v. Bartolini*, this Court held that an individual broker who executed a uniform submission agreement "*without reserving any rights* to contest jurisdiction," could not move to vacate an arbitration award rendered against him after the arbitration concluded. *Smith*, 2003 WL 21148940, at *8 (N.D. Ill. May 14, 2003) (emphasis added). And in *Traderight Sec., Inc. v. Kirschman*, this Court discussed the issue at length, recognizing that a uniform submission agreement would not be dispositive of arbitrability if a FINRA member contested FINRA's jurisdiction in its initial pleading in the arbitration—just like Osaic did here. *Traderight Sec., Inc.*, 2011 WL 614090, at *3 (N.D. Ill. Feb. 15, 2011).

Yet here, Defendants incorrectly rely on *Smith*, *Traderight Sec.*, and other cases to argue that Osaic agreed to arbitrate by executing a submission agreement without "reserving [its] right to contest arbitrability," even though the facts are inapposite:

> *Like the submission agreements before those courts, the Submission Agreement here contains no language reserving Triad's right to contest arbitrability.*

(ECF No. 26, Defs.' Opp., at 4.)

The argument is disingenuous at best and gamesmanship at worst. As a preliminary matter, Osaic contested arbitrability in its FINRA Answer (its first responsive pleading), refused to sign any submission agreement, and initiated this civil action seeking declaratory and injunctive relief on December 9, 2024. *See* Pl. Compl., Ex. C[2] (Osaic's Special Appearance Answer and Defenses at 1-2.); (ECF No. 1, Complaint). Then, the claimants in the underlying FINRA Arbitration filed a motion to compel Osaic to sign the submission agreement to engineer this exact argument.[3] In the arbitration, Osaic executed and submitted a modified submission agreement to FINRA, confirming it only agreed to arbitrate against its own customers, not Defendants:

> *Respondent agrees to arbitrate this matter only with respect to those Claimants who held a customer relationship with Triad Advisors LLC ("Triad"). With respect to those Claimants who never held a customer relationship with Triad, Respondent has filed an action for declaratory judgment and injunctive relief in the United States District Court for the Northern District of Illinois (the "Injunction Action") to enjoin the following Claimants from proceeding in this arbitration (or any FINRA arbitration proceeding):
>
> · Christopher and Jean Ambrose, as Trustee of the Jean Ambrose and Christopher Ambrose Trust;
> · Robert and Gwen Gorman;
> · Thomas Harrold; and
> · Carl Pedigo.
>
> Accordingly, Respondent maintains its objections with respect to these Claimants and does not agree to arbitrate their claims in the FINRA forum.
>
> John Stratton, whom Claimants seek to add as a Claimant in the Motion to Amend, is also a non-customer and has been named as a Defendant in the Injunction Action. As such, in the event that Claimants' Motion to Amend is granted, Respondent similarly maintains its objections and will not agree to arbitrate Mr. Stratton's claims in the FINRA forum.

*See* Pl. Compl., Ex. D (Osaic's Modified FINRA Submission Agreement).

This highlights the disingenuous nature of Defendants' argument. Defendants know that FINRA rejected the modified submission agreement: "Please forward an unaltered Submission Agreement (SA) without modification or changes." *See* Pl. Compl., Ex. E (FINRA Deficiency Notice). Defendants' litigation tactic is to create a catch-22, attempting to piggy-back non-

---

[2] References to Exhibit letters refer to those Exhibits attached to Osaic's Complaint for Injunctive Relief.

[3] Defendants filed this motion in FINRA while this action was pending and while the Court required additional briefing from Osaic to address this Court's subject matter jurisdiction before Osaic could file its motion for injunctive relief.

customer claims with customer claims. On the one hand, Osaic agrees to arbitrate with some of the claimants in the underlying arbitration (i.e., customers). On the other, Osaic does not agree to arbitrate with non-customers. Herein lies the issue—Defense counsel joined 20 unrelated claimants together in the same arbitration (i.e., customers and non-customers) knowing that FINRA will not accept a modified submission agreement.[4]

Under this Court's analysis in *Traderight Sec.*, it is clear that Osaic did not agree to arbitrate. In that case, a FINRA member attempted to avoid the uniform submission agreement in reliance on *Prudential Securities v. Emerson*, 905 F.Supp. 1038 (M.D. Fla. 1995), but was unsuccessful because it failed to raise a timely objection. Specifically, in *Traderight Sec., Inc.*, the broker-dealer did not object to FINRA arbitrability in its answer to the statement of claim, then waited several months and filed motions to dismiss in FINRA as to the merits. *See Traderight Sec., Inc.*, 2011 WL 614090, at *4 ("To the contrary, the motions argued the merits of the case, namely, that Traderight had breached no duty to the former clients of Enterprise, and thus the arbitrators should dismiss the arbitration.").

The Court contrasted the facts of *Traderight Sec., Inc.* with those of *Prudential Securities v. Emerson.* In *Prudential Securities,* an individual brought two claims against *Prudential:* one related to a brokerage account and one related to an insurance product. 905 F.Supp. at 1039. *Prudential* executed a uniform submission agreement. *Id.* at 1040–41. When *Prudential* submitted its written answer to the claims, it objected to the arbitrability of the insurance claims but executed the submission agreement because it did not object to the arbitrability of the securities-related claims. *Id.* This Court in *Traderight Sec., Inc.* acknowledged the *Prudential* court's decision finding that Prudential did not agree to arbitrate based on its continuous objections but denied that

[4] The issue is created because FINRA only sends one submission agreement for all claimants in an arbitration—without regard for whether some claimants have arbitrable claims and others do not.

relief to the plaintiff in *Traderight Sec., Inc.* because it raised no objection when signing the submission agreement, filing its answer, and then filing substantive motions to dismiss before contesting arbitrability. *See Traderight Sec., Inc.,* 2011 WL 614090, at *4 ("All this is in contrast to the evidence in Prudential that Prudential never agreed to arbitrate the dispute.").

Based on this Court's analysis in *Traderight Sec., Inc.,* Osaic did not agree to arbitrate the claims because it timely objected to FINRA jurisdiction in its first responsive pleading. *See* Ex. C (Osaic's Special Appearance Answer and Defenses at 1-2.) Consistent with Osaic's objection to FINRA jurisdiction, Osaic refused to sign the FINRA submission agreement.

In addition to the points addressed above, this Court in *Traderight Sec., Inc.* also held that filing a "declaratory judgment action" before signing a submission agreement (while not a required standard) is an appropriate measure to preserve non-waiver of objections to arbitrability. *Traderight Sec., Inc.,* 2011 WL 614090, at *4. Osaic did this too by filing this action for declaratory and injunctive relief on December 9, 2024. (ECF No. 1.)

There is another material distinction of fact between the *Smith* and *Traderight Sec.* cases and this one. In this case, there are more than 20 claimants—some of which are customers. As discussed above, Osaic submitted a modified submission agreement to agree to arbitrate with only the non-Defendant claimants. But just days later the FINRA Panel ordered Osaic to sign the submission agreement or face sanctions in seven days and expressly documented in the order that: "Respondent has made strenuous objections against filing a submission agreement in the form that FINRA requires and the submission agreement to be filed is only being signed based upon the panel's order to do so to avoid sanctions." *See* Pl. Compl., Ex. F (FINRA Order Compelling Unmodified Submission Agreement). The facts here are consistent with *Prudential Securities*

because Osaic only signed a submission agreement because some of the claims were arbitrable, even though others were not, while maintaining its objection.

The crux of Defendants' argument is that during this seven day period, Osaic should have rushed to Court and obtained injunctive relief—even though its objections were well-documented and even though it had already filed the complaint for declaratory and injunctive relief.[5] But that is not what the law requires. As this Court held in *Traderight Sec,* to contest arbitrability, "Traderight could have filed a declaratory judgment action—like this one—before executing the USA, agreeing to arbitrate …" *Traderight Sec., Inc.*, 2011 WL 614090, at *4. Osaic did that. To argue that Osaic was required obtain injunctive relief within a 7-day period, after having already filed a complaint for declaratory and injunctive relief, is unsupported by the law. And moreover, it ignores the practical realities of this case. This Court ordered Osaic to file additional briefing to address subject matter jurisdiction during this period. Promptly after this Court accepted subject matter jurisdiction, Osaic moved for injunctive relief. Further, to the extent Defendants imply Osaic should have been required to move for an ex-parte temporary restraining order in this period, this is an arbitrary and impractical standard. This Court held a conference to discuss what discovery was required between the parties *before* this Court could rule on the injunctive relief issue. The fact that Osaic included Defendants in the judicial process and conferred with the Court on limited

[5] Notably, the FINRA Submission Agreement does not contain an integration or merger clause, and the Court may examine outside evidence to determine if the parties intended it to be a complete and exclusive writing of the parties' agreement. *See GFRB, LLC v. Worthy Promotional Products, LLC,* 624 F. Supp. 3d 959 (N.D. Ill. 2022) (When a contract lacks an integration clause, the court must examine all relevant evidence to determine if the parties
intended the writing to be a complete and exclusive statement of the agreement's terms). Where there is no such clause, the Court may consider extrinsic evidence. *See Digitech Computer, Inc. v. Trans-Care, Inc.*, 583 F. Supp. 2d 984 (S.D. Ind. 2008) (If the contract is not fully integrated, the parol evidence rule permits the consideration of extrinsic evidence to supply omissions or to explain the terms of the contract). Osaic properly preserved its rights to contest arbitration.

discovery to increase judicial efficiency, simply cannot be used against it to force it to arbitrate claims it did not agree to arbitrate.

### B. Discovery Confirms that Defendants Were Not "Customers" of Osaic Directly or of Osaic Through its Associated Person within the Meaning of FINRA Rule 12200 and thus, Osaic Cannot Be Compelled to Arbitrate their Claims in FINRA.

As laid out in Osaic's opening Motion, and as confirmed through discovery in this matter, Defendants cannot force Osaic to arbitrate their claims against Osaic when none of the Defendants can show they had any customer relationship with Triad, and where the evidence shows that Defendants and their alleged purchases were both unknown to Triad (and systematically and deliberately kept secret from Triad) and were not sold through Triad in the first place. Here, the available documents and testimony show that the associated person, Mr. Walesa, took active steps to ensure that Triad never knew of these Defendants or their purchases, including by the associated person keeping records in hidden file cabinets and by the use of personal email addresses to correspond with the Defendants. Mr. Walesa's assistant, Debra Biosca, testified that the investments at issue were processed directly through the investment partnership entities rather than through Osaic. In other words, Defendants' contracts were Subscription Agreements with the investment partnerships themselves, not with Triad. Basic contract principles mandate that Osaic cannot reasonably be held to have consented to arbitrate these claims as there can be no intent to arbitrate with individuals that were never known to the FINRA member.

The facts establishing no connection between Defendants and Osaic were confirmed through testimony of the available witnesses, including the associated person's assistant (Debra Biosca), each of the Defendants in this matter, and through testimony of Osaic's custodian, Gregory Curley:

**1.** **<u>Mr. Walesa's assistant, Debra Biosca</u>**: Ms. Biosca was James Walesa's assistant from 1997 until he left Triad in 2019. *See* **<u>Exhibit 1</u>**[6], Biosca Aff, ¶¶2, 5, 51. She testified at her deposition that she sent the Subscription Agreements and paperwork for the private partnership investments at issue not to Triad, but rather to an individual named BJ Parrish who worked directly at the investments' partner entities Round Rock, Cibolo, Midland Red Oak and Fortress. *See* **<u>Exhibit 1</u>**, Biosca Dep., p.91:5-92:2; Biosca Aff, ¶31. Ms. Biosca testified she would often ask Mr. Walesa whether she should provide the subscription agreement to Triad's home office. *Id.* at 92:6-93:2; Biosca Aff, ¶33. She testified that Mr. Walesa instructed her not to send subscription agreements and other documentation to the Triad office because he told her Triad "did not need it." (*Id.*, Biosca Dep., pp. 92:6 – 93:19; Biosca Aff, ¶33). Walesa instructed her to keep the subscription agreement, risk disclosure, and prospectus receipt regarding the investments at issue in separate file cabinets away from any other Triad-related documents at Mr. Walesa's office. (*Id.*, Biosca Dep., pp. 94:21 – 96:17; Biosca Aff, ¶34). Ms. Biosca specifically described efforts to keep these investments separate from Triad:

> I recall Triad visiting the office periodically to conduct compliance checks. When they came to the office for visits, either Mr. Walesa or the Triad compliance person asked me to pull paperwork for Triad's compliance department. I was told by Mr. Walesa to only provide paperwork from the Triad file cabinets. Mr. Walesa's explicit direction, I would not pull any paperwork from the separate file cabinets with investments done separately from Triad. I do not know whether Triad knew of those separate files.

(**<u>Exhibit 1</u>**, Biosca Aff, ¶36.)

Ms. Biosca was specifically instructed to email clients regarding the investments done separately from Triad using her personal gmail account and not use her Triad-approved email

[6] Exhibit numbers in this brief are organized so that all testimony from each witness is cited in one exhibit (e.g. Exhibit 1 is the affidavit and deposition testimony of Debra Biosca).

address. (*Id*., Biosca Dep., pp. 52:25 – 54:3). She was not aware of any of the Defendants in this matter ever having an account through Triad. *Id.* pp.101:4-102:2.

When Ms. Biosca collected checks from investors and handled investor paperwork, she indicated this paperwork was processed through the investor's third-party Individual Retirement Account Custodian or directly to Mr. Parrish (not through Triad):

> When I was assisting with the Texas Fund paperwork, I would provide the subscription agreement to sign and then send the completed agreement with a check for the investment by mail to an individual named BJ Parrish or, without a check, to the client's third party Individual Retirement Account custodian. In those cases, the custodian would process the agreement and send it along with a check to Mr. Parrish.

(*Id*., Biosca Aff, ¶31.)

> Until the end of 2018, Mr. Parrish worked with Mr. Pearson who I understand Messrs Walesa and Luccioni worked with to form the Texas Funds. Mr. Parrish was a finance/administrative individual, but I do not know what title Mr Parrish or Mr. Pearson had or would company they officially worked for, if any. The IRA custodians I recall are now known as Equity Trust Co. and Pacific Premier Trust Co.

(*Id*., Biosca Aff, ¶32.)

Per the unrefuted testimony of Ms. Biosca, Mr. Walesa went to great lengths to ensure that the Defendants and the transactions at issue were done directly with the investment sponsors or through investors' IRA accounts, not through Triad. Even when Triad came to Walesa's office specifically to conduct compliance checks and audit his files, the files on these investments were kept separate and hidden from Triad's compliance officers. Defendants' counsel tried to get Ms. Biosca to connect these investments to Triad at Ms. Biosca's deposition, but she denied any connection to Triad:

> Q. So I want to go back to Defendant's Exhibit G which is your Affidavit. Mr. Sherman asked you some questions about paragraph 31. Also paragraph 33 as well, the paperwork. Let's look at paragraph 31. You can read it to yourself. I will ask you some questions. Now, with respect to paragraph 31

you mentioned that you would take the subscription agreement send it to the client for them to sign, take the completed subscription agreement and with a check you would then send that to either BJ Parrish or if there was no check to the client's third-party IRA custodian, right?

A. Well, if the investment was done through an IRA it was sent to the IRA custodian.

Q. If it was done in nonqualified money, it would be sent to Mr. Parrish?

A. Correct. If Jim told me to process it, yes, I would send it to BJ.

Q. Did you ever send the completed subscription agreements to any Triad designated principals for supervisory review?

A. No.

Q. Do you know if Mr. Walesa ever sent them to any Triad designated principals for supervisory review?

A. I do not know.

(**Exhibit 1**, Biosca Dep., pp. 114:9-115:13).

**2.** **The Defendants**: Each of the Defendants gave depositions in this matter in which they acknowledged that they: 1) never had accounts with Triad, 2) never communicated orally or in writing with anyone from Triad, 3) were not aware whether their securities were ever disclosed to Triad, or offered through Triad, and 4) never had any written customer agreement with Triad nor with Mr. Walesa. No defendant produced a single document that ever went to Triad, or came from Triad. Each Defendant's testimony is consistent with there being no relationship with Triad, nor a relationship with Triad through Walesa, and therefore no reasonable expectation that Triad agreed to arbitrate their claims. The relevant testimony from each Defendant is outlined below:

- **Carl Pedigo**

Carl Pedigo first met James Walesa in August 2019, on the recommendation of a close friend who had also been an investor with Mr. Walesa. (*See* **Exhibit 2**, Pedigo Decl., ¶ 5; Pedigo

Dep., p. 11:17-23). A week later, Pedigo invested $50,000 with Walesa to purchase one share of AIU Alternative Care, Inc. (*Id.*, Pedigo Decl., ¶ 6). He never saw or spoke with Walesa again after investing this money with him. (*Id.*, Pedigo Dep., p. 16:12-16). Pedigo was a one-time investor with Walesa, and testified that he was never a customer of Triad, never heard of Triad, nor had any connection whatsoever with Triad:

Q: Have you ever heard of a company called Triad Advisors?

A: Doesn't sound familiar.

Q: As you sit here today, do you know what kind of company that is?

A: Well, no.

(**Exhibit 2**, Pedigo Dep., pp. 18:21 – 19:2)

Q: To your knowledge, did you ever open an account with Triad?

A: No.

Q: To your knowledge, did you ever sign a customer contract with Triad?

A: I don't ever remember doing that, no.

(*Id.*, p. 19:6-11)

Q: So I take it you never spoke with anybody from Triad?

A: Not to my knowledge.

(*Id.*, p. 19:3-5)

- **Gwen Gorman and Robert Gorman**

Gwen Gorman and her husband Robert Gorman were introduced to Mr. Walesa by Ms. Gorman's family, who had also invested with Mr. Walesa. (*See* **Exhibit 3**, Gorman Decl., ¶ 5). Walesa recommended they invest $30,000 in a private investment called Longhorn Lodging. (Gorman Decl., ¶ 6). Following their investment, she only spoke with Walesa one more time.

(**<u>Exhibit 3</u>**, Gorman Dep., p. 11:2-5). Gorman was also a one-time investor with Walesa, and as shown through her deposition testimony, was never a customer of, nor had any connection with, Triad:

> Q: Did you ever receive any documents from Triad?
>
> A: I don't recall that.
>
> Q: To the best of your memory, did you ever open an account with Triad?
>
> A: No, except for with Mr. Walesa, the account – the investment we made with him.
>
> Q: You had an account related to that investment?
>
> A: Well, no.

(**<u>Exhibit 3</u>**, Gorman Dep., pp. 12:21 – 13:6)

> Q: Do you know what role, if any, Triad had regarding your Longhorn investment?
>
> A: No, I don't.

(*Id*., p. 12:18-20)

> Q: Did you ever receive any statements that had the name Triad on it?
>
> A: I don't recall.
>
> Q: Do you recall ever signing a customer agreement with Triad?
>
> A: No, I don't.

(*Id*., p. 14:2-7)

> Q: Do you remember ever signing a customer agreement with Jim Walesa or Debra Biosca?
>
> A: I just know that I signed for the investment. I don't know if there was a separate -- I don't -- I don't know -- I don't recall if there was a separate thing that I signed regarding what you stated.

(*Id*., p. 14:8-14)

Q: But as you sit here today, I think, you don't know that you ever received or sent a communication to or from Triad regarding your investments?

A. I don't recall that.

(*Id*., p. 15:12-16)

- **Jean Ambrose and Christoper Ambrose**

Jean Ambrose and Christopher Ambrose do not allege they purchased any investments at all.[7] Instead, Jean Ambrose's father, William Tosch, purchased investments from Mr. Walesa and Stephen Denari, investing in private funds called Longhorn, Trident, and Clearday. (*See* **Exhibit 4**, Ambrose Decl., ¶¶ 5-6; Ambrose Depo., p.8:11-15). Mr. Tosch later passed away in 2016, at which point Ms. Ambrose and her husband Christopher Ambrose inherited these investments through her father's trust. (*Id.*, Ambrose Decl., ¶ 7; Ambrose Depo., p.10:11-13). Ms. Ambrose has never met Mr. Walesa. (*Id.*, Ambrose Dep., p. 12:14-15). The Ambroses never directed Mr. Walesa or Mr. Denari to invest on behalf of Mr. Tosch, or his trust and the Ambroses never purchased investments on their own from Mr. Walesa, Mr. Denari or Triad, either. (*Id.*, Ambrose Depo., p.26:19-25). The Ambroses were also never customers of Triad and have had no connection with Triad, as shown through Ms. Ambrose's deposition testimony:

Q: Do you know what Triad is, what kind of company?

A: I am not sure.

(*Id.*, Ambrose Dep., p. 25:1-3)

Q: And do you know what role, if any, Triad had regarding the investments that we've been discussing in Longhorn and the Shadow Retail and ones that we just went over?

[7] The Ambrose Defendants cannot compel arbitration for the additional reason that they cannot stand in the shoes of the actual investment purchaser, William Tosch, as discussed in Section C, below.

A: I do not know.

(*Id*., p. 25:11-15)

Q: Do you know if you ever spoke with anybody from Triad?

A: I never did.

Q: Did you ever send any documents to Triad?

A: I do not know.

Q: [D]id you ever open an account with Triad?

A: I do not know.

Q: Have you had any kind of account statements that say "Triad" on them?

A: I do not know.

Q: Did you ever receive documents from Triad to the best of your knowledge?

A: I do not know.

Q: Do you have any customer contracts with Triad?

A: I do not know.

Q: How about any customer contracts with Walesa or Mr. Denari?

A: I would – I do not – I do not recall.

(**Exhibit 4**, pp. 25:16 – 26:11)

Q: Do you know if at any point in your or your husband's contacts with Mr. Walesa or Mr. Denari that they ever – that you or your husband ever provided Triad with information directly regarding any of these investments?

A: I am not aware.

(*Id*., p. 35:7-12)

- **Thomas Harrold**

Thomas Harrold was introduced to Mr. Walesa at an investment presentation that took place at the home of a friend. (*See* **Exhibit 5**, Harrold Decl., ¶ 5). He had met Walesa once before, at a Chicago Bears game, but at that point he thought Walesa was a tax accountant. (**Exhibit 5**, Harrold Dep., p. 12:9-20). He purchased shares of preferred stock in Allied Integral, but he asked for it to be converted to common stock in case he wanted to sell it, although he ultimately never sold. (*Id.*, Harrold Dep., pp. 16:16 – 17:6). Like the other Defendants, Mr. Harrold testified he never had any contact with Triad, nor any relationship with Triad:

Q. Do you know what Triad is, sir?

A. No, I don't.

Q. As you sit here today, any idea what kind
of company it is?

A. I don't know, maybe a land company or something.

(**Exhibit 5**, pp. 27:2 – 7)

Q: Did you ever speak with anybody from Triad?

A: Not that I recall.

Q: Do you recall ever sending any documents to Triad?

A: Not that I recall, I don't think so.

Q: Do you recall ever opening an account with Triad?

A: I know I didn't. I think I would have remembered that if I did.

(*Id.*, pp. 27:16 – 28:1)

Q: I take it you don't have any customer contracts with Triad?

A: Definitely not.

Q: Did you have any contract with Walesa?

A: I don't believe so.

Q: Do you know what role, if any, Triad had related to the investments in your declaration that we've covered?

A: I'm not sure what their role was.

(*Id*., 28:5-13)

- **John Stratton**

John Stratton invested in Longhorn, Trident, Shadow Retail, and Round Rock, at the recommendation of Mr. Walesa. (See **Exhibit 6**, Stratton Decl., ¶ 5). He understood Triad to be, based on what Walesa told him, "one of the companies [Walesa] worked for and invested with." (**Exhibit 6**, Stratton Dep., p. 14:9-10). He first met Walesa at a football game in 2012 and first invested with Walesa in 2013. (Stratton Dep., pp. 16:24 – 17:9). He met Walesa on multiple occasions, all at Chicago Bears games, and never met him anywhere else. (Stratton Dep., p. 21:10-18). He never provided any documents to Triad, though, everything went to Walesa. (Stratton Dep., p. 16:14-21). His deposition testimony illustrates that he never had any customer account or agreement with Triad:

Q: Do you recall ever having a Triad account, like a customer account?

A: I do not recall.

(*Id*., p. 19:18-20)

Q: [D]o you ever recall signing any type of customer agreement with Triad?

A: I have no immediate recollection.

(*Id*., p. 48:1-3)

Q. Okay. Did you ever speak with -- do you recall ever speaking with anyone from Triad?

A. All my speaking was done through -- communication rather was done through Jim Walesa and his assistant, Debbie.

Q. Okay. Do you recall ever sending any documents directly to someone at Triad?

A. I have no recollection of where documents went, sir.

Q. Okay. So if you were signing documents, who would you provide them to?

A. They would be provided -- most of them were electronic to Jim.

(**Exhibit 6**, p. 16:3-21)

Q. Have you -- well, I guess my question is do you recall ever receiving any type of account
statements from Triad?

A. Not to my recollection.

(*Id*., p. 20:9-12)

**3. Osaic representative Gregory Curley**: Mr. Curley gave a deposition as the individual from Osaic with knowledge of Triad's books and records as they relate to customer accounts, customer agreements and communications between Triad and its customers. (**Exhibit 7**, Curley depo, p. 6:3-10). Mr. Curley confirmed at his deposition that none of the Defendants were known to Triad, based upon Osaic's searches of its Triad records. (*Id.*, p. 85:13-16). Specifically, Mr. Curley testified that Osaic searched the available records and found no evidence on Triad's systems as far back as 2010 that any of the Defendants conducted business with Mr. Walesa through Triad. (*Id.* at p. 50:12-22). Osaic searched four separate databases of client records currently or previously utilized by Triad and no records were located indicating that any of the Defendants were Triad customers. (*Id.* at p.7:15-8:5). Mr. Curley testified that Triad may provide investment services through the firm's associated persons, but the key factor is whether there is a contract with a particular customer, because associated persons are independent contractors that are allowed to participate in certain outside business activities, "[s]o whether

something is a Triad activity or not is a matter of a contract between the customer and Triad." (*Id.* at p.13:7-20).

Mr. Curley testified it is possible that the Defendants dealt with Walesa in a way that is off the books and records of the firm, and Triad would have no way of knowing that. (*Id.* pp. 85:18 – 86:13). If Walesa engaged in a transaction with someone without submitting any documentation to Triad, it is very likely that Triad would never know about it. (*Id.* p. 88:7-10). Osaic looked through available data concerning commission payments to Walesa or Denari, and could not located available information regarding any commission payments to them for transactions involving any of the Defendants. (*Id.* p. 50:6-10).

By contrast, Defendants elicited no testimony from Mr. Curley, Ms. Biosca or anyone else, nor produced a single document refuting the evidence showing that Defendants were completely unknown to Triad and their alleged purchases were not made through Triad. Simply put, *there is no evidence that any of the Defendants were customers of Triad or were ever known to Triad, period.*

### C. The Ambrose Defendants Cannot Compel Osaic to Arbitrate Their Claims For the Additional Reason That They Cannot Stand in the Shoes of the Purchaser (William Tosch) To Compel Arbitration.

The Ambrose Defendants are unique among the Defendants in that they do not allege they ever purchased any securities from Mr. Walesa, Mr. Denari or Triad, but rather, they allege that Ms. Ambrose's father purchased the securities at issue. Specifically, they allege: "Jean [Ambrose]'s father, William Tosch, was a client of James Walesa and Stephen Denari." **Exhibit 4**, Ambrose Decl. at ¶ 5. The Ambroses allege that Mr. Tosch purchased the alleged investments. *Id*. at ¶ 6. The Ambrose Defendants allege that after Mr. Tosch died, they "inherited his investments, and they were placed in the Jean Ambrose and Christopher Ambrose Trust." *Id*. ¶ 7.

Like the other Defendants in this matter, the Ambrose Defendants produced no proof of investment documents, but the limited correspondence and tax forms they did produce confirm that the alleged investments they sue Triad for were made not by the Ambroses but rather were purchased by and through Mr. Tosch and his trust "The Tosch Living Trust Dated 6/28/1999." *See id.*, Ambrose Depo, p.17:2-10; 23:1-10. Indeed, Jean Ambrose confirmed this and also testified in this matter that she never met Walesa and had no recollection of ever meeting Mr. Denari:

> Q. I take it you never met Mr. Walesa yourself?
>
> A. Correct.
>
> Q. Did you ever meet Mr. Denari?
>
> A. It's possible, but I'm not sure. I believe he came to my father's house to discuss purchasing the stocks.

(**Exhibit 4** at pp.12:14-19.)

Although Ms. Ambrose was trustee for the Tosch Trust, she is not familiar with Triad, or whether it had any role in the investments her father purchased. *Id*. pp.25:1-15. She never spoke with anyone from Triad. *Id.* p. 25:16-18. She never asked Mr. Walesa or Mr. Denari to invest on behalf of her trust or her father's trust:

> Q. Right. My last question along these lines, as trustee of your father's trust, did you ever ask Mr. Walesa to invest on behalf of that trust?
>
> A. I personally never asked.
>
> Q. And I take it you never asked Mr. Walesa or Mr. Denari to invest on behalf of the Ambrose trust?
>
> A. No. I never asked.

(*Id.* at pp.26:19-25.)

The Ambroses clearly were never customers of Triad nor of Mr. Walesa or Mr. Denari. Their claims against Osaic are premised on their attempt to stand in for William Tosch, who is now deceased. The Ambrose Defendants' strained interpretation of the definition of the term "customer" for Rule 12200 purposes requires this Court to rule that anyone related to the alleged 'customer' be included. This situation is analogous to other cases where individuals who were not customers but were affiliated with alleged purchasers tried unsuccessfully to invoke Rule 12200 to compel arbitration. This Court's decision in *Interactive Brokers LLC v. Duran*, 2009 WL 393827 (N.D. Ill Feb. 17, 2009) construed Rule 12200's definition of "customer" in the analogous context of a firm's alleged liability to its customer's *purchaser* (who the Court called "a customer of a customer"). *Id*. at *4. This Court's reasoning in *Duran* is instructive here: "The Court concludes that even construing the term 'customer' broadly, Defendants do not qualify as 'customers' under Rule 12200 by virtue of being 'customers of a customer'." *Id*. at *5. This Court reasoned that "to hold differently would enable non-signatories (like Defendants here) to bind a signatory to an arbitration agreement more expansive . . . than the one that it actually signed." *Id*.

The Ambrose Defendants' position is materially the same – the Ambroses attempt to invoke Rule 12200 solely because of their relationship to the alleged purchaser, William Tosch. **Exhibit 4**, Ambrose Declaration, ¶¶ 5-7 (cited above). The Court's ruling should be the same as in *Duran*: the Ambroses cannot compel Osaic to arbitrate because they never purchased the investments at issue, they merely inherited them from the purchaser. Because the Ambroses were not the purchasers of the alleged investments and did not direct the investments at issue on behalf of the investor, William Tosch, Osaic cannot be held to have "consented" to arbitrate claims brought by the Ambrose Defendants over alleged investments sold to someone else. *See Duran*, 2009 WL

393827 *5 (N.D. Ill Feb. 17, 2009) ("an obligation to arbitrate can be based only on consent.") (quoting *Sokol Holdings v. BMB Munai, Inc.*, 542 F.3d 354, 358 (2d Cir. 2008).

**D. Case Law In the Seventh Circuit Holds That Investors Must Have Purchased Securities Through the Member Firm to be "Customers" Entitled to Compel Arbitration. Here, The Private Securities At Issue Were Not Purchased Through Osaic.**

Arbitration is fundamentally a matter of contract, and whether Defendants should be considered "customers" for purposes of a compelled FINRA arbitration is a matter of contract law relating to "the existence of a contract to arbitrate." *See UBS Financial Services, Inc. v. Carilion Clinic*, 706 F.3d 319 n.2 (4th Cir. 2013). As noted above, this Court has already approved *Carilion*'s definition of "customer" under the FINRA rules as one who purchases securities <u>from a FINRA member in the course of the member's business activities</u>. *See supra* p.2.

As Osaic illustrated in its underlying Motion, the Eastern District of Wisconsin enjoined a FINRA arbitration when answering an analogous question in this Circuit. *Centaurus Fin., Inc. v. Ausloos*, No. 19-CV-243, 2019 WL 2027271 (E.D. Wis. May 8, 2019). The *Ausloos* Court recognized the logical distinction that a registered broker may recommend a securities transaction that was not offered through the broker-dealer. The assessment was clear, and in line with this Court's definition endorsed in *Jacobson* as well: "If one does not purchase a good or service from the FINRA member, he is not the FINRA member's customer simply because he purchased the good or service from an 'associated person' acting on behalf of his or her own independent company." *Id.* at *5.

Elsewhere, in *Pershing LLC v. Bevis,* No. 13-672, 2014 WL 1818098 (M.D. La May 6, 2014) the Middle District of Louisiana enjoined a FINRA arbitration under nearly identical circumstances where the investors seeking to compel arbitration against the FINRA member firm could not produce any documents showing evidence of a customer relationship, such as a client

agreement, FINRA disclosures or monthly account statements. "The Defendants have failed to produce any of these documents. Moreover, two searches of [the member firm's] records failed to reveal any record of the Defendants' accounts. [cits omitted]. This lack of proof is fatal to any contention that the Defendants were [the member firm's] customers." *Id.* at *2.

Like in *Ausloos* and *Bevis*, here the evidence provided by Ms. Biosca, corroborated by Osaic representative Mr. Curley, and through the Defendant depositions, shows that Mr. Walesa (the associated person) sold Defendants private securities through the investment partnership directly, not through Triad – which explains why Osaic has no record of these transactions, nor of any of the Defendants or any commission payments to the brokers at issue related to any of the Defendants' investments. There are no indicia of a customer relationship with Triad, nor with Triad through Walesa as its associated person, such that Osaic could reasonably expect to be compelled to arbitrate the Defendants' claims.

Defendants rely principally on the ruling in *Smith v. Bartolini*, an unreported decision on a motion to vacate an arbitration award in this Court from 2003 in which Judge Nordberg parsed NASD Code Section 10301(a) – not FINRA Rule 12200 – and held that under the NASD Code "[the claimant] Bartolini need only show that she was Smith's [the registered representative] customer and that her dispute arose out of his activities." *See* Defts. Br. at p.13 (quoting *Smith v. Bartolini*, 2003 WL 21148940, at *5 (N.D. Ill, May 14, 2003). But *Bartolini* did not involve facts showing investments sold separate and apart from the member firm that are present here. The Court in *Bartolini* explained "[u]nlike most cases in this area, which involve a claim by a securities firm that an agent did something without its knowledge or permission, there is no such claim here." *Bartolini*, 2003 WL 21148940, at *6. Rather, *Bartolini* involved a situation where the alleged broker was both president of the SEC-registered investment adviser and also chairman of the SEC

broker dealer at issue. *Id.* *1. In short, there was no question that the investments were sold through the member firm with its knowledge as its chairman sold the security at issue. *Id.* Notably, the Court explained that the Plaintiffs in *Bartolini* "did not—as they had a right to do—bring this issue to federal court for a ruling on whether the dispute was arbitrable" as Osaic has done here. *See id.* *2. The *Bartolini* decision is an inapposite decision parsing an entirely different set of facts and procedural posture, and it does not account for the clear guidance on the definition of "customer" as relating to purchases made through the FINRA member firm, provided by this Court's 2019 decision in *Jacobson* cited above. The cases from other circuits cited by Defendants are also distinguishable as they are based on materially different facts where the investors at issue specifically relied on the associated person's affiliation with the broker in deciding to invest with the associated person. Those facts are simply not present in this case as the Defendants each admitted they have no information that Triad had any role with respect to their investments.[8]

In the instant case, all of the available evidence shows that none of the Defendants had reason to believe they had any relationship with Triad, and also that Triad had no reason to believe it had any relationship with any of the Defendants. None of the investors had any belief that they were dealing with Triad rather than with the investment partnership through Mr. Walesa. In fact, most of them do not even know at present what Triad is, even though they have sued Triad. There is no evidence to support Defendants' argument that Triad reasonably expected to arbitrate these

---

[8] Defendants' citation to *Washington Square Sec., Inc. v. Aune*, 385 F.3d 432 (4th Cir. 2004) is readily distinguishable (see Defts Br. at p.9). In that case, "the court found 'ample evidence' that [the associated person of the broker] acted with apparent authority from [the broker.]" *Id.* at 434. The court explained that its denial of the injunction request was premised on evidence that the investors "believed they were dealing with the member through an associated person." *Id.* at 440. *See also Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1365 (11th Cir. 2004) ("According to King, she relied, at least in part, on Micciche's affiliation with [the broker] in making the investments at issue.")

claims brought by individuals it knew nothing about, who themselves testified they knew nothing about Triad.

## II. OSAIC HAS SATISFIED THE OTHER REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

As noted in Osaic's opening Motion, courts have consistently held that being forced to arbitrate a dispute one did not consent to arbitrate constitutes irreparable injury per se. *See* Pl. Br. at 11-12 [Doc 20]. Defendants cite no contrary authority in their Opposition, in fact they did not address this issue and did not contest Osaic's arguments on the balance of hardships, public policy factors and waiver of bond request at all. To the extent Defendants raise issues in their closing brief related to factors 2 – 4 as outlined in Osaic's opening Motion, Triad requests the opportunity to address any such argument.

## CONCLUSION

For the reasons stated above and in Osaic's opening Motion, Osaic respectfully requests this Court to grant its Motion for a Preliminary Injunction.

Respectfully submitted this 25th day of April, 2025.

*/s/ Alison S. Cooney*
Alison S. Cooney (Illinois Bar No. #6312577)
**NELSON MULLINS RILEY SCARBOROUGH LLP**
123 N. Wacker Drive, Suite 2100
Chicago, IL 60606
(312) 376-1023
alison.cooney@nelsonmullins.com

Scott N. Sherman (*pro hac vice*)
**NELSON MULLINS RILEY SCARBOROUGH LLP**
201 17th Street NW, Suite 1700
Atlanta, Georgia 30363
scott.sherman@nelsonmullins.com

*Attorneys for Plaintiff Osaic Wealth, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record, and sent a copy via email to:

GANA WEINSTEIN LLP
Adam J. Gana
Adam J. Weinstein
345 Seventh Avenue
21st Floor
New York, New York 10001
Tel: (212) 776-4252
agana@ganallp.com

KURTA LAW
Jonathan Kurta
Robert Van De Veire
Hannah Ross
295 Madison Avenue, Suite 705
New York, New York 10017
Tel: (212) 658-1502
jkurta@kurtalawfirm.com

Dated this 25th day of April, 2025.

*/s/ Alison S. Cooney*
Alison S. Cooney