**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| OSAIC WEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:24-cv-12657 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| CHRISTOPHER AMBROSE and JEAN | ) | |
| AMBROSE, as Trustees of the Jean | ) | |
| Ambrose and Christopher Ambrose | ) | |
| Trust; GWEN GORMAN; ROBERT | ) | |
| GORMAN; THOMAS HARROLD; | ) | |
| CARL PEDIGO; JOHN STRATTON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Osaic Wealth, Inc., seeks to enjoin defendants Christopher and Jean Ambrose, Gwen and Robert Gorman, Thomas Harrold, Carl Pedigo, and John Stratton (collectively, the "Defendants") from pursuing claims against Osaic in a FINRA arbitration. For the reasons that follow, Osaic's motion for a preliminary injunction is denied.

## I.     BACKGROUND

In July 2024, the Defendants and other claimants (collectively, the "Claimants") initiated a FINRA arbitration against Osaic.[1] As relevant here, the Claimants alleged that Osaic representative James Walesa recommended to them a series of unsuitable investments, including investments in "private entities in which Walesa [was] involved as . . . an owner, executive, or both." Third Am. Compl. Ex. A at 10, ECF No. 12-1 at 11. The Claimants further alleged that

---

[1] Although defendant Stratton "was not a claimant in the initially filed" FINRA case, he joined the arbitration via amendment in October 2024. Third Am. Compl. 2 ¶ 4, ECF No. 12. The Claimants technically initiated the arbitration against Triad Advisors LLC, "a formerly registered broker-dealer," but Triad "merged into Osaic" about a month after arbitration began. *Id.* at 1 ¶ 1 n.1. For clarity, the Court uses "Osaic" to refer to both Osaic and Triad.

Osaic failed to "carefully monitor and supervise" Walesa's activities, thereby breaching its duty to the Claimants. *See id.* at 10-11, ECF No. 12-1 at 11-12.

As the basis for arbitration, the Claimants invoked FINRA Rule 12200. That rule, in full, reads as follows:

Parties must arbitrate a dispute under the Code if:

- Arbitration under the Code is either:

    (1) Required by a written agreement, or
    (2) Requested by the customer;

- The dispute is between a customer and a member or associated person of a member; and

- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

*12200. Arbitration Under an Arbitration Agreement or the Rules of FINRA*, Fin. Indus. Reg. Auth., https://www.finra.org/rules-guidance/rulebooks/finra-rules/12200 (last visited June 11, 2025) [hereinafter Rule 12200].

Some of the Claimants, Osaic concedes, are "customers." But others, it argues, are not. More specifically, Osaic argues that the Defendants are not "customers," and that their claims are not arbitrable as a result. Consistent with that argument, Osaic declined to sign FINRA's form arbitration agreement (the "Submission Agreement") when it responded to the Claimants' allegations on October 1, 2024.[2] Instead, it "objected to the arbitrability of claims brought by [the

---

[2] The Submission Agreement reads, in relevant part, as follows: "The undersigned parties . . . hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims, and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure." *See* Third Am. Compl. Ex. D at 1, ECF No. 12-1 at 149.

Defendants] and expressly reserved the right to pursue an injunction against [the Defendants] in court." Third Am. Compl. 3 ¶ 10, ECF No. 12.

On November 8, 2024, the Claimants filed a motion before FINRA to compel Osaic to sign the Submission Agreement and consent to arbitration. Osaic opposed the motion on November 18, 2024, and on December 9, 2024, it filed suit in this Court. On December 10, 2024, just one day later, Osaic signed and submitted a modified version of the Submission Agreement reading as follows:

> Respondent agrees to arbitrate this matter only with respect to those Claimants who held a customer relationship with [Osaic]. With respect to those Claimants who never held a customer relationship with [Osaic], Respondent has filed an action for declaratory judgment and injunctive relief in the United States District Court for the Northern District of Illinois (the "Injunction Action") to enjoin the following Claimants from proceeding in this arbitration (or any FINRA arbitration proceeding):
>
> - Christopher and Jean Ambrose, as Trustee[s] of the Jean Ambrose and Christopher Ambrose Trust;
> - Robert and Gwen Gorman;
> - Thomas Harrold; and
> - Carl Pedigo.
>
> Accordingly, Respondent maintains its objections with respect to these Claimants and does not agree to arbitrate their claims in the FINRA forum. John Stratton . . . is also a non-customer and has been named as a Defendant in the Injunction Action. . . . Respondent similarly maintains its objections and will not agree to arbitrate Mr. Stratton's claims in the FINRA forum.

*Id.* at 4 ¶ 18.

Following a December 10 hearing on the Claimants' motion to compel, the FINRA panel sent Osaic a deficiency notice rejecting the proposed Submission Agreement. The panel then granted the motion to compel, "ordering Osaic to sign the [standard] Submission Agreement . . . in unaltered form" within seven days. *Id.* at 5 ¶ 22. Recognizing that an unaltered Submission

Agreement would require Osaic to arbitrate with all Claimants, however, the panel wrote the following in its order:

> [T]he panel concludes that all parties are subject to FINRA's jurisdiction and that FINRA's submission agreement must be submitted pursuant to the rules. The recently submitted submission agreement that was altered is insufficient. The panel . . . recognizes that Respondent has **made strenuous objections against filing a submission agreement** in the form that FINRA requires and the submission agreement to be filed is **only being signed based upon the panel's order to do so to avoid sanctions**. The panel will announce sanctions in the future if the order to submit the signed submission agreement is not complied with.

Third Am. Compl. Ex. F at 3, ECF No. 12-1 at 158 (emphasis added). Osaic complied with the order "under protest," and it ultimately signed an unaltered version of the Submission Agreement. Third Am. Compl. 5 ¶ 23.

The Court repeatedly ordered Osaic to cure jurisdictional defects in its complaint, *see* ECF Nos. 5, 9, 11, and Osaic ultimately filed an amended complaint fully addressing the Court's concerns on January 22, 2025, *see* ECF No. 14. That (third) amended complaint seeks a declaration "that [the] Defendants are or were not customers of Osaic, and that [the] Defendants are precluded from pursuing their claims" in FINRA arbitration. Third Am. Compl. 14 ¶ 84. It also seeks an order enjoining the Defendants from proceeding before FINRA.

Although Osaic's initial complaint included a declaration in support of a motion for a temporary restraining order (TRO), *see* Compl. Ex. C at 1-3, ECF No. 1-3, Osaic never sought a TRO or other *ex parte* relief. Instead, on February 10, 2025—almost three weeks after it filed the third amended complaint, and more than a week after filing proof of service—Osaic filed the instant motion for a preliminary injunction. The motion seeks an order putting a stop to arbitration of the Defendants' FINRA claims.

## II.  DISCUSSION[3]

A plaintiff seeking a preliminary injunction must establish, as a threshold matter, "that he is likely to succeed on the merits." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Osaic has not met its burden, the Defendants say, for two reasons. First, Osaic signed the Submission Agreement, in effect agreeing to arbitrate the Defendants' claims before FINRA. Second, and in any event, Rule 12200 requires arbitration because each dispute "is between a customer and a [FINRA] member" and arises "in connection with the business activities of the member or [its] associated person." Rule 12200, *supra*. Osaic, on the other hand, argues that (1) it did not agree to arbitrate by signing the Submission Agreement, and (2) the Defendants are not "customers" for purposes of Rule 12200.

The parties essentially disagree as to the binding force of two different agreements. *See generally Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) ("Arbitration is contractual by nature—a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (cleaned up)). The first is the Submission Agreement, which the Defendants say is valid and Osaic disclaims. *See supra* note 2. And the second is Rule 12200, which can "serve[] as a sufficient agreement to arbitrate" when its conditions are met. *O.N. Equity Sales Co. v. Steinke*, 504 F. Supp. 2d 913, 916 (C.D. Cal. 2007)

---

[3] The Court has jurisdiction over Osaic's claims for declaratory and injunctive relief under 28 U.S.C. § 1332(a)(1). Osaic is a citizen of Delaware and Arizona, the Defendants are citizens of Illinois and Texas, and the Court can plausibly infer that each Defendant seeks damages north of $75,000 in the FINRA arbitration. *See* ECF Nos. 5, 11, 14 (explaining how the Court reached this conclusion); *Macken ex rel. Macken v. Jensen*, 333 F.3d 797, 799-800 (7th Cir. 2003) (in a suit for injunctive relief, "the amount in controversy is measured by the value of the object of the litigation," which here is what Osaic "stands to gain" from enjoining the Defendants' arbitral proceedings (quotation marks omitted)). More generally, "[a] district court has the authority to issue a preliminary injunction to enjoin an individual from pursuing a FINRA arbitration." *Morgan Stanley & Co. v. Seghers*, No. 10-cv-05378, 2010 WL 3952851, at *4 (S.D.N.Y. Oct. 8, 2010).

(quotation marks omitted); *see also, e.g.*, *Wash. Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004).[4] The Court addresses these agreements in turn.

### A.     The Submission Agreement

In Osaic's view, the Submission Agreement should be ignored. The company objected to the Agreement at every step, it says, and it ultimately signed only because FINRA threatened to impose sanctions. FINRA itself acknowledged these points. How can an arbitration agreement submitted under protest, Osaic asks, signal an intent to arbitrate?

The Defendants see things differently. Having signed the Agreement and submitted it to FINRA, they say, Osaic's argument that it did not consent to arbitration is now foreclosed. The Agreement contains no *express* reservation of Osaic's right to challenge arbitrability, the Defendants note. If Osaic really wanted to avoid arbitration, they add, it could have filed suit in this Court much earlier. That it waited until one day before FINRA's motion-to-compel hearing to initiate litigation—knowing full well that FINRA might order the submission of an unaltered Agreement—can only work against it.

The case law, Osaic admits, is not entirely on its side. Indeed, two courts in this District have found Submission Agreements enforceable even when the FINRA defendants (*i.e.*, those in Osaic's position) said they signed under protest. *Traderight Sec., Inc. v. Kirschman*, No. 10-cv-

---

[4] The cases just cited reference the National Association of Securities Dealers (NASD) Code rather than the FINRA Code, but that does not change the Court's analysis. NASD was FINRA's predecessor, and Rule 10301 of the NASD Code turned into FINRA Rule 12200. Because there was no "substantive change" during the transition, cases "interpreting and apply[ing] Rule 10301 apply equally to Rule 12200." *Ross Sinclaire & Assocs. v. Premier Sr. Living, LLC*, No. 11-cv-05104, 2012 WL 2501115, at *6 n.10 (N.D. Cal. June 27, 2012); *see, e.g.*, *N.Y. Bay Cap., LLC v. Cobalt Holdings, Inc.*, 456 F. Supp. 3d 564, 569 (S.D.N.Y. 2020) (noting that Rule 12200 "constitutes an agreement to arbitrate"); *Credit Suisse Sec. (USA) LLC v. Sims*, No. 13-cv-01260, 2013 WL 5530827, at *2 (S.D. Tex. Oct. 4, 2013) (same). Where relevant, the Court uses FINRA and NASD (as well as Rule 10301 and Rule 12200) interchangeably. Osaic does not dispute that Rule 12200 can serve as a binding agreement to arbitrate.

02042, 2011 WL 614090, at *3-5 (N.D. Ill. Feb. 15, 2011); *Smith v. Bartolini*, No. 01-cv-04311, 2003 WL 21148940, at *8-9 (N.D. Ill. May 14, 2003). But those cases, Osaic says, are distinguishable:

- In *Smith v. Bartolini*, the FINRA defendant agreed to arbitrate "without reserving any rights to contest jurisdiction." 2003 WL 21148940, at *8. Here, by contrast, Osaic says it reserved its rights by objecting early and often.

- In *Traderight Securities, Inc. v. Kirschman*, the FINRA defendants "did not challenge arbitrability at the outset of the arbitration proceeding," instead submitting answers and then waiting "several months before filing motions to dismiss." 2011 WL 614090, at *3. Here, by contrast, Osaic made "repeated objections to [FINRA's] authority" to hear the dispute from the beginning. *Id.*

The facts here, it is true, are different than the facts in *Smith* and *Traderight*.[5] There is no evidence that the FINRA defendant in *Smith* objected to arbitrability at all; he simply signed the Submission Agreement because he felt that he had to. *See* 2003 WL 21148940, at *9. Similarly, the FINRA defendants in *Traderight* did not "immediately and repeatedly challenge[] arbitrability from [their] first written answer[s] and regularly throughout the arbitration," as Osaic did here. 2011 WL 614090, at *3.

---

[5] They are also different than the facts in *Triad Advisors, LLC v. Kim*, another case brought by Osaic to enjoin a FINRA arbitration. No. 24-cv-03092 (N.D. Ill. filed Apr. 17, 2024). There, Osaic signed a Submission Agreement at the same time it answered the claimants' FINRA claims (and only later purported to unilaterally modify that agreement). *See* Order at 4, *Triad Advisors, LLC v. Kim*, No. 24-cv-03092 (N.D. Ill. Nov. 6, 2024), ECF No. 28. It also signed a second Submission Agreement "not accompanied by any extra-contractual attempt by [Osaic] to reserve its right to contest arbitrability." *Id.* at 5. Judge Wood denied Osaic's motion for a preliminary injunction on these bases, finding that Osaic had agreed to arbitrate through the two Submission Agreements. *Id.* at 3-5. Here, Osaic—perhaps having learned its lesson from the briefing in Judge Wood's case—declined to submit the Agreement along with its answer, and submitted only one Agreement after FINRA threatened sanctions.

Those differences, however, are immaterial. Like the FINRA defendants in both *Smith* and *Traderight*, Osaic signed a statement with "clear and unequivocal language indicating that [it] agreed to arbitrate all the claims" set forth by the Defendants. *Smith*, 2003 WL 21148940, at *9; *Traderight*, 2011 WL 614090, at *5 (quotation marks omitted). Whatever rights Osaic thinks it reserved by objecting elsewhere, and whatever FINRA said in its order, Osaic's "unwritten subjective intent . . . did not affect the legal consequence of [it ultimately] signing" the Submission Agreement. *Traderight*, 2011 WL 614090, at *5. And the Agreement's arbitration language is unambiguous.[6] *Supra* note 2; *see also, e.g.*, *Safra Sec., LLC v. Gonzalez*, 764 F. App'x 125, 126 (2d Cir. 2019) (per curiam) (finding, despite the FINRA defendant's assertion that it "did not freely assent to the Submission Agreement it signed," that it "cannot be said with positive assurance that [the defendant] did not agree to arbitrate [the relevant] claims" (quotation marks omitted)). The Court concludes that the Submission Agreement is a valid agreement to arbitrate, and Osaic is unlikely to succeed on the merits of its arbitration claims.

Osaic, to use FINRA's words, strenuously objects to this conclusion. Finding the Submission Agreement to be a valid arbitration agreement, it argues, would create a catch-22: FINRA defendants in Osaic's position would either need to (1) submit the unaltered FINRA Agreement for all claimants (and forfeit any right to contest arbitration before a court), or else

---

[6] Osaic asserts that, because the Submission Agreement contains no integration or merger clause, "the Court may examine [extrinsic] evidence to determine" whether Osaic actually intended to arbitrate. Prelim. Inj. Mot. 7, ECF No. 20. But as a general matter, extrinsic evidence is only relevant to a contract's terms when, "as a matter of law, . . . the contract is ambiguous." *See, e.g.*, *McMahon Food Corp. v. Burger Dairy Co.*, 103 F.3d 1307, 1314 (7th Cir. 1996) (quotation marks omitted) (noting that Illinois courts take this approach for non-U.C.C. cases).

(2) face sanctions from FINRA.[7] Neither option is desirable, Osaic says, and FINRA defendants would face a binary choice.

The Court disagrees. There is a third option, and it is one that Osaic failed to exercise in this case. Recall the timeline of key events:

- **July 2024**: Claimants filed their FINRA claims.

- **October 1, 2024**: Osaic responded to the claims, but declined to sign the Submission Agreement.

- **November 8, 2024**: Claimants moved to compel signature of the Submission Agreement.

- **December 9, 2024**: Osaic filed suit in this Court.

- **December 10, 2024**: Osaic signed a modified Submission Agreement, which the FINRA panel rejected; FINRA ultimately gave Osaic seven days to sign an unaltered Submission Agreement.

- **January 22, 2025**: Jurisdictional issues resolved.

- **February 10, 2025**: Osaic moved for a preliminary injunction.

Osaic knew, by October 1, 2024, at the latest, that it wanted to challenge arbitrability as to the Defendants. And yet it did not file the instant suit until two months later—one day before the hearing on the Claimants' motion to compel, which had already been pending for a month. And even then, Osaic declined to move for a TRO. It first sought preliminary injunctive relief

---

[7] Although query whether, if certain claims are not arbitrable, FINRA has jurisdiction to enter sanctions as to those claims. *Cf. Smith*, 2003 WL 21148940, at *9 ("We fail to see why [Smith] was required to submit to arbitration if there was no jurisdiction."). Osaic does not explain why it could not have (1) persisted in its position that the Defendants' claims were not arbitrable, (2) refused to sign the Submission Agreement, and (3) challenged in court any sanction FINRA attempted to impose. *See, e.g.*, *Safra*, 764 F. App'x at 126 (party contesting FINRA arbitration "never explain[ed] why it could not have maintained its objections to FINRA's jurisdiction, refused to sign the Submission Agreement, and proceeded to the district court").

three weeks after all jurisdictional issues were resolved, and more than two months after filing its complaint.[8] Osaic, in other words, could have sought emergency relief from this Court before (and perhaps long before) it would have been subject to FINRA sanctions. But it did not. *Cf. Traderight*, 2011 WL 614090, at *4 (noting that the FINRA defendants "could have filed a declaratory judgment action . . . *before* executing the [Submission Agreement and] agreeing to arbitrate the [relevant] claims").[9]

Given that FINRA defendants in Osaic's shoes can seek (and potentially secure) injunctive relief before being forced to sign the Submission Agreement, there is no catch-22. Osaic's problem in this case is not that it failed to object strenuously enough, *see* Order at 4, *Triad Advisors, LLC v. Kim*, No. 24-cv-03092 (N.D. Ill. Nov. 6, 2024), ECF No. 28, but that it failed to act quickly enough. Having signed the Submission Agreement (albeit under protest), it is too late for Osaic to object to the Agreement's validity.[10] *See id.* at 3 (numerous courts have

---

[8] True, the Court may have denied Osaic's initial motion for a TRO due to jurisdictional concerns. But Osaic could have resolved those concerns in the seven-day period FINRA gave it to sign the Submission Agreement; that it did not, and that it waited to seek a preliminary injunction even after the Court confirmed jurisdiction was proper, is telling.

[9] Osaic reads *Traderight* to espouse the following rule: "[F]iling a declaratory judgment action before signing a submission agreement . . . is an appropriate measure to preserve . . . objections to arbitrability." Prelim. Inj. Mot. 6 (quotation marks omitted). The Court does not read *Traderight*'s language so broadly. Given the *Traderight* court's focus on the "clear and unequivocal language" of the Submission Agreement, it is hard to see how the mere filing of a lawsuit—as opposed to the filing of a motion seeking injunctive relief as to the Agreement— could be the critical event. 2011 WL 614090, at *5.

[10] Osaic relies on *Prudential Securities, Inc. v. Emerson*, 905 F. Supp. 1038 (M.D. Fla. 1995), to support its argument that the Submission Agreement is not binding. But *Prudential* is distinguishable. The *Prudential* court found, in view of repeated objections, that a Submission Agreement fell short of the "clear, unequivocal agreement [required] to submit the issue of arbitrability to the arbitrators." *Id.* at 1044; *see id.* at 1042 (noting that "courts should not assume . . . the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so" (quotation marks omitted)). But that standard does not apply when determining whether the parties agreed to arbitrate. Here, the dispute is about whether Osaic agreed to arbitrate, not who should determine arbitrability, and in this context "there remains the long standing presumption in favor of arbitration." *Id.* at 1043. To the extent Osaic tries to read

found Submission Agreement language "to be a clear commitment to arbitrate a dispute, regardless of some reason, not otherwise expressed in the contract's text[,] for objecting to arbitrability" (quotation marks omitted)).

### B. Rule 12200

Even if the Submission Agreement were not binding, the Court's conclusion that Osaic is unlikely to succeed on the merits would not change. That is because Osaic and the Defendants implicitly agreed to arbitrate under FINRA Rule 12200. *See supra* note 4 and accompanying text.

Under Rule 12200, parties "must arbitrate a dispute" if (1) arbitration is "[r]equested by [a] customer," (2) the dispute is "between a customer and a [FINRA] member or associated person of a member," and (3) the dispute "arises in connection with the business activities of the member or the associated person." Rule 12200, *supra*. In the Defendants' view, all three conditions are met in this case. In Osaic's view, the Defendants are not Rule 12200 "customers," meaning conditions one and two are not satisfied.

Osaic advances two arguments to support its conclusion. First, it says, the Defendants "have not presented any evidence of a customer relationship with Osaic," and there is "no evidence that [the] Defendants were ever customers of Osaic's associated person[] . . . Walesa." Prelim. Inj. Mot. 7-8, ECF No. 20. And second, "even if [the] Defendants were customers of Walesa" while Walesa was associated with Osaic, that does not make them "customers" for

---

into *Prudential* a broader rule—strenuously and repeatedly objecting to the Submission Agreement after signing is enough to void that Agreement—it is off the mark. In determining whether the FINRA defendant had agreed to arbitrate, the *Prudential* court accepted that the Submission Agreement and relevant FINRA rules required arbitration of the claims that fell within their scope. *Id.* at 1045 (finding that the FINRA defendant "[u]ndoubtedly" agreed to arbitrate claims that arose in connection with its business). That holding does nothing to help Osaic.

purposes of Rule 12200. *Id.* at 8. To be "customers," Osaic insists, the Defendants must be Osaic customers, not merely customers of an Osaic-associated individual. Neither argument has merit.

### 1.     The Meaning of "Customer"

The Court begins with Osaic's second argument, as it raises a legal question rather than a factual one. To the Court's knowledge, the Seventh Circuit has not clearly defined "customer" as that term is used in Rule 12200.[11] But other circuits have defined the term, and the Court finds those circuits' definitions persuasive.

In *John Hancock Life Insurance Co. v. Wilson*, the Second Circuit was confronted with a scenario like the one here: Individuals sought to arbitrate directly against John Hancock, a FINRA member, based on sales made by Frank Fucilo, a Hancock affiliate. 254 F.3d 48, 50-51 (2d Cir. 2001). The individuals dealt only with Fucilo, not Hancock, and there was "no evidence that Fucilo represented to the [individuals] that he was affiliated with . . . Hancock, or that the [individuals] knew . . . Fucilo was affiliated with . . . Hancock." *Id.* at 51. Moreover, there was no evidence that Fucilo had "authority from . . . Hancock to sell the fraudulent investment products," or that Hancock had "any knowledge . . . Fucilo was selling [the] products." *Id.* Hancock argued that, based on these disconnects, the individuals could not be Hancock "customers." *See id.* at 59 (noting Hancock's' argument "that the [individuals] must be customers of . . . Hancock and not merely of [Hancock's] associated person" to be "customers" under Rule 12200). The Second Circuit rejected this argument, embracing the district court's view that "the term 'customer' plainly refers to either the member's or the associated person's

---

[11] Although the Seventh Circuit has declined to "prohibit[] the customer of an associated person . . . from compelling a [FINRA] member to arbitrate" under Rule 12200, *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 59 (2d Cir. 2001) (citing *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998)), it has not, as far as the Court can tell, offered an explicit analysis of the word "customer."

customer." *Id.* (cleaned up); *see also id.* at 59-60 (citing case law supporting this position, noting that FINRA defines "customer" broadly, and concluding that even if there were ambiguity, the term "customer" would be construed to favor arbitration). Following the Second Circuit's lead, the Fourth, Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits have held that Rule 12200 "customers" must "include investors, even those that invest [solely] with associated persons." *Oppenheimer & Co. Inc. v. Mitchell*, 135 F.4th 837, 846 (9th Cir. 2025).[12]

The Court agrees with the reasoning of these decisions: As used in Rule 12200, "customer" covers both (1) customers of FINRA members, and (2) customers of associated persons. "There is nothing in the language of [Rule 12200], or any other provision in the [FINRA] code, that compels" the narrow definition of "customer" Osaic embraces. *Hancock*, 254 F.3d at 59; *see 12100. Definitions*, Fin. Indus. Reg. Auth., https://www.finra.org/rules-guidance/rulebooks/finra-rules/12100 (last visited June 11, 2025) (defining "customer" to exclude only a broker or a dealer). And Osaic's narrow definition—"customer" can only mean "direct customer of a FINRA member"—would in many cases render Rule 12200's language allowing arbitration "between a customer and . . . [an] associated person of a member" superfluous. Rule 12200, *supra*; *see Smith*, 2003 WL 21148940, at *3 (making this point and

---

[12] *See Waterford Inv. Servs., Inc. v. Bosco*, 682 F.3d 348, 353 (4th Cir. 2012) (noting that a FINRA member "must arbitrate the claims of its associated person's customers"); *Cal. Fina Grp., Inc. v. Herrin*, 379 F.3d 311, 318 (5th Cir. 2004) (concluding that "customer" is "plainly broad enough to include persons who purchased securities from" an associated person of a FINRA firm); *Vestax Sec. Corp. v. McWood*, 280 F.3d 1078, 1081-82 (6th Cir. 2002) (agreeing that "an agent or representative of a financial services firm is an associated person under [Rule 12200] such that a relationship with the agent entitles the investor" to arbitrate against the firm (quotation marks omitted)); *Berthel Fisher & Co. Fin. Servs. v. Larmon*, 695 F.3d 749, 753 (8th Cir. 2012) (describing the "unremarkable" proposition that "customers of associated persons of a [FINRA] firm may compel arbitration with the firm"); *Multi-Fin. Sec. Corp. v. King*, 386 F.3d 1364, 1368-69 (11th Cir. 2004) ("Our interpretation of the Code's unambiguous language finds support in almost every other decision on this issue.").

reaching the same conclusion).[13] Finally, to the extent there is any ambiguity around the word "customer," the Court might be "compelled to construe the [word] in favor of arbitration" and reject Osaic's narrow interpretation of the term. *Hancock*, 254 F.3d at 59; *see, e.g.*, *Oppenheimer*, 135 F.4th at 846 (applying this rule as recently as April 2025); *but see Citigroup Glob. Mkts. Inc. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014) (rejecting the relevant language in *Hancock* as dicta). Osaic's argument that the Defendants are not "customers" because they are not *Osaic* customers thus fails as a matter of law.

Osaic, once again, strenuously objects. In so doing, it cites cases from the Second, Fourth, Eighth, and Ninth Circuits that it says adopt its reading of "customer." *See, e.g.*, *Citigroup*, 761 F.3d at 275 (defining "customer" as "one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member").[14] But the relevant cases cited by Osaic recognize the broad definition of "customer," declining to apply that broad definition only because the claimant did not purchase from a FINRA member *or* its associated person. *See id.* at 274-76 (noting that Rule 12200 "requires a

---

[13] Osaic reads *Smith* to support its interpretation of "customer," noting that the *Smith* court (1) found that the claimant was a customer of the member based on the close relationship between the associated person and the member, and (2) distinguished other cases where, as here, the relationship might not be so close. *See, e.g.*, Prelim. Inj. Mot. 11 (noting that the Walesa transactions were "both unknown [to] and concealed from Osaic"). But as Osaic acknowledges, that was all dicta: Judge Nordberg rejected the position that a "customer" must be a member's customer, concluding that it made "no sense as a matter of logic," and reached the aforementioned conclusions in a section beginning as follows: "Even if we were to proceed on the assumption that [the claimant] must establish some connection or customer relationship with [the member], we would still find in her favor . . . ." *Smith*, 2003 WL 21148940, at *3, *5.

[14] *See also Morgan Keegan & Co. v. Silverman*, 706 F.3d 562, 566 (4th Cir. 2013) (defining "customer" as "an entity that is not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities" (quotation marks omitted)); *Berthel Fisher*, 695 F.3d at 752 (noting that "customer" refers to "one involved in a business relationship with a FINRA member" (cleaned up)); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741 (9th Cir. 2014) (defining "customer" as "a non-broker and non-dealer who purchases commodities or services from a FINRA member").

FINRA member to arbitrate disputes with its customers, or the customers of its associated persons," but observing that the claimant made an investment agreement with Citi UK, which was neither (quotation marks omitted)).[15] Insofar as Osaic relies on language like "purchases a good or service from a FINRA member" from the Second Circuit, "from a FINRA member" must mean "from a FINRA member directly or via its associated person." *Id.* at 275; *see, e.g.*, *Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 396-97 (E.D.N.Y. 2014) (noting that *Hancock*'s holding was "reaffirmed" in the Second Circuit opinion on which Osaic relies). Osaic's objections are unpersuasive in light of the case law above,[16] and the Court concludes that the Defendants can show they are "customers" by demonstrating a customer relationship with either (1) Osaic, or (2) an Osaic associate like Walesa.

Osaic lodges one final objection on this point: The term "customer" must be construed "in a manner consistent with the reasonable expectations of FINRA members," and here it had no expectation that it would need to arbitrate with the Defendants. *Citigroup*, 761 F.3d at 274 (quotation marks omitted). In its final brief, Osaic emphasizes that Walesa took active steps to hide from Osaic his sales to the Defendants. *See, e.g.*, Pl.'s Final Br. 8-10, ECF No. 58 (Walesa

---

[15] *See also Morgan Keegan*, 706 F.3d at 567 (claimants did not purchase services or commodities from FINRA member or associated person); *Berthel Fisher*, 695 F.3d at 752-53 (citing the broad definition in note 12 above, but concluding that no direct or indirect customer relationship existed between the FINRA member and the claimants); *Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 386-87 (4th Cir. 2013) (similar). Although *Goldman Sachs* found the claims in question arbitrable under its definition (and did not mention associated persons), 747 F.3d at 741, nothing in that decision is at odds with the Ninth Circuit's more recent decision in *Oppenheimer*, cited above.

[16] Osaic identifies a single district court case that explicitly went the other way on the "customer" question: *Centaurus Financial, Inc. v. Ausloos*, No. 19-cv-00243, 2019 WL 2027271 (E.D. Wis. May 8, 2019). There, the court concluded that if "one does not purchase a good or service [directly] from the FINRA member, he is not the FINRA member's customer simply because he purchased the good or service from an associated person acting on behalf of his or her own independent company." *Id.* at *5 (quotation marks omitted). *Centaurus* relies on cases distinguished above, and the Court finds its reasoning both unpersuasive and contrary to the overwhelming weight of authority on the meaning of "customer."

directed his assistant to keep documents away from Osaic, and Walesa hid files from Osaic during compliance checks). How, Osaic asks, can a FINRA member reasonably expect "customer" to include someone it did not know about?

FINRA itself has answered that question. FINRA Rule 3280 (previously Rule 3040) prohibits an associated person from engaging in "any private securities transaction" without first providing "written notice to the member" and obtaining approval. *3280. Private Securities Transactions of an Associated Person*, Fin. Indus. Reg. Auth., https://www.finra.org/rules-guidance/rulebooks/finra-rules/3280 (last visited June 11, 2025). And as far back as 1985, FINRA told its members that they "may be liable for the actions of [an] associated person even though [they were] not aware of his or her participation in [a] transaction." *Notice To Members 85-54: Proposed New Rule of Fair Practice Relating to Private Securities Transactions*, Fin. Indus. Reg. Auth. (Aug. 13, 1985), https://www.finra.org/rules-guidance/notices/85-54.

As the SEC noted in 2009, FINRA accepts as arbitrable "cases by customers against [an] associated person's member firm if there is any allegation that the member was or should have been involved in the events, such as an alleged failure to supervise the associated person." Order Approving Proposed Rule Change Relating to Amendments to the Code of Arbitration Procedure for Customer Disputes and the Code of Arbitration Procedure for Industry Disputes, 74 Fed. Reg. 731, 736 n.37 (Jan. 7, 2009). That allegation is present here, and any argument that Osaic could not have expected the Defendants' claims does not withstand scrutiny. Just as in *Hancock*, 254 F.3d at 51, it does not matter for purposes of Rule 12200 whether (1) Walesa said he was affiliated with Osaic, (2) the defendants knew Walesa was affiliated with Osaic, (3) Walesa had authority from Osaic to sell the investments, or (4) Osaic knew of Walesa's sales.

16

### 2. Evidentiary Burden

Still, Osaic says, the Defendants have not met their burden of showing that they are (or were) Walesa's customers.[17] The Defendants, Osaic argues, have "produced no evidence" that they purchased unsuitable investments (1) at the recommendation of Walesa, and (2) while Walesa was an Osaic affiliate. Prelim. Inj. Mot. 8; *but see, e.g.*, Pl.'s Final Br. 1 (noting that discovery showed "the Defendants purchased the . . . investments at issue . . . through [Osaic's] associated person, James Walesa").

Osaic gets the burden of proof backwards. It may be that, in a FINRA arbitration, the Defendants bear the burden of showing that they purchased investments through Walesa (and that they are therefore customers entitled to arbitrate with Osaic under Rule 12200). But in seeking a preliminary injunction before this Court, *Osaic* bears the burden of showing that the Defendants *did not* purchase such investments. *See Winter*, 555 U.S. at 20. Osaic has not met that burden: It has offered no evidence that the Defendants were *not* Walesa's customers while Walesa was affiliated with Osaic, and it has done nothing to refute the Defendants' affirmative evidence to that effect.[18] *Compare Smith*, 2003 WL 21148940, at *5 ("No one would dispute that [the claimant] was [the associated person's] customer. She met with him face-to-face. He gave her investment advice. She followed that advice. It is that simple."), *with* Defs.' Final Br. 8-13,

---

[17] The Defendants do not argue that they are (or were) direct Osaic customers, so the Court does not engage with Osaic's arguments on that point. *See* Pl.'s Final Br. 7-18 (arguing that "[t]he facts establishing no connection between [the] Defendants and [Osaic] were confirmed" during discovery).

[18] The record shows that Walesa ended his affiliation with Osaic "[b]y September 2019." Biosca Aff. 11 ¶ 51, ECF No. 58-1. It appears that all defendants invested with Walesa before that date, and Osaic does not argue otherwise. *See* Ambrose Dep. 12:6-13:20, ECF No. 58-4 at 7 (Ambrose trust invested with Walesa before 2016); Gorman Dep. 9:2-11:1, ECF No. 58-3 at 6-7 (Gormans invested with Walesa in 2009); Harrold Dep. 10:21-11:11, ECF No. 58-5 at 7 (Harrold invested with Walesa before 2019); Pedigo Dep. 14:2-5, ECF No. 58-2 at 8 (Pedigo invested with Walesa in August 2019); Stratton Dep. 17:6-9, ECF No. 58-6 at 9 (Stratton invested with Walesa in 2013).

ECF No. 56 (noting that the Defendants met with Walesa and followed his investment advice, and that additional evidence supports their status as Walesa's customers). For purposes of Osaic's preliminary injunction motion, the Defendants were Walesa's customers even if they were not customers of Osaic.

Osaic claims, for the first time in its final brief, that Christoper and Jean Ambrose cannot compel FINRA arbitration because they never made investments through Osaic *or* Walesa. Jean Ambrose's *father* was a client of Walesa, Osaic says; the Ambroses cannot now stand in his shoes and pretend they "met with [Walesa] face-to-face." *Smith*, 2003 WL 21148940, at *5.

The Court need not consider this argument because it was not raised in the opening brief. *See, e.g.*, *Hopkins v. Bd. of Educ.*, 73 F. Supp. 3d 974, 983 n.8 (N.D. Ill. 2014) ("Arguments not raised in an opening brief are deemed forfeited."). But in any event, it seems to lack merit. As Osaic acknowledges, Jean's father purchased the investments at issue for his trust, and the Ambroses now hold that trust's assets in their own trust.[19] The Ambroses are not asserting FINRA claims against Osaic in their individual capacities, but in their capacities as trustees. It therefore matters little that "the Ambroses . . . were never customers . . . of . . . Walesa." Pl.'s Final Br. 20. The *trust* (acting through its original trustee) was the customer, and the Ambroses are now representing that customer in the FINRA arbitration. The Ambroses thus appear to be Walesa's customers. *See Chauffeurs Loc. No. 391 v. Terry*, 494 U.S. 558, 567 (1990) ("In most cases, a trustee has the exclusive authority to sue third parties who injure the beneficiaries' interest in the trust, including any legal claim the trustee holds in trust for the beneficiaries." (citations omitted)).

---

[19] When Jean's father passed away, she became the trustee of his trust and placed the trust's investments in the Jean Ambrose and Christoper Ambrose Trust.

### 3. Putting It All Together

So, to recap: A Rule 12200 "customer" can be either a customer of a FINRA member or a customer of a member's associated person, and the Defendants were all customers of Osaic's associated person (Walesa). The first two requirements of Rule 12200 are therefore met, as (1) arbitration was requested by customers, and (2) each dispute is between a customer and a FINRA member. The third requirement is also met, as each dispute "arises in connection with the business activities of [at least] the . . . associated person." Rule 12200, *supra*; *see, e.g.*, *Hancock*, 254 F.3d at 58-59 (finding claims arbitrable because a dispute "that arises from a firm's lack of supervision over its brokers arises in connection with [the firm's] business," and the claims arose from an associated person's business activities regardless (quotation marks omitted)); *O.N. Equity Sales Co. v. Prins*, 519 F. Supp. 2d 1006, 1012 (D. Minn. 2007) (similar). Even if the Submission Agreement does not govern arbitrability, Rule 12200 does. On the second agreement, too, Osaic is unlikely to succeed on the merits.[20]

### III. CONCLUSION

Osaic agreed to arbitrate with the Defendants when it signed the Submission Agreement. And even if it did not, it is bound to arbitrate with the Defendants, the customers of its affiliated person, under Rule 12200. Because Osaic is not likely to succeed on the merits, its motion for a preliminary injunction is denied.

---

[20] Given this conclusion, the Court need not consider Osaic's arguments regarding irreparable harm, the balance of the equities, and whether an injunction is in the public interest. *See Winter*, 555 U.S. at 20.

Date: June 20, 2025

John J. Tharp, Jr.
United States District Judge